Office of Court Management
Fiscal Affairs Department
**ORDER FORM**

FA-02

**INTERNAL SEQUENCE NUMBER** 2025 - 029 A
**Calendar Year – Chronological Seq.**

**Court Department:** SUFFOLK COURT **Court Division:** SUPERIOR CIVIL
**Organization:** TRC 1330 **Phone Number:** 617-788-7631,617-788-7614.
**Court Office: (CHECK ONE →)** ■ **Clerk-Magistrate** ☐ **Register of Probate** ☐ **Land Court Recorder**

---

**Name of Payor:** ______ **Address of Payor (if applicable)** ______
**Date of Request:** ______
**Cashier's Initials:** ______

**Case Number:** 2284CV02889 **MASSCOURTS RECEIPT #** ______
**Case Name:** Progin, Janice VS. Umass Memorial Health Care, Inc. **(To be completed once receipted in MassCourts)**

**CHECK ONE ↓:**
☐ **Cash** ______ ☐ **Other** ______
☐ **Check** ______
☐ **Credit Card** ______

| Quantity | Service/Item | Per Unit Cost | Service/Item Subtotals |
|---|---|---|---|
| | Copies | $ | $ |
| | Tapes | $ | $ |
| | Civil Summons | $ | $ |
| | Hospital Records | $ | $ |
| | Certificate of Judgement | $ | $ |
| | Transcripts | $ | $ |
| | Notary Certificates | $ | $ |
| | Depositions | $ | $ |
| 314 | Certified copy | $ | $ |
| | Other: ______ | $ 2.50 | $ 785.00 |
| | ______ | $ | $ |

**Total Paid for All Services/Items:** $ 785.00

1-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**2284CV02889 Progin, Janice vs. Umass Memorial Health Care, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 12/20/2022 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | B - Special Track (BLS) |
| **DESCRIPTION:** | Fraud, Business Torts, etc. | | |
| **CASE DISPOSITION DATE:** | 01/15/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 01/15/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

| Party | Attorney |
|---|---|
| **Plaintiff**<br>Progin, Janice | **Attorney** **215620**<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 12/20/2022<br><br>**Attorney** **549049**<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 12/20/2022<br><br>**Attorney** **663866**<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 12/20/2022 |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| Party | Attorney |
| --- | --- |
| **Defendant**<br>Harrington Memorial Hospital, Inc. | **Attorney** 649407<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 12/06/2024<br>**Attorney** 564860<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |
| **Defendant**<br>Marlborough Hospital | **Attorney** 649407<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 12/06/2024<br>**Attorney** 564860<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |
| **Defendant**<br>Umass Memorial Health Care, Inc. | **Attorney** 564860<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | |
|---|---|
| **Defendant**<br>Umass Memorial Healthalliance-Clinton Hospital, Inc. | **Attorney** **649407**<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 12/06/2024<br><br>**Attorney** **564860**<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |
| **Defendant**<br>Umass Memorial Hospitals, Inc. | **Attorney** **649407**<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 12/06/2024<br><br>**Attorney** **564860**<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |
| **Defendant**<br>Umass Memorial Medical Center, Inc. | **Attorney** **649407**<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 12/06/2024<br><br>**Attorney** **564860**<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/18/2023 |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 12/20/2022 | Civil Filing Fee (per Plaintiff) Receipt: 37990 Date: 12/21/2022 | 240.00 | 240.00 | 0.00 | 0.00 |
| 12/20/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 37990 Date: 12/21/2022 | 30.00 | 30.00 | 0.00 | 0.00 |
| 12/21/2022 | Civil Filing Fee (per Plaintiff) Receipt: 37990 Date: 12/21/2022 | 240.00 | 240.00 | 0.00 | 0.00 |
| 12/21/2022 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 37990 Date: 12/21/2022 | 20.00 | 20.00 | 0.00 | 0.00 |
| 12/21/2022 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 37990 Date: 12/21/2022 | 15.00 | 15.00 | 0.00 | 0.00 |
| | **Total** | **545.00** | **545.00** | **0.00** | **0.00** |

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 12/20/2022 | 1 | Complaint electronically filed. | |
| 12/20/2022 | 2 | Civil action cover sheet filed. | |
| 12/20/2022 | | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Janice Progin | |
| 12/20/2022 | | Attorney appearance<br>On this date Michelle H Blauner, Esq. added for Plaintiff Janice Progin | |
| 12/20/2022 | | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Janice Progin | |
| 12/21/2022 | | Docket Note: Six summonses by mail | |
| 12/21/2022 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Edward F Haber, Esq. ehaber@shulaw.com<br>Plaintiff, Attorney: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff, Attorney: Patrick Vallely, Esq. pvallely@shulaw.com | |
| 12/29/2022 | 3 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS2"<br>This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS2. Dated: December 22, 2022 Notice sent 12/28/22 (See P#3 for complete notice) | Salinger |
| 01/18/2023 | | The following form was generated:<br><br>Notice to Appear - BLS<br>Sent On: 01/18/2023 12:50:22 | |
| 01/18/2023 | 4 | Defendants Umass Memorial Health Care, Inc., Umass Memorial Hospitals, Inc., Umass Memorial Medical Center, Inc., Umass Memorial Healthalliance-Clinton Hospital, Inc., Marlborough Hospital, Harrington Memorial Hospital, Inc.'s Notice of<br>Filing of Removal<br>(U.S. Dist.# 23cv10113) | |
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Umass Memorial Health Care, Inc. | |
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Umass Memorial Hospitals, Inc. | |
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Umass Memorial Medical Center, Inc. | |
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Umass Memorial Healthalliance-Clinton Hospital, Inc. | |

| | | | |
|---|---|---|---|
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Marlborough Hospital | |
| 01/18/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Harrington Memorial Hospital, Inc. | |
| 02/13/2023 | | REMOVED to the U.S. District Court<br>of Massachusetts | |
| 02/13/2023 | | Case transferred to another court. | |
| 05/09/2023 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>05/17/2023 02:00 PM<br>Has been: Not Held For the following reason: Transferred to another session<br>Comments: Removed to U.S. District Court on 2/13/23; continues in U.S. District Court through today 5/9/23. Should it return to Superior Court, it will be rescheduled.<br>Hon. Kenneth W Salinger, Presiding<br>Staff:<br>Beatriz E Van Meek, Assistant Clerk Magistrate | Salinger |
| 07/18/2023 | | Remanded to the Superior Court from the U.S. District Court.<br><br>ACTION RETURN TO COURT ACCORDINGLY<br><br>See P#13 Notice sent 7/24/2023 | |
| 07/18/2023 | 5 | Notice of Removal to the United States District Court filed by<br><br>Defendant<br><br>Applies To: Progin, Janice (Plaintiff) | |
| 07/18/2023 | | Defendant Umass Memorial Health Care, Inc.'s Submission and<br>Corporate Disclosure Statements | |
| 07/18/2023 | 6 | Defendants Umass Memorial Health Care, Inc., Umass Memorial Medical Center, Inc., Umass Memorial Healthalliance-Clinton Hospital, Inc., Harrington Memorial Hospital, Inc.'s Assented to Motion to<br>Extend Time<br>ELECTRONIC ORDER entered granting the Motion. (Burroughs, J. USD) entered 1/23/2023 | |
| 07/18/2023 | 7 | Plaintiffs Janice Progin's Joint Motion for<br>Entry of Schedule regarding Motions to Remand and to Extend Time for Defendants to Respond to the Complains<br>ELECTRONIC ORDER entered granting the Motion. (Burroughs, J. USD) entered 2/3/2023 | |
| 07/18/2023 | 8 | Plaintiff Janice Progin's Motion to<br>Remand with Memorandum of Law in Support of Motion to Remand | |
| 07/18/2023 | 9 | Opposition to Plaintiffs' Motion to Remand filed by Defendants | |
| 07/18/2023 | 10 | Defendant Umass Memorial Health Care, Inc.'s Request for<br>Judicial Notice | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 07/18/2023 | 11 | Plaintiff Janice Progin's Reply in Support of motion to remand | |
| 07/18/2023 | 12 | General correspondence regarding MEMORANDUM AND ORDER (Burroughs, J. USD) entered 1/23/2023<br>Details see # 12 | |
| 07/18/2023 | 13 | General correspondence regarding Certified Order of Remand<br>In accordance with this Court's Memorandum and Order dated July 13, 2023, GRANTING the Plaintiffs' Motion to Remand, it is hereby ordered that this case be REMANDED to Suffolk County Superior Court for further proceedings. (Burroughs, J., USD) entered 7/13//2023 | |
| 07/18/2023 | 14 | General correspondence regarding Docket Entries Received | |
| 08/09/2023 | 15 | Defendant Umass Memorial Health Care, Inc., Umass Memorial Hospitals, Inc., Umass Memorial Medical Center, Inc., Umass Memorial Healthalliance-Clinton Hospital, Inc., Marlborough Hospital, Harrington Memorial Hospital, Inc.'s Motion for extension of time to respond to the complaint (Unopposed Motion) | |
| 08/17/2023 | | Endorsement on Motion to stay Superior Court Proceedings (#6.0): ALLOWED<br>Clerk shall schedule a status conference after the first 60-days status report is filed on or about 10/16/2023.<br>(Dated 8/16/2023) | Ricciuti |
| 08/17/2023 | | Endorsement on Motion for extension of time to respond to the complaint (#15.0): ALLOWED<br>(Dated 8/16/2023) | Ricciuti |
| 08/31/2023 | 16 | Plaintiff Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session | |
| 08/31/2023 | 17 | Janice Progin's Memorandum in support of Plaintiff's Motion to Consolidate and Transfer Cases to the Business Litigation Session | |
| 08/31/2023 | 18 | Opposition to Plaintiff's motion to consolidate and transfer cases to the business litigation session filed by | |
| 08/31/2023 | 19 | Reply/Sur-reply<br><br>Reply in Support of Plaintiff's Motion to Consolidate and Transfer Cases to the Business Litigation Session | |
| 09/07/2023 | 20 | Defendants Umass Memorial Health Care, Inc., Umass Memorial Hospitals, Inc., Umass Memorial Medical Center, Inc., Marlborough Hospital, Harrington Memorial Hospital, Inc.'s Motion for Extension of Time to Respond to the Complaint | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 09/11/2023 | 21 | General correspondence regarding NOTICE OF TRANSFER TO BUSINESS LITIGATION SESSION "BLS1"<br>Upon review, the court orders this case transferred to the Business Litigation Session (BLS) and assigned to BLS1. In the future, all parties must include the initials "BLS1" at the end of the relevant docket number on all filings, as shown above. Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/supercourt-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and serving the attached form.<br>Dated: September 11, 2023 Notice sent 9/11/23 (See P#21 for complete notice) | Salinger |
| 01/02/2024 | | The following form was generated:<br><br>Notice to Appear - BLS<br>Sent On: 01/02/2024 15:48:40 | |
| 01/05/2024 | | ORDER: Re: Rule 16 Conference<br>(Dated: 1/2/24) | Krupp |
| 01/22/2024 | 22 | Proposed Filings/Orders<br><br>Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases | |
| 01/24/2024 | | Endorsement on Stipulation and proposed order to stay all proceedings pending interlocutory appeal in related cases (#22.0): ALLOWED<br>After review, ALLOWED. Proceedings in this case are stayed pending a decision in the appeals of Vita v. Beth Israel Hospital and Vita v. New England Baptist together, "the Vita Appeals"). The Rule 16 conference scheduled for 1/31/24 is cancelled. Within 14 days of the decision in the Vita appeals, the parties shall notify the Court and proposed three alternative dates in the following 60 days when all parties could attend a Rule 16 conference in this matter.<br>(Dated 1/23/24) Notice Sent 1/24/24 | Krupp |
| 01/31/2024 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 01/31/2024 02:00 PM<br>Has been: Canceled For the following reason: Joint request of parties<br>Hon. Peter B Krupp, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Krupp |
| 12/05/2024 | 23 | Plaintiff Janice Progin's Notice of<br>Supreme Judicial Court Decision in Vita v. New England Baptist Hospital | |
| 12/05/2024 | 24 | Defendant Umass Memorial Health Care, Inc., Umass Memorial Hospitals, Inc., Umass Memorial Medical Center, Inc., Umass Memorial Healthalliance-Clinton Hospital, Inc., Marlborough Hospital, Harrington Memorial Hospital, Inc.'s Notice of<br>Supreme Judicial Court Decision in Vita v. New England Baptist Hospital | |
| 12/13/2024 | 25 | Amended: amended complaint filed by Janice Progin | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | |
|---|---|---|
| 01/02/2025 | 26 | Defendants Umass Memorial Medical Center, Inc., Umass Memorial Healthalliance-Clinton Hospital, Inc., Marlborough Hospital, Harrington Memorial Hospital, Inc., Umass Memorial Health Care, Inc.'s Notice of Filing of Removal<br><br>(U.S. Dist. #25cv-40003) |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Edward F Haber, Esq. ehaber@shulaw.com<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com<br>Defendant: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Sent On: 01/06/2025 12:43:04 |
| 01/15/2025 | | REMOVED to the U.S. District Court<br>Of Massachusetts |
| 01/15/2025 | | Case transferred to another court. |

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number



po

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 22-2889BLS1<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

po

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. ______________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

"tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

2. Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

3. Defendants do not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the UMass Memorial Website, nor do they seek their content for such disclosure. On the contrary, Defendants **falsely** tell healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party to the communication secretly records the communication or aids another in recording the communication. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when (i) the identity of the parties to the communication; (ii) the existence of the communication; **or** (iii) any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Although the internet did not exist at the time of the Act's passage, internet communications fall comfortably within the Act's express terms, and, if anything, the purposes of which the Massachusetts Wiretap Act were enacted are only more significant today, as technology companies have continually chipped away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or substance of the communications intercepted.

7. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

8. Defendants aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the UMass Memorial Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website.

## PARTIES

9. Plaintiff Janice Progin is a resident of Gardner, Massachusetts. Plaintiff is a patient at the UMass Memorial Medical Center and regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and

backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal.

10. Defendant UMass Memorial Health Care, Inc. is a corporation that operates in Worcester, MA. It is the parent company for defendants UMass Memorial Hospitals, Inc. and UMass Memorial Medical Center, Inc. Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

11. Defendant UMass Memorail Hospitals, Inc., is a corporation that operates in Worcester, MA. It is a subsidiary of Umass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s]...information systems" to those healthcare facilities. Based on this filing and upon information and belief, Umass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

12. Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

13. Defendant UMass Memorial Healthalliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health – HealthAllicance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and

Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

14. Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

15. Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses in Southbridge, MA and Webster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

16. In this complaint, Plaintiff refers collectively to the defendants described in this section as "Defendants."

## JURISDICTION

17. The exercise of personal jurisdiction over the Defendants is proper according to M.G.L. c. 223 § 3 because, among other things, Defendants are located in Massachusetts, and Plaintiff's claim arises out of Defendants' transacting business in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The UMass Memorial Facilities and Their Website

18. Defendants operate hospitals and other healthcare facilities in Worcester and surrounding communities (the "UMass Health Facilities"). The UMass Health Facilities offer inpatient and outpatient care to residents near Worcester and surrounding communities in central Massachusetts. The facilities provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, pregnancy and newborn care, children's services, women's services, and trauma care.

19. Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/ (the "UMass Memorial Website"). Through that website, healthcare consumers can obtain information about the services UMass Memorial provides, including information about doctors, services and treatments provided by Defendants, and particular medical conditions.

20. The UMass Memorial Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The website provides general information about the UMass Memorial Facilities.

(b) The website provides information about healthcare services provided at the UMass Memorial Facilities, communicated through service-specific pages for a range of services such as "Birthing/Maternity Center," "Pediatrics," "Cancer Care," and "Women's Health," among others.

(c) The website provides substantive information about specific health conditions through the website's "Health Library," including numerous interactive "Risk Assessments" individuals can take to determine whether they need healthcare services for a range of conditions, including highly personal conditions such as drug addiction, alcohol abuse, and sexually transmitted diseases.

(d) The website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by specialty, gender, language, and location.

(e) The website permits healthcare consumers to book an appointment online through the website.

(f) The website permits healthcare consumers to access and pay bills online.

(g) The website lets healthcare consumers access their private medical information online through the MyCharts portal. MyCharts is a third-party provider of online access to healthcare records.

21. Because the UMass Memorial Website provides an interactive experience through which a healthcare consumer can obtain information about particular conditions, doctors, specialties, and, indeed, the individual's own healthcare records, a website user's interaction with the website reveals private health information about the individual.

**Reasonable Expectations of Users of the UMass Memorial Website**

22. Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the UMass Memorial Website.

23. Users of healthcare-related websites such as the UMass Memorial Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Defendants will not share their private health information—including their communications with the website—with third parties, without their consent.

24. The expectations and understandings of website users are supported by the Health Insurance Portability and Accountability Act ("HIPAA"), which prohibits healthcare providers such as Defendants from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

25. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared contemporaneously with third parties such as Google and Facebook for marketing purposes.

26. The expectations and understanding of the UMass Memorial Website users are informed by what Defendants tell them about how Defendants handle their personal information.

27. The UMass Memorial Website terms of service state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained more fully below, the website tracks the user's IP address and connects its IP address to the user's browsing activity. More troublingly, those communications and associated IP addresses are contemporaneously shared with third parties such as Google and Facebook, which then can use that information to connect the user's activity on the website with the individual's Google and Facebook profiles. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals.

28. The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about their them when they do.

29. The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

30. The UMass Memorial Website terms of service also describe to healthcare consumers the website's use of "cookies" in a deceptive manner. The terms state:

> A cookie is a piece of data stored on your hard drive that contains information about you. Use of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site. UMass Memorial only uses cookies to identify you while you are logged into the UMass Memorial site. Upon exiting the site, the cookie terminates with no retained record of your use of the site.

As explained below, the technologies Defendants use to transmit healthcare consumers' communications contemporaneously to Google, Facebook, and other companies are not limited to "cookies." But, in any event, the above passage and the other passages quoted above foster a strong impression that a user's activities on the website will not be linked to personally identifiable information. This is false. As described below, Defendants use Google, Facebook, and other tracking technologies specifically designed to associate the users' activities on the website with their profiles with Google, Facebook, and elsewhere.

31. Moreoever, it is utterly false to state that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." On the contrary, Facebook, Google, and other third parties retain precise records of website users' activities on the UMass Memorial Website.

32. In short, reasonable healthcare consumers expect that the personal health information reflected in their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Defendants' false statements on their website. The interceptions of website users' communications with Defendants were, therefore, truly secret and made without any consent from the website users.

**<u>Third-Parties Offering Tracking Technologies</u>**

33. Plaintiff describes in this complaint various tracking technologies implemented on the UMass Memorial Website that cause the secret interception, recording, and retransmission of

the contents of Class Members' internet communications with Defendants. The technological aspects of those technologies are described in the next section. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Defendants and the purposes for which interceptions are made.

34. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

35. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

36. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

37. Among the ways Facebook tracks users on websites not owned by Facebook in order to create detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook incentivizes websites to use Meta Pixel by advertising that it allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

[1] Facebook rebranded its parent company as "Meta" in October 2021.

38. Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

39. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

40. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."

41. Google LLC is a multinational technology conglomerate, a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

42. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

43. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

44. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its

website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google can profit from Google Analytics by using the data obtained about individual users to build such individuals' profiles further. This information can then be used to serve upon such individuals better-targeted individualized advertisements.

**Website Tracking Technologies on the UMass Memorial Website**

45. Defendants have injected hidden code into the UMass Memorial Website that tracks healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the UMass Memorial Website with the website user's Facebook profile.

46. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Defendants, the contents of communications between Class Members and Defendants and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website. This information reflects individuals' personal health information as defined by the Health Information Portability and Accountability Act ("HIPAA").

47. Defendants use several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48. Before describing the techniques such technologies use, it is important to define some basic technological terms.

49. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50. An **"IP address**" is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the UMass Memorial Website, as of the time of this complaint, is 162.249.110.234. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the UMass Memorial Website is http://www.ummhealth.org. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the UMass Memorial Website has a page specifically about the UMass Memorial Health Cancer Center; that page's URL is https://www.ummhealth.org/umass-memorial-health-cancer-center.

52. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. Cookies can, for example, confirm to Google and Facebook that

a particular individual accessing the UMass Memorial Website is the same individual who also accesses a particular Google or Facebook account from the same device.

53. **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

54. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Defendants) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is executed automatically within the individual's web browser.

55. The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a single-pixel image from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology). That image or other small file is not displayed or visible to the website user; the loading and execution of the Javascript code and the subsequent loading of an image or another small file occurs entirely in the background, invisible to the website user.

56. Critically, when the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as http://www.ummhealth.org); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

57. When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the UMass Memorial Website to its collection of information it has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook can record and associate the content of the communications it has intercepted with an individual's Facebook profile, which includes the individual's real name and other information about them.

58. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not actually displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity the third party such as Google or Facebook.

59. The tracking technologies described in this complaint intercept and retransmit to third parties the contents of communications between healthcare consumers and the UMass Memorial Website contemporaneously with those communications. The tracking technologies intercept and retransmit the contents of those communications to third parties before the webpage has even completed loading.

**<u>Defendants' Use of Tracking Technologies on the UMass Memorial Website</u>**

60. Defendants use various tracking technologies across the numerous web pages on the UMass Memorial Website. Many of those tracking technologies are embedded in the code of all or almost all of the pages within the Umass Memorial Website. For example, on the main landing page of the UMass Memorial Website, Defendants have injected secret code that loads Google Analytics, Meta Pixel, and various other tracking technologies.

61. The code is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the network activity generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

62. Below is an image of the main landing page for the UMass Memorial Website:




63. When a user loads the main landing page for the UMass Memorial Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the Javascript code for Google Analytics. The website then causes the user's web browser to execute the Javascript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

64. The image below depicts the landing page for the UMass Memorial Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




65. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and retransmitted to Google, is presented below (with highlighting added). The "Payload" refers to information transmitted to a web server when a file is retrieved from that server. In this case, the "Payload" reflects the information that Google Analytics causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

```
v: 1
_v: j97
a: 530489752
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.ummhealth.org%2F
dr: https%3A%2F%2Fwww.google.com%2F
ul: en-us
de: UTF-8
dt: UMass%20Memorial%20Health
sd: 24-bit
sr: 1920x1080
vp: 1002x926
je: 0
_u: QCCACEABRAAAAC~
jid: 1767544177
gjid: 455434716
cid: 102320041.1664411294
tid: UA-48961693-1
_gid: 1962499786.1664411294
_r: 1
gtm: 2wg9q0TP5LSLQ
z: 1301636959
```

66. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the UMass Memorial Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.umasshealth.org"[2]);

(b) The URL of the prior webpage the user had visited before arriving at the UMass Memorial Website landing page (www.google.com); and

[2] The characters "%3A" and "%2F" are comptuer codes that replace the ":" and "/" characters.

(c) The title of the webpage (after the letters "dt," which includes "UMass Memorial Health").[3]

67. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings), identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, UMass Health) and the website's account with Google AdSense, a website monetization program offered by Google. The information transmitted also contains a unique identifier for the particular user visiting the website, enabling Google to track that individual across the website.

68. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Defendants' website and retransmits those contents to Google, the Javascript code also causes the user's web browser to reveal the user's IP address to Google. This permits Google to associate the content of the user's communications with the website with any other information Google has on the individual, including the individual's real identity. Google can then use the contents of communications that it has secretly intercepted for commercial purposes, including serving personalized advertisements in the future to the particular website user browsing the UMass Memorial Website.

69. Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can further confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This allows Google to confirm further that a particular individual using Google's services (for example, a Gmail account) and an individual visiting the

[3] The characters "%20" are comuter code that reflect a space.

UMass Memorial Website is the same individual, particularly when combined with the user's IP address, which is also a unique identifier.

70. The same landing page on the UMass Memorial Website also loads Javascript code for Meta Pixel, called "fbevents.js." That javascript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the UMass Memorial Website. The network activity intercepted and retransmitted to Facebook when loading the UMass Memorial Website's landing page is below:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/
rl:
if: false
ts: 1667852243703
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1667852243663
coo: false
rqm: GET
dt: pvtwa5g22qp40t1kc012sh9pf061srm4

71. Similar to Google Analytics, Meta Pixel causes the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Defendants' website, including the URL of the webpage visited. The transmission to Facebook

also includes information about the user's browser configuration and various codes to associate the communications with Defendants' advertising account with Facebook.

72. Also, similar to Google Analytics, the Javascript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can serve personalized advertising to the website user in the future.

73. Moreover, similar to Google Analytics, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

74. The text fields communicated to Facebook by the Meta Pixel code include a persistent identifier for each particular user, which permits Facebook to track that individual across the UMass Health Website and further confirm that individual's real-world identity.

75. Defendants have configured the UMass Memorial Website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the UMass Memorial Website, which in turn may reveal private health information about the healthcare consumer.

76. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

77. The UMass Memorial Website contains a page entitled "Women's Health: Maternity Center," designed to provide information to the website user about pregnancy and the

services Defendants offer in connection with pregnancy. A user, by visiting this web page, necessarily reveals to Defendants that the user has some interest in maternity services (for example, the user might be pregnant or know someone who is). When the user communicates with Defendants by visiting this particular webpage, Defendants cause the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Maternity Center webpage:




78. The graphic below presents the contents of the communication between the website user and Defendants that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics javascript code that Defendants secretly inject into the website (the blue highlighting is added):

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

id: 247143013759083
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/services-treatments?_ga=2.131274511.1059841755.1664411875-1880997322.1664411875
if: false
ts: 1664412113322
sw: 1920
sh: 1080
v: 2.9.84
r: stable
ec: 0
o: 30
fbp: fb.1.1664411293998.360887419
it: 1664412112865
coo: false
rqm: GET
dt: u8gc9rdrkgppw0n48qyfw2aitdsgxtgy

79. As reflected in the above screenshot, Defendants contemporaneously intercept and retransmit to Google the fact that the website user is visiting a "maternity-center" webpage—information that Google then stores and can use for its own commercial purposes (and which could be accessible via subpoena by third parties, such as states who may be interested in such information for political or legal reasons).[4]

80. The same webpage also contains hidden code that intercepts the user's communication with the website and retransmits that same information to Facebook. The data transmitted to Facebook is depicted below:

[4] *See, e.g.*, NRP, "Privacy advocates fear Google will be used to prosecute abortion seekers," https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions.

× Headers Payload Preview Response Initiator Timing Cookies

▾ Query String Parameters view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/
if: false
ts: 1668123242798
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668123242777
coo: false
rqm: GET

81. Similar to Google Analytics, Defendants cause the secret interception and transmission to Facebook of the contents of the communication between the website user and Defendants, including that the user is visiting a "maternity-center" webpage, which Facebook can then use for commercial purposes (and which data it retains, and can then be accessed by third parties, such as by way of subpoena).

82. The UMass Memorial Website contains dozens of similar pages on particular medical specialties and practices that the Defendants' healthcare facilities offer. The UMass Memorial Website, for each of such page, aids in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Maternity Center example.

83. The UMass Memorial Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Defendants. When an individual uses the search function, Defendants aid in the secret interception of the contents of that search and retransmission of those contents to Google, Facebook, and other third parties.

84. For example, the screenshot below depicts the search results page when a user enters the phrase "I'm pregnant"[5] into the search bar on the UMass Memorial Website:




[5] This is an example and does not reflect Plaintiff's personal activity on the website.

85. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-04YJCL6W7W
gtm: 2oeb90
_p: 1900279729
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.106|Chromium;107.0.5304.106|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668123203
sct: 19
seg: 1
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=I%27m+pregnant&form_build_id=form-NW-Iov5m3eeoU14WvjOS1Ay6loVwQ6a3bNxrIb5YFbw&form_id=search_block_form
dr: https://www.ummhealth.org/umass-memorial-medical-center
dt: Search Results - UMass Memorial Medical Center - UMass Memorial Health
en: page_view

86. The above screenshot reflects that when an individual enters a search on the website, Google intercepts the contents of the search. Google then associates those search terms with the individual's real-world identity and then uses that information for commercial purposes (and retains them for potential use by other parties in the future).

87. Defendants also aid in Facebook's secret interception of the same sensitive communication. Below is a screenshot of the information intercepted and transmitted to Facebook:

× Headers Payload Preview Response Initiator Timing
▾ Query String Parameters view source view URL-encoded
id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=_removed_&form_build_id=form-NW-Iov5m3eeoUl4WvjOS1Ay6lqVwQ6aJbNxrIbSYFbw&form_id=search_block_form&_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%224f5044badb6767ad742dc945137f520213bbeb130b6ea306cbcb53aae5357d58%22%5D%7D#gsc.tab=0&gsc.q=I'm%20pregnant&gsc.page=1
rl: https://www.ummhealth.org/umass-memorial-medical-center?_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%5D%7D
if: false
ts: 1668124020275
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668124020264
coo: false
rqm: GET
dt: bsa8ed5a382mjclxgc26vm8iyxlbdy34

88. The UMass Memorial Website also includes a "Find a Doctor" function that allows healthcare consumers to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester[6]:




89. Hidden Google Analytics code in this results page causes the secret interception of the facts that the individual is using the find-a-doctor function and the specific criteria the individual has inputted. The contents of the communication that are secretly intercepted and transmitted to Google are captured below:

[6] Again, this is not a search Plaintiff performed but is instead presented to illustrate the types of communications that tracking technologies intercept and retrainsmit to third parties.

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-HDYC9M7247
gtm: 2oeb90
_p: 1829352063
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.107|Chromium;107.0.5304.107|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668449031
sct: 4
seg: 1
dl: https://physicians.umassmemorial.org/results?Affiliations=60&SubSpecialties=1636%2c1635&address=Worcester%2c+MA+01601%2c+USA&distance=5&latlng=42.26%2c-71.8&sortDirection=asc&sortby=distance&Gender=Female
dr: https://physicians.umassmemorial.org/results?Affiliations=60&Gender=Male%2CFemale&SubSpecialties=1636%2C1635&sortby=distance&sortDirection=asc&address=Worcester%2C+MA+01601%2C+USA&distance=5&latlng=42.26%2C-71.8
dt: Search Results - UMass Memorial Health
en: page_view

90. The highlighted portion above uses numeric codes for the affiliations and specialties criterion ("Affiliations=6" references UMass Memorial Medical Center, and "SubSpecialties=163" references Obstetrics & Gynecology), and the preferred geographic location ("Worcester") and doctor gender ("Female"), plus the permissible distance from Worcester ("5"

miles). Each of these inputs are intercepted by Google. Although a couple of fields use numeric codes, the meaning of those codes can easily be discerned by loading the full URL, including the parameters highlighted in blue above, to reveal the substance of the individual's search.

91. The UMass Memorial Website also features numerous "Risk Assessments," through which individuals can relate information about themselves to receive an instant assessment. Those assessments include, among others, an Alcohol Use Assessment, a Breast Cancer Risk Assessment, a Depression Risk Assessment, and a Substance Abuse Assessment. The screen capture below, for example, depicts the Substance Abuse Assessment (the selected answers do not reflect any particular individual's responses but are provided by way of example):



92. When a website user first loads a risk assessment, that communication is intercepted via Google Analytics code, and communication contents are transmitted to Google. The graphic below depicts the information intercepted and transmitted to Google upload loading of the Substance Abuse Assessment:




93. As highlighted above, the fact that a user is taking a Substance Abuse Assessment is communicated to Google via Google Analytics.

94. When a user completes and submits the assessment form, a new webpage is loaded with the user's results. That page is depicted below:




95. When the results page loads for the risk assessment, that communication is secretly intercepted via the Google Analytics code, and parts of the communication are sent to Google. The information sent to Google is depicted below:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view decoded

v: 1

_v: j98

a: 1049796374

t: pageview

_s: 1

dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2

dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2

ul: en-us

de: UTF-8

dt: Substance%20Abuse%20Assessment

sd: 24-bit

sr: 1920x1080

vp: 1231x979

je: 0

_u: AACAAEABAAAAACAAI~

jid: 1267990952

gjid: 2074061852

cid: 1972491336.1664909972

tid: UA-17264146-13

_gid: 2122978964.1664909972

_r: 1

_slc: 1

z: 1530351183

96. The user's responses to each question in the risk assessment are highlighted in the screen capture above. Those responses are intercepted and transmitted to Google. Although the parameters are communicated in code (after the word "Parameters"), that code can easily be used to identify the user's response to each question by loading the full highlighted URL.

97. The above examples are just that—examples. Defendants use similar Google Analytics and Meta Pixel code throughout nearly all parts of the UMass Memorial Website, closely tracking individuals' communications with the UMass Memorial Website.

98. In addition to Google and Facebook, the communications between healthcare consumers and UMass Health are intercepted and retransmitted to various companies without the individual's consent. These additional third parties include:

(d) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(e) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(f) **Sharethis.** Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Defendants insert code on their website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

99. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the UMass Health Website's operation. The UMass Health Website can and would operate just the same from the perspective of healthcare consumers without the tracking technologies described in this complaint.

100. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For

example, a website can contain links to its Facebook profile or invite website users to interact with Defendants via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a simple link to a Facebook profile; any website can have one without the other.

101. Moreover, even if a company wishes to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate business reason for any company to keep secret from website users the use of these tracking technologies. Indeed, disclosure of such tracking technologies is possible and, if implemented properly, would avoid the secret interception of internet communications. Some websites, for example, disclose tracking technologies through a pop-up displayed to the user when the user first accesses the website. The quality and legal validity of these kinds of disclosures vary depending on how they are presented and their substance, but a disclosure could, in principle, disclose the use of tracking technologies and their impact on confidentiality.

102. A healthcare consumer visiting the UMass Memorial Website is presented with no pop-up disclosure informing them that their communications with the website are intercepted or tracked. Even if the UMass Memorial Website were to feature such a pop-up that links to the UMass Memorial Website terms of service or privacy policy, those policies do **not**, as described above in paragraphs 26 to 31, disclose the tracking technologies described in this complaint. To the contrary, those terms of service mislead website users by telling them that such sharing of communications between Class Members and Defendants is **not** taking place.

## Class Action Allegations

103. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.ummhealth.org within three years prior to the date of the original complaint in this action.

104. This action is properly maintainable as a class action.

105. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

106. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Defendants, through the UMass Memorial Website, were wire communications under the Massachusetts Wiretap Act.

(b) Whether Defendants inserted tracking technologies into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the UMass Memorial Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether, by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Defendants;

(g) Whether Class Members' communications with Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent;

(h) Whether Class Members' privacy interests were violated by the interceptions of their communications with Defendants' website;

(i) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

107. Plainitff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the UMass Memorial Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

108. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

109. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, the damage that any individual Class member has suffered is not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

110. Defendants have acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seek for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

111. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

112. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act

provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

113. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Defendants, through the UMass Memorial Website, were therefore wire communications under the Massachusetts Wiretap Act.

114. The tracking technologies inserted into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the UMass Memorial Website; (ii) Class Members' web browsers used to access the UMass Memorial Website; (iii) Defendants' own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the UMass Memorial Website.

115. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

116. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent

to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Defendants.

117. Class Members' communications between the Class Members and Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

118. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of violation or $1,000, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 20, 2022

Respectfully submitted,

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst. Clerk

po

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Janice Progin | UMass Memorial Health Care, Inc.; UMass Memorial Hospitals, Inc.; UMass Memorial Medical Center, Inc.; UMass Memorial Healthalliance-Clinton Hospital, Inc.; Marlborough Hospital; Harrington Memorial Hospital, Inc. |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Michelle H. Blauner (BBO #549049)<br>Shapiro Haber & Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108 | ATTORNEY (if known) |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ________ ________________ (B) ☑ Yes ☐ No

# BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this class action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the defendants aided in the interception of communications between Plaintiff and other Class Members and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta"), and other companies that provide so-called "tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. UMass Memorial aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the UMass Memorial Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record /s/ Michelle H. Blauner
DATE: 12-20-22

I HEREBY ATTEST AND CERTIFY ON
January 16, 2025 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

# CIVIL ACTION COVER SHEET
# INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

BA.1 claims relating to the governance and conduct of internal of entities
BA2. claims relating to employment agreements
BA3. claims relating to liability of shareholders, directors, officers, partners etc.

BB.1 shareholder derivative claims
BB.2 claims relating to or arising out of securities transactions

BC.1 claims involving mergers, consolidation, sales of assets, issuance of debt, equity and like interests

BD.1 claims to determine the use or status of, or claims involving, intellectual property
BD.2 claims to determine the use or status of, or claims involving, confidential, property or trade secret information
BD.3 claims to determine the use or status, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, mis-representation business torts or other violations involving business relationships

BF.1 claims under the U.C.C. involving complex issues
BG.1 claims arising from transactions with banks, investment bankers

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BL.1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a party

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK * | IS THIS A JURY CASE? |
|---|---|---|---|
| BD3 | Restrictive covenants | (B) | Yes No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, in the face sheet a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCU-RATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A special tracking order shall be created by the presiding justice of the Business Litigation Session at the Initial Rule 16 Conference.

\ 12/27

NOTIFY

Commonwealth of Massachusetts
County of Suffolk
The Superior Court – Business Litigation Session

3

CIVIL DOCKET#: **2284CV02889-BLS2**

Case: Progin v. UMass Memorial Health Care, Inc. et al.

## NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS2**.

Hereafter, as shown above, all parties must include the initials "**BLS2**" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project). Counsel may indicate their respective client's participation by completing, filing, and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: December 22, 2022

NOTICE SENT (2)
12/27

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ____________________

Case: ________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,** ____________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ________________________________________

Docket Number CIVIL DOCKET#: ____________________

Counsel For ____________________ Date ____________

Firm Name and Address:

____________________________

____________________________

____________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**OR**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
CIVIL ACTION NO. 2284CV02889-BLS2

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.

Defendants.

SL

**NOTICE OF FILING NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on January 17, 2023, Defendants UMass Memorial Health Care, Inc.; UMass Memorial Community Hospitals, Inc., incorrectly named under its prior name as UMass Memorial Hospitals, Inc.; UMass Memorial Medical Center, Inc.; UMass Memorial HealthAlliance-Clinton Hospital, Inc.; Marlborough Hospital, Inc.; and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named under its prior name as Harrington Memorial Hospital, Inc., (together, "UMass Memorial") filed a Notice of Removal pursuant to 28 U.S.C. § 1442(a)(1) in the United States District Court for the District of Massachusetts, thereby removing this action. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Suffolk County Superior Court, UMass Memorial has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1146(d).

Dated: January 17, 2023

Respectfully submitted,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

/s/ *Stephen T. Paterniti*
*One of the attorneys for defendants*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | Case No.:<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02899-BLS2]<br><br>DEFENDANTS' NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1) |

**NOTICE OF REMOVAL**

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Janice Progin:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions of the named Defendants UMass Memorial Health Care, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance - Clinton Hospital, Inc., Marlborough Hospital, Inc., and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named as Harrington Memorial Hospital, Inc., UMass Memorial Hospitals, Inc. [1] (altogether

[1] Although the Complaint names UMass Memorial Hospitals, Inc. as a defendant, there is no legal entity with that name.

"UMass Memorial") has taken in connection with pursuing that directive. UMass Memorial therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pages 9 and 10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, UMass Memorial provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

**NATURE OF THE CASE**

1. UMass Memorial Health Care, Inc. is a Massachusetts nonprofit charitable corporation that is the direct or indirect corporate member of each of the entities that makes up the UMass Memorial healthcare system, including but not limited to the other named Defendants, with the exception of UMass Memorial Hospitals, Inc. because there is no such legal entity (altogether, "UMass Memorial," as previously noted).[2]

2. On December 20, 2022, Plaintiff Janice Progin filed a complaint against UMass Memorial, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2284CV02899-BLS2.

3. Plaintiff served UMass Memorial with the Complaint, effective on December 28, 2022.

4. Plaintiff's Complaint purports to challenge UMass Memorial's routine on-line practices as "the interception of communications that disclose healthcare consumers' private health information," and illegal wiretapping. *See, e.g.,* Complaint at ¶¶ 6, 20, 21, 27, 46, 75, 111-118.

[2] As Plaintiff recognizes, "Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/." Complaint at ¶ 19.

5. UMass Memorial operates websites, including www.ummhealth.org (the "website" at issue), that provide information to the public about UMass Memorial and access to medical records through an Epic myChart patient portal.

6. Plaintiff alleges she is a UMass Memorial patient who "regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal." Compl. ¶ 9.

7. UMass Memorial's website "is designed for communications with healthcare consumers." *Id.* ¶ 20. Among other alleged functions, "[t]he website permits healthcare consumers to use a 'Find a Doctor' function to search for doctors by specialty, gender, language, and location," and "[t]he website lets healthcare consumers access their private medical information online through the MyCharts [sic] portal. MyCharts [sic] is a third-party provider of online access to health records." *Id.* ¶ 20(e), (g).

8. Plaintiff alleges that the Facebook[3] or Meta Pixel, allegedly used on the UMass Memorial website, "allows website owners to track users across their website." Compl. ¶ 25.

9. Plaintiff similarly alleges that Google Analytics, allegedly used on the UMass Memorial website, allows "websites to track the behavior of users on its website." *Id.* ¶ 44.

10. According to Plaintiff, "tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook." *Id.* ¶ 45. Plaintiff further contends: "These tracking technologies transmit to Google, Facebook, and other companies, private health information, including the individual's

---

[3] Facebook rebranded itself as Meta in 2021.

medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website."

11. However, Plaintiff does not assert that UMass Memorial discloses names, social security numbers, diagnoses, birthdates, or comparable information to the third parties.

**BASIS FOR REMOVAL**

12. UMass Memorial removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

13. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants can remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[4]

14. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to

[4] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given this requirement a broad reading and held that no causal link is required." *Moore*, 25 F.4th at 35.

develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid program (like UMass Memorial's clinical affiliates) to offer patients online access to their records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

15. UMass Memorial has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

***The Meaningful Use Program***

16. In 2004, President Bush issued an Executive Order that established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

17. Five years later, Congress codified the office in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

18. Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated

that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

19. One critical aspect of this strategy is the "Meaningful Use" program of CMS. 42 C.F.R. § 495.2-495.370. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records through the creation of patient portals.

20. Under this program, providers must meet certain criteria in order to receive full Medicare reimbursement, one of which is having an interoperable patient portal. Regulations provided for incentive payments of up to two percent for providers who reached certain level engagement with electronic health record use through the patient portal.

21. To achieve those specifications, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records.

22. The ONC has specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly." ONC has also specified "how a patient portal helps

achieve meaningful use requirements," and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013) available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

23. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

***UMass Memorial Is A "Person" Within § 1442(a)(1)***

24. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

25. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st

Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

26. UMass Memorial Health Care, Inc. is a non-profit charitable corporation organized in Massachusetts, Compl. ¶ 10 (*see also id.* ¶¶ 11-15), and since the federal officer statute is to be broadly construed, UMass Memorial qualifies as a person under that statute.[5]

***UMass Memorial is Acting Under a Federal Officer***

27. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

28. Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising UMass Memorial's actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

29. First, UMass Memorial (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector

[5] Although in other contexts, UMass Memorial may not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

30. Second, in the absence of UMass Memorial's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

31. Third, the government has specified how to best enhance patient engagement, including through patient portals. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

32. Finally, the government has created an office dedicated to this endeavor and has closely monitored the work of private entities (like UMass Memorial). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes UMass Memorial and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

33. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's]

participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

34. In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id.* at *6. The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in *UPMC*, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

***Plaintiff's Claims Relate to the Actions Under Color of Federal Office***

35. Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, any single claim is independently sufficient to

satisfy the "for or relating to" requirement under § 1442(a)(1). *Id.* (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)).

36. Plaintiff's Complaint directly challenges UMass Memorial's website analytics practices, which help drive patients to UMass Memorial websites.

37. Plaintiff's Complaint also generally targets UMass Memorial's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

38. The entire point of using the third-party services is to direct traffic to, and increase engagement with, UMass Memorial websites. *See, e.g.*, Compl. ¶¶ 20-22, 97-98. Indeed, Plaintiff acknowledges that the Meta Pixel and Google Analytics help "track" users and types of actions they take. *See, e.g.*, ¶¶ 37, 44. Plaintiff recognizes that "[t]he tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website." *Id.* ¶ 44.

***UMass Memorial Raises Colorable Federal Defenses to Plaintiff's Claims***

39. The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar, merely requiring that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*, 489 U.S. 121, 129-30 (1989); *Moore*, 25 F.4th at 37 (a "colorable federal defense" need not be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations omitted); *accord. Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

40. Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfies this requirement.

41. In response to Plaintiff's repeated claims that "private health information" and "private medical information" were disclosed, UMass Memorial will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Another district court has already made this holding in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense therefore turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

42. Because each of the requirements of the removal statute are satisfied, removal to this Court is proper.

**PROCEDURAL REQUIREMENTS FOR REMOVAL**

43. UMass Memorial likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

44. UMass Memorial is filing this Notice of Removal within twenty (20) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446; Mass. R. Civ. P. 12(a)(1).

45. UMass Memorial files this Notice in the United States District Court of the District of Massachusetts, Eastern Division, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this

federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

46. UMass Memorial has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Complaint.

47. Upon filing this notice, UMass Memorial will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

As set forth above, Plaintiff's Complaint directly challenges practices and procedures UMass Memorial has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE**, UMass Memorial respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

Dated: January 17, 2023

Respectfully submitted,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
CIVIL ACTION NO. 2284CV02889-BLS2

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.

Defendants.

**NOTICE OF FILING NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on January 17, 2023, Defendants UMass Memorial Health Care, Inc.; UMass Memorial Community Hospitals, Inc., incorrectly named under its prior name as UMass Memorial Hospitals, Inc.; UMass Memorial Medical Center, Inc.; UMass Memorial HealthAlliance-Clinton Hospital, Inc.; Marlborough Hospital, Inc.; and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named under its prior name as Harrington Memorial Hospital, Inc., (together, "UMass Memorial") filed a Notice of Removal pursuant to 28 U.S.C. § 1442(a)(1) in the United States District Court for the District of Massachusetts, thereby removing this action. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Suffolk County Superior Court, UMass Memorial has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1146(d).

Dated: January 17, 2023

Respectfully submitted,

/s/ *Stephen T. Paterniti*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendants*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 17, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendants*

5

Suffolk Superior Civil Court

22-2889

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | Case No.:<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02899-BLS2]<br><br>DEFENDANTS' NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1)<br><br>SUFFOLK SUPERIOR COURT<br>CIVIL CLERK'S OFFICE<br>FILED<br>JUL 18 2023<br>JOHN E. POWERS, III<br>ACTING CLERK MAGISTRATE |

**NOTICE OF REMOVAL**

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Janice Progin:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions of the named Defendants UMass Memorial Health Care, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance - Clinton Hospital, Inc., Marlborough Hospital, Inc., and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named as Harrington Memorial Hospital, Inc., UMass Memorial Hospitals, Inc. [1] (altogether

[1] Although the Complaint names UMass Memorial Hospitals, Inc. as a defendant, there is no legal entity with that name.

"UMass Memorial") has taken in connection with pursuing that directive. UMass Memorial therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pages 9 and 10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, UMass Memorial provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. UMass Memorial Health Care, Inc. is a Massachusetts nonprofit charitable corporation that is the direct or indirect corporate member of each of the entities that makes up the UMass Memorial healthcare system, including but not limited to the other named Defendants, with the exception of UMass Memorial Hospitals, Inc. because there is no such legal entity (altogether, "UMass Memorial," as previously noted).[2]

2. On December 20, 2022, Plaintiff Janice Progin filed a complaint against UMass Memorial, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2284CV02899-BLS2.

3. Plaintiff served UMass Memorial with the Complaint, effective on December 28, 2022.

4. Plaintiff's Complaint purports to challenge UMass Memorial's routine on-line practices as "the interception of communications that disclose healthcare consumers' private health information," and illegal wiretapping. *See, e.g.*, Complaint at ¶¶ 6, 20, 21, 27, 46, 75, 111-118.

[2] As Plaintiff recognizes, "Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/." Complaint at ¶ 19.

UMass Memorial operates websites, including www.ummhealth.org (the "website" issue), that provide information to the public about UMass Memorial and access to medical records through an Epic myChart patient portal.

6. Plaintiff alleges she is a UMass Memorial patient who "regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal." Compl. ¶ 9.

7. UMass Memorial's website "is designed for communications with healthcare consumers." *Id.* ¶ 20. Among other alleged functions, "[t]he website permits healthcare consumers to use a 'Find a Doctor' function to search for doctors by specialty, gender, language, and location," and "[t]he website lets healthcare consumers access their private medical information online through the MyCharts [sic] portal. MyCharts [sic] is a third-party provider of online access to health records." *Id.* ¶ 20(e), (g).

8. Plaintiff alleges that the Facebook[3] or Meta Pixel, allegedly used on the UMass Memorial website, "allows website owners to track users across their website." Compl. ¶ 25.

9. Plaintiff similarly alleges that Google Analytics, allegedly used on the UMass Memorial website, allows "websites to track the behavior of users on its website." *Id.* ¶ 44.

10. According to Plaintiff, "tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook." *Id.* ¶ 45. Plaintiff further contends: "These tracking technologies transmit to Google, Facebook, and other companies, private health information, including the individual's

[3] Facebook rebranded itself as Meta in 2021.

medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website."

11. However, Plaintiff does not assert that UMass Memorial discloses names, social security numbers, diagnoses, birthdates, or comparable information to the third parties.

**BASIS FOR REMOVAL**

12. UMass Memorial removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office ..." *Id.* § 1442(a)(1).

13. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants can remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[4]

14. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to

[4] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given this requirement a broad reading and held that no causal link is required." *Moore*, 25 F.4th at 35.

develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid program (like UMass Memorial's clinical affiliates) to offer patients online access to their records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

15. UMass Memorial has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

***The Meaningful Use Program***

16. In 2004, President Bush issued an Executive Order that established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

17. Five years later, Congress codified the office in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

18. Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated

that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

19. One critical aspect of this strategy is the "Meaningful Use" program of CMS. 42 C.F.R. § 495.2-495.370. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records through the creation of patient portals.

20. Under this program, providers must meet certain criteria in order to receive full Medicare reimbursement, one of which is having an interoperable patient portal. Regulations provided for incentive payments of up to two percent for providers who reached certain level engagement with electronic health record use through the patient portal.

21. To achieve those specifications, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records.

22. The ONC has specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly." ONC has also specified "how a patient portal helps

achieve meaningful use requirements," and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013) available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

23. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

***UMass Memorial Is A "Person" Within § 1442(a)(1)***

24. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

25. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st

Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

26. UMass Memorial Health Care, Inc. is a non-profit charitable corporation organized in Massachusetts, Compl. ¶ 10 (*see also id.* ¶¶ 11-15), and since the federal officer statute is to be broadly construed, UMass Memorial qualifies as a person under that statute.[5]

***UMass Memorial is Acting Under a Federal Officer***

27. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

28. Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising UMass Memorial's actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

29. First, UMass Memorial (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector

[5] Although in other contexts, UMass Memorial may not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

30. Second, in the absence of UMass Memorial's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

31. Third, the government has specified how to best enhance patient engagement, including through patient portals. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

32. Finally, the government has created an office dedicated to this endeavor and has closely monitored the work of private entities (like UMass Memorial). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes UMass Memorial and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

33. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's]

participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

34. In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id.* at *6. The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in *UPMC*, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

***Plaintiff's Claims Relate to the Actions Under Color of Federal Office***

35. Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, any single claim is independently sufficient to

satisfy the "for or relating to" requirement under § 1442(a)(1). *Id.* (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)).

36. Plaintiff's Complaint directly challenges UMass Memorial's website analytics practices, which help drive patients to UMass Memorial websites.

37. Plaintiff's Complaint also generally targets UMass Memorial's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

38. The entire point of using the third-party services is to direct traffic to, and increase engagement with, UMass Memorial websites. *See, e.g.*, Compl. ¶¶ 20-22, 97-98. Indeed, Plaintiff acknowledges that the Meta Pixel and Google Analytics help "track" users and types of actions they take. *See, e.g.*, ¶¶ 37, 44. Plaintiff recognizes that "[t]he tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website." *Id.* ¶ 44.

***UMass Memorial Raises Colorable Federal Defenses to Plaintiff's Claims***

39. The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar, merely requiring that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*, 489 U.S. 121, 129-30 (1989); *Moore*, 25 F.4th at 37 (a "colorable federal defense" need not be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations omitted); *accord. Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

40. Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfies this requirement.

41. In response to Plaintiff's repeated claims that "private health information" and "private medical information" were disclosed, UMass Memorial will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Another district court has already made this holding in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense therefore turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

42. Because each of the requirements of the removal statute are satisfied, removal to this Court is proper.

**PROCEDURAL REQUIREMENTS FOR REMOVAL**

43. UMass Memorial likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

44. UMass Memorial is filing this Notice of Removal within twenty (20) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446; Mass. R. Civ. P. 12(a)(1).

45. UMass Memorial files this Notice in the United States District Court of the District of Massachusetts, Eastern Division, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this

federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

46. UMass Memorial has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Complaint.

47. Upon filing this notice, UMass Memorial will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

As set forth above, Plaintiff's Complaint directly challenges practices and procedures UMass Memorial has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE,** UMass Memorial respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

Dated: January 17, 2023

Respectfully submitted,

*<u>/s/ Stephen T. Paterniti</u>*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

Date Filed 8/10/2023 6:20 PM
Superior Court - Suffolk
Docket Number 2384CV01611

08.15
Notify

6

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION No. 2384CV01611-BLS-2

MASSACHUSETTS ELECTRIC COMPANY d/b/a NATIONAL GRID and NEW ENGLAND POWER COMPANY d/b/a NATIONAL GRID,

Plaintiffs,

kg

v.

MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, SALVATORE M. GIORLANDINO IN HIS OFFICIAL CAPACITY AS CHIEF PRESIDING OFFICER OF THE OFFICE OF APPEALS AND DISPUTE RESOLUTION, CITY OF EVERETT, CITY OF MALDEN, CITY OF MEDFORD,

Defendants.

**Service by e-mail**

**JOINT MOTION TO STAY SUPERIOR COURT PROCEEDINGS**

Plaintiffs Massachusetts Electric Company d/b/a National Grid and New England Power Company d/b/a National Grid (collectively, "National Grid") and Defendants Massachusetts Department of Environmental Protection ("MassDEP"); Salvatore M. Giorlandino in his official capacity as Chief Presiding Officer of MassDEP's Office of Appeals and Dispute Resolution ("OADR"); and Cities of Everett, Malden, and Medford, respectfully request an order staying these proceedings in light of further proceedings at MassDEP that may moot or otherwise resolve this matter. In support of this motion, the Parties state:

1. On July 14, 2023, National Grid filed this action for relief from OADR's order denying National Grid's Motion to Withdraw [its Administrative] Appeal and setting deadlines leading up to an adjudicatory hearing on National Grid's administrative challenge to MassDEP's draft Chapter 91 license ("OADR Order").

Allowed-clerk shall schedule a status conference after the first 60-day status report is filed on or about 10/14/23.

[signature]
8/16/23

to Federal Rules of Civil Procedure, Rule 81(c)(2)(C), Defendants' deadline to file their responsive pleading is January 24, 2023.

As grounds for this motion, there are certain scheduling conflicts among Defendants' counsel which has made the turnaround time to respond to Plaintiff's complaint difficult. Defendants, therefore, with Plaintiff's assent, respectfully request that their deadline to respond to the Complaint be extended by thirty (30) days, from January 24, 2023, up to and including February 23, 2023.[2]

[2] This extension will not alter the date of any event or any deadline fixed by Court order.

Dated: January 20, 2023

Respectfully submitted,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendants*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret McBuckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 20, 2023, the foregoing assented-to motion was filed using the Court's CM/ECF service which will provide service copies to the Plaintiff's counsel of record listed below.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for the Defendants*

Suffolk Superior Civil Court

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

22-2889

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-40154

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D]

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]

**JOINT MOTION FOR ENTRY OF SCHEDULE REGARDING MOTIONS TO REMAND AND TO EXTEND TIME FOR DEFEENDANTS TO RESPOND TO THE COMPLAINTS**

The Plaintiffs John Doe, Lisa Colleton and Janice Progin in each of the above referenced actions, and UMass Memorial Healthcare, the common defendant in each of those actions, along with the additional defendants in the Progin Action (the "Parties"), jointly move this Court to enter a scheduling order for the briefing of Motions to Remand each of these actions, as set forth below.

Each of the above actions were filed in the Massachusetts state court. The Doe class action case was filed first, with the Colleton and Progin class action cases filed in succeeding months, making similar claims against UMass Memorial Healthcare, the common defendant and against the additional defendants in the Progin Action. The Doe and Colleton Actions were filed in the Worcester Superior Court. The Progin Action was filed in the Business Litigation Section of the Suffolk Superior Court.

The Defendants removed each of these actions to this Court alleging federal jurisdiction under the federal officer removal provision of 28 U.S.C. § 1442(a)(1). The Doe Action was removed on November 28, 2022, the Colleton Action was removed on December 28, 2022, and the Progin Action was removed on January 17, 2023. Plaintiff Doe filed a Motion to Remand the Doe Action on January 6, 2023 (Doe ECF 9 and 10). Plaintiffs Colleton filed a Motion to Remand the Colleton action on January 27, 2023 (Colleton ECF 13). Progin will be filing a Motion to Remand her case by February 16, 2023.

Since the bases for seeking removal of the three actions are similar, the Parties anticipate that some, but not necessarily all, of the legal issues raised in their respective Motions to Remand will be the same. Accordingly, coordinated briefing on the Motions to Remand would serve the interests of legal and judicial economy. Accordingly, the Parties respectfully move this Court to establish the following uniform dates for the remaining briefing of the Motions to Remand in the three related actions.

1. Plaintiff Progin will file her Motion to Remand by February 16, 2023.
2. Defendants will file their Oppositions to each of the Motions to Remand by March 20, 2023. Defendants shall file a single omnibus opposition to the three Motions to Remand, and the opposition memoranda may be up to 25 pages.
3. Plaintiffs shall file their replies in support of their Motions to Remand by April 19, 2023. Plaintiffs shall file a single omnibus reply in support of the three Motions to Remand. Each Plaintiff may also file a supplemental reply, not exceeding 5 pages, addressing issues specific to the Motion to Remand that Plaintiff's action.

By making this request of the Court, the Parties seek to streamline the Court's consideration of the removal to this Court and associated remand motions. The Parties do not seek consolidation of these actions at this time, nor do the Parties intend in any way to interfere with this Court's determination of its jurisdiction in these matters.

The Parties also move this Court to order that the Defendants' time to move, plead, answer, or otherwise respond to each of the complaints in the above referenced actions shall be extended until 30 days after the Court rules on the Motions to Remand.

Dated: February 2, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO#
681627Victoria Santoro Mair, BBO#
679120 Erin E. McHugh, BBO#
703701 **SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Counsel for John Doe***

*/s/ William P. Doyle III*
William Patrick Doyle III, BBO #556999
**COLONNA, DOYLE AND SIMEOLOA**
26 Main St, 3rd Floor
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

***Counsel for Lisa Colleton***

*/s/ Michelle H. Blauner*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Janice Progin***

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
**BAKER & HOSTETLER LLP**
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlgodt
**BAKER & HOSTETLER LLP**
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

Stephen T. Paterniti (BBO #564860)
**JACKSON LEWIS P.C.**
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: February 2, 2023

*/s/ Michelle H. Blauner*
Michelle H. Blauner

8

Suffolk Superior Civil Court

22-2899

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**PLAINTIFF'S MOTION TO REMAND**

Pursuant to 28 U.S.C. § 1447(c), Plaintiff respectfully moves this Court to remand this action to the Massachusetts Superior Court, for the reasons stated in the accompanying Memorandum of Law in Support of Plaintiff's Motion to Remand.

Dated: February 16, 2023

*/s/ Michelle H. Blauner*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Attorneys for Janice Progin***

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: February 16, 2023

*/s/ Michelle H. Blauner*
Michelle H. Blauner

9

Suffolk Superior Civil Court

22-2889

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |
| LISA COLLETON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 1:22-cv-40154-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D] |
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., *et al.*,<br><br>Defendants. | Case No.: 4:23-cv-10113-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DEFENDANTS UMASS MEMORIAL HEALTH CARE, INC., *et al.*'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND**

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

A. President Bush Establishes the Position of National Health Information Technology Coordinator ........ 2

B. The National Coordinator Makes Access to Online Health Care Records a National Priority ........ 3

C. Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online ........ 3

D. The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations ........ 5

E. The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online ........ 6

F. UMass Memorial Acted in Response to and in Furtherance of this Federal Directive ........ 6

III. STANDARD OF REVIEW ........ 7

IV. ARGUMENT ........ 9

A. UMass Memorial was "Acting Under" a Federal Authority When Implementing the Meaningful Use Program ........ 9

a. UMass Memorial Assisted the Federal Government in Building a Nationwide Electronic Health Records System. ........ 9

b. UMass Memorial Followed the Close Direction of the Federal Government ..13

c. If not for Private Actors Like UMass Memorial, The Federal Government Itself Would Have Had to Build the Electronic Records System. ........ 15

d. Plaintiffs' Case Law is Inapt and Distinguishable. ........ 16

e. Plaintiffs' Efforts to Attack UPMC and ProMedica Miss the Mark. ........ 17

B. UMass Memorial Easily Satisfies the "Relating To" Requirement. ........ 19

C. UMass Memorial Has Presented A "Colorable Federal Defense" ........ 21

V. CONCLUSION ........ 22

## TABLE OF AUTHORITIES

**Cases**

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ........ 22

*Doe I v. UPMC*,
No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) ........ passim

*Doe v. BJC Health System*,
No. 4:22-CV-919, 2023 WL 369427 (E.D. Mo. Jan. 10, 2023) ........ 12

*Doe v. Cape Cod Healthcare, Inc.*,
No. 1:23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan. 25, 2023) ........ 12, 13

*Doe v. ProMedica Health Sys., Inc.*,
No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020) ........ passim

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
865 F.3d 1237 (9th Cir. 2017) ........ 14

*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*,
790 F.3d 457 (3d Cir. 2015) ........ 8

*Jefferson Cnty., Ala. V. Acker*,
527 U.S. 423 (1999) ........ 8, 21

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286, 292 (5th Cir. 2020) ........ 19

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022) ........ passim

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........ 12, 19

*O'Connell v. Foster Wheeler Energy Corp.*,
544 F. Supp. 2d 51 (D. Mass. 2008) ........ 8, 13

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016) ........ 16, 18

*Quinto v. The Regence of the Univ. of Cal.*,
No. 3:22-cv-04429-JD, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) ........ 12, 13

*Rhode Island v. Shell Oil Prods. Co., L.L.C.*,
979 F.3d 50 (1st Cir. 2020) ........ 17, 18, 20

*Shepherd v. Air & Liquid Sys. Corp.*,
No. CA 12-143L, 2012 WL 5874781 (D.R.I. Nov. 20, 2012) ........ 8, 13

*Smith v. Facebook*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ........ 21

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) ........ 2, 9, 10, 12

*White v. United States*,
2017 WL 3262165 (E.D. Tex., 2017). ........ 16

*Winters v. Diamond Shamrock Chemical Co.*,
149 F.3d 387 (5th Cir. 1998) ........ 15

**Statutes**

28 U.S.C. § 1442(a)(1) ........ 1, 7

42 U.S.C. § 1395w ........ 4

42 U.S.C. § 300jj ........ 4

American Recovery and Reinvestment Act of 2009,
Pub. L. No. 111-5, 123 Stat. 115 (2009) ........ 4

Removal Clarification Act of 2011,
Pub. L. No. 112-51, 125 Stat. 545 (2011) ........ 19

**Regulations**

42 C.F.R. § 495.20 ........ 5

45 C.F.R. § 170.102 ........ 6

45 C.F.R. § 170.314 ........ 5

Exec. Order 13335 (Apr. 27, 2004). ........ passim

**Rules and Other Authorities**

DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010)........ 5

NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013)........ 6

Office of the National Coordinator for Health Information Technology, 2011-2015 Federal Health Information Technology Strategic Plan........ 11, 15

Office of the National Coordinator for Health Information Technology, 2015-2020 Federal Health Information Technology Strategic Plan........ 11, 15

Office of the National Coordinator for Health Information Technology, 2020-2025 Federal Health Information Technology Strategic Plan........ 11

## I. INTRODUCTION

The federal officer removal statute permits removal, in pertinent part, when the defendant is "any officer (or any person acting under that officer) of the United States or of any agency therefore . . . for or relating to any act under color of such office ..." 28 U.S.C. § 1442(a)(1) (emphasis added). Through the Meaningful Use program and regulations, the federal government has incentivized and directed health care providers like Defendant UMass Memorial Health Care, Inc. ("UMass Memorial") to offer patients online access to their records, and to optimize patient engagement with their medical information, including through the use of patient portals.[1] As evidenced in the supporting declaration of Dr. Eric Alper ("Alper Decl."), UMass Memorial assisted the federal government in carrying out this federal directive by increasing web traffic to UMass Memorial's website, which contains a link to a patient portal on UMass Memorial's website.[2] Alper Decl. ¶ 6.

Plaintiffs have brought three related putative class actions against UMass Memorial: *Doe v. UMass Memorial Health Care, Inc.*, Case No. 4:22-cv-12022-ADB ("*Doe*"), *Colleton v. UMass Memorial Health Care, Inc.*, Case No. 1:22-cv-40154-ADB ("*Colleton*"), and *Progin v. UMass Memorial Health Care Inc., et al.*, Case No. 4:23-cv-10113-ADB ("*Progin*").[3] In each case, Plaintiffs challenge UMass Memorial's alleged efforts to optimize, and monitor traffic to, its

[1] *See, e.g., Doe* Compl. at ¶¶ 14–20 (describing federal "Meaningful Use" Program).

[2] As noted in UMass Memorial's Notice of Removal (*Doe* Compl. ¶¶ at 1, 5), UMass Memorial is a non-profit charitable corporation that operates hospital websites, including but not limited to www.ummhealth.org and www.harringtonhospital.org, which provide information to the public about UMass Memorial and access to medical records through an Epic myChart patient portal.

[3] In *Doe* and *Colleton*, UMass Memorial Health Care, Inc. is the sole defendant. The *Progin* Complaint erroneously names UMass Memorial Hospitals, Inc. as a defendant , which is the former name of the entity that is now known as UMass Memorial Community Hospitals, Inc. As for the other named defendants in *Progin*, UMass Memorial Health Care, Inc. is their ultimate parent company. *See Progin* Dkt. 2. This Omnibus Opposition refers to a singular "Defendant" and/or "UMass Memorial" for simplicity to encompass all Defendants.

website. *See, e.g.*, *Doe* Compl. ¶¶ 16, 17, 74–76; *Colleton* Compl. ¶¶ 14–16; *Progin* Compl. ¶¶ 19–21. As UMass Memorial's alleged efforts were in furtherance of assisting the federal government's goal, this is sufficient to effectuate removal to this Court under the federal officer removal statute, which must be liberally and broadly construed. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In like circumstances, at least two district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). Because those cases are directly on point, well-reasoned, and consistent with longstanding Supreme Court and First Circuit precedent, UMass Memorial respectfully urges the Court to follow them and similarly deny Plaintiffs' motions to remand.

## II. STATEMENT OF FACTS

In this case, Plaintiffs' complaints directly challenge actions that UMass Memorial allegedly took in connection with optimizing and monitoring traffic to its website that links to an electronic health record patient portal. For reasons discussed below, driving website traffic to the patient portal assists the federal government in carrying out its federal mission to create a unified system for patient electronic health records and optimizing patient access to their own health information.

### *A. President Bush Establishes the Position of National Health Information Technology Coordinator*

In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("National Coordinator"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

Through the Executive Order, President Bush further ordered the National Coordinator to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

### *B. The National Coordinator Makes Access to Online Health Care Records a National Priority*

From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at pg. e (July 21, 2004). But years later, when the percentage of Americans accessing their health information online remained low, the National Coordinator reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." *Id.* (emphasis added). *See also, e.g.*, Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

### *C. Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

In 2009, Congress codified the Office of the National Coordinator ("ONC") in the Health Information Technology for Economic and Clinical Health Act of 2009. American Recovery and

Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 247 (2009).[4] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [National Coordinator]." *Id.*

As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and

[4] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

### *D. The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs*; *Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, at 44321.

One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability to *view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements,* HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

The regulations required health care providers to attest to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for

"[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

### *E. The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*

To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use*." *Id.* (emphasis added).

### *F. UMass Memorial Acted in Response to and in Furtherance of this Federal Directive*

UMass Memorial gave its patients the opportunity to access their personal electronic health records with UMass Memorial through an Epic myChart patient portal. *See Doe* Compl. at ¶¶ 5, 36; *see also Doe* Compl. ¶¶ 74–75 (discussing patient portal); *Progin* Compl. ¶ 20 (same). In

UMass Memorial's patient portal, patients can access medical information, including medical test results. *See* Alper Decl. ¶ 6. Every year, UMass Memorial has submitted reports on its involvement in the Meaningful Use Program[5] to the Center for Medicare and Medicaid Services (CMS). *Id.* ¶ 8. These reports have been specifically prepared in order to meet federal Meaningful Use requirements and included submissions regarding the UMass Memorial patient portal and patients' use of that portal. *Id.* In the years that UMass Memorial satisfied the Meaningful Use Program criteria, UMass Memorial and its hospitals and providers received incentive payments from the federal government for their development and use of the UMass Memorial patient portal. *Id.* ¶ 9. UMass Memorial has been successful in meeting federal Meaningful Use criteria at least in part because of increased patient awareness and increased patient use of the UMass Memorial patient portal. *Id.* ¶ 10. Plaintiffs' complaints challenge UMass Memorial's website management practices designed to increase web traffic and increase engagement with UMass Memorial's website in furtherance of the goals of the Meaningful Use Program. *See, e.g.*, *Doe* Compl. ¶¶ 4, 17, 29, 44–48, 52–54, 71, 122.

## III. STANDARD OF REVIEW

The federal office removal statute permits removal when the defendant is "any officer (or *any person acting under that officer*) of the United States or of any agency therefore, in an office or individual capacity, for or *relating to* any act under color of such office ..." 28 U.S.C. § 1442(a)(1) (emphasis added). As a threshold matter, the Supreme Court has made clear that the federal officer removal statute ***must*** be "liberally construed" in favor of removal jurisdiction. *See Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 n.3 (1st Cir. 2022) (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). Indeed, "the policy favoring removal 'should not be

[5] The Meaningful Use Program is now known as the Promoting Interoperability Program.

frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 n.5 (D. Mass. 2008) (citing *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). This is unlike the typical presumption that federal jurisdiction is limited. *See, e.g., In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 466–67 (3d Cir. 2015). In this significant way, the federal officer removal statute differs from other removal statutes. *O'Connell*, 544 F. Supp. 2d at 54 n.5.

Contrary to Plaintiffs' merits-based characterizations of their cases, the Court instead must "credit [defendant's] theory of the case." *See Jefferson Cnty., Ala. V. Acker*, 527 U.S. 423, 432 (1999). The Court therefore construes the facts in the removal notice in the light most favorable to the defendant. *See, e.g., Shepherd v. Air & Liquid Sys. Corp.*, No. CA 12-143L, 2012 WL 5874781, at *5 (D.R.I. Nov. 20, 2012).

To invoke federal officer jurisdiction, UMass Memorial must show that (a) it is a "person" within the meaning of the statute; (b) it "act[ed] under" a federal officer; (c) there is some causal connection between its actions and plaintiff's claims; and (d) it can assert a "colorable federal defense." *Moore*, 25 F.4th at 34 (citations omitted).

Plaintiffs concede that UMass Memorial is a "person" but argue that: (1) UMass Memorial is not "acting under" a federal authority because it was not "told," "directed," or "ordered" by a federal authority to implement the Meaningful Use program or use the Facebook pixel; (2) there is no "causal connection" between UMass Memorial's actions and any federal authority; and (3) UMass Memorial has failed to raise a colorable federal defense. Each argument fails.

## IV. ARGUMENT

### *A. UMass Memorial was "Acting Under" a Federal Authority When Implementing the Meaningful Use Program*

"'The words 'acting under' are broad,' and the Supreme Court has made clear that the statute ***must*** be 'liberally construed.'" *Watson*, 551 U.S. at 147 (emphasis added). To that end, the Supreme Court in *Watson* has identified several factors courts should consider (liberally) in determining whether a person is "acting under" a federal officer for purposes of jurisdiction:

First, the Court considers whether the person is acting on behalf of the officer in a manner akin to an agency relationship. *Id.* at 151–52; *see also Moore,* 25 F.4th at 34 n.3. Second, the Court considers whether the person is subject to the officer's close direction, such as acting under the "subjection, guidance or control" of the officer, or in a relationship which is an unusually close one involving detailed regulation, monitoring or supervision. *Watson*, 551 U.S. at 151; *Moore,* 25 F.4th at 34 n.3. Third, the Court considers whether the private person is assisting the federal officer in fulfilling basic government tasks that the Government would have to perform if it had not contracted with a private firm. *Watson*, 551 U.S. at 153–54; *Moore,* 25 F.4th at 34 n.3.

#### *a. UMass Memorial Assisted the Federal Government in Building a Nationwide Electronic Health Records System*

With regard to the first factor (the type of relationship between the entity and the federal government), *Watson* clarified that the types of relationships that may trigger the federal officer removal statute include, *but are not limited to*, those established by contract, *payment*, employer-employee relationships, and agent-principal arrangements. 551 U.S. at 156. In arguing that UMass Memorial was not an agent of the government and/or was "ordered" by the government to act, Plaintiffs misstate the legal standard. *See Doe* Dkt. 10 at 7, 10–16; *Colleton* Dkt. 13, Ex. 1 at 5–8; *Progin* Dkt. 14 at 10–11. The proper question is whether the private entity's complained-of conduct

"'involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152 (emphasis in original). That requirement is met here.

A close examination of UMass Memorial's actions within the Meaningful Use program demonstrates that UMass Memorial was *at minimum* assisting the federal government. The government paying providers like UMass Memorial for their compliance with the Meaningful Use program (*see* Alper Decl.¶¶ 5, 8) reflects the "payment" relationship *Watson* specifically identified as one that can satisfy the "acting under" requirement. 551 U.S. at 156. This payment relationship demonstrates how the federal government used private healthcare providers like UMass Memorial to fulfill a federal goal, not merely regulating healthcare providers. *Moore*, 25 F.4th at 35 n.3.

In *UPMC*, as in this case, plaintiffs sought redress under state law for a hospital system's alleged unauthorized disclosure of their personally identifiable information to third parties (including Facebook) for marketing purposes. 2020 WL 4381675 at *1. The *UPMC* court explained:

> UPMC, as a participant in the Meaningful Use Program, *receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria.* (ECF No. 1, at ¶ 39). In particular, UPMC must, among other things, *raise awareness and increase usability of the UPMC website and the MyUPMC portal*. Id. at 1, ¶ 42. Plaintiffs' Complaint *addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. The fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network* shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*. And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore "acting under" a federal superior for purposes of the federal officer removal statute.

*UPMC*, 2020 WL 4381675 at *6 (emphasis added). But the federal government has done more than simply provide payment. The Meaningful Use program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the

program through UMass Memorial submitting detailed reports on patient portal activities. *See* Request for Judicial Notice ("RJN"), Ex. B, 2011-2015 Fed. Health Info. Strategic Plan. Through these reports, the federal government monitored UMass Memorial's activities in increasing the use of the patient portal. *See* Alper Decl. ¶ 7. The federal government also offered a model for providers to follow that uses third-party marketers like Facebook to increase engagements.[6]

Indeed, the federal government has repeatedly emphasized the collaborative nature of the Meaningful Use program, further highlighting the close relationship between the government and UMass Memorial:

- "[F]ederal agencies" were to "**collaborate** with … **private stakeholders** to … build a culture of electronic health information access and use."[7]
- "Federal, state, and local governments, along with the **private sector,** have **worked together** to help digitize health information and healthcare."[8]

While Plaintiffs argue that such statements of collaboration show that UMass Memorial was not under the *direction* of the federal government (*Doe* Dkt. 10 at 15; *Colleton* Dkt. 13, Ex. 1 at 11), this ignores that it is the National Coordinator who is responsible for leading this effort. *See* RJN, Ex. A (Exec. Ord. 13,335).

Under nearly identical facts, the *UPMC* and *ProMedica* courts held that the healthcare providers acted like government contractors in implementing the Meaningful Use program, thus

---

[6] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

[7] *See* RJN, Ex. D, ONC's updated 2015-2020 Federal Health IT Strategic Plan, at 8.

[8] *See* RJN, Ex. E, ONC's updated 2020-2025 Federal Health IT Strategic Plan, at 2.

qualifying for removal under Section 1442(a)(1).[9] *UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3. As the *ProMedica* Court explained: "The aim of [the Meaningful Use program] is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' prong." *Id.* (emphasis added).

Other courts have ruled differently, as Plaintiffs note, including *Doe v. BJC Health System*, No. 4:22-CV-919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023), *Quinto v. The Regence of the Univ. of Cal.*, No. 3:22-cv-04429-JD, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023), and *Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan. 25, 2023). Those decisions were wrongly decided or distinguishable.

*BJC* is currently being appealed to the Eighth Circuit and had focused its decision on the view that the statute "neither authorizes nor obligates the federal government to create the [electronic health records] itself." 2023 WL 369427 at *4. But this reading ignores the ***obligations*** placed on the National Coordinator in Executive Order 13335, which provided that the National Coordinator "***shall***, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." *See* RJN, Ex. A. (emphasis added).

[9] While *UPMC* and *ProMedica* are decisions by district courts within the Third and Sixth Circuits, respectively, First Circuit law does not differ from Third or Sixth Circuit law in any way that would support a different outcome. *See, e.g.*, *Moore*, 25 F.4th at 35 n.3 (citing to Third Circuit decision). The federal officer removal statute is a federal statute that has been interpreted by the Supreme Court on both the "acting under" and the "relating to" language at issue, as the First Circuit has explained. *Id.*; *see Watson*, 551 U.S. at 151–52; *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Thus, there can be no circuit split; there is only different case law decided on its own unique facts analyzing whether or not removal is appropriate under the Supreme Court's guidance.

*Cape Cod* was decided *sua sponte* without either party having had the opportunity to brief the issues and ignored the fact that health care providers do far more than simply comply with the law. Slip op. at ECF No. 10. It also determined that the defendant had not presented a colorable defense, without analyzing the HIPAA duty-based defense or the type of federal preemption defense raised by UMass Memorial here. *Id.*

Similarly, *Quinto* emphasized that "merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction." 2023 WL 1448050 at *3. Again, UMass Memorial is not merely subject to a regulatory scheme, but rather has been paid incentive benefits by the federal government to fulfill the government's own mission of developing a nationwide electronic health records system. *See* Alper Decl. ¶¶ 5, 8. Furthermore, *Quinto* relied on two cases in the Ninth Circuit where the "private entity's conduct was clearly related to a federal policy or program, but not a specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute." 2023 WL 1448050 at *3. Unlike here, where the obligation of the National Coordinator in Executive Order 13335 led to the development of a nationwide electronic health records infrastructure. *See* RJN, Ex. A.

Courts within the First Circuit have regularly accepted cases removed under the federal officer removal statute in circumstances where, like here, the entity "assist[ed]" or "help[ed] carry out" the tasks of the federal government. *See, e.g., Moore,* 25 F.4th at 34 n.3 (holding that "the words 'acting under' are 'broad' and 'liberally construed'"); *O'Connell*, 544 F. Supp. 2d at 55 (finding that defendant's "affidavits and attached exhibits clearly establish a plausible" federal government reliance); *Shepherd*, 2012 WL 5874781 at **4–5 (same).

***b. UMass Memorial Followed the Close Direction of the Federal Government***

For this factor, the Court considers whether the defendant is subject to the officer's close direction, such as acting under the "subjection, guidance, or control" of the officer. *Moore,* 25

F.4th at 34 n.3. Plaintiffs argue that UMass Memorial is not "acting under" a federal authority because it was not "told," "directed," or "ordered" by a federal authority (*Doe* Dkt. 10 at 1, 7, 8, 10, 11, 18, 19; *see also Colleton* Dkt. 13, Ex. 1 at 5–7; *Progin* Dkt. 14 at 8-13), but rather "decided to partake in the Meaningful Use Program . . ." *Doe* Dkt. 10 at 13. As a threshold matter, Plaintiffs misstate the legal standard.[10] The entity need not be under direct orders by a federal authority, as the First Circuit has long recognized. *See Moore*, 25 F.4th at 34 n.3 (recognizing First Circuit precedent for broadly construing "acting under" a federal officer); *see also Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1248 (9th Cir. 2017) ("Nowhere [is there] support for the proposition that only non-discretionary choices qualify for removal."). To the contrary, "[f]or a private entity to be "acting under" a federal officer, the private entity must be involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," which is precisely what UMass Memorial is doing here. *Moore,* 25 F.4th at 34 n.3 (citing to *Watson*, 551 U.S. at 147) (emphasis in original). "And the words 'acting under' are 'broad' and 'liberally construed.'" *Id.*

As the *UPMC* and *ProMedica* decisions illustrate, participation in the Meaningful Use Program is sufficient to satisfy the "acting under" requirement. The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior." *Id.* at *4. "The private entity need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.* at *5.

[10] *Doe* Plaintiff complains that UMass Memorial did not attach an "affidavit" or "declaration" to its already-detailed notice of removal. *Doe* Dkt. 10 at 6. Plaintiff cites to no law requiring this because there is none. To the contrary, 28 U.S.C. § 1446(a) only requires a "short and plain statement of the grounds for removal," which is precisely what UMass Memorial prepared.

Here, the Meaningful Use program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the program through UMass Memorial submitting detailed reports on patient portal activities. Alper Decl. ¶ 7. The federal government also offered a model for providers to follow that uses third-party marketers like Facebook to increase engagements.[11] Thus, UMass Memorial's actions go well beyond that of merely complying with federal laws and regulations and illustrate at least "detailed regulation" or "monitoring" by the federal government. *See* RJN, Ex. B at 7 ("monitor[] health IT successes"); *Moore*, 25 F.4th at 35; *see also UPMC*, 2020 WL 4381675 at *6 (describing the criteria required for compliance with the Meaningful Use program). Thus, in implementing the Meaningful Use program, UMass Memorial followed the close direction of the federal government.

#### c. *If not for Private Actors Like UMass Memorial, The Federal Government Itself Would Have Had to Build the Electronic Records System*

In the absence of UMass Memorial's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its federal mission of digitizing health information and increasing engagement with Medicare beneficiaries. *See* RJN, Ex. D at 4 ("participation of over thirty-five federal entities… demonstrate the extensive interest across the government to digitize the health experience for all individuals"); *see also Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (defendant performed a job that the government itself would otherwise have to do). As the *UPMC* court recognized, the "federal government, as one of the largest purchasers of healthcare services,

[11] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States." *UPMC*, 2020 WL 4381675 at *5.

Indeed, President Bush's Executive Order 13335 created a mandatory obligation that the National Coordinator "*shall*, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." RJN, Ex. A. (emphasis added).

Without the use of private entities, the National Coordinator would be responsible for building this electronic records system itself.

***d. Plaintiffs' Case Law is Inapt and Distinguishable***

In their Motions, Plaintiffs rely on cases that are distinguishable and inapt. For example, *Ohio State Chiropractic* involved a contract between CMS and an insurance company participating in the Medicare Advantage Program. *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622–23 (6th Cir. 2016). The insurance company "profit[s] by providing care at a cost lower than the value of [per-beneficiary rates set by CMS]." *Id.* at 624. This has nothing to do with the federal government using healthcare entities to fulfill the federal goal of a nationwide internet healthcare system. *See UPMC*, 2020 WL 4381675 at **4–6; *ProMedica*, 2020 WL 7705627 at **2–3. As the *Doe* Plaintiff acknowledges by citing to *White v. United States*, 2017 WL 3262165, at *1 (E.D. Tex., 2017),[12] the Meaningful Use Program served "to improve the quality and cost of health care in the United States," a momentous undertaking.

Plaintiffs otherwise cite to cases holding that a private actor's mere compliance with regulations or orders does not satisfy the "acting under" requirement. *See Doe* Dkt. 10 at 12 (string-citing cases); *Progin* Dkt. 14 at 11 (same). Again, this argument is a red herring because this case

---

[12] *White* did not involve the federal officer removal statute.

involves far more than simply complying with regulations or orders; as noted, it involves the federal government relying on healthcare entities to fulfill the federal mission of a nationwide digitized healthcare system. *See UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3. Moreover, no arms-length business arrangements with the federal government are at issue like in *Rhode Island v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50 (1st Cir. 2020). As the *UPMC* and *ProMedica* courts held, the relationship between the healthcare entity and the federal government here is more akin to a government-contractor relationship. *UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3.

This is also why the First Circuit's decision in *Moore* is instructive. *Moore* involved a federal contractor removing a case involving injuries allegedly arising from a product manufactured for the government, and explained that "[c]ourts have consistently held that the 'acting under' requirement is *easily satisfied*" in that context. *Moore*, 25 F.4th at 34 n.3 (citing to cases). Similarly here, and like the providers in *UPMC* and *ProMedica*, UMass Memorial functions like a federal contractor by implementing and/or assisting in implementing federal policy to nationalize the health information technology infrastructure. *See also* Alper Decl. ¶¶ 5–9.

***e. Plaintiffs' Efforts to Attack UPMC and ProMedica Miss the Mark***

The *Doe* and *Colleton* Plaintiffs do not attempt to distinguish *UPMC* or *ProMedica*, and simply attempt to attack the decisions on two unavailing grounds: [13]

First, *Doe* Plaintiff complains that the *UPMC* court "incorrectly conflated" the meaningful use of patient portals and the use of public-facing hospital websites. *Doe* Dkt. 10 at 16. Yet, just like in *UPMC*, *Doe* Plaintiff's Complaint targets, not only the public website, but also the UMass

[13] The *Doe* Plaintiff attempts to minimize *ProMedica*: "In *ProMedica*, the Northern District of Ohio simply applied the holding of *UPMC*," without explaining the court's reasoning. *See Doe* Dkt. 10 at 15. The *Colleton* Plaintiff attempts to brush both on-point decisions off, contending courts "have rejected [their] line of reasoning." *See Colleton* Dkt. 13, Ex. 1 at 7.

Memorial patient portal. *See, e.g.*, *Doe* Compl. ¶ 75 (discussing "clicking a button to register, login, or logout of a patient portal"); *id.* ¶ 190 (discussing "appointments," "bill payment," and "logins"). *Doe* Plaintiff is careful not to contend otherwise in his motion. Moreover, the public-facing website is relevant to the Meaningful Use Program because (a) it contains a link to UMass Memorial's patient portal, and (b) its design and functionality help drive patient engagement and usership, as *Doe* Plaintiff himself acknowledges. *See, e.g., Doe* Compl. ¶¶ 4, 90, 17, 29, 44-48, 52–54, 71, 122, 140.

Second, the *Doe* Plaintiff complains that the *UPMC* court "incorrectly focused on the fact that the defendant hospital received an incentive payment for creating and maintaining EHR." *Doe* Dkt. 10 at 16. This argument misses the mark. As the *ProMedica* court succinctly explained: "Because Defendant's participation assisted the federal government in achieving th[e] goal [of creating a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong." *ProMedica*, 2020 WL 7705627 at **2–3. The financial incentives under the Meaningful Use Program illustrate how UPMC and countless other medical providers (including UMass Memorial) have assisted the federal government by "rais[ing] awareness and increas[ing] usability of the UPMC website and the MyUPMC portal." *UPMC*, 2020 WL 4381675 at *6. Moreover, the two cases cited by the *Doe* Plaintiff in support did not involve incentive payments and had nothing to do with the federal goal of a nationwide internet healthcare system. *See Shell Oil*, 979 F.3d at 59[14] ("three contracts with the federal government related to the production of oil"); *Ohio State Chiropractic* 647 F. App'x at 622–24 (contract between CMS and insurance company participating in Medicare Advantage Program).

[14] The *Shell Oil* judgment was vacated by the Supreme Court and the case was remanded to the First Circuit on procedural grounds. *Shell Oil Prod. Co. v. Rhode Island*, 210 L. Ed. 2d 830 (2021).

### *B. UMass Memorial Easily Satisfies the "Relating To" Requirement*

In 2011, Congress amended the federal officer removal statute to *broaden* the scope of removable claims by adding the relevant "related to" language. *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (2011) (adding "or relating to" language to the provision).

The Fifth Circuit explained, through this statutory amendment, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (emphasis in original); *see also id.* at 296 (same).

Similarly, the First Circuit recently clarified that "[c]ircuits have consistently given this requirement a *broad reading* and held that *no causal link is required*." *Moore,* 25 F.4th at 35 (emphasis added). As the United States Supreme Court has explained, "[t]he ordinary meaning of these words is a broad one—'to stand *in some relation*; to have *bearing or concern*; to *pertain*; refer; to bring into *association* with or *connection* with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (citing to Black's Law Dictionary 1158 (5th ed. 1979)) (emphasis added).

Here, the "very act" of UMass Memorial's use of technology on its website and patient portal was in furtherance of the government's directive to optimize patient engagement with their medical information. *See, e.g, Doe* Compl. ¶¶ 12; 13, 16, 21.

Indeed, the *UPMC* court emphasized that plaintiffs' "allegations target mechanisms by which UPMC manages and markets its website and patient portal. *There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program*, particularly the incentives that are tied to patient participation and usability. Plaintiffs' claims are therefore 'for or relating to' an act under color of federal office." 2020 WL 4381675 at *6 (emphasis added). The *ProMedica* court also noted that "the claims alleged by

Plaintiff implicate Defendant's electronic-health-record patient portal, and Defendant's handling of this electronic information is central to the claims in this case." 2020 WL 7705627 at *3.

Consistent with the liberal construction of the "relating to" requirement, the plain language of Section 1442(a), and the guidance of the *UPMC* and *ProMedica* decisions, UMass Memorial satisfies the "relating to" requirement.

Plaintiffs argue that UMass Memorial's "installation of a hidden tool on its website that transmits patients' health data to Facebook" bears no connection or association with the Meaningful Use Program. *Doe* Dkt. 10 at 18; *see also Progin* Dkt. 14 at 19–20. Those are precisely the kind of merits-based "specific allegations" that courts have rejected in the "relating for" analysis. *See Moore,* 25 F.4th at 36 (rejecting plaintiff's attempt "to defend against removal with more specific allegations Electric Boat in particular failed to provide safe equipment, provide adequate safety measures and protection, maintain proper and safe conditions on the premises, and follow state and federal laws and regulations.").

The *Doe* Plaintiff otherwise relies exclusively on the *Shell Oil* decision. *Doe* Dkt. 10 at 18–20. In *Shell Oil*, the First Circuit flagged the obvious lack of a "nexus" between (a) defendants "damaging the environment and engag[ing] in a misinformation campaign about the harmful effects of their products on the earth's climate," and (b) "three contracts with the federal government related to the production of oil." *Shell Oil*, 979 F.3d at 59–60. Here, by contrast, as the *UPMC* court explained: the "relating to" requirement is easily satisfied because "plaintiffs' allegations target mechanisms by which UPMC manages and markets its website and patient portal," and thus "[t]here is plainly a connection or association between [the hospital's] website management and marketing strategies and the Meaningful Use program . . ." *UPMC*, 2020 WL 4381675 at *6; *see* Compl. ¶¶ 4, 17, 29, 44–48, 52–54, 71, 122.

### *C. UMass Memorial Has Presented A "Colorable Federal Defense"*

Plaintiffs also improperly argue the merits of UMass Memorial's defenses in an effort to support her claim that UMass Memorial has not presented a colorable federal defense. *Colleton* Dkt. 13, Ex. 1. at 10–11; *Progin* Dkt. 14 at 5-8. However, as UMass Memorial pointed out in its Notices of Removal, a "'colorable federal defense' need not be 'clearly sustainable,' but rather, a federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Doe* Dkt. 1 ¶ 37 (quoting *Moore*, 25 F.4th at 37); *see also Jefferson*, 527 U.S. at 431 (explaining the defendant does not have to "win his case before he can have it removed").

UMass Memorial has presented a clear and substantial duty-based federal defense under HIPAA. "In the federal officer removal context, a duty-based defense must be one that is based on a federal duty to act, or the lack of such a duty, such as denying alleged violations of a federal duty." *UPMC*, 2020 WL 4381675 at *6 (W.D. Pa. July 31, 2020) (citations and quotations omitted). Like the *UPMC* plaintiff, Plaintiffs' Complaints frames their allegations in reference to HIPAA. *See Colleton* Compl. ¶ 47 (Under HIPAA, "IP addresses are individually identifiable health information."); *Progin* Compl. ¶¶ 24, 46 (HIPAA "prohibits health care providers such as Defendants from using or disclosing individuals' protected health information…"). Consistent with persuasive caselaw on point, UMass Memorial's duty-based defense is that Plaintiffs' "protected health information" that was allegedly disclosed is not protected by HIPAA and does not constitute PHI. *Smith v. Facebook*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017) (dismissing state-law claims, rejecting argument that HIPAA applied to internet metadata because "[t]he same pages are available to every computer, tablet, smartphone, or automated crawler that send GET requests to these URLs," and thus also "[n]othing about the URLs, or the contents of the pages

located at those URLs, relates 'to the past, present, or future physical or mental health or condition of an individual'") (quoting 45 C.F.R. § 160.103, emphasis in original).

Whether HIPAA applies to Plaintiffs' browsing on a public healthcare website is a question of federal law that should be decided by federal courts. Although Plaintiff's merits-based argument misses the mark, the merits are irrelevant at this stage; the operative question is whether UMass Memorial's asserted defense is "colorable," and it is under *Smith*.

Another colorable federal defense here is preemption. "A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute." *UPMC*, 2020 WL 4381675 at *7. In *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001), the Supreme Court held that plaintiffs' state law fraud on the Food and Drug Administration claims brought against the defendant inevitably conflicted with the FDA's responsibility to police fraud consistently with the Agency's judgment and objections. The Supreme Court held that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347. As the *UPMC* court recognized under similar circumstances, "the relationship between [a health care provider] and DHHS is 'inherently federal' in nature, such that the issue of whether [Plaintiff's] state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court." *UPMC*, 2020 WL 4381675 at *7. As such, the *UPMC* court, as should this Court here, determined that the health care provider had raised colorable federal defenses.

## V. CONCLUSION

UMass Memorial respectfully asks the Court to deny Plaintiffs' motions to remand.

Dated: March 20, 2023

Respectfully submitted,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice in *Doe*)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 20, 2023 copies of the foregoing memorandum were transmitted electronically via CM/ECF System to the following recipients.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
KELLERMAN POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff John Doe*

William Patrick Doyle III
COLONNA, DOYLE AND SIMEOLOA
26 Main St, 3rd Floor
Lynnfield, MA 01940
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

*Attorneys for Plaintiff Lisa Colleton*

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff Janice Progin*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

10

Suffolk Superior Civil Court

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

22-2889

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |
| LISA COLLETON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 1:22-cv-40154-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D] |
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., *et al.*,<br><br>Defendants. | Case No.: 4:23-cv-10113-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS UMASS MEMORIAL HEALTH CARE, INC., *et al.*'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND**

Pursuant to Federal Rules of Evidence ("FRE"), Rule 201(b), Defendant UMass Memorial Health Care, Inc. ("UMass Memorial")[1] respectfully requests that the Court take judicial notice of the information and facts contained in the following listed Exhibits (the "Request"). These Exhibits constitute self-authenticating evidence under FRE 902(5), and require no extrinsic evidence of authenticity in order to be admitted, because they are official publications issued by public authorities. Additionally, the information and facts in the Exhibits are not subject to reasonable dispute because they can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned.

Attached as **Exhibit A** is a true and correct copy of Executive Order 13,335–Incentives for the Use of Health and Information Technology and Establishing the Position of the National Health Information Technology Coordinator, dated April 27, 2004, and obtained from the United States Government Publishing Office website, GovInfo.gov, at https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf.

Attached as **Exhibit B** is a true and correct copy of the Office of the National Coordinator for Health Information Technology's ("ONC") 2011-2015 Federal Health Information Technology Strategic Plan obtained from the ONC website, HeathIT.gov, at https://www.healthit.gov/sites/default/files/utility/final-federal-health-it-strategic-plan-0911.pdf.

Attached as **Exhibit C** is a true and correct copy of the ONC's publication entitled "Connecting Health and Care for the Nation: A 10-Year Vision to Achieve an Interoperable Health

[1] In *Doe* and *Colleton*, UMass Memorial Health Care, Inc. is the sole defendant. The *Progin* Complaint erroneously names UMass Memorial Hospitals, Inc. as a defendant, which is the former name of the entity that is now known as UMass Memorial Community Hospitals, Inc. As for the other named defendants in *Progin*, UMass Memorial Health Care, Inc. is their ultimate parent company. *See Progin* Dkt. 2. This Request for Judicial Notice refers to a singular "Defendant" and/or "UMass Memorial" for simplicity to encompass all Defendants.

IT Infrastructure," obtained from the ONC website, HeathIT.gov, at https://www.healthit.gov/sites/default/files/ONC10yearInteroperabilityConceptPaper.pdf.

Attached as **Exhibit D** is a true and correct copy of ONC's 2015-2020 Federal Health IT Strategic Plan obtained from the ONC website, HealthIT.com, at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf.

Attached as **Exhibit E** is a true and correct copy of ONC's 2020-2025 Federal Health IT Strategic Plan, obtained from the ONC website, HealthIT.gov, at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf.

UMass Memorial respectfully submits that, pursuant to FRE 201(c)(2), the Court should grant the Request in its entirety, because UMass Memorial has supplied the Court with all necessary information to allow the Court to take judicial notice of the attached Exhibits and the information and facts contained therein.

Dated: March 20, 2023

Respectfully submitted,

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice in *Doe*)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. [signature]
Asst. Clerk

II

Suffolk Superior Civil Court

22-2889

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022 |
| LISA COLLETON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-40154 |
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., et al.,<br><br>Defendants. | Case No.: 4:23-cv-10113-ADB |

**OMNIBUS REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND**

Despite the growing consensus across the country rejecting UMass's theory of federal officer jurisdiction, UMass insists that all those other cases—including a decision from the District of Massachusetts—got it wrong. UMass says that a private party who voluntarily complies with a regulatory scheme assists the government with its stated goals and should therefore enjoy the privilege of litigating state law claims in federal court. That argument is even less persuasive now than when UMass improvidently removed these cases just a few months ago.

UMass's argument for federal officer jurisdiction suffers from three fundamental defects. First, UMass performed no basic governmental task. That is, by facilitating the interception of communications between UMass and Facebook, Google, and other third parties through tracking pixels, it was not performing a task the federal government would have had to do in UMass's absence. Participating in regulatory programs does not count as "acting under" a federal officer. Moreover, UMass fails to point to a single regulatory direction that required UMass to install the Meta Pixel or to keep the installation of Meta Pixel and similar tracking technologies secret from website users.[1] Second, because no federal officer directed UMass to install the Meta Pixel or similar tracking technologies, the misconduct Plaintiffs allege does not "relate to" any official authority. Finally, UMass identifies no colorable federal defense to any state-law claims it faces, and it cites ***no*** authority whatsoever providing for any federal defense to any of Plaintiffs' claims.

In short, UMass fails to establish any of the three requirements under First Circuit precedent, which are each required to permit this Court to assert jurisdiction over the parties' disputes.[2] The Court should remand the three cases.

---

[1] For simplicity, Plaintiffs refer to the secret interceptions enabled by the Meta Pixel, but that does not change the discussion or analysis of the removal issues for Google Analytics and other tracking technologies implicated by Plaintiffs' complaints.

[2] On the very first page of its argument, UMass rewrites the First Circuit's test for whether a private party acts under a federal officer to support jurisdiction. Defs.' Omnibus Opp. Plas.' Mot. Remand ("Resp.") 9. The First Circuit does not follow the multi-factor test used by the Ninth Circuit, or any variation of it, as UMass impliedly argues throughout

**A. UMass was not "acting under" a federal officer's authority when it secretly installed the Meta Pixel.**

**1. Developing UMass's website for UMass's patients is not a basic governmental task that a federal officer would have done if UMass had not.**

UMass argues that it assisted the federal government to carry out the duties or tasks of a federal superior. Resp. 10. But it never identifies any basic governmental task that it completes as a substitute for the government. *See* Resp. 9–13. This omission is dispositive. To prevail on its federal officer jurisdiction theory, it is not enough that a private company be subject to some "subjection, guidance, or control" ***in general.*** Were that enough, practically all companies would be federal officers, given the breadth of federal regulations, which touch nearly all companies in some fashion. *See, e.g., Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-CV-10080, Elec. Order at ECF No. 10 (D. Mass. Jan. 25, 2023). Instead, to support federal officer jurisdiction, a company must "go[] beyond simple compliance with the law and help[] [federal] officers fulfill other basic governmental tasks." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153 (2007). That is, the relevant federal "subjection, guidance, or control" must relate to the private company's performance of a "basic governmental task"—a task that the federal officer would have been bound to do himself had such a task not been delegated to the private company. *See id.* at 153–54 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform").

*Watson* draws the critical distinction between "regulation" and "delegation." *Id.* at 157 (finding removal improper where federal direction at issue "sounds to us like regulation, not

its response. Instead, the First Circuit requires ***each*** of the three elements be met. *Compare Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (three burdens for private party seeking removal), *with Cnty. San Mateo v. Chevron Corp.*, 32 F.4th 733, 759 (9th Cir. 2022) (laying out multi-factor analysis).

delegation"). The former does ***not*** support federal jurisdiction, while the latter ***may*** support jurisdiction if the other requirements of the removal statute are met.

Here, the "tasks" UMass attempts to identify reflect broad, aspirational, regulatory goals; they do not reflect the federal government's delegation to UMass of any truly basic governmental task. UMass argues that it is helping the government "build a culture of electronic health information" and "help[ing] digitize health information and healthcare." Resp. 11. These quotes—taken from sub-regulatory strategic plans rather than legislation or regulation—reflect classic ***regulatory*** goals; they do not explain how UMass's development of its website or digitization of medical records fulfill any basic governmental task. Moreover, UMass ignores the specific acts giving rise to liability here—the secret deployment of Meta Pixel and other tracking technologies on the UMass website. There is no suggestion that any federal officer had any duty to perform any action Plaintiffs describe in their complaints. Even Executive Order 13335, which UMass cites repeatedly throughout its response, does not include such obligations. *See* Resp. 12, 16 (Office of the National Coordinator of Health Information "***shall***, to the extent permitted by law, ***develop***, ***maintain***, and ***direct*** the ***implementation of a strategic plan to guide*** the nationwide implementation of interoperable health information technology") (emphasis added).

UMass tells the Court the government would have to build an electronic records system without UMass but then includes no citations that prove this conclusory remark. *See* Resp. 15–16 (citing Executive Order 13335, a Fifth Circuit opinion about a manufacturer of Agent Orange, and misquoting a strategic plan about "thirty-five federal entities that worked in concert to develop this [Strategic] Plan"). Similarly, it claims that the "development of a nationwide electronic health records infrastructure" is a "specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute," but never points

to any evidence that setting up such databases is a traditional responsibility of the government or something assumed by statute. Resp. 13 (quoting and comparing to *Quinto v. Regs. Univ. Cal.*, No. 3:22-cv-04429-JD, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023)). Without such evidence, the suggestion that the federal government traditionally creates databases of private health information borders on the absurd. More to the point, Plaintiffs' claims do not concern the development of "health records infrastructure"; instead, they relate to the secret deployment of tracking technologies on the UMass website. UMass offers nothing to show that the conduct at issue reflects any basic governmental task. UMass cannot show that it is doing something that the federal government must do in UMass's absence.

As a result, UMass is engaging in no more than the "voluntary and unilateral adoption of a practice that may be consistent in some respects with a nonbinding federal policy." *Cape Cod*, No. 1:23-CV-10080, Elec. Order at ECF No. 10. The Supreme Court is clear that this type of "help" or "assistance" is not at all what the removal statute encompasses. *Watson*, 551 U.S. at 152 ("the help or assistance necessary to bring a private person within the scope of the statute does ***not*** include simply ***complying*** with the law") (emphasis added).

In this regard, UMass's failure to meaningfully distinguish *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622–23 (6th Cir. 2016) is glaring. Resp. 16. There, Humana was administering private health-insurance benefits to Medicare-eligible patients under contract with the Centers for Medicare & Medicaid Services ("CMS") in accordance with the Medicare Advantage program—otherwise known as Medicare Part C. *Humana Health Plan, Inc.*, 647 Fed. App'x at 620–21. UMass remarkably states that *Humana* "has nothing to do with the federal government using healthcare entities to fulfill the federal goal of a nationwide internet healthcare system." Resp. 16. The case, however, stands for the proposition that even when the

federal government contracts with a private party to fulfill the federal goal of ***administering Medicare, that was still not enough*** to be "acting under" a federal superior. Critical to this holding was the Sixth Circuit's answer to the question, "[D]o [Medicare Advantage Organizations] perform a job that the government would have to perform itself if it did not contract with private firms?" *Id.* at 624.

> We think not. If no health insurer chose to contract with CMS as an MAO, it is doubtful that the government would get into the business of offering its own MA plans. It certainly doesn't ***have*** to. More likely, it would fall back on traditional fee-for-service Medicare—which it must provide regardless.

*Id.* (bold added). Does UMass perform a job that the government would have to perform itself if it did not provide incentive payments to UMass? No. If UMass chose not to submit applications for incentive payments under the Meaningful Use Program, it is doubtful that the government would (or could) get into the business of creating and maintaining electronic health records for UMass's patients. It is even more doubtful that the government would secretly inject hidden code into a website causing the unauthorized disclosure of healthcare consumers' communications with social media and technology companies. UMass has pointed to no legal requirements suggesting the government would do so.

UMass is a regulated entity responding to federal incentives to make more money. It is not performing any basic governmental function that federal agents would perform in UMass's absence.

**2. Voluntary participation with regulatory programs is no different than complying with regulations.**

UMass repeats throughout its response that it is subject to detailed regulations and submits detailed reports for the federal government's alleged monitoring as if this were material. Resp. 9, 11, 15. This is entirely irrelevant and likely driven by a misreading of controlling authority. There is a clear distinction between federal contractors subject to detailed commands in connection with

performing some basic governmental task (who are "acting under" federal authorities) and private actors complying with detailed regulations in their industry (who are not).

*Watson* notes that certain federal ***contractors*** may be "acting under" a federal authority where the contracts provide detailed regulation, monitoring, or supervision. *Watson*, 551 U.S. at 153 ("[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision"). First Circuit precedent for certain federal contractors is the same. *See, e.g.*, *Moore*, 25 F.4th at 35–36 ("The Navy oversaw ***every aspect of the design, construction, maintenance, and modernization*** of the submarine, including the use of asbestos in the construction of the submarine. The undisputed record demonstrates that Moore's claims clearly 'relate to' Electric Boat's contracted work while 'acting under' the Navy.") (emphasis added); *see also Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 136 (D. Mass. 2009) ("Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, ***but only under certain circumstances***.") (emphasis added).

*Watson* could not be clearer. No matter how detailed or demanding regulations imposed on a private entity are, in contrast to a federal contractor, a regulated entity is not "acting under" a federal superior when it follows regulations:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Watson*, 551 U.S. at 153.

UMass points to no contract with the federal government to secretly install Meta Pixel without the consent of healthcare consumers visiting its website, or even set up its website in general or to digitize records. *See generally* Resp. Much less does UMass point to a contract that spells out "every aspect of the design, construction, [and] maintenance" of such activities. *See Moore*, 25 F.4th at 35–36. Its reliance on *UPMC* is misplaced because the relationship here is not "akin to a government-contractor relationship" without such a contract. Resp. 16–17 (citing *Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020)). The district court in *UPMC* failed to ask the question the *Humana* court answered negatively—whether the regulated party was performing a governmental function that federal agents would have otherwise had to perform. That failure explains —in part— why most courts have since declined to follow *UPMC*.

Ultimately, UMass's voluntary compliance with regulations to get incentive payments is still just compliance with regulations. Such compliance cannot support federal officer jurisdiction.

**3. UMass also failed to establish that it was subject to relevant guidance or control when installing the Meta Pixel on its website.**

Just as UMass's citations to sub-regulatory strategic plans do not support its argument that it performed a basic governmental function, UMass cites no authority to establish that the federal government told UMass to secretly install the Meta Pixel or other tracking technologies or to permit Facebook, Google, and other third parties secretly to intercept communications between healthcare consumers and UMass.

Unsurprisingly, no legislation or regulation requires UMass to install the Meta Pixel; there is certainly no regulation that requires it to do so secretly and without healthcare consumers' consent. UMass does not even attempt to argue that the government told them to install the Meta Pixel tool. *See* Resp. 9–22. UMass says the Meaningful Use Program "prescribes a specific framework and guidelines for providers to follow." Resp. 15. What do those "specific framework

and guidelines" direct a provider like UMass to do? UMass does not say. *Id.* Surely they do not indicate that UMass should inject hidden code into their website that forwards healthcare consumers' data to Facebook without their consent. *See id.*

The absence of any evidence of relevant direction or control makes UMass nothing like the contractor in *Moore*. *Contra* Resp. 10, 13–15, 17 (UMass comparing itself favorably to a manufacturer of submarines for the U.S. Navy). In *Moore*, the "Navy supervised Electric Boat's operations, had designated officials present at the Electric Boat shipyard to oversee Electric Boat's employees, and maintained a substantial presence at the shipyard, including offices, sleeping quarters, training centers, and other facilities." 25 F.4th at 33. What is more, the defendant there supported removal with the affidavit of a retired Rear Admiral who attested that the Navy "directed, controlled and approved any warnings relating to health or safety to its servicepersons such as [the plaintiff]." *Id.* In that failure to warn, negligence, and strict product liability lawsuit, the parties did not even dispute that the defendant was acting under a federal officer's authority. *Id.* at 34. Here, in contrast, UMass cannot point to any legislation, regulation, or other command that provides specific instructions for setting up and operating UMass's website, to say nothing of secretly installing the Meta Pixel.

UMass cannot be "acting under" a federal superior when it installed the Meta Pixel unless UMass establishes any relevant "subjection, guidance, or control" required UMass to secretly install the Meta Pixel. No such "subjection, guidance, or control" exists.

**4. Instead, UMass focuses on non-dispositive conduct in the First Circuit.**

1. *Payment from the government is not sufficient to establish UMass was "acting under" a federal officer.*

Rather than focus on anything material, UMass spends much of its response highlighting irrelevant aspects of its choice to comply with a voluntary regulatory program. For example,

UMass argues that receipt of an incentive payment is important in establishing that it was "acting under" a federal authority. Resp. 9–10, 13. This focus on payment stretches dicta from *Watson* much too far. *Compare Watson*, 551 U.S. at 156 ("[W]e have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement"), *with* Resp. 10 (incentives to UMass "reflect[] the 'payment' relationship *Watson* specifically identified as one that can satisfy the 'acting under' requirement").

*Watson* recognizes there may be contractor arrangements—that is, when the private party receives payments from the federal government—that may not support federal officer jurisdiction. *Watson*, 551 U.S. at 153 ("[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision"). Courts in the First Circuit have recognized this too. *See Shell Oil*, 979 F. 3d at 59–60 (rejecting that oil companies were acting under a federal officer even though they had contracts to provide oil to government); *see also Holdren*, 614 F. Supp. 2d at 136 ("Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, but only under certain circumstances.") (citation omitted).

The receipt of a payment, however, does not make one a contractor or even comparable to a contractor. Regulations often incentivize compliance either by imposing a monetary penalty on regulatory noncompliance or a monetary reward on regulatory compliance. Regulatory penalties and payments are two sides of the same coin. Indeed, as UMass's own authorities describe, the monetary incentives to which UMass cites will, over time, transition to monetary penalties,

underscoring the equivalence of regulatory incentives and penalties. *See also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health* (HITECH) Act, at p. 2 (CONG. RES. SERV. Apr. 27, 2009) ("Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified [electronic health records]."). In any event, payment is neither necessary nor sufficient to establish that a private party is "acting under" a federal authority for purposes of the statute. If it were, the federal government could not create financial incentives for various industries without simultaneously conferring federal jurisdiction over vast swaths of commercial conduct.

2. *Complying with "general auspices" of published regulation is not "acting under" a federal officer.*

UMass twice claims that the federal government "model[s] for providers" the use of third-party marketers like Facebook. Resp. 11, 15. UMass's passing references to such "modeled" behavior reflect a concession that the government did not tell UMass how to set up its website. "It is not enough to prove only that the 'relevant acts occurred under the general auspices of a federal office or officer' . . . ." *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 146 (D. Mass. 2007) (quoting *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002)). Imitating perceived government behavior does not demonstrate that the government directed UMass to secretly facilitate the interception of communications between UMass and healthcare consumers.

**5. UMass fails to distinguish the growing consensus among federal courts considering federal officer jurisdiction in similar data privacy cases.**

UMass relies heavily on *UPMC* and *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). Resp. 10–12, 14–22. It is increasingly becoming clear that these cases are outliers and wrongly decided.

In addition to the recent Meta Pixel case Plaintiffs have already cited, which UMass fails to distinguish, just last month (and one week before UMass filed its response), yet another district court rejected a medical center's attempt to gain access to the federal courts based on voluntary compliance with the Meaningful Use Program. *Heard v. Torrance Mem. Medical Ctr.*, No. CV 22-09466 DSF, 2023 WL 2475544, *3 (C.D. Cal. March 13, 2023). There, the court held that the Meaningful Use Program "directions [defendant] points to are general regulations and public directives regarding the development of health information technology and an electronic health records infrastructure. Therefore removal is not justified by federal officer jurisdiction." *Id.*

Just last week, the Central District of California again remanded a Meta Pixel case to state court for the same reasons. *See Doe v. Torrance Memorial Medical Ctr.*, No. 2:23-cv-01237, 2023 WL 2916548 (C.D. Cal. Apr. 12, 2023). The exact same conclusion applies here, as the District of Massachusetts, the Eastern District of Missouri, and the Northern District of California have each concluded. *See Doe* ECF No. 29.

**B. UMass does not show that secretly embedding the Meta Pixel on its website "relates to" any official authority.**

No federal official authorized UMass to secretly install the Meta Pixel. *Supra* Part A. Since UMass did not perform this actionable conduct under color of ***any*** federal office, no matter how "broadly" one reads the words "relating to," none of the three cases filed against UMass is "for or relating to any act under color of ***such*** office." 28 U.S.C. 1442(a)(1) (emphasis added).

UMass tries to avoid this inescapable fact by relying on *UPMC* and *ProMedica*. Resp. 19–20. These cases are misguided. *Supra* Part A. Without them, UMass can point to no other federal superior it allegedly acted under to secretly install the Meta Pixel. As a result, the actionable conduct does not "relate to" any act under color of federal office.

For a related reason, UMass's unsuccessful attempt to distinguish *Shell* is illuminating. Resp. 20. Again touting *UPMC*, UMass argues that the actionable conduct in the Plaintiffs' cases is website management and marketing strategies, which it says relates to the Meaningful Use Program. *Id.* But none of the plaintiffs seeks to hold UMass liable for website management and marketing strategies. They seek to hold UMass liable for secretly installing the Meta Pixel. This is just like the state of Rhode Island not seeking to hold Shell liable for distribution or marketing on the Naval bases, but rather for damaging the environment and engaging through a misinformation campaign. *Shell Oil*, 979 F.3d at 60. UMass fails to acknowledge that if *UPMC* had been decided in the First Circuit after *Shell*, it would have misapplied controlling authority.

Similarly, UMass seeks removal by aggressively recasting Plaintiffs' claims as challenging the use of tracking technologies like Meta Pixel generally rather than the ***secret*** use of such technologies. UMass ignores and fails to distinguish two decisions from this District that Plaintiffs cite, which draw this precise distinction in the context of the federal removal statute. *See Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020) (rejecting defense attempt to convert claim arising from deception concerning fossil fuels into a claim challenging the sale fossil fuels ***in general***, similar to how UMass ignores that Plaintiffs' claims arise from the ***secret*** use of tracking technologies); *Holdren*, 614 F. Supp. 2d at 140, 143, 150 (rejecting federal officer removal where the defendant attempted to recast plaintiff's asbestos failure to warn claims as claims challenging asbestos manufacture generally). This Court should likewise reject UMass's efforts to obtain removal by mischaracterizing Plaintiffs' claims.

**C. UMass fails to assert any colorable federal defense.**

UMass agrees that it ***must*** have a colorable federal defense to the Plaintiffs' state law claims. *See* Resp. at 21. UMass also agrees that a purported federal defense is not colorable if it is "immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and

frivolous." *Id.* at 21. Here, UMass asserts that HIPAA provides them a federal defense solely to obtain jurisdiction; the purported defense is wholly insubstantial and frivolous.

**1. Plaintiffs do not have to prove that any secretly intercepted information was protected health information under HIPAA.**

The ***only*** purported colorable federal defense UMass asserts in its Notices of Removal in *Progin* and *Colleton* is that "the information purportedly disclosed . . . is outside the purview of protected health information as defined by the Health Information Portability and Accountability Act [HIPAA]." *Progin* Notice at ¶ 41, and *Colleton* Notice at ¶ 39. UMass makes this same assertion in the *Doe* Notice at ¶ 39.[3] This is no defense at all.

The Complaints in the three removed cases allege UMass violated the Massachusetts Wiretap Act, G.L. c. 272 § 99. Violation of the Massachusetts Wiretap Act is the only claim made in the single-count Complaints in *Progin* and *Colleton.* That statute expressly prohibits the secret interception of "***any*** wire or oral communication." *Id.* § 99(B)(4) (emphasis added). As stated in the Complaint in *Progin*: "***Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or the substance of the communications intercepted.***" *Progin* Complaint ¶ 6 (emphasis added). Plaintiffs simply do not have to prove secretly intercepted communications concerned protected health information to prevail on the Massachusetts Wiretap Act claim.

Tellingly, UMass fails to cite ***any*** authority—from this circuit or elsewhere—holding that HIPAA confers a defense (either direct or affirmative) to any of the claims Plaintiffs assert here. *See* Resp. 21–22. UMass cites without elaboration to *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943

[3] UMass also asserts in *Doe* a purported federal defense of preemption of one common law claim asserted in Doe. *See* ECF No. 1 at ¶ 40. No common law claims are asserted in *Progin* or *Colleton.*

(N.D. Cal. 2017), but does not address Plaintiffs' discussion of *Smith*, in which they explain that HIPAA was potentially relevant in *Smith* because the plaintiffs there took the position that Facebook had to meet a stricter disclosure standard under HIPAA. *Compare Smith*, 262 F. Supp. 3d at 954–56, *with* Resp. 21–22. In contrast, here, no Plaintiff invokes HIPAA either as part of their proof for their claims or to respond to any defense UMass could raise. *See, e.g.*, *Doe* ECF No. 1-1 at ¶¶ 162–244; *Progin* ECF No. 15 at 7–8. HIPAA could not exist and Plaintiffs' claims would still be viable. Compliance with HIPAA is therefore hardly material to any of the claims.

**2. HIPAA does not preempt any of the Plaintiffs' claims.**

UMass pays lip service to preemption in the very last paragraph of their memorandum without even identifying what federal statute they claim preempts any state law claims here and without citing ***any*** case law that would support a "colorable" argument for preemption. *See* Resp. 22 (citing case about claim for fraudulent misrepresentation to the Food and Drug Administration being preempted by the Food, Drug, and Cosmetic Act). UMass also ignores that it never asserted preemption as a purported federal defense to the Massachusetts Wiretap Act claims in any of their three Notices of Removal.[4] Indeed, UMass's Notices of Removal in *Progin* and *Colleton* do not mention preemption at all.

Finally, UMass essentially ignores Judge Stearns' decision in *Cape Cod*, in which he emphatically rejected the notion that federal law preempts state law claims like those here. As Judge Stearns held:

> The touchtone of preemption of a state common-law or statutory claim is a clear indication of Congressional intent. *Mendes v. Medtronic, Inc.*, 18 F, 3d 13, 16 (1st Cir. 1994). This is especially true when federal law or policy is said to entrench on matters historically

[4] UMass asserts in the Notice of Removal in *Doe* a purported federal defense of preemption, but only of the common-law claim of invasion of privacy asserted in *Doe*, none of which are asserted in *Progin* or *Colleton*. The Plaintiff Doe will respond to UMass's purported preemption federal defense in that case in the *Doe* case specific reply memorandum authorized by the Court. *Doe* ECF Nos. 24–25.

> committed to the police powers of the state. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S, 218, 230 (1947). Here, Congress has given no whiff of a suggestion that the 'Meaningful Use Program' was created to displace the Massachusetts Wiretap Statute, the Massachusetts Privacy Act, or state common-law claims . . . .

No. 1:23-cv-10080, slip op. at ECF No. 10; *see also Doe* ECF No. 29-2; *Progin* ECF No. 15-1. UMass utterly fails to set forth a colorable federal defense of preemption. It is proffered here "solely for the purpose of obtaining jurisdiction" and is "wholly insubstantial and frivolous." Resp. 21.

UMass's curt treatment of the federal colorable defense requirement is notable. "It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases." *Holdren*, 614 F. Supp. 2d at 140. That UMass could barely be bothered to engage with this Constitutional requirement reflects how far afield it is from securing access to the federal courts. The Court should send these lawsuits back to the state courts where they belong.

## CONCLUSION

UMass alternatively misapplies or ignores First Circuit caselaw and champions two unpublished out-of-circuit district court decisions in its response which are incompatible with controlling authority. Ultimately, UMass's decision to secretly install and use the Meta Pixel was a private commercial decision, not the performance of a basic governmental task. The claims in the underlying complaints relate to UMass's private decision, and there is no federal defense for UMass's misconduct. Plaintiffs jointly ask for all cases to be remanded.

Dated: April 19, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for John Doe***

/s/ William P. Doyle III
William Patrick Doyle III, BBO #556999
**COLONNA, DOYLE AND SIMEOLOA**
26 Main St, 3rd Floor
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. [signature]
Asst. Clerk

Lance Spitzig
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

***Counsel for Lisa Colleton***

*/s/ Edward F. Haber*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Janice Progin***

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 19, 2023, a copy of this reply was filed electronically and served on all counsel of record via ECF:

*/s/ Edward F. Haber*
Edward F. Haber

12

Suffolk Superior Civil Court

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

22-2889

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

| | | |
|---|---|---|
| JANICE PROGIN, on behalf of herself and all others similarly situated, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 23-cv-10113-ADB |
| UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC., | * | *Related Cases:* Civil Action No. 22-cv-12022-ADB; Civil Action No. 22-cv-40154-ADB |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Janice Progin ("Plaintiff") filed this putative class action in Massachusetts Superior Court against UMass Memorial Health Care, Inc., UMass Memorial Hospitals, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance-Clinton Hospital, Inc., Marlborough Hospital, and Harrington Memorial Hospital, Inc. (collectively, "Defendant")[1] on December 20, 2022. [ECF No. 1-3 ("Compl.")]. Plaintiff alleges that Defendant shared communications about

[1] Defendant UMass Memorial Health Care, Inc. avers that (1) UMass Memorial Hospitals, Inc. has been erroneously named as a defendant, because that entity is now known as UMass Memorial Community Hospitals, Inc., and (2) UMass Memorial Health Care, Inc. is the ultimate parent company of all other named defendants, including UMass Memorial Community Hospitals, Inc. [ECF Nos. 2, 17]. As such, Defendant UMass Memorial Health Care, Inc. asserts that it is the sole properly named defendant. For purposes of this Order, the Court refers to all named defendants as "Defendant."

her private medical information with Facebook and Google without Plaintiff's knowledge or consent, in violation of the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99. [Id. ¶¶ 111–118].

Defendant removed the case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). [ECF No. 1 ("Notice of Removal")]. Presently before the Court is Plaintiff's motion to remand back to state court pursuant to 28 U.S.C. § 1447. [ECF No. 14]. Two related putative class actions were filed against Defendant, also in Massachusetts Superior Court, which Defendant also removed to this Court pursuant to 28 U.S.C. § 1442(a)(1). See [Colleton v. UMass Mem'l Health Care, Inc., No. 22-cv-40154 (D. Mass.) ("Colleton Action"); Colleton Action, ECF No. 1 ("Colleton Notice of Removal"); Colleton Action, ECF No. 1-1 ("Colleton Compl."); Doe v. UMass Mem'l Health Care, Inc., No. 22-cv-12022 (D. Mass.) ("Doe Action"); Doe Action, ECF No. 1 ("Doe Notice of Removal"); Doe Action, ECF No. 1-1 ("Doe Compl.")].[2]

Plaintiffs in the other actions also filed motions to remand. [Colleton Action, ECF No. 13; Doe Action, ECF No. 9]. Defendant filed an omnibus response to the three motions to remand, [ECF No. 17], and Plaintiffs, in turn, filed an omnibus reply in further support of their motions, [ECF No. 19].

For the reasons set forth below, Plaintiff's motion to remand, [ECF No. 14], is GRANTED.

[2] The other two actions named UMass Memorial Health Care, Inc. as the sole defendant. See [Colleton Compl.; Doe Compl.].

## I. BACKGROUND[3]

Defendant is a healthcare service provider that developed, owns, and/or operates a website, www.ummhealth.org (the "Website"), which offers a wide range of healthcare services and a patient portal. [Compl. ¶ 19; Colleton Compl. ¶¶ 2, 14; Doe Compl. ¶¶ 16–17]. Plaintiff has previously accessed the Website. [Compl. ¶ 107]. The Website collects various types of information about its users, including individuals' medical conditions and the doctors they may be seeing. [Compl. ¶ 46]; see also [Colleton Compl. ¶ 17 (describing information Website allegedly collects, including type of medical treatment and the names of physicians with whom individuals schedule appointments); Doe Compl. ¶¶ 76–77 (describing information Website allegedly collects, including type of medical treatment, diagnoses, and procedures)]. The Website uses a code analytics tool called "Facebook Pixel,"[4] [Compl. ¶ 60; Colleton Compl. ¶ 24; Doe Compl. ¶ 76], which tracks the actions of Website users and sends users' Website communications to Facebook, [Compl. ¶¶ 70–74; Colleton Compl. ¶ 27; Doe Compl. ¶ 77]. The Website also uses a code analytics tool called "Google Analytics," which communicates similar information to Google.[5] [Compl. ¶¶ 60, 63–67; Colleton Compl. ¶¶ 43–44]. Website users like

[3] For purposes of this Order, the relevant facts are drawn from the three Complaints, the three Notices of Removal, and Defendant's briefing, [ECF No. 17]. Additionally, the Court takes judicial notice of various public documents relating to the Meaningful Use Program, further discussed infra. See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008).

[4] Facebook Pixel is now called Meta Pixel.

[5] Unlike Plaintiffs Progin and Colleton, Plaintiff Doe does not address the Google analytics tool in his Complaint.

Plaintiff did not know of or consent to the sharing of their communications to a third-party. [Compl. ¶ 32; Colleton Compl. ¶¶ 40, 45; Doe Compl. ¶¶ 88, 90].

In its Notice of Removal, Defendant asserts that it optimizes and increases traffic to its Website in compliance with the Meaningful Use Program[6] ("Meaningful Use Program" or "Program"). [Notice of Removal ¶ 28; Colleton Notice of Removal ¶ 26; Doe Notice of Removal ¶ 26]. The Meaningful Use Program implements provisions of the American Recovery and Reinvestment Act of 2009. Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. 144, 44,314 (July 28, 2010). The Program was established in 2010 by the Department of Health and Human Services ("HHS") to promote the use of certified electronic health record technology in a meaningful way as "one piece of a broader [health IT] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." [ECF No. 17 at 10 (quoting Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. at 44,321)].

Also in the American Recovery and Reinvestment Act of 2009, Congress established the Office of the National Coordinator ("ONC") within HHS, and charged the ONC with various obligations, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A). The ONC provides guidance for complying with the Program, including a model website that

[6] Although the Meaningful Use Program was renamed the Promoting Interoperability Program in 2018, the parties all use the Program's original name. For consistency, the Court does the same.

uses third-party marketers such as Facebook and Google. [Notice of Removal ¶¶ 22–23; Colleton Notice of Removal ¶¶ 20–21; Doe Notice of Removal ¶¶ 20–21]. The Program provides for incentive payments of up to two percent for providers who reach certain levels of engagement with electronic health record use through providers' patient portals. [Notice of Removal ¶ 20; Colleton Notice of Removal ¶ 18; Doe Notice of Removal ¶ 18]. In the future, these payments will phase out and transition into penalties for providers that do not comply. [ECF No. 17 at 10]. Defendant submits reports to the Center for Medicare and Medicaid Services ("CMS") on its involvement in the Program, specifically related to the patient portal and patients' use of the portal. [Id. at 12].

Defendant asserts that in maintaining the Website, it is acting under the authority of the federal government. [Notice of Removal ¶¶ 28–33; Colleton Notice of Removal ¶¶ 26–31; Doe Notice of Removal ¶¶ 26–31]. Specifically, Defendant claims that through the Meaningful Use program the federal government "incentiviz[es], regulat[es], monitor[s], and supervis[es]" Defendant's use and promotion of its Website "in order to meet the federal government's national priority of interoperable health information technology." [Notice of Removal ¶ 28; Colleton Notice of Removal ¶ 26; Doe Notice of Removal ¶ 26].

## II. LEGAL STANDARD

Federal courts are courts of limited jurisdiction, "possess[ing] only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). If the Court lacks subject-matter jurisdiction over a removed action, the action must be remanded to state court. 28 U.S.C. § 1447(c).

As pertinent here, a case filed in state court may be removed to federal court pursuant to 28 U.S.C. § 1442(a)(1), which confers jurisdiction to federal courts over actions against the

"United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." As the Supreme Court has explained:

> Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties. The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice.

Arizona v. Manypenny, 451 U.S. 232, 241–42 (1981) (citations omitted).

Under § 1442(a)(1), Defendant bears the burden of establishing that (1) it is "acting under" the authority of a federal officer; (2) the charged conduct was carried out "for or relating to" the asserted official authority; and (3) Defendant has a "colorable federal defense." Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022).

Generally, "[b]ecause removal to federal court deprives the state court of jurisdiction, 'removal statutes are to be narrowly construed.'" Massachusetts v. Libertad, No. 22-cv-10131, 2022 WL 479799, at *1 (D. Mass. Feb. 16, 2022) (quoting Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009)). Conversely, the Supreme Court held that the "acting under" the authority of a federal officer language in § 1442(a)(1) should be "liberally construed," while also cautioning that this "broad language is not limitless." Watson v. Philip Morris Cos., 551 U.S. 142, 147 (2007) (quoting Colorado v. Symes, 286 U.S. 510, 517 (1932)).

## III. DISCUSSION

Plaintiff argues that the Court must remand this case back to state court because Defendant has failed to show that the Court has subject-matter jurisdiction pursuant to the federal officer removal statute. [ECF No. 15]. While Plaintiff concedes that Defendant is a "person" under the statute, Plaintiff contends that Defendant (1) was not "acting under" any federal authority with regard to the charged conduct, (2) that its conduct was not "related to" a federal

office, and (3) that Defendant cannot raise a colorable federal defense. [Id. at 6–7]. Defendant asserts that each of these elements is satisfied and that this Court therefore has subject-matter jurisdiction. [ECF Nos. 1, 17].

"'Acting under' [the authority or direction of a federal officer] connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" Rhode Island v. Shell Oil Prod. Co., 979 F.3d 50, 59 (1st Cir. 2020) (quoting Watson, 551 U.S. at 152), summarily vacated on other grounds, 141 S. Ct. 2666 (2021) (Mem.). Such help or assistance "does not include simply complying with the law." Watson, 551 U.S. at 152 (emphasis omitted) (noting that taxpayers who fill out complex tax forms or airline passengers who obey federal regulations may be assisting federal authorities but would not fall within the scope of the statute). A private firm's compliance with federal regulations does not alone constitute "acting under" a federal authority, even if the firm's activities are "highly supervised and monitored." Id. at 153 (noting that, if the rule were otherwise, the scope of the statute would be expanded considerably to include, potentially, "state-court actions filed against private firms in many highly regulated industries"); see also Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R., 319 F. Supp. 3d 587, 595 (D.P.R. 2018) (finding that "Defendants have not established that they were in any way acting under the direction of a federal superior" because although "Defendants are certainly subject to detailed federal regulations and . . . may even be 'highly supervised and monitored[,]' . . . Defendants have not shown anything to indicate that they 'assist, or . . . help carry out, the duties or tasks of the federal superior' with respect to the Medicaid program." (emphasis omitted) (quoting Watson, 551 U.S. at 153)).

Delegated duties do fall under the statute, but "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so."

Watson, 551 U.S. at 157. As relevant here, government contractors may be found to be "acting under" federal officers' authority when contractors go "beyond simple compliance with the law and help[] officers fulfill other basic government tasks," id. at 153, such as producing items that the government needs, like products used to fight a war, id. at 153–54 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998), holding modified by Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286 (5th Cir. 2020)). These tasks are obligations that "the [g]overnment itself would have had to perform" if the contractors did not. Id. at 154. As in, if the government did not contract for items used in a war effort, it would be required to make those items itself. In contrast, "receiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty." Quinto v. Regents of Univ. of Cal., No. 22-cv-04429, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023).

Defendant asserts that it is assisting the federal government in its goal of building a nationwide electronic health records system. [ECF No. 17 at 14]. Defendant further contends that the federal government has delegated duties to it in line with a contractor relationship. [Id. at 22]. In support of these contentions, Defendant points to the fact that it receives incentive payments, makes efforts to increase the use of the patient portal and Website, and reports user metrics to CMS, all in furtherance of its compliance with the Meaningful Use Program. [Id. at 15–16 (citing Doe I v. UPMC, No. 20-cv-00359, 2020 WL 4381675 (W.D. Pa. July 31, 2020))]. The Court disagrees.

To begin, the fact that the federal government provides incentive payments to Defendant for its participation in the Program does not create a contractor relationship in and of itself. If

that were the case, "the federal officer removal statute would sweep into the federal courts" countless cases involving private entities' receipt of incentive payments or incorporation of practices "consistent with a policy promoted by the federal government as socially desirable." Doe v. Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10 (D. Mass. Jan. 25, 2023). Moreover, the fact that incentive payments will, in the future, shift to penalty payments if a provider fails to comply with the Meaningful Use Program further suggests that this is a regulation rather than a government contract.

Defendant does not produce a product that the government needs, nor is it otherwise fulfilling a basic government task. Although the ONC has an obligation to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology," [ECF No. 17 at 8], participation in the Meaningful Use Program serves broad federal goals, not basic government functions, see Doe v. Hoag Mem'l Presbyterian Hosp., No. 23-cv-00444, 2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023); Crouch v. Saint Agnes Med. Ctr., No. 22-cv-01527, 2023 WL 3007408, at *5 (E.D. Cal. Apr. 19, 2023); Quinto, 2023 WL 1448050, at *2. The federal government does not have an obligation to create a health information infrastructure and, if hospital systems like Defendant chose not to maintain patient portals, like the Website, the government would not be required to create its own. See Watson, 551 U.S. at 154; Doe, I v. BJC Health Sys., No. 22-cv-00919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023).

Additionally, although Defendant submits reports to CMS and relied on guidance from the ONC in creating the Website, Defendant has not shown that the federal government exercised the type of tight control that would bring Defendant's conduct within the scope of the statute. Cf. Moore, 25 F.4th at 35–36 (finding that a contractor was "acting under" a federal

authority in building a submarine because "[t]he Navy oversaw every aspect of the design, construction, maintenance, and modernization of the submarine"). Further, the Court finds there has been no formal delegation of any of the federal government's duties to Defendant. Compare Watson, 551 U.S. at 156 (finding that the FTC's provision of testing specifications, inspection and supervision of the testing laboratories, and prohibition of statements in advertising were merely regulations that did not constitute formal delegation), with Camacho v. Autoridad de Telefonos de P.R., 868 F.2d 482, 486 (1st Cir. 1989) (finding that defendants were acting under the authority of the federal government because they "were acting under express orders, control and directions of federal officers" when wiretapping).

In sum, although Defendant's conduct may assist the federal government in achieving a broad goal, the Court finds that its participation in the Meaningful Use Program is merely compliance with federal law and is not sufficient to bring it within the scope of the federal officer statute. See Watson, 551 U.S. at 153. The Court recognizes, as Defendant points out, that some courts have found removal appropriate in similar Meaningful Use Program cases. See generally UPMC, 2020 WL 4381675; Doe v. ProMedica Health Sys., Inc., No. 20-cv-01581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). The Court nonetheless joins the number of other courts that have declined to adopt this broad interpretation of the statute in this context. See generally Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10; BJC Health Sys., 2023 WL 369427; Hoag Mem'l Presbyterian Hosp., 2023 WL 3197716; Crouch, 2023 WL 3007408; Quinto, 2023 WL 1448050.

The Court therefore finds that Defendant has failed to establish that it was "acting under" any federal authority when it engaged in the charged conduct, and, as such, has failed to establish

that this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).[7] In the absence of any other basis for subject-matter jurisdiction, this case must be remanded to state court.

## IV. CONCLUSION

Accordingly, Plaintiff's motion to remand, [ECF No. 14], is GRANTED and this matter is remanded to state court for further proceedings.

**SO ORDERED.**

July 13, 2023

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

[7] Because Defendant has failed to meet its burden on the "acting under" element of the analysis, the Court need not address the remaining elements.

13

Suffolk Superior Civil Court 22-2889

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

Janice Progin
*on behalf of herself and all others similarly situated*
Plaintiff

v. Civil Action No. 4:23-cv-10113-ADB

UMass Memorial Health Care, Inc. et al
Defendants

**ORDER OF REMAND**

Burroughs, DJ

In accordance with this Court's Memorandum and Order dated July 13, 2023, GRANTING the Plaintiffs' Motion to Remand, it is hereby ordered that this case be REMANDED to Suffolk County Superior Court for further proceedings.

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

BY THE COURT,

/s/ Caetlin McManus

Deputy Clerk

DATED: July 13, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk
Date: 07/13/2023

Suffolk Superior Civil Court 14

22 - 2889

CLOSED

**United States District Court**
**District of Massachusetts (Worcester)**
**CIVIL DOCKET FOR CASE #: 4:23-cv-10113-ADB**

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 1 8 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

Progin v. UMass Memorial Health Care Inc. et al
Assigned to: Judge Allison D. Burroughs
Case in other court: Suffolk County Superior Court, 2284CV02889-BLS2
Cause: 28:1442 Notice of Removal

Date Filed: 01/17/2023
Date Terminated: 07/13/2023
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Janice Progin**
*on behalf of herself and others similarly situated*

represented by **Michelle H. Blauner**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Email: mblauner@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward F. Haber**
Shapiro Haber & Urmy LLP
Seaport East
Two Seaport Lane, 6th Flr.
Boston, MA 02210
617-439-3939
Fax: 617-439-0134
Email: ehaber@shulaw.com
*ATTORNEY TO BE NOTICED*

**Patrick J. Vallely**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Email: pvallely@shulaw.com
*ATTORNEY TO BE NOTICED*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

V.

**Defendant**

**UMass Memorial Health Care Inc.**

represented by **Stephen T. Paterniti**
Jackson Lewis PC
75 Park Plaza

Date Filed 8/9/2023 5:26 PM
Superior Court - Suffolk
Docket Number 2284CV02889

08·15

Notif/

15

kg

COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT DEPARTMENT BUSINESS LITIGATION SESSION

SUFFOLK, ss.

| | |
|---|---|
| JANICE PROGIN<br><br>Plaintiff, on behalf of herself and all others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | CIVIL ACTION NO. 2284CV02889-BLS2 |

**DEFENDANTS' UNOPPOSED MOTION FOR**
**EXTENSION OF TIME TO RESPOND TO THE COMPLAINT**

Defendants UMass Memorial Health Care, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance - Clinton Hospital, Inc., Marlborough Hospital, Inc., and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named as Harrington Memorial Hospital, Inc., UMass Memorial Hospitals, Inc.[1] (altogether "UMass Memorial"), by and through undersigned counsel, hereby files this Unopposed Motion for Extension of Time to Respond to the Complaint.

On December 20, 2022, Plaintiff Janice Progin brought this action in the Suffolk Superior Court Department Business Litigation Session. On January 17, 2023, Defendants removed this

[1] Although the Complaint names UMass Memorial Hospitals, Inc. as a defendant, there is no legal entity with that name.

Allowed.
MDR
8/14/23

case to the United States District Court for the District of Massachusetts. On February 3, 2023, U.S. District Court Judge Allison D. Burroughs granted a Joint Motion for Entry of Schedule which extended the Defendants' time to move, plead, answer or otherwise respond to the complaint to thirty days after the United States District Court ruled on the Motion to Remand. On July 13, 2023, the United States District Court for the District of Massachusetts remanded this matter to the Business Litigation Session of the Suffolk Superior Court Department of the Trial Court.

On August 8, 2023, Counsel for Defendants contacted Counsel for Plaintiff to request an extension to September 8, 2023 to respond to the complaint. Counsel for Plaintiff responded that they would not oppose Defendants' motion for an extension of time to respond to the complaint. Defendants seek this extension of time to assess the allegations and claims asserted.

WHEREFORE, Defendants UMass Memorial respectfully requests this Honorable Court:

A. GRANT Defendants' Unopposed Motion for Extension of Time to Respond to the Complaint;

B. EXTEND the time for Defendants to respond to the complaint until September 8, 2023; and

C. GRANT such other and further relief as the Court shall deem fit and proper.

Dated: August 9, 2023

Respectfully submitted,

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendants*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 9, 2023 copies of the foregoing were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

16

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01205 |
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01293<br><br>2023 AUG 31 P 4:49 |
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 BLS2 |

16

**PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Plaintiff Janice Progin hereby moves, pursuant to Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, to consolidate *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Doe* Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Colleton* Action"), currently pending in Worcester Superior Court, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889 (the "*Progin* Action"), currently pending in the Business Litigaiton Session ("BLS") of Suffolk Superior Court, and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* Action.

As detailed in the accompanying Memorandum, the cases should be consolidated in the BLS because they raise common questions of law and fact and involve a common party, because interests of judicial economy will be served by consolidation and transfer to the BLS and because no party to any of the cases will be prejudiced as a result. The propriety of transferring the cases to the BLS is confirmed by the fact that the BLS is already handling not only the *Progin* Action, but also a significant number of similar class actions alleging violations of the Massachusetts Wiretap Act by other defendants.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

/s/Edward F. Haber

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

## RULE 9C CERTIFICATE OF COMPLIANCE

I, Edward F. Haber, hereby certify that on August 14, 2023, I provided counsel for the plaintiffs in the *Doe* and *Colleton* Actions, and counsel for Defendants in all three actions, with a copy of this motion and the supporting memorandum and asked if they would assent to or not oppose the motion. I received an e-mail reply from attorney Tucker Merrigan, one of the counsel for plaintiff in the *Doe* action, that he agreed that the *Doe* and *Colleton* cases should be transferred to the Business Litigation Session. But he did not agree to assent or not oppose this motion. I did not get any response from counsel for the defendants, Elizabeth Scully, regarding her position on this motion. However, in previous email and telephone conversations she had advised me that the defendants agreed that the three cases should be consolidated in the BLS.

/s/Edward F. Haber
Edward F. Haber

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

/s/Edward F. Haber
Edward F. Haber

17

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01205 |

| | |
|---|---|
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01293 |

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

2023 AUG -1 P 1:49

all of which are presently in the identical procedural posture having just been remanded to Superior Court, would serve the interests of judicial economy and that judicial economy would be best served by consolidation in the BLS.

The *Doe* and *Colleton* Actions should be consolidated in and transferred to the Business Litigation Session where the *Progin* Action is already pending. The BLS has accepted and overseen, and developed and continues to develop significant experience and expertise in, a significant number of similar consumer class actions alleging violation of the Massachusetts Wiretap Act due to the use of Facebook and/or Google tracking software to intercept communications on the defendants' websites. Those BLS cases include:

- *Doe v. Partners Healthcare, Inc.*, No. 1984CV01651 (motion to dismiss denied and case settled);
- *Doe v. Cape Cod Healthcare, Inc.*, Nos. 2272CV00493 and 2384CV01236 (originally filed in Barnstable County, then transferred to Business Litigation Session on May 24, 2023, where case is proceeding following defendant's Answer);
- *Doe v. Boston Medical Center Corp.*, No. 2384CV00326 (motion to dismiss briefed, argued and under advisement);
- *Doe v. The Children's Hospital Corp.*, No. 2384CV00411 (motion to dismiss briefed, argued and under advisement);
- *Vita v. Beth Israel Deaconess Med. Ctr.*, No. 2384CV00480 (motion to dismiss fully briefed and filed and pending);
- *Vita v. New England Baptist Hospital*, No. 2384CV00857 (motion to dismiss fully briefed and and filed and pending);
- *Nova v. Boston Medical Center Corp.*, No. 2384CV01086 (motion to dismiss briefing occurring now)
- *Doe v. Lawrence General Hospital*, No. 2384CV00728 (motion to dismiss briefing occurring now);
- *Vita v. Blue Cross and Blue Shield of Mass., Inc.*, No. 2384CV00542 (motion to dismiss 9A package scheduled to be filed in September 2023);

- *McManus v. Tufts Med. Ctr.*, No. 2384CV00930 (removed to District of Mass and remanded to BLS in July 2023);
- *Doe v. Atrius Health, Inc.*, No. 2384CV00597 (removed to District of Mass., where motion to remand is currently pending); and
- *Doe v. Steward Health Care System LLC*, No. 2384CV00174 (removed to District of Mass., where motion to remand is currently pending).

Judge Salinger, the BLS Administrative Judge, has accepted all of the foregoing cases, as well as the *Progin* Action, into the BLS. It is therefore apparent that *Doe* and *Colleton* Actions would also be accepted into the BLS. Consolidation of all three Actions in the BLS would manifestly serve the interest of judicial economy in light of the BLS's existing and developing experience and expertise presiding over these Massachusetts Wiretap Act class actions.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

/s/Edward F. Haber
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

/s/Edward F. Haber
Edward F. Haber

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

19

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01205 |

| | |
|---|---|
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01293 |

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

The *Doe* and *Colleton* parties (collectively, the "Worcester Parties") "oppose" (the "Opposition") this motion for three reasons. As an initial matter, it is far from clear that the Worcester Parties actually oppose the relief Plaintiff Progin seeks in the Motion—the consolidation and transfer of the three Actions to the BLS. They have already obtained consolidation of their two actions and have filed a motion to transfer those cases to the BLS. In any event, none of the Worcester Parties' arguments warrant denial of the Motion.

First, the Worcester Parties argue that Progin does not have standing to bring this Motion because she is not a party to the Worcester Actions. This is categorically incorrect. As noted, Mass. Super. Ct. Rule 31 expressly provides Progin with standing to move to consolidate all three Actions, and Super. Ct. Admin. Dir. No. 17-1 allows "*any* party [to] file in the session to which the case is assigned a motion requesting a transfer to the BLS," even in cases where "a plaintiff files an action outside of Suffolk County." That is precisely what Progin has done and what Superior Courts have allowed in prior cases. *See, e.g.*, *Fiorillo v. Arcuri*, 2019 Mass. Super. LEXIS 1679, *6-7 (July 12, 2019) (consolidating a 2018 Plymouth Superior Court case with a 2014 Worcester Superior Court case and transferring both to Worcester); *Alvarado v. Commonwealth*, 2016 Mass. Super. LEXIS 2696, *1 (Oct. 19, 2016) (ordering that "all pleadings filed [in the "Worcester Superior Court case"], together with an attested copy of the docket entries be transferred to the Suffolk County Superior Court[.]"); *Olson v. Energy N.*, 1999 Mass. Super. LEXIS 45, *7-9, 9 Mass. L. Rep. 494, 1999 WL 1332362 (Jan. 14, 1999) (holding that "[c]onsolidation is also appropriate here because, with the addition of the two plaintiffs in the Middlesex case to the Norfolk case and the certification of the class as to all but the fraud and deceit claim in the Norfolk case[,] the Middlesex case becomes mostly redundant except as to

certain allegations and claims not found in the Norfolk case.").[2] This approach is also consistent with Mass. R. Civ. Proc. 42(a), which expressly contemplates consolidation of cases "involving a common question[s] of law or fact [] pending [] in the same county *or different counties*[.]"

Second, the Worcester Parties claim this motion is moot because the Worcester Actions have already been consolidated (in Worcester). This argument makes no sense. While the two Worcester Actions have been consolidated in Worcester, Plaintiff Progin seeks to consolidate her third related Action pending in the BLS with those two cases and to have all three cases transferred and consolidated in the BLS in Suffolk Superior Court, which has not yet happened.

Finally, the Worcester Parties erroneously claim Progin's counsel's 9C certificate "does not make sense," Opposition at ¶ 3, but it is the Worcester Parties' position in response to Plaintiff Progin's Motion, both during the Rule 9C process and now having seen their Opposition, which does not make sense. It is entirely unclear from the Opposition whether the Worcester Parties oppose consolidation and transfer of the three related Actions to the BLS. It appears they may wish to have their two cases transferred to the BLS on their own initiative rather than as a result of Plaintiff Progin's Motion, in a misguided effort to secure a leadership role over the three Actions once they are consolidated and transferred to the BLS. Their conduct leading up to the filing of the Motion suggests such a motivation.

When Plaintiff Progin's counsel reached out to counsel for the Worcester Parties to ask whether they would assent to the Motion, counsel for the Worcester Parties indicated as follows:

> We are already in the process of filing a joint motion to transfer Colleton/Doe and expect to do so very soon – which we can agree on. Therefore your filing would be duplicative. I can have a 9C to discuss further if necessary, but this issue should be resolved. I just confirmed the same with Elizabeth Scully -- we are all on the same page to go to the BLS.

[2] *See also* the case law cited on p. 4 of Plaintiff Progin's opening memorandum.

E-mail from Tucker Merrigan to Edward Haber dated August 14, 2023 (Ex. A). The Worcester Parties apparently were trying to lull counsel for Plaintiff Progin into a false sense of security that she did not need to move to consolidate and transfer the cases to the BLS because all parties to all cases were in agreement and "on the same page." The very next day, however, without notifying or serving Plaintiff Progin, the Worcester Plaintiffs moved to consolidate their two cases in Worcester and filed a motion to be appointed lead counsel in those cases. When Plaintiff Progin filed an opposition to that motion for appointment of lead counsel, the Worcester Plaintiffs promptly withdrew it.[3]

There is no question that the three Actions are related, nor is there any reason why they should not be transferred to the BLS, given its undisputed experience and expertise in these cases regarding the Massachusetts Wiretap Act. This Court should consolidate and transfer the cases to the BLS and, assuming the BLS accepts the cases, the BLS should resolve the issues surrounding leadership and management of the cases.

For these reasons, Progin's Motion should be granted, and the three above-captioned cases consolidated and transferred to the Business Litigation Session in Suffolk County.

---

[3] *See* Motion, Opposition and Withdrawal Papers relating to Worcester Plaintiffs' Motion for Appointment as Lead Counsel (Ex. B).

Dated: August 31, 2023

Respectfully submitted,

*/s/Edward. F Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

*/s/Edward F. Haber*
Edward F. Haber

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

# Exhibit A

SUCV
2022-2229

**Patrick Vallely**

| | |
|---|---|
| **From:** | Tucker Merrigan <tucker@sweeneymerrigan.com> |
| **Sent:** | Monday, August 14, 2023 11:47 AM |
| **To:** | Ed Haber; Scully, Elizabeth; Michelle Blauner; Patrick Vallely; Victoria M. Santoro; Erin McHugh; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com |
| **Cc:** | Karlsgodt, Paul; Patrick Vallely; Ian McLoughlin; Kristen Field; Tom Merrigan |
| **Subject:** | RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare |

Ed,

We are already in the process of filing a joint motion to transfer Colleton/Doe and expect to do so very soon – which we can agree on. Therefore your filing would be duplicative. I can have a 9C to discuss further if necessary, but this issue should be resolved. I just confirmed the same with Elizabeth Scully -- we are all on the same page to go to the BLS.

Please contact me on email or cell (413-824-9512) if you have any questions.

Thanks

Tucker

**From:** Ed Haber <ehaber@shulaw.com>
**Sent:** Monday, August 14, 2023 9:30 AM
**To:** Scully, Elizabeth <EScully@bakerlaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Tucker Merrigan <tucker@sweeneymerrigan.com>; Victoria M. Santoro <victoria@sweeneymerrigan.com>; Erin McHugh <EMcHugh@sweeneymerrigan.com>; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>; Ed Haber <ehaber@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Ian McLoughlin <imcloughlin@shulaw.com>
**Subject:** RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel:

Attached please find the motion we plan to serve today, pursuant to Rule 9A, which seeks the consolidation of the three referenced UMass Memorial cases (Doe, Colleton and Progin) and the transfer of Doe and Colleton to the Business Litigation Session where Progin is pending. I also attach the memorandum of law in support which we also plan to serve today.

It is my understanding, per Elizabeth Scully's email below and subsequent conversations with her, that defendants also seek the relief sought by our motion. Elizabeth: Please confirm that we can indicate that the defendants assent to the allowance of the motion.

It is also my understanding from conversations with counsel for Doe that they and counsel for Colleton also agree that the three cases should be consolidated and that Doe and Colleton should be transferred to the BLS. Please advise if we can indicate that the plaintiffs Doe and Colleton assent to the allowance of the motion.

If all parties advise us that they assent to, or do not oppose, the motion, we will reflect that the motion is assented to or unopposed by all parties and file it in each of the three cases.

Of course, we are happy to discuss this with any of you today. I could do so anytime except between noon and 1 pm EDT. I can best be reached at 617-901-3739.

Thank you.

**Edward F. Haber**
**Shapiro Haber & Urmy LLP**
**One Boston Place**
**Suite 2600**
**Boston, MA 02108**
Tel: 617-439-3939
ehaber@shulaw.com
www.shulaw.com

**From:** Scully, Elizabeth <EScully@bakerlaw.com>
**Sent:** Wednesday, July 19, 2023 10:22 AM
**To:** Ed Haber <ehaber@shulaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; tucker@sweeneymerrigan.com; victoria@sweeneymerrigan.com; emchugh@sweeneymerrigan.com; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>
**Subject:** Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel,

I am writing regarding the Court's recent Remand Order in the above referred matters, and to propose a potential agreement for the orderly movement forward of these matters. UMass Memorial Healthcare is prepared to forego its right to appeal the Remand Order in exchange for the parties reaching agreement to have the three matters consolidated and proceed in BLS 1, and agreeing to a schedule for the filing of a consolidated complaint and UMass's response thereto (avoiding the filing of separate motions to the three pending separate complaints). Please let me know if you would like to arrange a call to discuss.

Sincerely,

Elizabeth

**Elizabeth Scully**
She | Her | Hers
Partner

BakerHostetler
Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1698

escully@bakerlaw.com
bakerlaw.com

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

# Exhibit B

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

COMMONWEALTH OF MASSACHUSETTS

| WORCESTER, S.S. | | SUPERIOR COURT |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2285CV01205 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

COMMONWEALTH OF MASSACHUSETTS

| WORCESTER, S.S. | | SUPERIOR COURT |
|---|---|---|
| LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2285CV01293D |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**MOTION TO APPOINT INTERIM CLASS COUNSEL**

Pursuant to Massachusetts Rule of Civil Procedure Rule 23(d), Plaintiffs John Doe (C.A. No. 2285CV01205) and Lisa Colleton (C.A. No. 2285CV01293D), individually and on behalf of

all others similarly situated ("Plaintiffs"), respectfully submits this Motion to Appoint Interim Class Counsel. In support of the Motion to Appoint Interim Class Counsel, Plaintiffs file the accompanying memorandum of law.

*(Space left intentionally blank)*

Dated: August 4, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warran Postman (*pro hac vice pending*)
Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza , Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
wdp@kellerpostman.com

William P. Doyle, BBO# 556999
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Nicholas A. Coulson (*pro hac vice pending*)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on August 4, 2023 in accordance with Superior Court Rule 9A, I served the following documents:

- Motion to Appoint Interim Class Counsel;
- Memorandum of Law in Support of Plaintiffs' Motion to Appoint Interim Class Counsel;
- Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Seth Meyer in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Foster C. Johnson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Nicholas A. Coulson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel; and
- [Proposed] Order Appointing Interim Class Counsel;

on all counsel of record, via electronic mail to the following parties of interest:

James H. Rollinson, Esq.
Elizabeth Scully, Esq.
Paul Karlsgodt, Esq.
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
jrollinson@bakerlaw.com
escully@bakerlaw.com
pkarlsgodt@bakerlaw.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

**COMMONWEALTH OF MASSACHUSETTS**

**Worcester, ss.**

| | |
|---|---|
| JOHN DOE,<br><br>Individually and on behalf of all others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br><br>Civil Action No. 2285cv01205 |
| LISA COLLETON,<br><br>On behalf of herself and all others similarly situated<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br><br>Civil Action No. 2285cv01293D |

**JANICE PROGIN'S OPPOSITION**
**TO MOTION TO APPOINT INTERIM CLASS COUNSEL**

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

## I. INTRODUCTION

This opposition is submitted by Janice Progin, a plaintiff with a putative class claim pending against UMass Memorial Healthcare, Inc. ("UMass Memorial") in the Business Litigation Session ("BLS")[1] that overlaps in substance with the claims asserted by plaintiffs John Doe and Lisa Colleton (the "Worcester Plaintiffs"), whose claims are pending in this Court.

The pending motion for appointment of lead counsel filed by the Worcester Plaintiffs is curious. After obtaining consolidation of their two actions pending in this Court against UMass Memorial Healthcare, Inc. ("UMass Memorial"), those plaintiffs seek to appoint **all** counsel from those two cases as **lead** counsel for their consolidated case. If the Worcester Plaintiffs' claim were to remain in this Court, this order would serve no practical purpose, as counsel for the Worcester Plaintiffs already have control over their own consolidated class claims. The true, undisclosed purpose of the motion is quite different.

The reality is that the Worcester Plaintiffs' claims will likely not be litigated in this Court. Although their motion makes no mention of it, the Worcester Plaintiffs and UMass Memorial have already agreed that their claims should be transferred to the Business Litigation Session ("BLS," incorrectly referred to by the Worcester Plaintiffs as the "Business Law Section"). And, although their motion makes no mention of it, Ms. Progin ("the BLS Plaintiff") has already served pursuant to Superior Court Rule 9A a motion that, if granted, would consolidate her claims and case and the Worcester Plaintiffs' claims and case with the BLS Plaintiff's claims and case and transfer all the claims and cases to the BLS. A copy of that motion and memorandum are attached to the Declaration of Edward F. Haber as Exhibit B.[2]

While concealing their agreement to such transfer, the Worcester Plaintiffs ask **this Court** to make one final order before transfer: to appoint their counsel as "lead counsel," notwithstanding that this Court, pursuant to the agreement of all the parties to all the cases, will not likely preside over a

---

[1] *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). The Complaint in *Progin* is attached to the Declaration of Edward F. Haber ("Haber Decl.") as Exhibit A.

[2] Exhibit B does not include the exhibits attached to that motion, as the exhibits are somewhat voluminous, but they are available upon request.

consolidated action. The Worcester Plaintiffs' motion raises obvious questions—why do the Worcester Plaintiffs want this Court to appoint leadership when these cases will likely be litigated not here but in the BLS? Why not have the BLS decide lead counsel issues, given it will be presiding over all three cases? Why did the Worcester Plaintiffs rush to file this motion in flagrant disregard for Superior Court Rule 9A, while, as explained below, concealing their motion from the BLS Plaintiff in an attempt to have this Court resolve the motion without hearing from the BLS Plaintiff?

The answer to each of these questions is the same: the Worcester Plaintiffs, through this motion, attempt to hoodwink the Court into entering an order that they can then invoke in the BLS to argue that control over the litigation has already been decided, precluding Ms. Progin not only from exercising control over her own case but even **being heard** on that precise issue.

The Court should deny the motion to appoint interim counsel for the two Worcester cases for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

## II. BACKGROUND

### A. *Litigation and Press Relating to Tracking Technologies: the Partners Case, The Markup, and In re Meta Pixel.*

In recent years, significant litigation has emerged nationwide regarding healthcare providers' surreptitious use of so-called tracking technologies on healthcare provider websites. These tracking technologies, including Meta Pixel, Google Analytics, and several others, operate through hidden website code executed in website users' browsers, permitting third parties such as Facebook and Google to

intercept communications between healthcare providers and website users. The third parties can then use the contents of those intercepted communications for their own commercial purposes. The Worcester Plaintiffs' and the BLS Plaintiff's Complaints each assert claims against UMass Memorial Healthcare ("UMass Memorial") arising from the secret use of these tracking technologies.

Although *Doe* is the first-filed case against UMass Memorial, its claims are not new; it follows similar cases that have been filed and litigated in the Commonwealth and nationally. Within Massachusetts, the true first-filed case asserting these types of claims was *Doe v. Partners Healthcare System, Inc.* (Super. Ct. Case No. 1984CV01651-BLS1), filed in the BLS on May 23, 2019 (by counsel not involved in any of the UMass Memorial Cases). The plaintiffs in *Partners Healthcare* asserted wiretap and other claims arising from the same tracking technologies at issue in the UMass Memorial Cases, based on substantially the same factual and legal theories as in *Doe*, *Colleton*, and *Progin*. The *Doe* complaint closely tracks the substance of the *Partners Healthcare* complaint. After the Suffolk Superior Court, Business Litigation Session (Davis, J.) denied a motion to dismiss in *Partners Healthcare* case on December 7, 2020, the case settled on a class basis, and the court finally approved that settlement on January 24, 2022.

Recently, a new wave of litigation relating to healthcare providers' use of Meta Pixel and similar tracking technologies was sparked by a June 16, 2022 report by online privacy magazine The Markup that reported on the widespread use of Meta Pixel on hospital websites, implemented in a manner that posed significant concerns to patient privacy.[3] Congressional investigations and further press quickly followed in the summer of 2022,[4] bringing the serious privacy issues raised by Meta Pixel and similar tracking technologies to the forefront.

[3] "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medicalinformation-from-hospital-websites.

[4] See "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-overmetas-healthcare-data-collection-policies.

In late June 2022, the undersigned counsel for Janice Progin began investigating potential claims relating to Massachusetts healthcare providers' use of Meta Pixel. Haber Decl. ¶ 4. Later that same month and over the next several months, numerous lawsuits were filed directly against Facebook relating to the use of Meta Pixel on healthcare provider websites; those cases were consolidated in the Northern District of California. *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022). Many other cases directly against various healthcare providers, including the UMass Memorial Cases, have followed.

B. *The UMass Memorial Cases Are Filed, Removed, and Remanded.*

The three UMass Memorial cases were each filed in late 2022, all within two months of each other:

(i) *Doe* was filed on October 24, 2022. After service on November 7, 2022, UMass Memorial removed *Doe* on November 28, 2022. The plaintiff in *Doe* did not file a motion to remand until January 6, 2023.

(ii) *Colleton* was filed in this Court on November 28, 2022; UMass Memorial removed *Colleton* on December 28, 2022. The plaintiff in *Colleton* filed a timely motion to remand on January 27, 2023.

(iii) *Progin* was filed in the BLS on December 20, 2022. UMass Memorial removed *Progin* on January 17, 2023, and Progin filed a timely motion to remand on February 16, 2023.

After UMass Memorial filed separate removal papers for each of the three related cases, and the plaintiffs in each case filed their own motion to remand, counsel for Progin spearheaded the successful effort to efficiently litigate the three remand motions, including negotiating for UMass Memorial to file a consolidated opposition and for the plaintiffs in the three related cases to submit a joint reply. Thereafter, the United States District Court (Burroughs, J.) remanded each of the three cases on July 13, 2023 (*Doe* and *Colleton* to this Court; *Progin* to the BLS).

C. *The Worcester Plaintiffs' Conduct Leading Up to this Motion*

After the federal court ordered the remand of the three UMass Memorial cases, the plaintiffs and defendants discussed the next procedural steps. UMass Memorial advised that it wanted the Worcester cases to be transferred to and consolidated with *Progin* in the BLS. Haber Decl. ¶ 6.

The plaintiffs in each of the UMass Memorial Cases agreed that the cases should be transferred to and consolidated in the BLS, and plaintiffs' counsel discussed amongst themselves how to organize a consolidated case over several meetings and telephone calls in late July and early August 2023. *Id.* ¶ 7. Those discussions, although productive, did not result in any agreement among the plaintiffs in the UMass Memorial Cases. Counsel for *Progin* (i.e., the undersigned counsel) understood that those discussions regarding case organization were ongoing; counsel for *Progin* discussed case organization issues with UMass Memorial's counsel, Elizabeth Scully, on August 8. *Id.* ¶¶ 8–9.

Before learning of the filing of the instant lead counsel motion, Ms. Progin's counsel prepared and served on all parties to the three UMass Memorial cases, pursuant to Superior Court Rule 9A, a motion to consolidate the three UMass Memorial Cases and transfer the Worcester cases to the BLS. *Id.* ¶ 11 & Haber Decl. Ex. B. This motion reflected what all parties had already agreed to and provided a procedural path forward to centralize and consolidate the cases. That motion has not yet been filed in this Court and in the BLS because the time for responses to it has not yet passed.[5] The BLS Plaintiff's motion is silent on the question of leadership, as the BLS should resolve such issues after the transfer of the Worcester Plaintiffs' cases to the BLS. *Id.*

The BLS Plaintiff provided copies of these motion papers to counsel to the Worcester Plaintiffs and UMass Memorial on August 14, 2023, seeking their assent to the motion. Tucker Merrigan, an attorney in *Doe*, indicated via email that the Worcester Plaintiffs intended to soon file a joint motion to transfer, which he indicated would make the BLS Plaintiff's motion "duplicative." Haber Decl. Ex. C. However, no such motion to transfer has been filed. The Worcester Plaintiffs have instead opted to file first the present leadership motion **on that same day as Attorney Merrigan's email saying they would be filing a motion to transfer**. Attorney Merrigan did not disclose to the BLS Plaintiff their intent to file such a motion. Attorney Merrigan's email hid from BLS Plaintiff's counsel the Worcester plaintiffs'

[5] Counsel for all defendants in all of the cases has advised that she agrees with the relief sought by Progin's motion. Counsel for the plaintiffs in the Worcester actions have also said they agree that all three cases should be consolidated in the BLS.

plan to delay seeking transfer until this Court appointed leadership without the BLS Plaintiff and her counsel knowing about or being heard on the matter. *Id.* ¶ 12. Only by checking the online docket for *Doe* and *Colleton* did the undersigned counsel discover the Worcester Plaintiffs' filing. *Id.*

Pursuant to Rule 9A, the BLS Plaintiff served the motion to consolidate and transfer the next day, August 15, 2023. Responses are due August 25, 2023. Pursuant to Rule 9A, the BLS Plaintiff's motion to consolidate and transfer has not yet been filed.

The Worcester Plaintiffs lack of candor extends to the motion submitted to this Court. They make only a passing reference to the *Progin* case without naming it, suggesting via that *Progin* is a "copycat" case filed "well after" the Worcester Plaintiffs' cases (*see* Mem. Law at 7). As an initial matter, *Progin* was filed only a few weeks after *Colleton* and fewer than two months after *Doe*. In any event, it is in no way a "copycat" case. Even a brief perusal of the *Progin* complaint (Haber Decl. Ex. A) confirms this. The complaint was drafted from scratch based on counsel's independent investigation, which began long before *Doe* was filed. Haber Decl. ¶ 13. *Progin* is no more a "copycat" of *Doe* than *Doe* is a copycat of *Partners Healthcare* or *In re Meta Pixel Healthcare*.

## III. ARGUMENT

The Court should deny the Worcester Plaintiffs' motion to appoint lead counsel for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case with the BLS Plaintiff's case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

A. *The Worcester Plaintiffs Failed to Comply with Superior Court Rule 9A in Multiple Respects.*

Superior Court Rule 9A is not a mere formality; it serves the important substantive purpose of limiting unnecessary motion practice, encouraging the parties to resolve their disputes amicably without court intervention, and ensuring all interested parties are notified and offered the opportunity to present their views to the Court.

As a simple matter, Superior Court Rule 9A requires the parties to ***serve*** motion papers, including an initial motion and memorandum and responsive briefs, before filing them. *See* Super. Ct. R. 9A(b). Only after a motion is fully briefed by all interested parties may it be filed. *Id.* Critically, Rule 9A requires that the moving party must serve motions not only on the named parties to the case in which they are filed but also other parties, including where "the Motion seeks an order or other relief against the non-party" **or** "**the issues" raised in the Motion "affect…interests of the non-party**." *Id.* (b)(ii) ("When service on non-parties is required.") (emphasis added). Both of those circumstances exist here.

*First*, although the motion purports to appoint "lead counsel" only in the two consolidated cases, the clear import of the motion, together with the Worcester Plaintiffs' agreement (not disclosed in the motion) to transfer their cases to the BLS, reflects a scheme to have this Court to determine a leadership structure without considering the viewpoints of all affected parties. That is, the motion and the agreed imminent transfer to the BLS seek an order "affect[ing]…the interests of" the current BLS Plaintiff that would impact their participation in the contemplated consolidated litigation in BLS.

Second, for the same reasons, the proposed relief plainly affects the BLS Plaintiff's interests. Presumptively relegating her to a nonparticipatory role in a consolidated case in the BLS affects her interest in prosecuting class litigation that may affect her rights. The potential impact of being forced to forego participation in litigation is exacerbated because Rule 23 of the Massachusetts Rules of Civil Procedure, unlike its federal counterpart, does not permit class members to opt out from participation in class litigation, *see* Mass. R. Civ. Proc. 23; *Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595, 602 (1985) ("There

are no provisions in our rule 23…which would permit a judge to allow individual parties to 'opt out' of a class action.").

Notably, although the motion references a proposed order, the Worcester Plaintiffs chose not to file it publicly, preventing the BLS Plaintiff from fully responding to what precise "relief" the Worcester Plaintiffs seek, including any restrictions the proposed order would place on the BLS Plaintiff's ability to litigate her own claims or be heard on leadership. Counsel for the BLS Plaintiff has explicitly asked counsel for the Worcester Plaintiffs for all motion papers filed (including the proposed order), a request their counsel simply ignored, suggesting a lack of good faith in bringing this motion and an improper attempt to prevent the BLS Plaintiff from being heard.

B. *The BLS Should Decide Case Leadership as the Court that Will Hear the Consolidated Cases.*

The Court should deny the motion or, at a minimum, defer its resolution until it first decides whether to transfer *Doe* and *Colleton* to the BLS (which, to repeat, all parties have agreed). If the Court transfers *Doe* and *Colleton* to the BLS, then, respectfully, the BLS, not this Court, should resolve any disputes over how to organize the consolidated cases. It makes practical sense for the Court before which consolidated claims will be litigated to resolve such issues, particularly given its specialized experience as a court in complex and class action litigation, which frequently involve consolidation of multiple, overlapping cases and attendant case management issues arising from consolidation. *See Italian Colors Rest. v. Am. Express Co.*, No. C 03-3719 SI, 2003 U.S. Dist. LEXIS 20338, at *20 (N.D. Cal. Nov. 7, 2003) (denying motion to appoint lead counsel as "premature" where transfer of venue pending); *Wang v. OCZ Tech. Grp., Inc.*, No. C 11-01415 PSG, 2011 U.S. Dist. LEXIS 69803, at *4 (N.D. Cal. June 29, 2011) (appointment of interim lead counsel "premature" and "would undermine principles of judicial efficiency" before "another case is consolidated with [the] action").

Moreover, assuming the parties are unable to agree on how to organize and prosecute the consolidated cases, deferring resolution of the instant motion or denying it without prejudice for refiling in the BLS would permit Ms. Progin and her counsel an opportunity to be heard on a motion that directly

affects them. Ms. Progin and her counsel do not, through this opposition, submit a competing application for the appointment of lead counsel but would and will do so given the opportunity in the appropriate forum.

C. *The Worcester Plaintiffs' Counsel's Conduct Provides Additional Reason to Deny or Defer Their Motion*

As detailed above, counsel for the Worcester Plaintiffs have engaged in deceptive conduct directed to both the undersigned counsel and this Court in an attempt to trick the Court into resolving a dispute that should properly be resolved by the BLS after considering the views of all interested parties, including Ms. Progin. That deceptive conduct includes (i) concealing their intention to file this motion; (ii) refusing to provide Ms. Progin copies of their motion papers and the proposed order for this motion as required by Rule 9A; (iii) omitting from their motion any reference to their agreement and plan to transfer *Doe* and *Colleton* to BLS; and (iv) preemptively disparaging Ms. Progin and her counsel through several deceptive statements, without providing any record supporting their allegations that would permit the Court to investigate such disparaging statements.

This conduct provides an additional reason for this Court to deny or defer the resolution of this motion, resolve the transfer issue first, and then permit an appropriate Court to resolve any case management disputes, including permitting all interested parties an opportunity to be heard.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the motion to appoint interim lead counsel or, at a minimum, defer its resolution until after the Court first decides Progin's attached but not-yet-filed motion to consolidate the three cases against UMass and transfer them to the BLS, which all parties have indicated they agree should be done.

Dated: August 23, 2023

Respectfully submitted,

/s/ Edward F. Haber

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by email upon counsel of record for all parties to the captioned actions on August 23, 2023.

*/s/ Edward F. Haber*
Edward F. Haber

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.<br><br>Defendant. | § § § § § § § § § § § § § | C.A. No. 2285CV01205 |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.<br><br>Defendant. | § § § § § § § § § § § § § | C.A. No. 2285CV01293D |

**WITHDRAWAL OF MOTION TO APPOINT INTERIM CLASS COUNSEL**

Now come the plaintiffs in these consolidated cases and Withdraws its Motion to Appoint Interim Class Counsel. See Dkt. # 14.[1] Plaintiffs reserve their right to refile such a motion at a later date.

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

Respectfully submitted,

/s/ J. Tucker Merrigan
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

[1] Plaintiffs have been served with an Opposition to the Motion to Appoint Interim Class Counsel on behalf of the plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). Progin's Opposition to the Motion to Appoint Interim Class Counsel filed in this case has not yet been docketed as of this filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan categorically dispute Progin's description of the communications, factual allegations and legal argument as articulated in Attorney Haber's filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan reserve all rights to challenge one-sided misrepresentations concerning this matter.

SUCV 2022-2889

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on August 24, 2023, a copy of the foregoing Notice of Withdrawal of Motion to Appoint Interim Class Counsel was filed electronically and served on all counsel of record via email.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

20

**COMMONWEALTH OF MASSACHUSETTS**
**SUPERIOR COURT DEPARTMENT BUSINESS LITIGATION SESSION**

**SUFFOLK, ss.**

| | |
|---|---|
| JANICE PROGIN<br><br>Plaintiff, on behalf of herself and all others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | CIVIL ACTION NO. 2284CV02889-BLS2 |

**DEFENDANTS' UNOPPOSED MOTION FOR**
**<u>EXTENSION OF TIME TO RESPOND TO THE COMPLAINT</u>**

Defendants UMass Memorial Health Care, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance - Clinton Hospital, Inc., Marlborough Hospital, Inc., and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named as Harrington Memorial Hospital, Inc., UMass Memorial Hospitals, Inc. [1] (altogether "UMass Memorial" or "Defendants"), by and through undersigned counsel, hereby files this Unopposed Motion for Extension of Time to Respond to the Complaint.

On August 15, 2023, Counsel for Plaintiff Janice Progin ("*Progin* Plaintiff") served a Motion to Consolidate and Transfer Cases to the Business Litigation Session and a Memorandum

[1] Although the Complaint names UMass Memorial Hospitals, Inc. as a defendant, there is no legal entity with that name.

in Support to the plaintiffs and UMass Memorial in two related matters: *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01205 ("*Doe*") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 ("*Colleton*"). On August 25, Counsel for the *Doe* and *Colleton* Plaintiffs served an Opposition to Plaintiff Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session, in part due to their pending Motion to Consolidate filed in Worcester Superior Court and request to transfer those actions after consolidation to the Business Litigation Section. On August 31, 2023, Counsel for the *Progin* Plaintiff served a Reply in Support of Plaintiff Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session and filed a Superior Court 9A Notice of Filing of the aforementioned documents in the Worcester Superior Court.

On August 17, 2023, the Worcester Superior Court granted the *Doe* and *Colleton* Plaintiffs' Joint Motion to Consolidate. On August 29, 2023 the Worcester Superior Court "allowed contingent to acceptance by the BLS" the *Doe* and *Colleton* Plaintiff's Assented-To Motion to Transfer to the Business Litigation Section [sic], and the *Doe* and *Colleton* actions are currently pending transfer to the Business Litigation Session ("BLS").

Given the pending transfer of the *Doe* and *Colleton* matters to the BLS and the *Progin* Plaintiff's pending motion to consolidate, Defendants anticipate that a superseding Consolidated Complaint will be filed after the issue of consolidation of these matters is resolved.

On September 5, 2023, Counsel for Defendants contacted Counsel for the *Progin* Plaintiff to request an extension to respond to the complaint until thirty (30) days after the filing of a consolidated complaint. Counsel for Plaintiff responded that they would not oppose Defendants' motion.

WHEREFORE, Defendants UMass Memorial respectfully requests this Honorable Court:

A. GRANT Defendants' Unopposed Motion for Extension of Time to Respond to the Complaint; and

B. EXTEND the time for Defendants to respond to the *Progin* complaint until thirty (30) days after the filing of a consolidated complaint, or in the event that Progin's motion to consolidate and transfer is denied, the denial of that motion.

Dated: September 7, 2023

Respectfully submitted,

*/s/ Stephen T. Paterniti*

Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
*Attorneys for Defendants*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk



4890-7554-9054.1

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 7, 2023 copies of the foregoing were served on the following by email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

21

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2284CV02889-BLS1**

Case: Progin v. UMass Memorial Healthcare, Inc. et al.

**NOTICE OF TRANSFER TO**
**BUSINESS LITIGATION SESSION**

Upon review, the court orders this case transferred to the Business Litigation Session (BLS) and assigned to **BLS1**. In the future, all parties must include the initials **"BLS1"** at the end of the docket number on all filings, as shown above.

Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/superior-court-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and serving the attached form.

Dated: September 11, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst. Clerk

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ____________________

Case: ________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,**_____________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ________________________________________

Docket Number CIVIL DOCKET#: ____________________

Counsel For ____________________ Date ______________

Firm Name and Address:

____________________________

____________________________

____________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**<u>OR</u>**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

Date Filed 1/22/2024 11:13 AM
Superior Court - Suffolk
Docket Number 2284CV02889

BC

NOTIFY

22

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**SUPERIOR COURT**
**BLS**
**C.A. No.** 2284CV02889-BLS1

JANICE PROGIN

Plaintiff, on behalf of herself and all others similarly situated,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

**JOINT STIPULATION AND PROPOSED ORDER TO STAY ALL PROCEEDINGS PENDING INTERLOCUTORY APPEAL IN RELATED CASES**

Plaintiff Janice Progin ("Plaintiff") and Defendants UMass Memorial Health Care, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance - Clinton Hospital, Inc., Marlborough Hospital, Inc., and UMass Memorial Health - Harrington Hospital, Inc., incorrectly named as Harrington Memorial Hospital, Inc., UMass Memorial Hospitals, Inc.[1] ("Defendants," and with Plaintiff, the "Parties") move to stay this case pending completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1). In support of this motion, the Parties state as follows:

Plaintiff filed her Complaint on December 20, 2022. Defendant removed the case to the United States District Court for the District of Massachusetts on January 17, 2023. The District Court remanded the case to this Court on July 13, 2023.

[1] Although the Complaint names UMass Memorial Hospitals, Inc. as a defendant, there is no legal entity with that name.

1/29/24 After review, ALLOWED. Proceedings in this case are stayed pending a decision in the appeals of Vita v. Beth Israel Deaconess and Vita v. New England Baptist Hospital (together, "the Vita Appeals"). The Rule 16 conference scheduled for 1/31/24 is cancelled. Within 14 days of the decision in the Vita Appeals, the parties shall notify the Court and propose three alternative dates in the following 60 days when all parties could attend a Rule 16 conference in this matter.

On October 31, 2023, the Court denied the motions to dismiss in *Beth Israel* and *New England Baptist*. The Court also decided to report its decisions denying the motions to dismiss in those cases to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a). The issues raised in the *Beth Israel* and *New England Baptist* appeals overlap with the issues in this case, including those presented through Defendant's pending motion to dismiss.

This Court entered an Order dated January 2, 2024 scheduling a Rule 16 conference on January 31, 2024, at 2 p.m. The Order noted that *Beth Israel* and *New England Baptist* present similar issues are currently before the Appeals Court. *See Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2023-P-1308 (entered Nov. 13, 2023), and *Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2023-P-1310 (entered Nov. 13, 2023). The Order stated that "[i]f, prior to January 31, 2024, the parties agree that one or more of these cases should be stayed, the parties may file a joint motion to that effect, and if granted, the hearing on January 31, 2024 shall be cancelled as to such cases."

The Parties have conferred and agreed to stay all Superior Court proceedings in this matter, including the Rule 16 conference scheduled on January 31, 2024, pending completion of the appeals in *Beth Israel* and *New England Baptist* and that the stay should remain in place and be lifted only after the completion of those appeals.

Accordingly, the Parties stipulate and agree, subject to the Court's approval, that:

1. All Superior Court proceedings, time standards, and deadlines in this matter, including the Rule 16 conference scheduled on January 31, 2024, should be stayed during the pendency of the appeals in *Beth Israel* and *New England Baptist*.

2. No discovery requests or responses will be exchanged between the Parties during the pendency of the stay, including (without limitation) interrogatories, requests for the production of documents/data, or deposition notices.

3. Fourteen days after the completion of the appeals in the *Beth Israel* and *New England Baptist* (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further appellate review), this stay shall be automatically lifted, and the Parties may then proceed with further litigating the case in this Court.

Dated: January 22, 2024

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ Stephen T. Paterniti*
JACKSON LEWIS P.C.
Stephen T. Paterniti (BBO #564860)
75 Park Plaza, 4th Floor
Boston, MA 02116
(617) 305-1221 – Telephone
Stephen.Paterniti@jacksonlewis.com

*Counsel for Defendants*

The Court hereby approves the Parties' Joint Stipulation above and so orders.

Entered: _______________, 2024

_______________________________
Associate Justice, Superior Court
Commonwealth of Massachusetts

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**NOTICE OF SUPREME JUDICIAL COURT DECISION IN *VITA v. NEW ENGLAND BAPTIST HOSPITAL***

Pursuant to the Court's order of January 23, 2024, Plaintiff hereby notifies the Court that on October 24, 2024, the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024), reversing the Superior Court's denial of motions to dismiss in the two cases on appeal. Rescript issued in both appealed cases on November 21, 2024. Plaintiff reached out to counsel for Defendant on December 3, 2024, regarding proposed dates for a Rule 16 conference (after learning that rescript had issued), but Defense counsel did not respond to Plaintiff's counsel by the date of this notice.

Plaintiff's counsel is available for Rule 16 conference on January 7, 2025; January 8, 2025; or January 15, 2025. Plaintiff has also notified Defendant that she intends to file an amended complaint in light of the SJC's decision in *Vita*.

Respectfully submitted this 5th day of December 2024:

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
pvallely@shulaw.com

*Counsel for Plaintiff and the Proposed Class*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Defendant's counsel by email on December 5, 2024.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

24

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**THE UMASS MEMORIAL DEFENDANTS' NOTICE OF SUPREME JUDICIAL COURT DECISION IN *VITA v. NEW ENGLAND BAPTIST HOSPITAL***

Pursuant to the Court's order of January 23, 2024, the UMass Memorial Defendants hereby notify the Court that on October 24, 2024, the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024), reversing the Superior Court's denial of motions to dismiss in the two cases on appeal. Rescript issued in both appealed cases on November 21, 2024.

Plaintiff has notified the UMass Memorial Defendants that she intends to file an amended complaint in light of the SJC's decision in *Vita*, which is dispositive of Plaintiff's current sole Massachusetts Wiretap Act claim.

The UMass Memorial Defendants were unable to connect with Plaintiff's counsel before Plaintiff's counsel filed their notice today. The UMass Memorial Defendants believe scheduling a Rule 16 Conference at this time may be premature. However, the UMass Memorial Defendants are available on January 7, 8, or 15, 2025. There are 16 putative class actions pending in this Court challenging the

alleged use of website technologies. That includes this action as well as a second consolidated action against the UMass Memorial Defendants, *see John Doe, et al. v. UMass Memorial Health Care, Inc., et al.*, No. 2384CV02448-BLS1, which Plaintiff previously agreed should be further consolidated so the claims against the UMass Memorial Defendants proceed in a single consolidated action. This issue of consolidation was not resolved before the matters were stayed pending resolution of the *Vita* appeal and remains pending.

For the Court's convenience, the related actions that have been stayed pending resolution of *Vita* are as follows:

| | |
|---|---|
| *Janice Progin, et al. v. UMass Mem'l Health Care, Inc., et al.* | No. 2284CV02889-BLS1 |
| *Jane Doe v. Steward Health Care Sys., LLC* | No. 2384CV00174-BLS1 |
| *John Doe et al. v. Boston Med. Ctr. Corp.* | No. 2384CV00326-BLS1 |
| *Jane Doe v. Children's Hosp. Corp.* | No. 2384CV00411-BLS1 |
| *Kathleen Vita v. Beth Israel Deaconess Med. Ctr., Inc.* | No. 2384CV00480-BLS1 |
| *Kathleen Vita v. Blue Cross & Blue Shield of Mass., Inc., et al.* | No. 2384CV00542-BLS1 |
| *Jane Doe v. Atrius Health, Inc.* | No. 2384CV00597-BLS1 |
| *Jane Doe v. Lawrence Gen Hosp.* | No. 2384CV00728-BLS1 |
| *Kathleen Vita v. New England Baptist Hosp.* | No. 2384CV00857-BLS1 |
| *Karen McManus v. Tufts Med. Ctr., Inc.* | No. 2384CV00930-BLS1 |
| *Elizabeth Nova v. Boston Med. Ctr., Corp.* | No. 2384CV01086-BLS1 |
| *Jane Doe v. Cape Cod Healthcare, Inc.* | No. 2384CV01236-BLS1 |
| *Jane Doe v. Baystate Health Sys., Inc.* | No. 2384CV01949-BLS1 |
| *John Doe et al., v. UMass Mem'l Health Care, Inc.* | No. 2384CV02448-BLS1 |
| *John Doe et al., v. Atrius Health, Inc.* | No. 2384CV02704-BLS1 |

In the event the Court intends to proceed with scheduling a Rule 16 Conference, the UMass Memorial Defendants ask that it be a joint Conference to address next steps across all these pending actions. The UMass Memorial Defendants have consulted with counsel for Defendants in the other pending actions and understand that counsel for Defendants are currently available for such a Conference on the dates above.

Dated: December 5, 2024

Respectfully submitted,

*James H. Rollinson*
BAKER & HOSTETLER LLP
James H. Rollinson (BBO #649407)
127 Public Street
Suite 2000
Cleveland, OH 44116
T: (216) 621-0200
F: (216) 626-0740
jrollinson@bakerlaw.com

*Counsel for The UMass Defendants*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, by email, on December 5, 2024.

*James H. Rollinson*
James H. Rollinson

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284cv02889-BLS1<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and certain healthcare providers, including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications

were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

2. Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

3. Healthcare consumers' electronic communications with Defendants were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent, including through tracking technologies hidden on many webpages of the UMass Memorial Website that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, the precise terms of keyword searches, doctor searches, and risk assessments. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4. Defendants do not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the UMass Memorial Website, nor do they seek their consent for such disclosure. On the contrary, Defendants **falsely** tell healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

5. Defendants owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

6. Despite the stigmas that, unfortunately, are so often associated with certain health issues and treatments, Defendants chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

7. As described more fully below, Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

8. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist*

*Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

9. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Right to Privacy Act, and several claims under common law.

10. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, Defendants intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for Defendants' interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

11. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common

claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

**PARTIES**

12. Plaintiff Janice Progin is a resident of Gardner, Massachusetts. Plaintiff is a patient at the UMass Memorial Medical Center and regularly used the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal.

13. As described below, Defendants implemented tracking technologies that intercepted communications between Defendants and healthcare consumers on nearly every page of the UMass Memorial website. The webpages Plaintiff visited on the UMass Memorial Website were among the webpages on which Defendants embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 95-97, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 84-89, *infra* (tracking technologies embedded on pages about medical conditions and procedures); ¶¶ 109-11, *infra* (tracking technologies embedded on patient portal).

14. Plaintiff did not consent to or authorize the use of Private Information by third parties or Defendants enabling third parties to access and use such Private Information.

15. Defendant UMass Memorial Health Care, Inc. is a corporation that operates in Worcester, MA. It is the parent company for defendants UMass Memorial Hospitals, Inc. and UMass Memorial Medical Center, Inc. Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

16. Defendant UMass Community Entities, Inc.[1] is a corporation that operates in Worcester, MA. It is a subsidiary of UMass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s]…information systems" to those healthcare facilities. Based on this filing and upon information and belief, UMass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

17. Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

18. Defendant UMass Memorial Healthalliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health – HealthAllicance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

19. Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

20. Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses

---

[1] Defendants informed Plaintiff that one defendant named in the original complaint—UMass Memorial Hospitals, Inc., changed its name to UMass Memorial Community Hospitals, Inc. Subsequent filings with the Massachusetts Secretary of State confirm that this entity again changed its name on or about April 9, 2024, to UMass Memorial Community Entities, Inc. Plaintiff has updated the name of this entity in the body and caption of this amended complaint.

in Southbridge, MA and Webster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

21. In this complaint, Plaintiff refers collectively to the defendants described in this section as "Defendants."

## JURISDICTION

22. The exercise of personal jurisdiction over the Defendants is proper according to M.G.L. c. 223 § 3 because, among other things, Defendants are located in Massachusetts, and Plaintiff's claim arises out of Defendants' transacting business in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The UMass Memorial Facilities and Their Website

23. Defendants operate hospitals and other healthcare facilities in Worcester and surrounding communities (the "UMass Health Facilities"). The UMass Health Facilities offer inpatient and outpatient care to residents near Worcester and surrounding communities in central Massachusetts. The facilities provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, pregnancy and newborn care, children's services, women's services, and trauma care.

24. Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/ (the "UMass Memorial Website"). Through that website, healthcare consumers can obtain information about the services UMass Memorial provides, including information about doctors, services and treatments provided by Defendants, and particular medical conditions.

25. The UMass Memorial Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The website provides general information about the UMass Memorial Facilities.

(b) The website provides information about healthcare services provided at the UMass Memorial Facilities, communicated through service-specific pages for a range of services such as "Birthing/Maternity Center," "Pediatrics," "Cancer Care," and "Women's Health," among others.

(c) The website provides substantive information about specific health conditions through the website's "Health Library," including numerous interactive "Risk Assessments" individuals can take to determine whether they need healthcare services for a range of conditions, including highly personal conditions such as drug addiction, alcohol abuse, and sexually transmitted diseases.

(d) The website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by specialty, gender, language, and location.

(e) The website permits healthcare consumers to book an appointment online through the website.

(f) The website permits healthcare consumers to access and pay bills online.

(g) The website lets healthcare consumers access their private medical information online through the MyChart portal. MyChart is a third-party provider of online access to healthcare records.

26. Because the UMass Memorial Website provides an interactive experience through which a healthcare consumer can obtain information about particular conditions, doctors, specialties, and, indeed, the individual's own healthcare records, a website user's interaction with the website reveals private health information about the individual.

**<u>Reasonable Expectations of Users of the UMass Memorial Website</u>**

27. Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the UMass Memorial Website.

28. Users of healthcare-related websites such as the UMass Memorial Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Defendants will not share

their private health information—including their communications with the website—with third parties, without their consent.

29. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Defendants from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Defendants from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

30. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared contemporaneously with third parties such as Google and Facebook for marketing purposes.

31. The expectations and understanding of the UMass Memorial Website users are informed by what Defendants tell them about how Defendants handle their personal information.

32. The UMass Memorial Website terms of service state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained more fully below, the website tracks the user's IP address and connects its IP address to the user's browsing activity. More troublingly, those communications and associated IP addresses are contemporaneously shared with third parties such as Google and Facebook, which then can use that information to connect the user's activity on the website with the individual's Google and

Facebook profiles. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use the contents of the intercepted communications to serve personalized advertising to those individuals.

33. The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about their them when they do.

34. The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

35. The UMass Memorial Website terms of service also describe to healthcare consumers the website's use of "cookies" in a deceptive manner. The terms state:

> A cookie is a piece of data stored on your hard drive that contains information about you. Use of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site. UMass Memorial only uses cookies to identify you while you are logged into the UMass Memorial site. Upon exiting the site, the cookie terminates with no retained record of your use of the site.

As explained below, the technologies Defendants use to transmit healthcare consumers' communications contemporaneously to Google, Facebook, and other companies are not limited to

"cookies." But, in any event, the above passage and the other passages quoted above foster a strong impression that a user's activities on the website will not be linked to personally identifiable information. This is false. As described below, Defendants use Google, Facebook, and other tracking technologies specifically designed to associate the users' activities on the website with their profiles with Google, Facebook, and elsewhere.

36. Moreover, it is utterly false to state that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." On the contrary, Facebook, Google, and other third parties retain precise records of website users' activities on the UMass Memorial Website.

37. In short, reasonable healthcare consumers expect that the personal health information reflected in their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Defendants' false statements on their website. The interceptions of website users' communications with Defendants were, therefore, truly secret and made without any consent from the website users.

**Third Parties Offering Tracking Technologies**

38. Plaintiff describes in this complaint various tracking technologies implemented on the UMass Memorial Website that cause the secret interception, recording, and retransmission of the contents of Class Members' internet communications with Defendants. The technological aspects of those technologies are described in the next section. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Defendants and the purposes for which interceptions are made.

39. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It

[2] Facebook rebranded its parent company as "Meta" in October 2021.

owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

40. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

41. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

42. Among the ways Facebook tracks users on websites not owned by Facebook in order to create detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook incentivizes websites to use Meta Pixel by advertising that it allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

43. Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

44. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

45. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."

46. Google LLC is a multinational technology conglomerate, a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and

operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

47. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

48. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

49. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on their websites. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google profits from Google Analytics by using the data obtained about individual users to build such individuals' profiles further. This information can then be used to serve upon such individuals better-targeted individualized advertisements.

**Website Tracking Technologies on the UMass Memorial Website**

50. Defendants have injected hidden code into the UMass Memorial Website that tracks healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular

individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the UMass Memorial Website with the website user's Facebook profile.

51. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Defendants, the contents of communications between Class Members and Defendants and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website. This information reflects individuals' personal health information as defined by HIPAA.

52. Defendants use several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

53. Before describing the techniques such technologies use, it is important to define some basic technological terms.

54. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

55. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the UMass Memorial Website, as of the time of this complaint, is 162.249.110.234. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

56. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the UMass Memorial Website is http://www.ummhealth.org. Numerous URLs also point to specific pages on that website. Sometimes, a URL will reveal information about the particular webpage itself or the substance of the information communicated through it. For example, the UMass Memorial Website has a page specifically about the UMass Memorial Health Cancer Center; that page's URL is https://www.ummhealth.org/umass-memorial-health-cancer-center. That is, one can tell from the URL itself the substance of the communication between Defendants and the healthcare consumer—that the consumer is requesting information about cancer treatment

57. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. Cookies can, for example, confirm to Google and Facebook that a particular individual accessing the UMass Memorial Website is the same individual who also accesses a particular Google or Facebook account from the same device.

58. **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

59. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a

website owner (here, Defendants) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is executed automatically within the individual's web browser.

60. The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a single-pixel image from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology). That image or other small file is not displayed or visible to the website user; the loading and execution of the Javascript code and the subsequent loading of an image or another small file occurs entirely in the background, invisible to the website user.

61. Critically, when the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as http://www.ummhealth.org); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

62. When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits third parties, such as Google or Facebook, to associate the information they have received about the individual's communications with the identity of a particular individual known to Google

and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the UMass Memorial Website to its collection of information it has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook can record and associate the content of the communications it has intercepted with an individual's Facebook profile, which includes the individual's real name and other information about them.

63. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not actually displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to a third party such as Google or Facebook.

64. The tracking technologies described in this complaint intercept and retransmit to third parties the contents of communications between healthcare consumers and the UMass Memorial Website contemporaneously with those communications. The tracking technologies intercept and retransmit the contents of those communications to third parties before the webpage has even completed loading.

**<u>Defendants' Use of Tracking Technologies on the UMass Memorial Website</u>**

65. Defendants use various tracking technologies across the numerous webpages on the UMass Memorial Website. Many of those tracking technologies are embedded in the code of all or almost all of the pages within the UMass Memorial Website. For example, on the main landing page of the UMass Memorial Website, Defendants have injected secret code that loads Google Analytics, Meta Pixel, and various other tracking technologies.

66. It appears that after lawsuits were filed against it relating to the tracking technologies, Defendants may have reduced their use of Meta Pixel on certain pages of the UMass Memorial Website, although Defendants still use the other tracking technologies described in this complaint on nearly every page of the UMass Memorial Website. The examples provided below of Defendants' deployment of Google Analytics and other tracking technologies on the UMass Memorial Website reflect such deployment around the time of the original complaint in this action. Defendants control when and how they use tracking technologies on their own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Defendants' current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

67. The code for tracking technologies is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the network activity generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

68. Below is an image of the main landing page for the UMass Memorial Website:




69. When a user loads the main landing page for the UMass Memorial Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the Javascript code for Google Analytics. The website then causes the user's web browser to execute the Javascript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

70. The image below depicts the landing page for the UMass Memorial Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




71. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and retransmitted to Google, is presented below (with highlighting added). The "Payload" refers to information transmitted to a web server when a file is retrieved from that server. In this case, the "Payload" reflects the information that Google Analytics causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view decoded

v: 1
_v: j97
a: 530489752
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.ummhealth.org%2F
dr: https%3A%2F%2Fwww.google.com%2F
ul: en-us
de: UTF-8
dt: UMass%20Memorial%20Health
sd: 24-bit
sr: 1920x1080
vp: 1002x926
je: 0
_u: QCCACEABRAAAAC~
jid: 1767544177
gjid: 455434716
cid: 102320041.1664411294
tid: UA-48961693-1
_gid: 1962499786.1664411294
_r: 1
gtm: 2wg9q0TPSLSLQ
z: 1301636959

72. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the UMass Memorial Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.umasshealth.org"[3]);

(b) The URL of the prior webpage the user had visited before arriving at the UMass Memorial Website landing page (www.google.com); and

(c) The title of the webpage (after the letters "dt," which includes "UMass Memorial Health").[4]

[3] The characters "%3A" and "%2F" are comptuer codes that replace the ":" and "/" characters.
[4] The characters "%20" are comuter code that reflect a space.

73. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings), identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, UMass Health) and the website's account with Google AdSense, a website monetization program offered by Google. The information transmitted also contains a unique identifier for the particular user visiting the website, enabling Google to track that individual across the website.

74. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Defendants' website and retransmits those contents to Google, the Javascript code also causes the user's web browser to reveal the user's IP address to Google. This permits Google to associate the content of the user's communications with the website with any other information Google has on the individual, including the individual's real identity. Google can then use the contents of communications that it has secretly intercepted for commercial purposes, including serving personalized advertisements in the future to the particular website user browsing the UMass Memorial Website.

75. Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can further confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This allows Google to confirm further that a particular individual using Google's services (for example, a Gmail account) and an individual visiting the UMass Memorial Website is the same individual, particularly when combined with the user's IP address, which is also a unique identifier.

76. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[5] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

77. The same landing page on the UMass Memorial Website also loads Javascript code for Meta Pixel, called "fbevents.js." That Javascript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the UMass Memorial Website. The network activity intercepted and retransmitted to Facebook when loading the UMass Memorial Website's landing page is below:

```
× Headers   Payload   Preview   Response   Initiator   Timing
▾ Query String Parameters     view source     view URL-encoded
   id: 362069588546911
   ev: PageView
   dl: https://www.ummhealth.org/
   rl:
   if: false
   ts: 1667852243703
   sw: 1920
   sh: 1080
   v: 2.9.89
   r: stable
   ec: 0
   o: 28
   fbp: fb.1.1664411293998.360887419
   it: 1667852243663
   coo: false
   rqm: GET
   dt: pvtwa5g22qp40t1kc012sh9pf061srm4
```

[5] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

78. Similar to Google Analytics, Meta Pixel causes the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Defendants' website, including the URL of the webpage visited. The transmission to Facebook also includes information about the user's browser configuration and various codes to associate the communications with Defendants' advertising account with Facebook.

79. Also, similar to Google Analytics, the Javascript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can serve personalized advertising to the website user in the future.

80. Moreover, similar to Google Analytics, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

81. The text fields communicated to Facebook by the Meta Pixel code include a persistent identifier for each particular user, which permits Facebook to track that individual across the UMass Health Website and further confirm that individual's real-world identity.

82. Defendants have configured the UMass Memorial Website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the UMass Memorial Website, which in turn may reveal private health information about the healthcare consumer.

83. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff

does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which Defendants embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with Defendants, including Private Information, were intercepted similarly to the illustrative examples set forth below.

84. The UMass Memorial Website contains a page entitled "Women's Health: Maternity Center," designed to provide information to the website user about pregnancy and the services Defendants offer in connection with pregnancy. A user, by visiting this web page, necessarily reveals to Defendants that the user has some interest in maternity services (for example, the user might be pregnant or know someone who is). When the user communicates with Defendants by visiting this particular webpage, Defendants cause the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Maternity Center webpage:




85. The graphic below presents the contents of the communication between the website user and Defendants that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics Javascript code that Defendants secretly inject into the website (the blue highlighting is added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 247143013759083
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/services-treatments?_ga=2.131274511.1059841755.1664411875-1880997322.1664411875
if: false
ts: 1664412113322
sw: 1920
sh: 1080
v: 2.9.84
r: stable
ec: 0
o: 30
fbp: fb.1.1664411293998.360887419
it: 1664412112865
coo: false
rqm: GET
dt: u8gc9rdrkgppw0n48qyfw2aitdsgxtgy

86. As reflected in the above screenshot, Defendants contemporaneously intercept and retransmit to Google the fact that the website user is visiting a "maternity-center" webpage—information that Google then stores and can use for its own commercial purposes (and which could be accessible via subpoena by third parties, such as states who may be interested in such information for political or legal reasons).[6]

87. The same webpage also contains hidden code that intercepts the user's communication with the website and retransmits that same information to Facebook. The data transmitted to Facebook is depicted below:

[6] *See, e.g.,* NRP, "Privacy advocates fear Google will be used to prosecute abortion seekers," https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions.

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/
if: false
ts: 1668123242798
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668123242777
coo: false
rqm: GET

88. Similar to Google Analytics, Defendants cause the secret interception and transmission to Facebook of the contents of the communication between the website user and Defendants, including that the user is visiting a "maternity-center" webpage, which Facebook can then use for commercial purposes (and which data it retains, and can then be accessed by third parties, such as by way of subpoena).

89. The UMass Memorial Website contains dozens of similar pages on particular medical specialties and practices that the Defendants' healthcare facilities offer. The UMass Memorial Website, for each such page, aids in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Maternity Center example.

90. The UMass Memorial Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often

enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Defendants. When an individual uses the search function, Defendants aid in the secret interception of the contents of that search and retransmission of those contents to Google, Facebook, and other third parties.

91. For example, the screenshot below depicts the search results page when a user enters the phrase "I'm pregnant"[7] into the search bar on the UMass Memorial Website:




92. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via hidden Google Analytics Code (with highlighting added):

[7] This is an example and does not reflect Plaintiff's personal activity on the website.

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-04YJCL6W7W
gtm: 2oeb90
_p: 1900279729
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.106|Chromium;107.0.5304.106|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668123203
sct: 19
seg: 1
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=I%27m+pregnant&form_build_id=form-NW-IovSm3eeoU14WvjOS1Ay6lqVwQ6a7bNxrIbSYFbw&form_id=search_block_form
dr: https://www.ummhealth.org/umass-memorial-medical-center
dt: Search Results - UMass Memorial Medical Center - UMass Memorial Health
en: page_view

93. The above screenshot reflects that when an individual enters a search on the website, Google intercepts the contents of the search. Google then associates those search terms with the individual's real-world identity and then uses that information for commercial purposes (and retains them for potential use by other parties in the future).

94. Defendants also aid in Facebook's secret interception of the same sensitive communication. Below is a screenshot of the information intercepted and transmitted to Facebook:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=_removed_&form_build_id=form-NW-Iov5m3eeoU14WvjOS1Ay6lqVwQ6a3bNxrIbSYFbw&form_id=search_block_form&_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%224f5044badb6767ad742dc945137f520213bbeb130b6ea306cbcb53aae5357d58%22%5D%7D#gsc.tab=0&gsc.q=I'm%20pregnant&gsc.page=1
rl: https://www.ummhealth.org/umass-memorial-medical-center?_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%5D%7D
if: false
ts: 1668124020275
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668124020264
coo: false
rqm: GET
dt: bsa8ed5a382mjclxgc26vm8iyxlbdy34

95. The UMass Memorial Website also includes a "Find a Doctor" function that allows healthcare consumers to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester[8]:




96. Hidden Google Analytics code in this results page causes the secret interception of the facts that the individual is using the find-a-doctor function and the specific criteria the individual has inputted. The contents of the communication that are secretly intercepted and transmitted to Google are captured below:

[8] Again, this is not a search Plaintiff performed but is instead presented to illustrate the types of communications that tracking technologies intercept and retransmit to third parties.

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-HDYC9M7247
gtm: 2oeb90
_p: 1829352063
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.107|Chromium;107.0.5304.107|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668449031
sct: 4
seg: 1
dl: https://physicians.umassmemorial.org/results?Affiliations=6&SubSpecialties=1636%2c1635&address=Worcester%2c+MA+01601%2c+USA&distance=5&latlng=42.26%2c-71.8&sortDirection=asc&sortby=distance&Gender=Female
dr: https://physicians.umassmemorial.org/results?Affiliations=6&Gender=Male%2CFemale&SubSpecialties=1636%2C1635&sortby=distance&sortDirection=asc&address=Worcester%2C+MA+01601%2C+USA&distance=5&latlng=42.26%2C-71.8
dt: Search Results - UMass Memorial Health
en: page_view

97. The highlighted portion above uses numeric codes for the affiliations and specialties criterion ("Affiliations=6" references UMass Memorial Medical Center, and "SubSpecialties=163" references Obstetrics & Gynecology), and the preferred geographic location ("Worcester") and doctor gender ("Female"), plus the permissible distance from Worcester ("5" miles). Each of these inputs are

intercepted by Google. Although a couple of fields use numeric codes, the meaning of those codes can easily be discerned by loading the full URL, including the parameters highlighted in blue above, to reveal the substance of the individual's search.

98. The UMass Memorial Website also features numerous "Risk Assessments," through which individuals can relate information about themselves to receive an instant assessment. Those assessments include, among others, an Alcohol Use Assessment, a Breast Cancer Risk Assessment, a Depression Risk Assessment, and a Substance Abuse Assessment. The screen capture below, for example, depicts the Substance Abuse Assessment (the selected answers do not reflect any particular individual's responses but are provided by way of example):



99. When a website user first loads a risk assessment, that communication is intercepted via Google Analytics code, and communication contents are transmitted to Google. The graphic below depicts the information intercepted and transmitted to Google upload loading of the Substance Abuse Assessment:



× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j98
a: 1736156123
t: pageview
_s: 1
dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
ul: en-us
de: UTF-8
dt: Substance%20Abuse%20Assessment
sd: 24-bit
sr: 1920x1080
vp: 1231x979
je: 0
_u: AACAAEABAAAAACAAI~
jid:
gjid:
cid: 1972491336.1664909972
tid: UA-17264146-13
_gid: 2122976964.1664909972
_slc: 1
z: 2014474095

100. As highlighted above, the fact that a user is taking a Substance Abuse Assessment is communicated to Google via Google Analytics.

101. When a user completes and submits the assessment form, a new webpage is loaded with the user's results. That page is depicted below:




102. When the results page loads for the risk assessment, that communication is secretly intercepted via the Google Analytics code, and parts of the communication are sent to Google. The information sent to Google is depicted below:

× Headers Payload Preview Response Initiator Timing

**▾ Query String Parameters** view source view decoded


v: 1

_v: j98

a: 1049796374

t: pageview

_s: 1

dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2

dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2

ul: en-us

de: UTF-8

dt: Substance%20Abuse%20Assessment

sd: 24-bit

sr: 1920x1080

vp: 1231x979

je: 0

_u: AACAAEABAAAAACAAI~

jid: 1267990952

gjid: 2074861852

cid: 1972491336.1664909972

tid: UA-17264146-13

_gid: 2122976964.1664909972

_r: 1

_slc: 1

z: 1530351183


103. The user's responses to each question in the risk assessment are highlighted in the screen capture above. Those responses are intercepted and transmitted to Google. Although the parameters are communicated in code (after the word "Parameters"), that code can easily be used to identify the user's response to each question by loading the full highlighted URL.

104. The UMass Memorial Website also contains a section permitting patients to pay bills they received from Defendants. The "Pay Bill Online" page of the UMass Memorial Website, is depicted below:




105. When a user visits the bill payment website, the user communicates that he or she is an individual who has received medical services from Defendants, thus confirming the individual's likely patient status. That communication with Defendants is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted by and transmitted to Google are depicted below (with highlighting added):




As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Pay Bills Online" page of "UMass Memorial Health." Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

106. The same communication was also intercepted by and transmitted to Facebook via Hidden Meta Pixel code that Defendants inserted into the same page of the UMass Memorial Website. The contents of the communication intercepted and transmitted to Facebook are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: [redacted]
rl: https://www.ummhealth.org/
if: false
ts: 1672169527073
sw: 1920
sh: 1080
v: 2.9.90
r: stable
ec: 0
o: 28
fbp: fb.1.1672166405999.53352171
it: 1672169527052
coo: false
exp: c1
rqm: GET

As shown above, the Meta Pixel code that Defendants inserted into their website causes the bill payment webpage to intercept and transmit to Facebook that the individual is accessing a webpage for "patients-visitors" to "pay-bills-online" as UMass Memorial. Facebook retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

107. If a user scrolls down on the same bill payment webpage, Defendants provide a link to their myChart patient portal in order to view and pay bills, as depicted in the screenshot below:

## Pay Your Bills Online

Pay your bills using myChart–whether or not you have a myChart account:

- Log-in to myChart and use the menu to navigate to Billing Summary
- Pay using the myChart Guest Portal

108. If a user clicks on the link to "Log-in to myChart," that communication through which the user connects to Defendants' patient portal (and confirms further their status as a patient) is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted by and transmitted to Google are depicted below (with highlighting added):




As reflected above, the communication through which the individual accesses the MyChart patient portal to pay a bill online is intercepted and transmitted to Google. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

109. The same interceptions occur if a patient accesses the myChart patient portal from other parts of the UMass Memorial Website. For example, if a patient clicks the myChart link from

the main landing page, that individual proceeds to a landing page for the myChart patient portal. That webpage is depicted below:




110. When a user requests the landing page for the myChart patient portal, that communication is intercepted and transmitted to Google through Google Analytics code that Defendants injected into the webpage. The contents of the communication that are intercepted and transmitted to Google are depicted below (with highlighting added):

X Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j98
a: 1178920862
t: event
ni: 0
_s: 1
dl: https%3A%2F%2Fwww.ummhealth.org%2F
dr: https%3A%2F%2Fwww.google.com%2F
ul: en-us
de: UTF-8
dt: [illegible]%20[illegible]%20[illegible]
sd: 24-bit
sr: 1920x1080
vp: 1097x979
je: 0
ec: All%20Clicks
ea: Click%20Text%20-%20MYCHART
el: Click%20URL%20-%20https%3A%2F%2Fwww.ummhealth.org%2F[illegible]%2F[illegible]
_u: SDCACEABRAAAACAAI~
jid: 158241309
gjid: 615808819
cid: 1445904815.1672166402
tid: UA-48961693-1
_gid: 1334664903.1672166402
_r: 1
gtm: 2wgbu0TP5LSLQ
z: 982284729

As shown above, Google Analytics code causes the communication through which the individual requests the "mychart patient website" for "UMass Memorial Health" to be intercepted and transmitted to Google. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

111. The same communication was also intercepted by and transmitted to Facebook via Hidden Meta Pixel code that Defendants inserted into the same page of the UMass Memorial Website. The contents of the communication intercepted and transmitted to Facebook are depicted below (with highlighting added):

X Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

id: 362069588546911
ev: PageView
dl: [redacted]
rl: https://www.ummhealth.org/
if: false
ts: 1672167589622
sw: 1920
sh: 1080
v: 2.9.90
r: stable
ec: 0
o: 28
fbp: fb.1.1672166405999.53352171
it: 1672167589598
coo: false
rqm: GET

That is, Meta Pixel code that Defendants injected onto this webpage causes the interception and transmission to Facebook of the fact that the individual is visiting the "mychart" patient portal on the UMass Memorial Health Website.

112. The above examples of Defendants' implementation of tracking technologies just that—examples. Defendants use similar Google Analytics and Meta Pixel code throughout nearly all parts of the UMass Memorial Website, closely tracking individuals' communications with the UMass Memorial Website.

113. In addition to Google and Facebook, the communications between healthcare consumers and UMass Health are intercepted and retransmitted to various companies without the individual's consent. These additional third parties include:

(d) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(e) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(f) **Sharethis.** Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Defendants insert code on their website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

**<u>The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary</u>**

114. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the UMass Health Website's operation. The UMass Health Website can and would operate just the same from the perspective of healthcare consumers without the tracking technologies described in this complaint.

115. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Defendants via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a simple link to a Facebook profile; any website can have one without the other.

116. Moreover, even if a company wishes to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate business reason for any company to keep secret from website users the use of these tracking technologies. Indeed, disclosure of such tracking technologies is possible and, if implemented properly, would avoid the secret interception of internet communications. Some websites, for example, disclose tracking technologies through a pop-up displayed to the user when the user first accesses the website. The quality and legal validity of these kinds of disclosures vary depending on how they are presented and their substance,

but a disclosure could, in principle, disclose the use of tracking technologies and their impact on confidentiality.

117. A healthcare consumer visiting the UMass Memorial Website is presented with no pop-up disclosure informing them that their communications with the website are intercepted or tracked. Even if the UMass Memorial Website were to feature such a pop-up that links to the UMass Memorial Website terms of service or privacy policy, those policies do **not**, as described above in paragraphs 31 to 36, disclose the tracking technologies described in this complaint. To the contrary, those terms of service mislead website users by telling them that such sharing of communications between Class Members and Defendants is **not** taking place.

**Defendants Violated HIPAA and the FTC Act.**

118. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[9]

119. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

120. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect

[9] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

121. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[10]

122. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

123. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[10] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

124. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

125. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

126. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[11]

127. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[12]

[11] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.10.
[12] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

128. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[13]

129. In other words, the HHS has expressly stated that entities like Defendants that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

130. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

131. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that

[13] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

132. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

133. Defendants' provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

134. Defendants are "covered entities" under HIPAA and thus subject to the Privacy Rule.

135. Defendants' use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

136. Defendants improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of Defendants by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, bill payment webpages, and the myChart patient portal).

137. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors and medical procedures, Defendants permitted third parties to intercept the identity of doctors for Plaintiff, and specific treatments connected to Plaintiff, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

138. Defendants improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Defendants disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

139. Defendants violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

140. Defendants further violated other HIPAA regulations as follows:

(g) Defendants failed to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(h) Defendants failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(i) Defendants failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(j) Defendants failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(k) Defendants failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(l) Defendants failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

141. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[14]

142. Defendants' undisclosed use of tracking technologies on their website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, Defendants' violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

143. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[15]

144. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

[14] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[15] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

145. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

146. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[16]

147. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[17]

---

[16] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[17] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

**Defendants Violated Industry Standards**

148. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

149. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

150. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

151. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

152. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[18]

153. Defendants, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Defendants failed to

[18] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**Plaintiff and Class Members Suffered Harm from Defendants' Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

154. As a direct and proximate cause of Defendants' unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by Defendnats' conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Defendants denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Defendants' services or would have demanded compensation for Defendants' use of their Private Information if they had known of Defendants' practices;

(d) Defendants eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Defendants' actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## Class Action Allegations

155. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.ummhealth.org within three years prior to the date of the original complaint in this action.

156. This action is properly maintainable as a class action.

157. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

158. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Defendants, through the UMass Memorial Website, were electronic communications under the ECPA.

(b) Whether Defendants inserted tracking technologies into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the UMass Memorial Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether, by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Defendants;

(g) Whether Class Members' communications with Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent;

(h) Whether Class Members' privacy interests were violated by the interceptions of their communications with Defendants' website;

(i) Whether and to what extent Defendants had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(j) Whether Defendants had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(k) Whether the promises made in Defendants' terms of service either were or formed part of a contract between Defendants and Plaintiff and Class Members;

(l) Whether Defendants' disclosure of Plaintiff's and Class Members' IHII and PHI breached Defendants' promises set forth in their terms of service, giving rise to liability for breach of contract;

(m) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of actions to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

159. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the UMass Memorial Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

160. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

161. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, the damage that any individual Class member has suffered is not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

162. Defendants have acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

**COUNT I**

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

163. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

164. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

165. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Defendants, through the UMass Memorial Website, were electronic communications under the ECPA.

166. The tracking technologies inserted into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the UMass Memorial Website; (ii) Class Members' web browsers used to access the UMass Memorial Website; (iii) Defendants' own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the UMass Memorial Website.

167. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website, including, but not limited to, (i) information about the webpages the

user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

168. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Defendants configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Defendants, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Defendants ), permitting the interception of the substance of requests for information on particular doctors, permitting the interception of the substance of search terms inputted by healthcare consumers, and using tracking technologies on pages that would confirm to third parties such as Google and Facebook the healthcare consumers' likely status as patients of Defendants.

169. With respect to Plaintiff, the tracking technologies revealed information regarding Plaintiff's doctors and medical conditions by configuring the tracking technologies to reveal the substance of communications searches for doctors and requests for information about conditions and medical procedures, as well as Plaintiff's status as a patient of UMass Memorial by using tracking technologies on webpages for medical records requests.

170. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

171. Additionally, through the above-described tracking technologies, after Defendants intercepted communications, the intercepted information was, in turn, used by third parties, such as

Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

172. Defendants facilitated the interception of communications between the Class Members and Defendants, and Defendants disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

173. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

174. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

175. Because of Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendants do not qualify for the party exemption.

176. As alleged above, Defendants violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

177. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

178. Plaintiff's Private Information that Defendants disclosed to third parties qualifies as IIHI, and Defendants violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Defendants used the intercepted electronic communications to increase its revenues.

179. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Defendants specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

180. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

181. Defendants' conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendants' use of the Facebook source code was for Defendants' commercial advantage to increase revenue from existing patients and gain new patients.

182. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

183. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Defendants' violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

184. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

185. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

186. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

187. Defendants had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

188. Plaintiff and Class Members did not authorize Defendants to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

189. Defendants distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Defendants' conduct reflected a public disclosure of private facts.

190. Additionally, Defendants' injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

191. Defendants' conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

192. Plaintiff and Class Members suffered injuries as a direct and proximate result of Defendants' disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

193. Defendants' acts or omissions violate the Massachusetts Right to Privacy Act.

194. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

195. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

196. A fiduciary relationship existed between Defendants, healthcare providers, and Plaintiff, a patient of Defendant. Furthermore, Defendants assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

197. When possessing nonpublic medical information, medical providers such as Defendants have a duty to keep such information completely confidential.

198. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Defendants through its website, which included highly sensitive Private Information. Defendants' terms of service bolstered that expectation, given their promises to Plaintiff that Defendants would not disclose communications on the website to third parties.

199. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Defendants installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

200. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

201. Defendants' secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of Defendants' fiduciary duties to Plaintiff to safeguard and protect their Private Information.

202. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

203. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

204. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Defendants owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

205. Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

206. It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

207. Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between Defendants and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

208. In addition, Defendants had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

209. Defendants' conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendants' misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

210. Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

211. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees.

## COUNT V

**(Breach of Confidence, on behalf of the Class)**

212. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

213. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

214. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

215. When possessing nonpublic medical information, medical providers such as Defendants have a duty to keep such information completely confidential.

216. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Defendants through its website, which included highly sensitive Private Information. Defendants' terms of service bolstered that expectation, given Defendants' promises to Plaintiff that Defendants would not disclose communications on the website to third parties.

217. In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became a guardian of Plaintiff's and Class Members' Private Information, Defendants became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendants did and does store and disclose.

218. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendants installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Defendants and the contents of those communications, including Private Information.

219. Defendants made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

220. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendants' employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendants' negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

221. Defendants disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

222. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

223. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees

## COUNT VI

**(Breach of Contract, on behalf of the Class)**

224. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

225. Defendants required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the UMass Memorial Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for Defendants' provision of services through the UMass Memorial Website, including the provision of information and the use of the website to obtain medical services.

226. In so doing, Plaintiff and Class Members entered into contracts with Defendants (or, in the alternative, implied contracts) by which Defendants agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Defendants' contractual promises included that (i) a website user could communicate over the UMass Memorial Website without identifying himself or herself; and (ii) that Defendants "do not disclose your information to third parties" except for limited circumstances not present here.

227. Plaintiff and Class Members fully performed their obligations under the contract with Defendants.

228. Defendants breached its agreement with Plaintiff and Class Members by directly breaching its promises to permit users to use the website without identifying themselves and not to disclose information to third parties.

229. As a direct and proximate result of Defendants' above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with Defendants.

230. As a direct and proximate result of Defendants' above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 154, *supra,* plus costs and attorneys' fees.

**COUNT VII**

**(Unjust Enrichment, on behalf of the Class)**

231. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

232. This claim is pleaded in the alternative to Plaintiff's other causes of action.

233. Defendants benefit from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

234. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

235. Defendants consciously collected and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

236. Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

237. The benefits that Defendants derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendants to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

238. Had Defendants informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now

knowing of Defendants' practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

239. The Court should compel Defendants to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Defendants unjustly received and such other relief as the Court may deem just and proper.

**Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 13, 2024

*/s/ Patrick J. Vallely*
Patrick J. Vallely

25

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 13, 2024

Respectfully submitted,

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

Date Filed 1/2/2025 4:13 PM
Superior Court - Suffolk
Docket Number 2284CV02889

SL

26

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

JANICE PROGIN,

Plaintiff, on behalf of herself and others similarly situated,

v.

UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,

Defendants.

**SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**

CIVIL ACTION NO. 2284cv02889-BLS1

U.S. Dist. # 25-cv-40003

**NOTICE OF FILING NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on January 2, 2025, Defendant UMass Memorial Health Care, Inc.; UMass Memorial Community Entities, Inc.; UMass Memorial Medical Center, Inc.; UMass Memorial HealthAlliance-Clinton Hospital, Inc.; Marlborough Hospital; and UMass Memorial Health – Harrington Hospital, Inc., incorrectly named under its prior name as Harrington Memorial Hospital Inc. (together, the "UMass Memorial Defendants") filed a Notice of Removal pursuant to 28 U.S.C. § 1441(c) in the United States District Court for the District of Massachusetts, thereby removing this action. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts and filing copies thereof with the Clerk at the Suffolk County Superior Court, the UMass Memorial Defendants have effected

removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant 28 U.S.C. § 1146(d).

Dated: January 2, 2025

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

Date Filed 1/2/2025 4:13 PM
Superior Court - Suffolk
Docket Number 2284CV02889

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 2, 2025 copies of the foregoing notice of removal were served on the following by email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

*/s/ James H. Rollinson*
*One of the attorneys for defendant*

Date Filed 1/2/2025 4:13 PM
Superior Court - Suffolk
Docket Number 2284CV02889

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | Case No. ___________________<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]<br><br>DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(c) |

**NOTICE OF REMOVAL**

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Janice Progin:

Plaintiff's Amended Complaint includes a federal claim against UMass Memorial Health Care, Inc., UMass Memorial Community Entities, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance-Clinton Hospital, Inc., Marlborough Hospital, and UMass Memorial Health – Harrington Hospital, Inc., incorrectly named under its prior name as Harrington Memorial Hospital, Inc. (collectively, "UMass Memorial Defendants") for violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511. The UMass Memorial Defendants therefore remove this case pursuant to federal question jurisdiction. 28 U.S.C. § 1331; 28 U.S.C. § 1441(c).

In support of removal, the UMass Memorial Defendants provide the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. UMass Memorial Health Care, Inc. is a Massachusetts nonprofit charitable corporation that is the direct or indirect corporate member of each of the entities that makes up the UMass Memorial Healthcare system, including but not limited to the other named Defendants (altogether "UMass Memorial Defendants," as previously noted).

2. On December 20, 2022, Plaintiff Janice Progin filed a complaint against the UMass Memorial Defendants, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2284CV02899-BLS2.

3. Plaintiff served the UMass Memorial Defendants with the Complaint, effective on December 28, 2022.

4. Plaintiff's Complaint challenged UMass Memorial's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See generally* Exhibit ("Ex.") 1, Complaint ("Compl."); *id.* at ¶¶ 6, 20, 21, 27, 46, 75, 111–118.

5. On January 17, 2023, the UMass Memorial Defendants filed a notice of removal to the United States District Court, informing the court that it removed the case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See generally*, Ex. 5, Notice of Removal.

6. Ultimately, on July 18, 2023, the case was remanded back to the Massachusetts Superior Court because the Court found the case was not within the scope of the federal officer statute. *See* Ex. 14, Order of Remand; Ex. 14, Memorandum and Order.

7. On September 11, 2023, the Court transferred the case to the Business Litigation Session 1. *See* Ex. 23, Notice of Transfer to the Business Litigation Session.

8. On January 22, 2024, the UMass Memorial Defendants and Plaintiff (collectively, the "Parties") filed a "Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases." *See generally* Ex. 25.

9. The Parties requested that all proceedings in this matter be stayed pending the completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1) because the issues in the appeals overlapped with the issues in this case regarding the interpretation of the Massachusetts Wiretap Act. *See generally id.*

10. On January 24, 2024, the court granted the joint stipulation to stay all proceedings pending interlocutory appeal. *See* Ex. 26, Endorsement of Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases.

11. On December 5, 2024, Plaintiff and the UMass Memorial Defendants filed separate notices, notifying the court that the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). *See* Ex. 27, Plaintiff's Notice of Supreme Judicial Court Decision in Vita v. New England Baptist Hospital; Ex. 28, The UMass Memorial Defendant's Notice of Supreme Judicial Court Decision in Vita v. New England Baptist Hospital.

12. In their notice, the UMass Memorial Defendants further explained that Plaintiff notified the UMass Memorial Defendants that she "intends to file an amended complaint in light of the SJC's decision in *Vita*, which is dispositive of Plaintiff's current sole Massachusetts Wiretap Act claim." *See* Ex. 28 at 1.

13. On December 13, 2024, Plaintiff filed an Amended Complaint. *See generally* Ex. 29, Amended Complaint.

14. The Amended Complaint includes a number of new claims against the UMass Memorial Defendants, including a claim for violation of the ECPA, 18 U.S.C. § 2511.

**BASIS FOR REMOVAL**

15. The UMass Memorial Defendants remove this case pursuant to federal question jurisdiction. 28 U.S.C. § 1441(c). The statute permits the removal of the entire action when the civil action includes "(A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and (B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute." *Id.* "[T]he entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B)." *Id.*

16. This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331.

17. This case is removable to this Court because Plaintiff asserted a claim under a law of the United States, specifically the ECPA, 18 U.S.C. § 2511. *See* Ex. 29 at 58; *id.* ¶ 170 ("By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2411(1)(a).").

18. Because this matter is an action arising under federal law of which this Court has original jurisdiction, as authorized by 28 U.S.C. § 1331, it is subject to removal under 28 U.S.C. § 1441(c).

19. Accordingly, this action is removable to this Court under 28 U.S.C. § 1441(c) and § 1331.

20. By removing this action, the UMass Memorial Defendants do not waive any defenses available to them.

21. By removing this action, the UMass Memorial Defendants do not admit any of the allegations in Plaintiff's Amended Complaint.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

22. The UMass Memorial Defendants likewise satisfy all of the procedural requirements under 28 U.S.C. § 1446.

23. The UMass Memorial Defendants timely remove this case. They are filing this Notice of Removal within thirty (30) days of its receipt of the Amended Complaint by "service." 28 U.S.C. § 1446.

24. The UMass Memorial Defendants file this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

25. The UMass Memorial Defendants have attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Amended Complaint.

26. Upon filing this notice, the UMass Memorial Defendants will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

27. As set forth above, Plaintiff's Amended Complaint includes a claim against the

UMass Memorial Defendants that arises under the laws of the United States. Plaintiff's Amended Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1441(c).

**WHEREFORE, the UMass Memorial Defendants respectfully remove this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.**

Dated: January 2, 2025

Respectfully submitted,

*<u>/s/ James H. Rollinson</u>*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 2, 2025 copies of the foregoing were filed using the Court's CM/ECF service which will provide service copies to the Plaintiff's counsel of record listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

*/s/ James H. Rollinson*
*One of the attorneys for defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 28, 2025, a copy of the foregoing certified record was filed using the Court's CM/ECF service which will provide service copies to the Plaintiff's counsels of record.

*/s/ James H. Rollinson*
*One of the attorneys for defendant*