## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANICE PROGIN, on behalf of herself and others similarly situated, <br><br>     Plaintiff, <br><br>       v. <br><br> UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC., <br><br>     Defendants. | Case No. 4:25-cv-40003 |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

## <u>TABLE OF CONTENTS</u>

NATURE OF ACTION AND ALLEGATIONS ........................................................................ 1

PARTIES TO THE ACTION ................................................................................................... 2

JURISDICTION AND VENUE ............................................................................................... 4

FACTUAL BACKGROUND ................................................................................................... 5

    A.   Defendants routinely disclosed private communications and the protected health information of their patients to third parties, including Facebook and Google. ................ 5

    B.   Plaintiffs' experience with Defendants. .................................................................... 6

    C.   Defendants misuse sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook. ............ 8

    D.   Tracking pixels provide third parties with a trove of personally identifying data, permitting them to uniquely identify the individuals browsing a website....................... 16

    E.   Facebook's Business Model: Exploiting Users' Personal Information for Profit. ... 22

    F.   Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites................................................... 25

    F.   Defendants have discretely embedded the Meta Pixel tool on its website, capturing and disclosing of patients' PII/PHI to Facebook. ............................................................ 32

    G.   Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information. ............................................................ 50

    H.   Defendants' disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary..................................................................................... 55

    I.   Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information. ................................... 56

    J.   Defendants harmed Plaintiffs when they illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI —which, after all, is Plaintiffs' property, and has economic value. .. 59

    K.   Defendants are enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI. ............................................................................ 61

TOLLING, CONCEALMENT, AND ESTOPPEL .................................................................... 62

CLASS ACTION ALLEGATIONS ........................................................................................ 63

CAUSES OF ACTION ........................................................................................................... 66

    COUNT I .......................................................................................................................... 66

    COUNT II ......................................................................................................................... 71

    COUNT III ........................................................................................................................ 76

    COUNT IV ........................................................................................................................ 80

    COUNT V .......................................................................................................................... 90

    COUNT VI ........................................................................................................................ 94

DEMAND FOR JURY TRIAL ............................................................................................. 95

PRAYER FOR RELIEF ......................................................................................................... 95

Plaintiffs Janice Progin, John Doe, and Lisa Colleton ("Plaintiffs"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), bring suit against Defendants UMass Memorial Health Care, Inc. UMass Memorial Community Entities, Inc. UMass Memorial Medical Center, Inc., UMass Memorial HealthAllianceClinton Hospital, Inc., Marlborough Hospital, and Harrington Memorial Hospital, Inc. ("Defendants"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1.      This case arises from Defendants' systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2.      Defendants assure visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without identifying yourself or providing personal information."[1]   Contrary to these assurances, Defendants did not follow this policy, nor the law prohibiting such disclosures.

3.      At all relevant times, Defendants assisted Facebook, Google, and other third parties in eavesdropping on communications between Defendants and its patients, resulting in disclosures of sensitive information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities–without their patients' knowledge, authorization, or consent.

---

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

4.    Defendants disclosed these private communications, including protected health information, through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendants' use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendants to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendants.

5.    Defendants' conduct in disclosing such protected health information about its patients to Facebook and other third parties violates both Massachusetts and Federal law.

## PARTIES TO THE ACTION

6.    Defendants UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendants is the largest health care system in Central Massachusetts.[2] Defendants own and manage many healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital.[3] Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

---

[2] https://www.ummhealth.org/umass-memorial-health/about-us
[3] https://www.ummhealth.org/locations

2

7.    Defendants UMass Community Entities, Inc.[4] is a corporation that operates in Worcester, MA. It is a subsidiary of UMass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s] ... information systems" to those healthcare facilities. Based on this filing and upon information and belief, UMass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

8.    Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

9.    Defendant UMass Memorial HealthAlliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health - HealthAlliance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

10.    Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

---

[4] Defendants informed Plaintiffs that one defendant named in the original complaint-UMass Memorial Hospitals, Inc., changed its name to UMass Memorial Community Hospitals, Inc. Subsequent filings with the Massachusetts Secretary of State confirm that this entity again changed its name on or about April 9, 2024, to UMass Memorial Community Entities, Inc. Plaintiffs have updated the name of this entity in the body and caption of this amended consolidated complaint.

11.    Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses.

12.    Plaintiff John Doe is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendants' physicians, and has been a patient of UMass Memorial Medical Center,[5] and thus also a patient of Defendants. John Doe is a user of Defendants' website at www.ummhealth.org.

13.    Plaintiff Lisa Colleton is an individual who is over 18 years and resides in Marlborough, Massachusetts. Plaintiff is also a patient of Defendants and a user of Defendants' website at www.ummhealth.org.

14.    Plaintiff Janice Progin is an individual who is over 18 years and resides in Gardner, Massachusetts. Plaintiff is also a patient of UMass Memorial and a user of UMass Memorial's website at www.ummhealth.org.

## **JURISDICTION AND VENUE**

15.    This Court has personal jurisdiction over Defendants because they regularly conduct business throughout Massachusetts and have their principal place of business in Massachusetts, including at 365 Plantation Street, Worcester, MA 01605.  G.L. c. 223A, § 2; G.L. c. 223A, § 3.

16.    Venue is appropriate in the Business Litigation Session per the Order to Transfer dated October 23, 2023.

---

[5] https://www.ummhealth.org/umass-memorial-medical-center

4

## FACTUAL BACKGROUND

**A.     Defendants routinely disclosed private communications and the protected health information of their patients to third parties, including Facebook and Google.**

17.     Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

18.     Medical patients such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendants without their express written consent and authorization.

19.     Patients also have reasonable expectations of privacy that their personal identifiable information and protected health information (together "PII/PHI") and communications will not be disclosed to third parties without their express written consent and authorization.

20.     As health care providers, Defendants have ethical, fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

21.     Defendants expressly and impliedly promise patients that they will maintain and protect the confidentiality of PII/PHI and communications.

22.     Defendants operate websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

23.     Defendants' websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

24.     Defendants encourage patients to use digital tools on their websites to seek and receive health services.

25.     The home page of Defendants' website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Defendants' services.

26.     Defendants also maintain a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers.  Collectively herein, Defendants' website and patient portal are defined as Defendants' "Web Properties."

27.     Notwithstanding patients' reasonable expectations of privacy, Defendants' legal duties of confidentiality, and Defendants' express promises to the contrary, Defendants disclose the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendants without patients' knowledge, authorization, or consent.

**B.     Plaintiffs' experience with Defendants.**

28.     Plaintiff Janice Progin has been a patient of Defendants for several years. During that time, she used Defendants' website on many occasions throughout the class period, including throughout 2022 when she was obtaining treatment from Defendants for a specific medical condition. She also visited and used Defendants' password-protected patient portal regularly during the class period, including numerous times in 2022.

29.     Janice Progin used Defendants' website to obtain information about her doctors and other doctors she was considering using for her own healthcare. She also used Defendants' website to request and obtain from Defendants information on particular symptoms she was experiencing, certain conditions she had, and medical procedures she was considering having Defendants' medical staff perform. She also used Defendants' patient portal to obtain and review her personal

medical records.

30.     Plaintiff John Doe was a patient of Defendants for over a decade. While a patient of Defendants, including in 2021 and 2022, John Doe visited Defendants' website regularly at www.ummhealth.org in the course of seeking medical treatment. He used Defendants' website to find a doctor and research locations for treatment. On Defendants' website, John Doe entered data, including sensitive medical information, such as details about his medical conditions and treating physicians. The information that Plaintiff John Doe transmitted included queries about treatment for a spinal injury that he suffered and for which he sought treatment from Defendants.

31.     In addition, John Doe regularly used Defendants' password-protected patient portal to review summaries of his visits and instructions from his treating physicians, schedule appointments, and pay for medical treatment.  He most recently used the patient portal to pay for treatment in 2023. When using Defendants' patient portal John Doe also communicated such specific details as his name, his patient status, his treating physician, and the specific medical conditions that he was seeking treatment for and information about.

32.     Plaintiff Lisa Colleton has likewise been a patient of Defendants for several years. While a patient of Defendants, she used Defendants' website on many occasions, including at least once in each of April, May, June, July, August, and September 2021. She also visited and used Defendants' password-protected patient portal.  At the times she visited Defendants' website and patient portal, she had and remained logged into a Facebook account.

33.     Lisa Colleton used Defendants' website to search for medical information, services and physicians, schedule appointments, and pay for treatment. She also used Defendants' patient portal to communicate with her treating physicians. When using Defendants' website and patient portal, Plaintiff Colleton entered data, including sensitive medical information, such as details

7

about her particular medical conditions and treating physicians. The information that Plaintiff Colleton transmitted included queries about treatment for a particular diagnosis she received.

34.    Unbeknownst to Plaintiffs, Defendants installed tracking technologies across its webpages, including pages and buttons on pages specifically designed for patients, such as (i) pages and the login button to its patient portal; (ii) pages used to make appointments; (iii) pages used to select doctors; and (iv) pages used to pay bills. The tracking technologies caused the individuals' status as patients, the medical information entered on those webpages, their personally identifiable information, including their IP Addresses and Browser Fingerprints, and Plaintiffs' interactions with Defendants' webpages, to be transmitted to third-party advertisers without their consent.

35.    On information and belief, Defendants also installed tracking technologies inside of its patient portal that caused the medical information Plaintiffs entered on that patient portal, their personally identifiable information including their IP Addresses and Brower Fingerprints, and Plaintiffs' interactions with Defendants' patient portal, to be transmitted to third party advertisers without their consent.

36.    Plaintiffs believed that their interactions with Defendants through their website and patient portal were private and would not be shared with anyone besides their health care providers and their staff. They were dismayed to learn that was not the case.

**C.    Defendants misuse sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

37.    Defendants' disclosures of patients' personal healthcare information occur because Defendants intentionally deploy hidden source code on the websites it operates, including www.ummhealth.org and www.harringtonhospital.org, that causes patients' personally

identifiable information (including the exact contents of their communications) to be transmitted to third parties, while concealing that disclosure from patients.

38.     By design, third parties receive and record the exact contents of patient communications before the full response from Defendants to patients has been rendered on the screen of the patient's computer device and while the communication between Defendants and the patient remains ongoing.

39.     For example, when Plaintiffs or a Class Member accessed Defendants' website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.  The information that Defendants sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendants' website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.  Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

40.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smartphone, via the client device's web browser.

41.     Web browsers are software applications that allow users to exchange electronic communications over the internet.

42.     Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server.  When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server

corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

43.    In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

44.    In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

45.    A web page consists primarily of "Markup" and "Source Code."  The markup of a web page comprises the visible portion of that web page.  Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen.  The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

46.    For example, typing https://www.ummhealth.org/ into a browser sends an HTTP request to Defendants' website, which returns a HTTP response in the form of the home page of Defendants' website:



47.     Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen.  Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendants' website, to third parties via pixels.

48.     For example, Defendants' website includes software code that transmits patients' HTTP requests to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

49.     The basic command that web browsers use to exchange data and user communications is called a GET request.[6]  For example, when a patient types "heart failure treatment" into the search box on Defendants' website and hits 'Enter,' the patient's web browser

---

[6] https://www.w3schools.com/tags/ref_httpmethods.asp

makes a connection with the server for Defendants' website and sends the following request: "GET search/q=heart+failure+treatment."

50.     When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user.  For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

51.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

52.     In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

53.     Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties, like Facebook and Google, via third-party tracking tools. Indeed, Google warns website developers and publishers that installing its ad-tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google. [7]

---

[7] https://support.google.com/platformspolicy/answer/6156630?hl=en

54.    Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

55.    In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

56.    These tracking pixels can collect dozens of data points about individual website users who interact with a website.  For example, when a patient clicked through Defendants' website to the page describing Defendants' "Reproductive Endocrinology and Infertility" services at                    https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/reproductive-endocrinology-and-infertility, the source code deployed on Defendants' website caused personally identifiable data and the content of patient communications to be transmitted to third parties like Facebook and Google:



57.    By design, the transmission of patient data to third parties occurs before Defendants' responsive communications about "Reproductive Endocrinology and Infertility" have been delivered in full to the patient.

58.    Tracking pixels such as the Meta Pixel tool allow Defendants and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendants' websites.  When patients visit Defendants' websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendants' websites.  This code is triggered when a patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends the patient's PII/PHI directly to Facebook.

59.    The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on

14

which they are surreptitiously installed.  Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

60.    For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' website by typing a term such as "breast cancer" into the search bar and then hitting enter.  Defendants' server in turn sends an HTTP response, which results in the search results being displayed.

61.    This is not the only HTTP request, however, that is created by a patient's interaction with Defendants' website.  In fact, at the very same time the web page is instructed to send an HTTP request to Defendants requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that the patient's HTTP request is shared with Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

62.    In addition to employing the Meta Pixel to track patients, Defendants' web properties and patient portal used Google Analytics, to track and disclose patient activity— including Plaintiffs'—without their consent. Unbeknownst to Plaintiffs and other Class Members, the installation of this code inside patient portal resulted in disclosures of patients' personal health information, including their patient status, whenever they logged into the patient portal for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The Google Analytics pixel within the patient portal also disclosed when patients viewed specific pages within the patient portal, including prescription information and test results.

15

63.     In addition, through Google Analytics, Defendants disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers.  Defendants routinely disclosed patients' PII/PHI to Google using this technology.

64.     A website developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.

65.     Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly.  A tag manager further obscures the third parties to whom user data is transmitted.

66.     Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

67.     Defendants deployed Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Defendants' website that is, in reality, an invisible window through which Defendants funnel tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

68.     By design, none of the tracking is visible to patients visiting Defendants' websites.

**D.     Tracking pixels provide third parties with a trove of personally identifying data, permitting them to uniquely identify the individuals browsing a website.**

69.     Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors.  While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition,  that

16

is not the case when the hospital website has embedded third-party tracking devices, as Defendants have.

70.    For example, an IP address is a numerical identifier that identifies each computer connected to the internet.  IP addresses are used to identify and route communications on the internet.  IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content.  IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[8]

71.    Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information. *See* 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

72.    Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

73.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet

---

[8] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

74.    Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

75.    In general, cookies are categorized by (1) duration and (2) party.

76.    There are two types of cookies classified by duration.

77.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

78.    "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

79.    Cookies are also classified by the party that uses the collected data.

80.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

81.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Defendants' website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically

helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

82. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

83. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendants can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendants are not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendants. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

84. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is

associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

85.     In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

86.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

87.     The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

88.     Defendants require patients using their patient portal to have enabled first-party cookies to gain access to its patient portal.

89.     The _fbp cookie is used as a unique identifier for patients by Facebook.

90.     If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie.  Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendants with Facebook users.

91.     Defendants have engaged in cookie syncing with Facebook, Google, and other third parties.

92.    Defendants' cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Defendants assign to patients to also be made to third parties.

93.    Defendants have used and caused the disclosure of patient cookie identifiers with each communication described herein, including patient communications concerning individual providers, conditions, and treatments.

94.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint."   A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

95.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed, to generate a unique identifier which can then be used to match a user across websites."[9] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[10]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[11]

96.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[12]

---

[9] https://www.blog.google/products/chrome/building-a-more-private-web/
[10] https://pixelprivacy.com/resources/browser-fingerprinting/
[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

97.    Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

98.    Defendants have used and caused the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each intercepted communication described herein, including patient communications concerning individual providers, conditions, and treatments.

99.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.[13]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[14]

100.    Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R) and are likewise capable of collection through pixel trackers.

101.    Each of the individual data elements described above is personally identifiable on their own.  However, Defendants' disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**E.    Facebook's Business Model: Exploiting Users' Personal Information for Profit.**

102.    Facebook, a social media platform founded in 2004 and today operated by Meta

---

[13] https://www.facebook.com/help/211813265517027
[14] https://smallseotools.com/find-facebook-id/

Platforms, Inc., was originally designed as a social networking website for college students.

103.    Facebook describes itself as a "real identity" platform.[15]  This means that users are permitted only one account and must share "the name they go by in everyday life."[16]  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[17]

104.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[18]  Facebook has since evolved into one of the largest advertising companies in the world.[19]  Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[20]  This allows Facebook to make inferences about users based on their interests, behavior, and connections.[21]

105.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network.  Facebook has more than 2.9 billion users.[22]

106.    Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications.  These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers.  Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook

---

[15] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[16] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[17] https://www.facebook.com/help/406644739431633
[18] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[19] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[20] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[21] https://www.facebook.com/business/ads/ad-targeting
[22] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

107.    Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers.  Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites.  Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

108.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target.  Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."  Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited).  This audience can be created by Facebook, the advertiser, or both working in conjunction.

109.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level.  For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[23]  Aided by highly granular data used to target specific

---

[23] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

110.    Defendants knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

111.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendants did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

112.    Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**F.    Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

113.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

114.    One of Facebook's most powerful tools is called the "Meta Pixel."

115.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[24] Once activated, the Meta Pixel "tracks the

---

[24] https://developers.facebook.com/docs/meta-pixel/

people and type of actions they take."[25] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[26] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[27]

116.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[28] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

117.    The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

118.    The transmission is invisible.

119.    The transmission is made without any affirmative action taken by the patient.

120.    The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[29] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which

---

[25] https://www.facebook.com/business/goals/retargeting
[26] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[27] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[28] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).
[29] *In re Facebook*, 956 F.3d at 596.

resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

121.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[30]

122.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data.  All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies that wish to display advertising for products similar to what the user looked at on the original shopping website.

123.    These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta

---

[30] *In re Facebook*, 956 F.3d at 596.

Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[31]

124.    The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[32]

125.    In exchange for installing its Meta Pixel, Facebook provides website owners like Defendants with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[33]

126.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

127.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[34]   According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[35]

128.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[36]

129.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code

---

[31] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[32] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[33] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[34] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[35] https://www.oviond.com/understanding-the-facebook-pixel
[36] https://developers.facebook.com/docs/meta-pixel/get-started

from blocking Pixel's execution and to ensure that visitors will be tracked.[37]

130.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.  Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID.  Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

131.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[38]

132.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

133.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[39]  HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[40]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[41]

134.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and

---

[37] https://developers.facebook.com/docs/meta-pixel/get-started
[38] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[39] https://developers.facebook.com/docs/meta-pixel/
[40] https://developers.facebook.com/docs/meta-pixel/
[41] https://developers.facebook.com/docs/meta-pixel/

specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[42]

135.    Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

136.    Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

137.    The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

138.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act,"

---

[42] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

"presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43]  These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

139.    Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

140.    Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website.  This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising.  Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendants bartered to Facebook so that Facebook can identify, target, and market products

---

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

and services to individuals.

**F.    Defendants have discretely embedded the Meta Pixel tool on its website, capturing and disclosing of patients' PII/PHI to Facebook.**

141.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic.  The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

142.    Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented.  When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar.  Facebook aggregates this data against all websites.[45]  Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

143.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.  For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.  Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

144.    Businesses install the Meta Pixel software code to help drive and decode key

---

[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

performance metrics from visitor traffic to their websites.[46]  Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[47]

145.    For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook.  If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

146.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time.  Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page transmits the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

147.    Defendants are among the hospital systems that have embedded Meta Pixel on their websites.  Via its use of the Meta Pixel, Defendants intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendants, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, Logout, or Enroll in Defendants' patient portal, summaries of Defendants' responsive communications, the parties to the communications, and the existence of communications at Defendants' websites.

148.    When patients like Plaintiffs and the Class Members visited the homepage of Defendants' website, the source code employed by Defendants caused their personally identifiable

---

[46] https://instapage.com/blog/meta-pixel
[47] https://instapage.com/blog/meta-pixel

information (such as Facebook IDs, their IP address, and their browser fingerprints) to be transmitted to Facebook along information identifying the specific pages on Defendants' website that they viewed. In other words, *every time* that Defendants' patients like Plaintiffs visited its website, Defendants disclosed not only *who* those patients were, but also *what* medical treatments they reviewed on the website, *what* doctors they reviewed on the website, *what* search terms they typed into online forms, and whether they had logged into the Defendants patient portal.

149.    For example, a patient searching for a doctor on Defendants' website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's hometown, the patient's language preference, and other information that the patient provides:



150.    All this data was disclosed to Facebook in real time via the Meta Pixel as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts.   Defendants also disclosed other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

151.    The UMass Memorial Website similarly includes a "Find a Doctor" function designed for patients that allows them to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester:



152.    Hidden code in the results page for find-a-doctor searches causes the secret interception of the fact that the patient is using the find-a-doctor function and the specific criteria the patient has inputted as part of that search, information that is then disclosed to Google and Facebook. The interception and disclosure to Facebook and Google reveal patient status, as the doctor search feature, as implemented by UMass Memorial, is designed for patients. Plaintiffs used the find-a-doctor function on Defendants' webpages, and the specific content of their requests for doctors were intercepted in a similar fashion to the examples provided above.

153.    Defendants also disclosed such personally identifying information and sensitive medical information even when patients were searching for doctors on their websites to assist them

36

with conditions such as substance abuse and addiction:



154.    Likewise, a patient who desires an appointment at a specific hospital using Defendants' websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients. The Make-an-Appointment page is depicted below:



155.    The above page is another page that, although public-facing, is specifically designed for patients, and access to the page reveals patient status to Google and Facebook through the tracking technologies. Defendants injected hidden code onto the page that caused the interception and disclose to Google and Facebook of the contents of the communication on the make-an-appointment page, including revealing patient status to Google and Facebook.

156.    The UMass Memorial Website also contains a section permitting patients to pay bills they received from Defendants. The "Pay Bill Online" page of the UMass Memorial website, is depicted below:



157.    When a user visits the bill payment website, the user communicates that he or she is an individual who has received medical services from Defendants, thus confirming the individual's likely patient status. That communication with Defendants is intercepted and transmitted to Google and Facebook via hidden code. The contents of the intercepted communication revealed to Google and Facebook that the user was seeking to "Pay Bills Online" on the "UMass Memorial Health" webpage, thus confirming the individual's patient status to Google and Facebook even before the user proceeds to pay a bill.

158.    If a user scrolls down on the same bill payment webpage, Defendants provide a link to their myChart patient portal in order to view and pay bills, as depicted in the screenshot below:

## Pay Your Bills Online

Pay your bills using myChart--whether or not you have a myChart account:

- Log-in to myChart and use the menu to navigate to Billing Summary
- Pay using the myChart Guest Portal

159.    If a user clicks on the link to "Log-in to myChart," that communication through which the user connects to Defendants' patient portal (and confirms further their status as a patient) is intercepted and transmitted to Google and Facebook via hidden code, including that the user has "click[ed]" on a button for the "myChart Guest Portal" from the "Pay Bill Online" page.

160.    The same interceptions occur if a patient accesses the myChart patient portal from other parts of the UMass Memorial Website. For example, if a patient clicks the myChart link from the main landing page, that individual proceeds to a landing page for the myChart patient portal. That webpage is depicted below:



161.    When a user requests the landing page for the myChart patient portal, that communication is intercepted and transmitted to Google and Facebook through hidden code that Defendants injected into the webpage. That code caused the communication through which the individual requests the "myChart patient website" for "UMass Memorial Health" to be intercepted and transmitted to Google, thus revealing the individual's patient status to those third parties.

162.    As noted above, Plaintiffs each visited Defendants' patient portals, and Defendants revealed the patient status of each Plaintiff to Google, Facebook, and other third parties in the manner described in the paragraphs above.

163.    All this data about patients' interactions with Defendants' website is disclosed to Facebook simultaneously in real time as visitors transmit their information, including information such as the doctor they choose for treatment, the doctor's specialty, the patient's location, the patient's language and gender preferences, and the full-string URLs generated by patient's searches. Along with other data, Defendants also disclose patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendants also disclose other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

164.    A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendants, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant.

165.    All these communications were acquired by Defendants and forwarded to third parties like Facebook and Google via tracking technologies that Defendants installed on their websites.

166.    In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendants were not sharing with third party marketing companies.

167.    Defendants discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services and Treatments" offered by Defendants,

communications made by patients using the website's Bill Pay function, communications made when patients access Defendants' patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

168.    Defendants have disclosed patient PII/PHI collected across their websites including (but not limited to) the following communications:

a.    when patients search via Defendants' search bars for their required care (e.g., for "substance abuse");

b.    when patients search for a physician or provider—which reveal their location and required medical services and medical conditions (e.g., searching for "Gynecology");

c.    when patients search for, register for, and/or click on classes or events; and

d.    when patients research treatment information and medical services.

169.    In other words, Facebook learned not just that the individuals communicating through the website were patients and were seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendants are not sharing with third-party marketing companies.

170.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used.  In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient.  The captured search terms and the resulting URLs divulge a patient's medical issues,

personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

171.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' websites.  The path identifies where a file can be found on a website.  Likewise, a query string provides a list of parameters.  The query string parameters in this search indicate that a search was done at Defendants' website for information about HIV.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue.

172.    Defendants also provided Facebook with details about online forms that patients fill out in the form of POST requests.  All the information that patients provided when filling out these forms was also disclosed to Facebook.

173.    As the above demonstrates, knowing what information a patient is reviewing on Defendants' websites can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Defendants' websites tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends.  But there is nothing visible on Defendants' websites that would indicate to patients that, when they used Defendants' search function, their personally identifiable data and the precise content of their communications with Defendants was being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

174.    The amount of data collected is significant.  Via the Meta Pixel, when patients interact with its website, Defendants discloses a full-string, detailed URL to Facebook, which

contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested.  For example, when a patient types a search term into the search bar on Defendants' website, the website returns links to information relevant to the search term.  When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

175.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full-string referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used.  In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient.  The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

176.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' website.  The path identifies where a file can be found on a website.    For example, take https://physicians.umassmemorial.org/details/5019/edward-appelbaum-orthopedics-southbridge.  Here, the "path" is details/5019/edward-appelbaum-orthopedics-southbridge.  Similarly, a patient reviewing information about "Services" that Defendants offers patients such as "Pediatrics" will generate a URL with the path https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/childrens-medical-centerpediatrics.

177.    Likewise, a query string provides a list of parameters. A query string includes fields added to a base URL by a user's web browser or other client application.  To illustrate, an example

of a full-string URL that provides a query string is https://www.ummhealth.org/search-results?search_block_form=cancer&form_build_id=form-LTYWYGzK9G3Apqp3zsv-6B9rFLxKRNgPOSZTLxkXC6k&form_id=search_block_form#gsc.tab=0&gsc.q=cancer&gsc.page=1.  The query string parameters in this search indicate that a search was done at Defendants' website for information about cancer.  In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

178.    The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendants' website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendants' website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

179.    Defendants also provide Facebook and Google with details about online forms that patients fill out in the form of POST requests. This results in information that patients provide when filling out these forms also being disclosed to Facebook and Google. For example, when Plaintiffs filled out the online forms that Defendants provided to assist patients in finding treating physicians, Defendants shared every detail that Plaintiffs entered into those forms, including the kind of doctor they searched for, their preferred treatment location, and their preferred gender of the treating physician.  All those details from Plaintiffs' communications with Defendants were simultaneously shared with Facebook and Google without Plaintiffs' knowledge or consent, via source code that Defendants had installed on its website.

180.    The nature of the collected data is also important. Defendants' unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual

patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendants' website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

181.    Defendants also disclosed the same kind of patient data described above to other third parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendants installed on its website. As with the Facebook Meta Pixel, Defendants provide patients and prospective patients with no notice that Defendants are disclosing the contents of their communications to these third parties. Likewise, Defendants does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

182.    These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[48] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendants routinely disclose patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

183.    Google cookies provide personally identifiable data about patients who visit Defendants' website to Google. Defendants transmit personally identifiable Google cookie data to Google.

184.    Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a

---

[48] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

185.    Defendants deploy Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendants and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendants' patient portal.

186.    By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Defendants knowingly discloses information that allows Facebook and other advertisers to link its patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[49]    Defendants intentionally share the PII/PHI of their patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

187.    Because Defendants embedded the Meta Pixel on its website, Defendants disclosed intimate details about Plaintiffs' interactions with its website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity.    For example, when Plaintiffs and Class Members visited Defendants' website, their

---

[49] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms.  During these same transmissions, Defendants' website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided—including the pages viewed, the physicians viewed, the appointments scheduled, and the locations of those physicians and appointments.  This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

188.    Moreover, each time Plaintiffs used Defendants' Website, Defendants willfully disclosed Plaintiffs' IP address, the information entered on Defendants' Website, the pages viewed, the physicians viewed, the physicians called, the appointments scheduled, and the locations of those physicians and appointments to Google via Google Analytics.

189.    This simultaneous disclosure of information allowed Google to read or learn the contents of communications between Plaintiffs and Defendants.

190.    Defendants affirmatively made the decision to intrude on Plaintiffs' privacy by installing source code on their website designed to secretly share patients' Personal Health Information with third parties.  For example, Defendants knew that by embedding Meta Pixel, it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. Defendants were also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites.  Defendants were also aware that installing the Meta Pixel tool would result in dozens (if not hundreds) of unauthorized persons at Facebook and Google viewing the Personal Health Information of Defendants' patients, including the Personal

49

Health Information of Plaintiffs and Class Members. Defendants' decision to affirmatively communicate and share their patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by Massachusetts law.

191.    Defendants also knew that installing tracking pixels would result in Plaintiffs' and Class Members' Personal Health Information being improperly accessed by Facebook and Google employees so that those companies could sell advertising.  Moreover, Defendants were also aware that once it shared Plaintiffs' health information with Facebook that it would no longer have any control over what Facebook did with that information or who Facebook would share that information with.  On information and belief, it is likely that the third parties with whom Defendants shared Plaintiffs' Personal Health Information further disseminated that information to additional third parties, including potential advertisers. On information and belief, Plaintiffs' Personal Health Information was viewed by one or more employees at Facebook for the purpose of targeting them with advertising.

192.    Defendants made the decision to barter their patients' personal health information to Facebook because they wanted access to the Meta Pixel tool.  While that bargain may have benefited Defendants and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**G.      Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

193.    Plaintiffs and Class Members had no idea when they interacted with Defendants' websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook, Google, and other third parties.  That is because, among other things, Meta Pixel is seamlessly integrated into Defendants' websites and is invisible to patients visiting those websites.

194.    For example, when Plaintiffs John Doe and Janice Progin visited Defendants' website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

195.    Plaintiffs and their fellow Class Members could not consent to Defendants' conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

196.    While Defendants purport to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendants' homepage in type so small as to be unreadable to many visitors:



197.    While disclosing that its website contains "cookies," Defendants' "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[50]    Contrary to that promise, Defendants' website automatically transmits personally identifiable information to Facebook

---

[50] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

using multiple cookies, including c_user, datr, fr, and xs cookies. The transmission of IP addresses and browser fingerprints also enable Google, Facebook, and other third parties to connect the contents of intercepted communications to the real-world identities of the individual whose communications are intercepted.

198.    The UMass Memorial Website terms of service also state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained above, the tracking technologies transmit to Google and Facebook the user's IP address, browser fingerprints, and unique identifiers assigned to individuals, which are designed to permit Google and Facebook to associate the intercepted communications with individuals' real-world identities. Google and Facebook can then use the contents of the intercepted communications to serve personalized advertising to those known individuals.

199.    The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about them when they do.

200.    The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or

those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

201.    To locate Defendants' "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[51]

202.    Defendants' "Privacy Policy" gives no indication to patients that Defendants routinely allow Facebook to capture and exploit patients' Personal Health Information.  Indeed, Defendants expressly promise in its "Privacy Policy"[52] that protecting patients' health information is a priority:

# JOINT NOTICE OF INFORMATION PRACTICES

At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

203.    These statements are false, deceptive, and misleading in light of Defendants' secret disclosure of patient information to numerous third parties, including Facebook and Google. Defendants' privacy policy is also false, deceptive, and misleading because Defendants in fact routinely sell and/or barter their patients' personal health information to Facebook and Google

---

[51] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[52] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

without patients' knowledge or consent in return for access to the Meta Pixel tool and other significant advertising benefits.   This included personally identifiable information protected against disclosure by law, including Plaintiffs' (and Class Members') IP addresses, device identifiers, and browser fingerprints that Facebook and Google used to personally identify Defendants' patients and target them with advertising.

204.    Even if a patient stumbled upon Defendants' carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendants is routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

205.    Defendants do not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with Facebook or Google, because this information is protected from such disclosure by law. *See* G.L. c.214, § 1B; 45 C.F.R. § 164.508.  Nor are Defendants permitted to disclose patients' Personal Health Information to advertising and marketing companies like Facebook without express written authorization from patients.

206.    Defendants failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendants of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred*.

207.    A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous

privacy policy hidden away on a company's website. Further, Defendants expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

208.    Neither Plaintiffs nor Class Members knowingly consented to Defendants' disclosure of their Personal Health Information to Facebook and Google. Nowhere on its website do Defendants tell patients that it routinely shares their Personal Health Information with Facebook and Google.  Without disclosing such practices, Defendants cannot have secured consent from Plaintiffs and Class Members for the disclosure of their Personal Health Information to Facebook, Google, and other third-party advertising companies.

209.    Accordingly, Defendants lacked authorization to intercept, disclose to Facebook, or use Plaintiffs and Class Members' personal health information, or to procure others (such as Facebook) to intercept, disclose, or use such personal health information.

**H.    Defendants' disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary.**

210.    There is no information anywhere on the websites operated by Defendants that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of PII/PHI to Facebook or Google necessary for Defendants to maintain their healthcare website.

211.    It is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign-ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendants to provide medical services to patients without sharing their personal health

information with Facebook so that this information can be exploited for advertising purposes.

212.    Indeed, after Plaintiffs filed suit in October 2022, Defendants removed the Facebook Meta Pixel from all pages on their website.

213.    Despite the wholly unnecessary nature of the Meta Pixel for Defendants to run its business, Defendants willfully chose to implement Meta Pixel and other tracking technologies on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendants, to third-parties, including Facebook.

**I.    Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information.**

214.    Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendants' surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Members' privacy interests.

215.    As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider would not disclose their PII/PHI to third parties without their express authorization.

216.    Patient personal health information is specifically protected by law.  *See* G.L. c.214, § 1B (Right to Privacy); G.L. c. 111, § 70E (Patients' and Residents' Rights).  The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 45 C.F.R. § 164.514(b)(2)(i).  Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

56

217.    HIPAA sets national standards for safeguarding protected health information.  For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients.  45 C.F.R. § 164.502.  These prohibitions include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes.  45 C.F.R. § 164.514(b)(2)(i).  HIPAA also requires that covered entities like Defendants implement appropriate safeguards to protect this information.  45 C.F.R. § 164.530(c)(1).  And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality.  42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11.  This legal framework applies to health care providers, such as Defendants.

218.    The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[53]

219.    The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[54]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

220.    For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust....Physicians must seek to protect patient

---

[53] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[54] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[55]

221.    The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [56]

222.    Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

223.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

224.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[57]

225.    Users act consistently with these preferences.  For example, following a new rollout

---

[55] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[56] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).
[57] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

58

of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[58]

226.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[59]

227.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook.  As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**J.    Defendants harmed Plaintiffs when they illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI —which, after all, is Plaintiffs' property, and has economic value.**

228.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants have collected and disclosed from Plaintiffs and Class Members.

229.    In 2013, the *Financial Times* reported that the data-broker industry profits from the

---

[58] https://www.wired.co.uk/article/apple-ios14-facebook
[59] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[60]

230.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[61]  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[62]

231.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[63]  This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[64]

232.    Despite the protections afforded by law, there is an active market for health information.  Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[65]

233.    Further, individuals can sell or monetize their own data if they so choose.  For

---

[60] https://ig.ft.com/how-much-is-your-personal-data-worth/
[61] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[62] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[63] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[64] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[65]    https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/;    *see  also* *https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

example, Facebook has offered to pay individuals for their voice recordings,[66] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[67]

234.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[68]

235.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendants has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Member's property.

**K.    Defendants are enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI.**

236.    In exchange for disclosing PII/PHI about its patients, Defendants has been compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. The access to these advertising benefits results in enormous financial savings to companies like Defendants because it reduces their advertising costs. Defendants have run numerous advertising campaigns on Facebook, utilizing the advantages it gained by installing the Meta Pixel on its website.

237.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels.  Once an individual's data is disclosed and shared with a third-party marketing company,

---

[66] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proun,unciations-app
[67] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[68] https://www.creditdonkey.com/best-apps-data-collection.html; *see also*
*https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

the advertiser is able to show ads to the user elsewhere on the internet.

238.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.  Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network.  The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

239.    Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

240.    The monetization of the data being disclosed by Defendants, both by Defendants and Facebook, demonstrates the inherent value of the information being collected.

## TOLLING, CONCEALMENT, AND ESTOPPEL

241.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

242.    Defendants seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into its websites, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendants had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with its websites that Plaintiffs' and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

243.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

244.    The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

245.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort.  Defendants' illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of at least the filing of the earliest Original Complaint.  What's more, Defendants were under a duty to disclose the nature and significance of its data collection practices but did not do so.  Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

246.    Defendants' conduct violates the law and breaches its express and implied privacy promises.

247.    Defendants' unlawful conduct has injured Plaintiffs and Class Members.

248.    Defendants' conduct is ongoing.

249.    Plaintiffs bring this action individually and as a class action against Defendants.

250.    Plaintiffs seek class certification for the following proposed Classes:

**The Massachusetts Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendants' websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.

**The Nationwide Class:** During the fullest period allowed by law, all current or former patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendants' websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.

63

251. Excluded from the proposed Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

252. Plaintiffs reserve the right to redefine the Classes and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

253. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

254. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Classes, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

255. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

   a.   Whether Defendants' acts and practices violated Plaintiffs' and Class Members' privacy rights;

   b.   Whether Defendants' acts and practices violate 18 U.S.C. § 2510, et seq.;

   c.   Whether Defendants' acts and practices violate G.L. c. 214, § 1B;

   d.   Whether Defendants' acts and practices violate G.L. c. 111, § 70E;

   e.   Whether Defendants knowingly allowed the surreptitious collection and disclosure of Plaintiffs' and Class Members' PII/PHI to Facebook and other third parties;

   f.   Whether Defendants' acts and practices constitute a breach of fiduciary duty;

g.    Whether Defendants profited from disclosures of patient PII/PHI to third parties including Facebook;

h.    Whether Defendants was unjustly enriched;

i.    Whether Defendants' acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j.    Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k.    Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

256.    These common questions of law and fact predominate over any questions affecting only the individual Class Members.

257.    **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendants who used the websites set up by Defendants for patients and are victims of Defendants' respective unauthorized disclosures to third parties, including Facebook. All claims of Plaintiffs and Class Members are based on Defendants' wrongful conduct and unauthorized disclosures.

258.    **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

259.    **Superiority:**    A class action is the superior method for fair and efficient adjudication of the controversy.  Although all Class Members have claims against Defendants, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Serial adjudication in numerous venues is not efficient, timely, or proper.  Judicial resources would be unnecessarily depleted by prosecution of individual claims.  The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications.  If a class action is not permitted, Class Members will continue to suffer losses, and Defendants' misconduct will continue without a proper remedy.

260.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action.  The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendants, electronically or by publication, the cost of which is properly imposed on Defendants.

261.    For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of
### 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

262.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

263.    Plaintiffs bring this claim on behalf of themselves and all members of the Nationwide Class.

264.    The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

265.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

266.    A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

267.    Plaintiffs' communications with Defendants on its web properties and patient portal are covered communications under 18 U.S.C. §§ 2510, 2511.

268.    Plaintiffs' and Class Members' communications with Defendants constitute "electronic communications because each communication was the transfer of data or intelligence, including, but not limited to:

a.  parties to the communications;

b.  the precise text of patient search queries;

67

c. personally identifiable information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendants' website(s);

k. the precise dates and times when patients visit Defendants' websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendants sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendants has aided third parties in scraping from webpages or communication forms at web properties.

269. Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b.  Plaintiffs and Class Members' web browsers;

c.  Plaintiffs and Class Members' browser-managed files;

d.  Facebook's Meta Pixel;

e.  Internet cookies;

f.  Defendants' computer servers; and

g.  Third-party source code used by Defendants.

270.   Whenever Plaintiffs and Patient Class members interacted with Defendants' web properties, including their MyChart patient portal, Defendants, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

271.   Defendants' intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

272.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

273.   Thus, although Defendants is a "part[y] to the communications" at issue, they still incur liability under the ECPA because they intercepted and then disclosed Plaintiffs' communications and personal information to third parties without consent and for criminal and tortious purposes, as alleged throughout this complaint.

274.    Defendants' acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a.    Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b.    Invasion of privacy in violation of G.L. c. 214, § 1B;

c.    Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d.    Breach of the common law duty of confidentiality.

275.    For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

276.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

277.    Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it:

a.    Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b.    Disclosed individually identifiable health information to Facebook and Google without patient authorization.

278.    Defendants accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

279.    Given the operation of the code for the tracking technologies that Defendants injected on their website, the interception of Plaintiffs' and Class Members' communications and the disclosure of those intercepted communications to Google and Facebook were separate and distinct acts. Furthermore, the subsequent misuse of communications improperly disclosed in violation of federal and state statutory and common law was also tortious, further establishing tortious acts separate from the interception itself.

280.    As such, Defendants cannot viably assert any affirmative defense of one-party consent to ECPA liability.

281.    As a result, Defendants harmed Plaintiffs and the Class, breaching the confidentiality of their private communications and medical information, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Defendants for care, and causing actual damages in an amount to be proven at trial.

282.    The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

283.    For these reasons, Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT II
### Invasion of Privacy in Violation of G.L. c. 214, § 1B
### (On Behalf of Plaintiffs and the Massachusetts Class)

284.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

71

285.    Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

286.    G.L. c. 214, § 1B (the "Massachusetts Right to Privacy Act") provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

287.    The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

288.    Undisclosed electronic surveillance violates the Massachusetts Right to Privacy Act. The improper electronic surveillance is made worse by the duty health care providers owe their patients, which Defendants violated, not to disclose private communications with or medical information about a patient without a patient's informed consent.

289.    G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

290.    Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

291.    Plaintiffs and Class Members are patients of Defendants.

292.    Defendants owe Plaintiffs and Class Members a duty of confidentiality.

293.    Despite its duty not to disclose patient communications and Personal Health Information without informed consent and written authorization, Defendants disclosed such

communications and information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

294.    The information disclosed included personally identifiable information, Plaintiffs' and Class Members' statuses as patients of Defendants, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendants, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendants' website.

295.    The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

296.    Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred.  Plaintiffs and Class Members never agreed that their communications with healthcare providers or their sensitive medical information could be collected, used, and monetized by Facebook.

297.    Defendants' intentional disclosure of patients' private communications and Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person.  Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third-party advertising companies.

298.    Defendants' disclosure of private communications and Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that Americans believe that

73

one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

299.    Given the nature of the private communications and Personal Health Information that Defendants disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Alzheimer's"), the condition selected from dropdown menus (i.e., "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

300.    To be clear, Defendants' facilitation of undisclosed electronic surveillance of Plaintiffs and Class Members further supports a claim under G.L. c. 214, § 1B, even independent of the medically sensitive nature of the communications intercepted. That is, Plaintiffs' claim under the Massachusetts Right to Privacy Act does not depend upon the contents of any intercepted communications being medical in nature or protected by any particular statutory provision.

301.    Defendants' breach caused Plaintiffs and Class Members, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their Personal Health Information; and

e.    Defendants' actions diminished the value of Plaintiffs' and Class Members' personal information.

302.    Plaintiffs' and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

303.    Plaintiffs' and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to seek just compensation, including monetary damages.

304.    Plaintiffs' and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions on Plaintiffs and Class Members' privacy.

305.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights.  Such damages are needed to deter Defendants from engaging in such conduct in the future.

306.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

307.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

308.    Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

309.    All conditions precedent to this action have been performed or occurred.

310.    In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

311.    As medical provider for Plaintiffs and Class Members, Defendants owe Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendants and Plaintiffs or Class Members.

312.    Defendants solicited and invited Plaintiffs and Class Members to communicate with Defendants and to provide their Private Health Information on their website as part of Defendants' regular business practices.  Defendants required Plaintiffs and Class Members to communicate with Defendants and obtain Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' communications and Personal Health Information.

313.    Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendants intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

314.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep private their healthcare-related communications and Private Health Information associated with obtaining healthcare.  To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their healthcare communications and Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

315.    Plaintiffs and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate their websites free of surreptitious collection and exploitation of communications between the parties. Defendants failed to do so.  Plaintiffs and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their Personal Health Information with Facebook without their knowledge or written consent.

316.    Defendants breached their duty of confidentiality by disclosing their communications with Plaintiffs and Class Members, and Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

317.    Defendants also materially breached their obligation to protect Plaintiffs' and Class Members' non-public communications and Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information.  For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate

reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

318.    The medical services that Defendants offer are available from many other health care systems that do protect the confidentiality of patient communications.  Had Defendants disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or its affiliated healthcare providers.

319.    Defendants' conduct in sharing Plaintiffs' and Class Members' Personal Health Information with Facebook also diminished the sales value of that information.  There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendants (which Defendants then shared with Facebook).  Indeed, Facebook itself has offered to pay the

public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

320.    As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the diminution in value of their Personal Health Information.

321.    Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

322.    Defendants' breach caused Plaintiffs and Class Members the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their Personal Health Information; and

e.    Defendants' actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied in Fact Contract**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

323.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

324.    Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

325.    Defendants solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on their website as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Defendants as part of acquiring Defendants' medical services and using their Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendants were obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendants took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

326.    Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendants when they sought medical treatment from Defendants. Specifically, through their course of conduct, Defendants, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendants to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

80

327.    Defendants required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendants, through their privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that they would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

328.    Implied in the exchange was a promise by Defendants to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members.  By asking for and obtaining Plaintiffs' and Class Members' Personal Health Information, Defendants assented to protecting the confidentiality of that information.    Defendants' implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

329.    Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendants' implied promise that this information would not be shared with third parties without their consent.

330.    These exchanges constituted an agreement and meeting of the minds between the parties:  Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendants (including the protection of their confidential personal and medical information).  A portion of the price of each

payment that Plaintiffs and the Class Members made to Defendants for medical services was intended to ensure the confidentiality of their Personal Health Information.

331.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendants would not allow third parties to collect or exploit their communications with Defendants without their consent.

332.    It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred.  Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendants but for the prospect of Defendants' promise of medical treatment and other benefits.  Conversely, Defendants presumably would not have taken Plaintiffs and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

333.    Defendants were therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

334.    Plaintiffs and Class Members accepted Defendants' medical services offer and fully performed their obligations under the implied contract with Defendants by providing their Personal Health Information to Defendants, among other obligations.  Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendants.

335.    As a condition of utilizing Defendants' Website and receiving services from Defendants' healthcare facilities and professionals, Plaintiffs and the Class Members provided their Personal Health Information and compensation for their medical care.

336.    Plaintiffs and Class Members relied on Defendants' implied promises to safeguard their Personal Health Information to their detriment.  Defendants breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

337.    Defendants' failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendants' intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties:  Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

338.    Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendants intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

339.    Plaintiffs and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate their websites free of surreptitious collection and exploitation of communications between the parties. Defendants failed to do so.  Plaintiffs and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their Personal Health Information with Facebook without their knowledge or written consent.

340.    Under the implied contracts, Defendants and/or their affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and

(b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendants' websites.

341.    Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

342.    The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendants' published Notice of Privacy Practices.

343.    Defendants' express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendants refrain from aiding or allowing third parties to collect Plaintiffs and Class Members' Private Health Information without consent.  By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendants assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

344.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would

not have entrusted their Private Health Information to Defendants and entered into these implied contracts with Defendants without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendants in the absence of its implied promise to do so.

345.    A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendants and/or their affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

346.    Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

347.    Defendants materially breached their contractual obligation to protect the nonpublic Private Health Information Defendants gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

348.    Defendants also materially breached their contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information.  For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that

visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

349.    As a result of Defendants' failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

350.    As a result of Defendants' material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendants because they spent more on medical services with Defendants than they would have if they had known that Defendants was not providing the reasonable data security and confidentiality of patient communications that Defendants represented that it was providing in its privacy policies. Defendants' failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendants for the services they received.

351.    The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendants were worth quantifiably less than the services that Defendants promised to provide, which included Defendants' promise that any patient communications with Defendants would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

352.    The medical services that Defendants offer are available from many other health care systems who do protect the confidentiality of patient communications.  Had Defendants disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or their affiliated healthcare providers.

353.    Defendants' conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information.  There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendants (which Defendants then disclosed to third parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes.  Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

354.    As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendants.

355.    Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

356.    Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendants' control and because anytime that Plaintiffs and/or Class Members interact with Defendants' websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information.  Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of Personal Health Information.

357.    Plaintiffs and Class Members would not have entrusted Defendants with their Private Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose their Personal Health Information without their consent.

358.    Plaintiffs and Class Members would not have retained Defendants to provide healthcare services in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Private Information without consent.

359.    Defendants deliberately and consciously breached these implied contracts by disclosing Plaintiffs' and Class Members' Personal Health Information without consent to third parties like Facebook and Google.

360.    Defendants consciously took advantage of Plaintiffs and Class Members, making the opportunistic calculation that it could engage in an intentional and profitable interference with Plaintiffs' and Class Members' legally protected property rights by secretly sharing their Personal Health Information with Facebook and Google, despite its express promises (1) that "uses and

disclosures not described in [their notice] may be made with [patients'] signed authorization"; and collected from its website "with any organization or business"; and (2) "[s]ome of the times [Defendants] may need [patients'] signed permission to use and disclose [patients'] information include sale of [patients'] information, [and] marketing purposes . . . ." Defendants consciously decided not to inform its patients that it was routinely sharing their Personal Health Information with third parties with the hope that its misconduct in intentionally breaching its implied contracts with Plaintiffs and Class Members would never come to light.

361.    By deliberately breaching its implied contracts with Plaintiffs and Class Members, Defendants was knowingly enriched by the savings in costs that should reasonably have been expended to protect the Personal Health Information of Plaintiffs and Class Members.  Defendants were further knowingly enriched by the financial benefits that it received for bartering Plaintiffs' and Class Members' Personal Health Information to third parties like Facebook and Google, including analytics and advertising benefits that Defendants received in exchange for Plaintiffs' and Class Members' health data.

362.    As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their Personal Health Information.

363.    Plaintiffs and Class Members are entitled to compensatory and consequential damages, including attorney's fees and actual damages, as a result of Defendants' breach of implied contract.  Alternatively, because Defendants' deliberate breach of contract resulted in profit to Defendants where the available damages remedy potentially affords inadequate protection to Plaintiffs' and Class Members' contractual entitlement, Plaintiffs and Class Members are

entitled to restitution measured by the profits realized by Defendants from its deliberate breach of contract.

364.    Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendants' control and because anytime that Plaintiffs and/or Class Members interact with Defendants' websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information.  Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of Private Health Information.


**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

365.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

366.    Plaintiffs hereby plead this Count in the alternative to Counts IV.

367.    Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

368.    Plaintiffs and Class Members conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendants appreciated this benefit.

369.    Defendants gained access to the Personal Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies from the public; (2) lying to the public in its privacy policies about protecting personally identifying information disclosed via the website from unauthorized disclosure to third parties; (3) failing to institute warnings on its website home page that it had installed pixel tracking technologies; (4) failing to provide industry standard privacy safeguards for its patients' health information; (5) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Personal Health Information from unauthorized disclosures to third parties; (6) intentionally violating its own internal privacy policies by making unauthorized disclosures of patients' Personal Health Information; and (7) intentionally violating Massachusetts law.

370.    Defendants benefited from the use of Plaintiffs' and Class Members' private communications and Personal Health Information and unjustly retained those benefits at their expense.

371.    Defendants collected, used, and disclosed this information for their own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Defendants bartered Plaintiffs' and Class Members' Personal Health Information to Facebook and Google in return for both advertising benefits and "free" website analytics information.  What's more, by sharing its patients' Personal Health Information with Facebook, Defendants gained the ability to utilize Facebook's customized audiences and targeted advertising features, which saved Defendants substantial revenues by making advertising far less expensive than it would have been otherwise.  Defendants also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

372.     Additionally, Plaintiffs and the Class Members conferred a benefit on Defendants in the form of monetary compensation.

373.     Defendants unjustly retained the monies that Plaintiffs and Class Members paid with the expectation that Defendants would spend a percentage of those funds to implement adequate data security and privacy training to protect their Personal Health Information against unauthorized disclosure to third parties.

374.     Plaintiffs and the Class Members would not have used the Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, and disclose this information to third parties like Facebook and Google.

375.     Defendants exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

376.     Facebook and Google are not charities.  Facebook and Google were willing to provide Defendants with "free" analytics benefits only because the patient health data that Defendants surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Facebook and Google provided Defendants.

377.     Defendants wrongfully secured the benefits it obtained from Plaintiffs and Class Members by intentionally misleading them about how it would use and exploit their Personal Health Information.

378.     Defendants' decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

379.    Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

380.    Plaintiffs were aware of the economic value of their Personal Health Information and reasonably expected to be *substantially* compensated by any party who shared or accessed their Personal Health Information to sell advertising.  Plaintiffs and Class Members did not consent to Defendants giving their health information away for free.

381.    By engaging in the acts and failures to act described in this Complaint, Defendants have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Defendants was on notice that its patients' Personal Health Information was protected by law; that its patients' Personal Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Personal Health Information, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of its patients' Personal Health Information to Facebook, Google, and other third parties.

382.    The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

383.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

93

**COUNT VI**
**Negligence**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

384.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

385.    Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Class, Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

386.    Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Private Information from unauthorized disclosure.

387.    It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

388.    Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiffs and Class Members' Private Information arose due to the special relationship between Defendants and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

389.    In addition, Defendants had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

390.    Defendants' conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Defendants' misconduct included the failure to (i) secure

Plaintiffs and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

391.    Defendants' wrongful actions and/ or inactions and the resulting unauthorized disclosure of Plaintiffs and Class Members' Private Information constituted negligence at common law.

392.    Accordingly, Plaintiffs, individually and on behalf of members of the Class, seek compensatory damages (including damages to compensate for the injuries described in Section J, supra), plus costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a.    Certifying the Classes and appointing Plaintiffs as the Classes' representatives;

b.    Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, Ahmad, Zavitsanos, & Mensing P.C., Colonna & Doyle, and Coulson P.C. as class counsel;

c.    Finding that Defendants' conduct as alleged herein was unlawful;

d.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendants from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e.    Awarding statutory damages of $10,000 per Plaintiffs and Class Members pursuant to 18 U.S.C. § 2520;

f.      Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

g.      Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h.      Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i.      Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j.      Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k.      Awarding costs of suit; and

l.      Such other and further relief to which Plaintiffs and Class Members may be entitled.


**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE
AND LISA COLLETON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Ryan Hawkins, BBO# 686289
Erin E. McHugh, BBO# 703701
Brett R. Corson, BBO# 677644
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
brc@sweeyemerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)

96

Justin C. Kenney (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
ajd@kellerpostman.com

*Attorneys for John Doe and the Putative Class*

William P. Doyle (556999)
**LAW OFFICES OF COLONNA & DOYLE**
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson*
* *Pro hac vice forthcoming*
**COULSON P.C.**
300 River Place Drive
Suite 1700
Detroit, MI 48207
(313) 644-2685
E: Nick@Coulsonpc.com

*Attorneys for Lisa Colleton and the Putative Class*

*/s/Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)

97

One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 - Telephone
(617) 439-0134- Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Janice Progin and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I, J. Tucker Merrigan, counsel of record for the Plaintiff John Doe in this action, do hereby certify that on June 16, 2025, the foregoing Consolidated Amended Action Complaint and Demand for Jury Trial was filed electronically and e-served on all counsel of record.


<i>/s/ J. Tucker Merrigan</i><br>J. Tucker Merrigan, BBO#: 681627