**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANICE PROGIN, LISA COLLETON, and JOHN DOE, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | Case No. 1:25-cv-40003-ADB |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

NATURE OF ACTION AND ALLEGATIONS ..... 1

PARTIES TO THE ACTION ..... 4

JURISDICTION AND VENUE ..... 6

FACTUAL BACKGROUND ..... 7

A. Plaintiffs' experiences with Defendants. ..... 7

B. Defendants routinely disclosed private communications and PHI of their patients to third parties, including Facebook and Google. ..... 11

C. The primary purpose for which Defendants deployed tracking technologies was to disclose the contents of intercepted patient communications to Google, Facebook, and other third parties so that Defendants could target patients with advertisements. ..... 13

1. Facebook and Meta Pixel track and profile Facebook users on third-party websites for purposes of targeted advertising. ..... 13

2. Defendants use Meta Pixel to track and advertise to patients and potential patients. ..... 19

3. Google and Google Analytics track and profile Google users on third-party websites for purposes of targeted advertising ..... 21

4. Defendants use Google Analytics to track and advertise to patients and potential patients ..... 23

5. Defendants' Purpose in Intercepting Communications Was to Engage in Acts that Violate HIPAA and Massachusetts Law. ..... 25

D. Defendants' criminal and tortious acts were separate and independent from the ECPA violation. ..... 33

1. The First Criminal and Tortious Act: Disclosure of Intercepted Communications and PHI. ..... 33

2. The Second Criminal and Tortious Act: Commercial Exploitation of Intercepted Communications and PHI. ..... 34

E. Defendants misuse sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook. ..... 35

F. Tracking technologies are designed to identify the individuals whose communications are intercepted, enabling Facebook, Google, and other third parties to build individualized behavioral profiles to inform targeted advertising. .... 43

1. IP Address .... 43

2. Cookies .... 44

3. Browser Fingerprint .... 51

4. User Identifiers .... 52

5. Advertising ID .... 53

G. How Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites. .... 54

H. Defendants discreetly embedded the Meta Pixel and similar tracking technologies throughout their websites, capturing and disclosing patients' PII/PHI to Facebook and other third parties. .... 60

I. Plaintiffs and the Class Members did not consent to the interception, disclosure, or commercial exploitation of their communications or PHI. .... 80

J. Defendants' disclosures of personal patient data to Facebook, Google, and other third parties, and their commercial exploitation of such data, are unnecessary. .... 86

K. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information. .... 87

L. Defendants harmed Plaintiffs when they illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI, which, after all, is Plaintiffs' property and has economic value. .... 90

M. Defendants are unjustly enriched by their unlawful, unauthorized, and unnecessary disclosures and commercial exploitation of their patients' PII/PHI .... 92

TOLLING, CONCEALMENT, AND ESTOPPEL .... 104

CLASS ACTION ALLEGATIONS .... 105

CAUSES OF ACTION .... 109

COUNT I .... 109

COUNT II .... 116

COUNT III ........ 121

COUNT IV ........ 125

COUNT V ........ 136

COUNT VI ........ 143

DEMAND FOR JURY TRIAL ........ 144

PRAYER FOR RELIEF ........ 144

Plaintiffs Janice Progin, John Doe, and Lisa Colleton ("Plaintiffs"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), bring suit against Defendants UMass Memorial Health Care, Inc., UMass Memorial Community Entities, Inc. UMass Memorial Medical Center, Inc., UMass Memorial HealthAllianceClinton Hospital, Inc., Marlborough Hospital, and Harrington Memorial Hospital, Inc. ("Defendants"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendants' systematic violation of the medical privacy rights of their patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendants assure visitors to their websites that they are "committed to protecting your privacy" and that "[w]e have designed our website to allow you to visit most areas without identifying yourself or providing personal information."[1] Contrary to these assurances, Defendants did not follow this policy, nor the law prohibiting such disclosures.

3. At all relevant times, Defendants intercepted communications with their patients and then disclosed the intercepted communications to Facebook, Google, and other third parties, resulting in disclosures of sensitive information about their patients—including their status as patients of Defendants, their physicians, their medical treatments, the hospitals they visited, and their personal identities--without those patients' knowledge, authorization, or consent.

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

4. Defendants disclosed these private communications, including PHI[2], through the deployment of various digital marketing and automatic rerouting tools embedded on their websites that purposefully and intentionally redirect patients' communications, including those that reveal PHI, to third parties. Those third parties (including Google and Facebook), as well as Defendants, then subsequently exploit the intercepted communications for advertising purposes, including advertising on Defendants' behalf. That was, in fact, the primary purpose of the tracking technologies—to enable Defendants, Google, Facebook, and other third parties to later exploit the intercepted communications to inform the content of individualized advertising to Defendants' patients on third-party advertising platforms, including Google's and Facebook's.

5. Defendants intercepted the contents of patient communications on their websites in order to disclose those communications to Google, Facebook, and other third parties so that those third parties and Defendants could then use the contents of the intercepted communications to advance Defendants' and the third parties' marketing efforts. The tracking technologies advanced Defendants' and the third parties' marketing efforts by enabling Defendants and the third parties to use third-party advertising platforms, including Google's and Facebook's, to target the patients whose communications were intercepted with advertising. That is, Defendants had an incentive, which they acted on, to disclose sensitive communications to Google, Facebook, and other third parties to advance Defendants' own marketing efforts. Defendants did all this knowing it constituted a violation of HIPAA and state law, for the purpose of reaping illicit financial gains from their criminal and tortious disclosures of patients' personally identifiable information ("PII") and protected health information ("PHI") (together, "PII/PHI") and communications.

[2] *See infra* ¶¶ 86-88.

6. As shown herein, Defendants intercepted communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.), and Massachusetts statutory and common law torts described below. In particular, HIPAA prohibits the (i) disclosure or (ii) use of PHI without informed consent, including, specifically, the use of PHI for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.*, ¶¶ 46-108), Defendants intercepted patient communications for the primary purpose of (i) disclosing the contents of those communications to third-party marketing companies in violation of HIPAA and Massachusetts law; and (ii) subsequently using the intercepted communications to advance Defendants' marketing of their services to patients, both of which are acts that violate HIPAA and Massachusetts tort law.

7. By intercepting their patients' communications for the primary purpose of disclosing individuals' PHI to third parties in violation of HIPAA and Massachusetts tort law, for commercial gain, including later using the contents of the intercepted communication for Defendants' targeting of advertisements to those patients through Google's and Facebook's advertising platforms, Defendants put their business interests over the privacy rights of their patients.

8. Defendants knew the privacy implications of deploying the tracking technologies throughout their websites, including on pages whose use reflected patient status, such as the patient portal, appointment request, and bill payment pages, and the patient portal mobile app. As detailed below, the functionality of the tracking technologies was well known to businesses that deployed them, and Google and Facebook expressly directed Defendants to obtain user consent for all

tracking technologies and not to use them on healthcare webpages. Notwithstanding this knowledge, Defendants deployed tracking technologies throughout their website, including on pages specifically designed for patients (such as their patient portals), without obtaining user consent. Indeed, Defendants deployed the tracking technologies for that very purpose: to disclose patients' status as patients of Defendants, and the patients' communications on their websites, so that Defendants and others could target those patients with advertising on Google's and Facebook's advertising platforms.

9. Defendants' use of these tools caused their patients' personally identifiable information and the contents of their patients' communications exchanged with Defendants to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights under Federal law, their rights as citizens of Massachusetts, and both the express and implied promises of Defendants.

10. Defendants' conduct in disclosing such PHI about their patients to Facebook and other third parties with the purpose of commercially exploiting the intercepted communications for targeted advertising violates both Massachusetts and Federal law.

**PARTIES TO THE ACTION**

11. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605, and is the largest health care system in Central Massachusetts.[3] It owns and manages many healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital.[4] Together with and

[3] https://www.ummhealth.org/umass-memorial-health/about-us
[4] https://www.ummhealth.org/locations

through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

12. Defendant UMass Community Entities, Inc.[5] is a corporation that operates in Worcester, MA. It is a subsidiary of UMass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including those that share the UMass Memorial Website. It also "provide[s] ... information systems" to those healthcare facilities. Based on this filing and upon information and belief, UMass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

13. Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

14. Defendant UMass Memorial HealthAlliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health - HealthAlliance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

---

[5] Defendants informed Plaintiffs that one defendant named in the original complaint-UMass Memorial Hospitals, Inc., changed its name to UMass Memorial Community Hospitals, Inc. Subsequent filings with the Massachusetts Secretary of State confirm that this entity again changed its name on or about April 9, 2024, to UMass Memorial Community Entities, Inc. Plaintiffs have updated the name of this entity in the body and caption of this amended consolidated complaint.

15. Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

16. Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses.

17. Plaintiff John Doe is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendants' physicians, and has been a patient of UMass Memorial Medical Center,[6] and thus also a patient of Defendants. John Doe is a user of Defendants' website at www.ummhealth.org.

18. Plaintiff Lisa Colleton is an individual who is over 18 years and resides in Marlborough, Massachusetts. Plaintiff is also a patient of Defendants and a user of Defendants' website at www.ummhealth.org.

19. Plaintiff Janice Progin is an individual who is over 18 years and resides in Gardner, Massachusetts. Plaintiff is also a patient of UMass Memorial and a user of UMass Memorial's website at www.ummhealth.org.

## JURISDICTION AND VENUE

20. Defendants invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through their Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (*i.e.*, federal question jurisdiction).

[6] https://www.ummhealth.org/umass-memorial-medical-center

21. Through their Notice of Removal, Defendants also assert venue is appropriate in this Court because the Massachusetts Superior Court from which this case was removed is within this District.

## FACTUAL BACKGROUND

### A. Plaintiffs' experiences with Defendants.

22. Plaintiff Janice Progin has been a patient of UMass Memorial since several years before her initial complaint in this case. During that time, she used the UMass Memorial website many times throughout the class period, including in 2022, when she received treatment from UMass Memorial for a specific medical condition. She also visited and used UMass Memorial's password-protected patient portal regularly during the class period, including numerous times in 2022.

23. Janice Progin used UMass Memorial's website to obtain information about her doctors and other doctors she was considering using for her own healthcare. She also used the UMass Memorial website to request and obtain from UMass Memorial information on particular symptoms she was experiencing, certain conditions she had, and medical procedures she was considering having UMass Memorial's medical staff perform. She also navigated to, logged in to, and used UMass Memorial's patient portal to obtain and review her personal medical records.

24. As described below, Defendants implemented tracking technologies that intercepted communications between Defendants and healthcare consumers throughout their websites. During the Class Period, Plaintiff Janice Progin visited specific pages on the UMass Memorial website on which Defendants embedded code for various tracking technologies, including Meta Pixel and Google Analytics. The pages Plaintiff Janice Progin visited included:

(i) The UMass Memorial patient portal (*see* ¶¶ 237-239, *infra*, for an explanation of how Defendants deployed tracking technologies to intercept patients'

navigation to the patient portal and patient portal mobile app for marketing and commercial purposes, and how those intercepted communications were disclosed to and subsequently used by Google, Facebook, Defendants, and other companies for marketing purposes, including targeted advertising);

(ii) Defendants' searchable "Find a Provider" database (*see* ¶¶ 225-230, *infra*, for an explanation of how Defendants deployed tracking technologies on their searchable database of doctors for marketing and commercial purposes, and how the intercepted communications were disclosed to and subsequently used by Google, Facebook, Defendants, and other companies for marketing purposes, including targeted advertising); and

(iii) pages about specific symptoms, conditions, and medical procedures Plaintiff obtained (*see* ¶¶ 240-245, 255-257, *infra*, for an explanation of how Defendants deployed tracking technologies on their pages about specific symptoms, conditions, and medical procedures for marketing and commercial purposes, and how the intercepted communications were disclosed to and subsequently used by Google, Facebook, Defendants, and other companies for marketing purposes, including targeted advertising).

25. Without Plaintiff Janice Progin's knowledge or consent, Defendants intercepted and disclosed her confidential communications and PII/PHI to Google, Facebook, and other third parties, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to the patient portal.

26. Plaintiff John Doe was a patient of Defendants for over a decade. While a patient of Defendants, including in 2021 and 2022, John Doe visited Defendants' websites regularly at

www.ummhealth.org in the course of seeking medical treatment. Among other things, he used Defendants' websites to find a doctor and research locations for treatment. On Defendants' website, John Doe entered data, including sensitive medical information, such as details about his medical conditions and treating physicians. The information that Plaintiff John Doe transmitted included queries about treatment for a spinal injury that he suffered and for which he sought treatment from Defendants.

27. In addition, John Doe regularly used Defendants' password-protected patient portal to review summaries of his visits and instructions from his treating physicians, schedule appointments, and pay for medical treatment. He most recently used the patient portal to pay for treatment in 2023. When using Defendants' patient portal, John Doe also communicated such specific details as his name, his patient status, his treating physician, and the specific medical conditions that he was seeking treatment for and information about.

28. Without Plaintiff John Doe's knowledge or consent, Defendants intercepted and disclosed his confidential communications and PII/PHI to Google, Facebook, and other third parties, including information about his patient status, messages he sent to his doctors, details about his medical condition, details about his treatment, and the precise days and times he logged in to the patient portal.

29. Plaintiff Lisa Colleton has likewise been a patient of Defendants for several years. While a patient of Defendants, she used Defendants' websites on many occasions, including at least once in each of April, May, June, July, August, and September 2021. She also visited and used Defendants' password-protected patient portal. At the times she visited Defendants' websites and the patient portal, she had, and remained, logged in to a Facebook account.

30. Lisa Colleton used Defendants' websites to search for medical information, services and physicians, schedule appointments, and pay for treatment. She also used Defendants' patient portal to communicate with her treating physicians. When using Defendants' websites and patient portal, Plaintiff Colleton entered data, including sensitive medical information, such as details about her particular medical conditions and treating physicians. The information that Plaintiff Colleton transmitted included queries about treatment for a particular diagnosis she received.

31. Without Plaintiff Lisa Colleton's knowledge or consent, Defendants intercepted and disclosed her confidential communications and PII/PHI to Google, Facebook, and other third parties, including information about her patient status, messages she sent to her doctors, details about her medical condition, details about her treatment, and the precise days and times she logged in to the patient portal.

32. Unbeknownst to Plaintiffs, Defendants installed tracking technologies across their webpages, including pages and buttons on pages specifically designed for patients, such as (i) pages within and the login button to their patient portal; (ii) pages used to make appointments; (iii) pages used to select doctors; and (iv) pages used to pay bills. The tracking technologies caused the individuals' status as patients, the medical information entered on those webpages, their personally identifiable information, including their IP Addresses and Browser Fingerprints, and Plaintiffs' interactions with Defendants' webpages, to be transmitted to third-party advertisers, including Google and Facebook, without their consent.

33. On information and belief, Defendants also installed tracking technologies inside their patient portal and patient portal mobile app. As a result, every time Plaintiffs and Class Members accessed the patient portal and patient portal mobile app, Defendants intercepted and

shared their login with third parties including Google, along with other PII/PHI such as their patient status, their appointment scheduling, and the pages they reviewed inside the patient portal and patient portal mobile app, along with personally identifying information such as their IP addresses, browser fingerprints, and Google cookies. Such PHI, including Plaintiffs' patient status, their medical conditions, and when and where they sought treatment, is specifically protected by HIPAA against unauthorized disclosure to third parties. *E.g.*, *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025).

34. Plaintiffs believed that their interactions with Defendants through Defendants' websites, patient portal, and patient portal mobile app were private and would not be shared with anyone besides their health care providers and their staff. They were dismayed to learn that was not the case.

### B. Defendants routinely disclosed private communications and PHI of their patients to third parties, including Facebook and Google.

35. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

36. Medical patients such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with their healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by their healthcare providers without their express written consent and authorization, and that their healthcare providers will not exploit their patient communications for their own commercial purposes. These interests and expectations all applied to Defendants because they were Plaintiffs' healthcare providers.

37. Patients also have reasonable expectations of privacy that their PII/PHI and communications will not be disclosed to third parties without their express written consent and authorization.

38. As healthcare providers, Defendants have ethical, fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

39. Defendants also expressly and impliedly promise patients that they will maintain and protect the confidentiality of PII/PHI and communications.

40. Defendants operate websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

41. Defendants' websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

42. Defendants encourage patients to use digital tools on their websites to seek and receive health services.

43. The homepage of Defendants' websites is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Defendants' services.

44. Defendants also maintain a patient portal and patient portal mobile app, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendants' website, patient portal, and patient portal mobile app are defined as Defendants' "Web Properties."

45. Notwithstanding patients' reasonable expectations of privacy, Defendants' legal duties of confidentiality, and Defendants' express promises to the contrary, Defendants disclose

the contents of patients' communications and patients' PII/PHI via automatic re-routing mechanisms embedded in the Web Properties operated by Defendants. Defendants do this without patients' knowledge, authorization, or consent, and then later commercially exploit the intercepted communications for marketing purposes, including using the communications to inform to whom to serve advertisements and the content of the advertisements.

### C. The primary purpose for which Defendants deployed tracking technologies was to disclose the contents of intercepted patient communications to Google, Facebook, and other third parties so that Defendants could target patients with advertisements.

46. Defendants' primary purpose in intercepting their patients' communications on their Web Properties was to disclose the contents of those communications, including PII/PHI, to third-party advertisers, including Facebook and Google. Defendants were then able to commercially exploit the communications by targeting their own patients with advertisements on Google's and Facebook's advertising platforms. They did so without the authorization or knowledge of Plaintiffs and class members, despite Facebook's and Google's express warnings to Defendants that they should not use the tracking technologies without consent.

47. Defendants purposefully invaded Plaintiffs' privacy and breached the confidentiality of their private communications and medical information, without authorization, for Defendants' own financial gain—all acts that violate federal and state criminal and tort law.

#### 1. Facebook and Meta Pixel track and profile Facebook users on third-party websites for purposes of targeted advertising.

48. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook," is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

49. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs machine-learning-powered algorithms to determine which advertisements to show users based on their habits and interests, and uses tracking software such as Meta Pixel to monitor and exploit those habits and interests.

50. Facebook describes itself as a "real identity" platform.[7] This means that users are permitted only one account and must share "the name they go by in everyday life."[8] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[9]

51. In 2007, realizing the value of direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[10] Facebook has since evolved into one of the world's largest advertising companies.[11] Facebook can target users so effectively because it surveils user activity both on and off its websites through tracking pixels.[12] Tracking pixels enable Facebook to infer users' interests, behavior, and connections.[13] Defendants' use of tracking pixels on their websites to intercept and

---

[7] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[8] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[9] https://www.facebook.com/help/406644739431633

[10] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[11] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[12] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[13] https://www.facebook.com/business/ads/ad-targeting

disclose their communications with Plaintiffs and Class members is one way in which their activities, behaviors, and connections are surveilled.

52. Today, Facebook provides advertising on its own social media platforms and on other websites through its Facebook Audience Network.[14]

53. Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to individuals by building extensive behavioral profiles for each individual. These profiles are based not only on individuals' use of Facebook products, such as Facebook and Instagram, but also on their activities on other websites that Facebook does not own, including those owned by Defendants.

54. Tracking users' habits and interests is a critical component of Facebook's business model because it is precisely this information that enables Facebook to sell advertising to its customers, including Defendants. Facebook encourages website owners like Defendants to use Facebook plug-ins and cookies to track users' browsing histories when they visit third-party websites, such as Defendants' websites. Facebook then compiles these browsing histories into personal profiles, which are sold to advertisers, including Defendants.

55. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account.[15] Even for someone without an account on any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook combines data it obtains through the Meta Pixel with other sources (including data from data brokers) to identify the individual.

[14] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/
[15] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

56. Facebook offers several advertising options based on the audience an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow advertisers, like Defendants, to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction. Here, Defendants target audiences who may use their hospital and medical services.

57. Ad Targeting has been extremely successful because Facebook can target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[16] Aided by highly granular data used to target specific users, millions of companies, including Defendants, utilized Facebook's advertising services.

58. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then use to build individual profiles to inform targeted advertising. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites the Meta Pixel (formerly the Facebook Pixel) for tracking.

[16] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

59. The Meta Pixel is a snippet of code embedded on a third-party website (like Defendants') that tracks users' activities as they navigate the site.[17] Website owners like Defendants are told that, once activated, the Meta Pixel "tracks the people and type of actions they take."[18]

60. Facebook tells website owners like Defendants that Meta Pixel can track and log each page a user visits, which buttons they click, and specific information users input into a website.[19] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website, such as clicking on a product or running a search via a query box. Meta Pixel also captures information such as which content a user views on a website and how far down a web page they scroll.[20]

61. Facebook advertises to businesses like Defendants that the Meta Pixel allows website owners to track users across their websites and to optimize Facebook advertising based on how those users use the websites. Once business owners like Defendants install the Meta Pixel on their websites, it automatically begins sending user information to Facebook.[21] The Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[22]

62. Facebook tells businesses like Defendants: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[23] The key features of the Meta Pixel, touted by Facebook, are:

---

[17] https://developers.facebook.com/docs/meta-pixel/
[18] https://www.facebook.com/business/goals/retargeting
[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[20] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[21] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[22] "Facebook spies on us but not by recording our calls. Here's how the social network knows everything," Jefferson Graham, USA TODAY, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).
[23] https://www.facebook.com/business/tools/meta-pixel.




63. Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook a user's communications on a website, identify that individual user, and target that individual with advertising from the website owner (here, Defendants). For example, Facebook tells website owners, like Defendants, to "[i]nstall the Facebook pixel if you want to retarget your website visitors."[24] Facebook explains to website owners like Defendants that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of Your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[25]

64. The primary reason businesses such as Defendants embed Meta Pixel on their websites is to maximize the effectiveness of their targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like Defendants that they can use the Meta Pixel to "[o]ptimize delivery of your ad

---

[24] https://www.facebook.com/business/goals/retargeting
[25] *Id.*

campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[26]

**2. <u>Defendants use Meta Pixel to track and advertise to patients and potential patients.</u>**

65. Defendants advertise through Facebook's advertising platforms; this is, in fact, the reason they use Meta Pixel—to advance their advertising efforts on Facebook's advertising platforms. This is reflected by the examples below of Defendants' advertisements through Facebook platforms, including advertisements for specialties and conditions:




[26] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel

66. Defendants purposefully served these advertisements to individuals who had shown an interest in particular conditions, treatments, or types of care, such as people who had communicated with Defendants about these conditions and treatments on their websites, where Defendants deployed Meta Pixel tracking technologies to intercept and disclose such communications to Facebook. Defendants designed such advertising to target individuals whom Facebook knew were interested in those conditions and treatments, through Defendants' secret interception of their own patients' communications without patients' knowledge. Because Plaintiffs visited webpages during the relevant period that contained specific conditions on Defendants' websites, they were subject to the same types of interception, disclosure, and misuse of their healthcare communications, including communications that revealed their patient status, medical conditions, and treatments, to target them with advertisements.

67. Defendants had an incentive, which they purposefully acted on, to share as much information as possible with Facebook through tracking technologies, including disclosing their patients' identities, treatments, and other sensitive information, to maximize the effectiveness of Defendants' advertising on Facebook platforms. Sharing such healthcare information with Facebook enabled Defendants to target their advertisements to patients with specific conditions or medical statuses based on the content of patients' intercepted communications.

68. Facebook warns website owners like Defendants that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[27]

69. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed Defendants to "provide[] robust and sufficiently prominent notice to users regarding [the Meta Pixel]," including,

[27] https://developers.facebook.com/docs/meta-pixel/get-started

a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads."[28] Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[29]

70. Despite these warnings expressly putting Defendants on notice about the operation of Meta Pixel and its implications for patients' privacy, Defendants ignored the directions and warnings and deployed Meta Pixel without patients' consent on pages containing health information. In fact, Defendants lied to Plaintiffs and the Class Members when they told them that they did not share their information with third parties.

71. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PHI to Facebook, Defendants did nothing to protect their patients from egregious intrusions into their privacy, choosing instead to benefit at those patients' expense.

72. Additionally, there is widespread knowledge within the healthcare community that installing the Meta Pixel tool on hospital websites results in the disclosure of patients' PHI to Facebook, as evidenced by multiple data breaches at hospitals in which data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights and ethical obligations involved.

### 3. Google and Google Analytics track and profile Google users on third-party websites for purposes of targeted advertising

73. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google owns and operates various software services, including the

[28] https://www.facebook.com/legal/technology_terms
[29] https://www.facebook.com/legal/terms/businesstools

popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

74. Google maintains detailed profiles on individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services. Google maintains detailed profiles on individuals, whether or not they have a Google account.

75. Google derives a substantial portion of its revenue through individually targeted advertising. Specifically, Google uses the information it collects about individuals to tailor advertising to them, making its advertising more valuable than other, less tailored forms.

76. One way Google collects information to build its detailed profiles of individuals is through Google Analytics, a marketing tool Google offers to website owners like Defendants. Google incentivizes website owners, including Defendants, to use Google Analytics by offering it as a free tool to track user behavior on their websites. Google tells website owners, including Defendants, that Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing."[30] Google also tells website owners, including Defendants, that Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[31]

77. Google uses data collected through Google Analytics, including communications intercepted by Defendants, to further build individuals' profiles. Google can then use this information to enable advertisers, including Defendants, to serve such individuals with better-targeted individualized advertisements.

---

[30] https://marketingplatform.google.com/about/analytics/
[31] https://marketingplatform.google.com/about/analytics/.

78. Google tells business owners, including Defendants, that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[32] By tying in Google Analytics with Google Ads, Defendants could "share [it]s Analytics audiences with those products," thus advancing its targeted advertising efforts.[33] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting Defendants to target advertising based on the intercepted communications.[34]

### 4. **Defendants use Google Analytics to track and advertise to patients and potential patients**

79. Defendants extensively used Google platforms during the Class Period to advertise, thus exploiting the information Defendants intercepted and disclosed to Google through Google's tracking technologies, as reflected by the examples below of Defendants' advertisements through Google's ad platforms:

[32] https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1

[33] https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=5860316122186797017-NA

[34] [GA4] Advanced settings to allow for ads personalization - Analytics Help.




80. Defendants served these advertisements to individuals who had shown an interest in particular conditions, treatments, or types of care, such as those who had visited pages on Defendants' websites regarding those conditions and treatments, where Defendants deployed Google Analytics to facilitate targeted advertisements for such individuals. Defendants designed such ads to target particular individuals whom Google knew to be interested in those conditions and treatments, including through the deliberate and secret interception of Defendants' own patients' communications without their knowledge. Because Plaintiffs visited webpages during the relevant period for specific conditions on Defendants' websites, they were subject to the same types of interception, disclosure, and misuse of their healthcare communications, including communications that revealed their patient status, medical conditions, and treatments, to target them with advertisements.

81. Defendants had an incentive, which they purposefully acted on, to share as much information as possible with Google through tracking technologies, including disclosing their patients' identities, treatments, and other sensitive information, to maximize the effectiveness and ROI of Defendants' advertising on Google's platforms. Sharing such healthcare information with Google enabled Defendants to target their advertisements to patients with particular conditions or medical statuses based on the content of the patients' intercepted communications.

82. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics, Google directed website owners, including Defendants, that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data." Defendants did not do so. To the contrary, Defendants lied to Plaintiffs and the Class Members when they told them that they did not share their information with third parties.

83. Google also warns businesses, such as Defendants, that their tracking technologies are not appropriate for use on health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category and should not be used by advertisers to target users with ads or to promote their products or services. Ignoring this warning, Defendants deliberately deployed tracking technologies throughout their websites, which fall within the prohibited "Health" category.

### 5. Defendants' Purpose in Intercepting Communications Was to Engage in Acts that Violate HIPAA and Massachusetts Law.

84. Under HIPAA, a healthcare provider may not disclose or use personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.

85. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their use is strictly constrained by the purpose for which the tools are used and by the adequacy of the consent obtained from patients for such use.

86. HIPAA's Privacy Rule defines "individually identifiable health information" ("IIHI") as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

87. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of eighteen identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources to identify a single individual. The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code," *id.*, such as a person's Facebook account. Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[35]

[35] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA

88. The Privacy Rule broadly defines "protected health information" ("PHI") as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

89. The HIPAA Privacy Rule requires any "covered entity," which includes health care providers, to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

90. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 U.S.C. § 1395x(s).

91. An individual's patient status with a particular entity, standing alone, is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with [i] health condition, [ii] health care provision, **or** [iii] payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI." (emphasis added).[36]

92. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for

---

identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[36] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.35.

marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies, in that a primary function of such technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Defendants) to use the contents of intercepted communications for marketing purposes after interception.

93. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[37]

94. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[38]

95. In other words, the entities like Defendants that implement Meta Pixel and Google Analytics and disclose patient information—including an individual's status as a patient of Defendants, together with the ability for the tracking technology vendor to identify the individual—violate HIPAA unless those entities obtain a HIPAA-compliant authorization.

---

[37] Marketing,
https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.
[38] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

96. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

97. Additionally, HHS has warned healthcare providers that protected information is not limited to patient portals that require patients to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity) relates to the individual's past, present, or future health or health care or payment for care."[39]

98. Defendants' own policies reflect their awareness of the restrictions HIPAA imposes and that disclosing PHI without written consent violates HIPAA. In Defendants' own privacy disclosures during the relevant period (available on their website), for example, defendant UMass Memorial Healthcare, Inc. wrote:

> When you visit a UMass Memorial Health Care facility, we use and disclose your protected health information to treat you, to obtain payment for services and to conduct normal business known as health care operations. We may also share

[39] As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above.

> information with a contracted business associate who must meet our privacy and security requirements….
>
> Other uses and disclosures not described in this notice may be made with your signed authorization. Some of the times we may need your signed permission to use and disclose your information include the **<u>sale of your information, marketing purposes</u>**, and most sharing of psychotherapy notes and other medical information identified under our state laws. You may cancel your authorization, in writing, at any time.[40]

99. As set forth below, Defendants' disclosure of patient communications, including communications that reveal PHI, to third parties such as Facebook and Google, violated the Privacy Rule.

100. Defendants are "covered entities" under HIPAA and thus subject to the Privacy Rule.

101. Defendants' use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit PHI to third parties.

102. Defendants improperly disclosed to third parties Plaintiffs' and Class Members' healthcare communications, including communications that reveal PII/PHI, including (a) individuals' statuses as patients of Defendants; (b) patient symptoms and health conditions, (c) patients' doctors, and (d) bill payments, among other things. Defendants disclosed to Google, Facebook, and other third parties the status of individuals as Defendants' patients by using tracking technologies on webpages designed specifically for patients (including doctor search pages, bill payment pages, and pages used to navigate to and log in to Defendants' patient portal and patient portal mobile app).

103. For example, by using tracking technologies on the webpages Plaintiffs visited—including those containing information on doctors, medical conditions, medical procedures, and

---

40 https://web.archive.org/web/20220602220032/https://www.ummhealth.org/patients-visitors/joint-notice-information-practices.

Defendants' patient portal and patient portal mobile app—Defendants intercepted and disclosed to third parties information about Plaintiffs' doctors, their specific medical conditions and treatments, and her patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

104. By using Meta Pixel and Google Analytics over a period of several years, Defendants, in substance, transferred to Facebook and Google a list of Defendants' patients. More specifically, each time a patient logged in to the patient portal (identifying the individual as one of Defendants' patients), Facebook and Google recorded that communication and associated it with the individual's real-world identity, and given that numerous patients logged into the portal over a period of years, the end result is Facebook and Google then possessed a list of Defendants' patients, which it could then use to target ads both on Defendants' behalf and for other advertisers. As described below, Defendants also deployed tracking technologies on pages that revealed patients' conditions, treatments, doctors, and other sensitive information, allowing Google and Facebook to add that information to the patient list they amassed, which Defendants and other advertisers could use to target individualized ads on Google and Facebook's platforms.

105. Defendants also knowingly and improperly disclosed to third parties Plaintiffs' and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Defendants disclosed HIPAA identifiers along with PHI, including information about conditions and treatments sought, patient status, provider information, and appointment details.

106. Defendants, through their Privacy Policy, affirmatively and deliberately misled Plaintiffs by promising that any identifiable information they submitted would only be used

to support their customer/patient relationship with them and that "UMass Memorial does not disclose your information to third parties," except in limited exceptions (such as legal compliance) not applicable to Defendants' conduct described in this complaint. Despite these assurances of privacy, Defendants intentionally transmitted Plaintiffs' private communications, which included their patient status, their search for information about specific medical conditions and providers, along with information that identified Plaintiffs, to Facebook and Google without their authorization. Defendants decided not to tell patients the truth in their Privacy Policy and Notice of Privacy Practices in order to encourage them to submit their PHI, which, in turn, Defendants disclosed to third parties for Defendants' commercial gain.

107. As detailed in Counts II, III, IV, and VI below, the disclosure of otherwise private communications was done purposefully and in violation of Defendants' privacy policies. Because Defendants' conduct contradicted their written promises to Plaintiffs and other class members, Defendants breached the confidentiality of their patients' private communications, which included medical information, for commercial gain, and therefore violated Massachusetts tort law, including the Massachusetts Right to Privacy Act, the common law fiduciary duty, and the common law for breach of confidence. Defendants intercepted communications for this purpose, which enabled them to commercially exploit Plaintiffs' private communications, notwithstanding their promises to Plaintiffs not to do so.

108. In deploying tracking technologies on their websites, Defendants acted with the primary purpose of making disclosures and engaging in acts that violated HIPAA and Massachusetts tort law. Defendants purposely injected tracking technologies into their websites and configured them to intercept and retransmit to Google and Facebook specific information revealing the patients' PHI without their consent. Defendants then used those intercepted

communications, including PHI, for their own commercial purposes without obtaining patient consent. Indeed, that is the principal purpose for which Defendants deploy the tracking technologies: to permit Defendants to use the illegally intercepted communications they shared with Facebook and Google to advertise through Facebook and Google's advertising platforms, acts that violate HIPAA (a criminal statute) and Massachusetts tort law.

### D. Defendants' criminal and tortious acts were separate and independent from the ECPA violation.

109. Defendants engaged in at least two distinct acts, each separate and independent of the interception itself, and both of which are criminal under federal law (namely, HIPAA) and tortious under Massachusetts state law. Those acts are (i) the disclosure to Google, Facebook, and other third parties of patient communications, including PHI; and (ii) the subsequent commercial exploitation of those communications, including PHI, for Defendants' own marketing purposes.

#### 1. <u>The First Criminal and Tortious Act: Disclosure of Intercepted Communications and PHI.</u>

110. The disclosures of Plaintiffs' communication that violated HIPAA and Massachusetts tort law were acts that were distinct, separate, and independent from the interception of those communications.

111. An interception, as the ECPA defines the term and as construed by the courts, occurs when an "acquisition" of a communication happens; such an acquisition occurs when JavaScript code for the technologies creates a duplicate of the communication between the patient and Defendants while a particular page is loading.

112. The JavaScript code, after acquiring the content of communications made through a particular webpage, subsequently connects to the tracking technology vendor's servers (e.g., Google or Facebook) and discloses the content of the intercepted communications to the vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program,

they are distinct events activated by different parts of the code for each tracking technology. Although they are distinct, sequential events, the interception and disclosure to third parties occur contemporaneously with the website communications between Class Members and Defendants.

113. Accordingly, although interception/acquisition and disclosure occur close in time, they are not the same act. Instead, the disclosure, as a technological matter, can occur only after interception, and this is what happened when Meta Pixel and Google Analytics operated on Defendants' own website. Defendants configured the tracking technologies and their own websites to operate in precisely this manner.

### 2. <u>The Second Criminal and Tortious Act: Commercial Exploitation of Intercepted Communications and PHI.</u>

114. HIPAA prohibits not only the disclosure of PHI but also its "use" without authorization. "Use" includes marketing. The Privacy Rule expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."

115. The use of healthcare-related communications, including PHI, also violates state law. In particular, a fiduciary's commercial exploitation of confidences disclosed to it by a principal violates the duty the fiduciary owes to the principal (i.e., that a healthcare provider owes

to a patient). That fiduciary breach occurs independently of any disclosure of any confidences entrusted to the fiduciary.

116. HIPAA and state law on fiduciary duty are directly implicated by tracking technologies in that the primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Defendants) to use the contents of the intercepted communications for marketing purposes after the interception occurs. Defendants implemented the tracking technologies precisely for this purpose—so that Defendants could later commercially exploit the intercepted communications for advertising targeted to individuals based on the content of their intercepted communications (for example, by targeting ads about a particular condition or treatment based on a patient's communications with Defendants about that condition or treatment).

117. Defendants' criminal and tortious commercial exploitation of intercepted communications can occur hours, days, weeks, or months after the interception occurs. Those are acts distinct, separate, and independent from the interception itself.

**E. Defendants misuse sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

118. Defendants' disclosures of patients' PII/PHI occur because Defendants intentionally deploy hidden source code on the websites they operate, including www.ummhealth.org and www.harringtonhospital.org, that causes patients' PII/PHI (including the exact contents of their communications) to be transmitted to third parties while concealing that disclosure from patients.

119. By design, third parties receive and record the exact contents of patient communications before the full response from Defendants to patients has been rendered on the

screen of the patient's computer device and while the communication between Defendants and the patient remains ongoing.

120. For example, when Plaintiffs or a Class Member accessed Defendants' website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendants sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendants' website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

121. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smartphone, via the client device's web browser.

122. Web browsers are software applications that allow users to exchange electronic communications over the internet.

123. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

124. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

125. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

126. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a user's device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

127. For example, typing https://www.ummhealth.org/ into a browser sends an HTTP request to Defendants' website, which returns an HTTP response in the form of the home page of Defendants' website:



128. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendants' website, to third parties via pixels.

129. For example, Defendants' websites include software code that transmits patients' HTTP requests to Facebook, including patients' PII/PHI, every time a patient interacts with a page on their websites.

130. The basic command that web browsers use to exchange data and user communications is called a GET request.[41] For example, when a patient types "heart failure treatment" into the search box on Defendants' websites and hits 'Enter,' the patient's web browser makes a connection with the server for Defendants' websites and sends the following request: "GET search/q=heart+failure+treatment."

131. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

132. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some

---

[41] https://www.w3schools.com/tags/ref_httpmethods.asp

other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

133. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

134. Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties, like Facebook and Google, via third-party tracking tools. Indeed, Google warns website developers and publishers that installing its ad-tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[42]

135. Third parties such as Facebook and Google use the information they receive to track user data and communications for marketing.

136. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

137. These tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicked through Defendants' website to the page describing Defendants' "Reproductive Endocrinology and Infertility" services at https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/reproductive-endocrinology-and-

[42] https://support.google.com/platformspolicy/answer/6156630?hl=en

infertility, the source code deployed on Defendants' websites caused personally identifiable data and the content of patient communications to be transmitted to third parties like Facebook and Google:




138. By design, the transmission of patient data to third parties occurs before Defendants' responsive communications about "Reproductive Endocrinology and Infertility" have been delivered in full to the patient.

139. Tracking technologies such as the Meta Pixel tool allow Defendants and third parties like Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendants' websites and patient portal. When patients visit Defendants' websites and patient portal, unbeknownst to them, the web page displayed on the patient's browser includes the tracking technology as embedded code, which is not visible to patients or other visitors to Defendants' websites and patient portal. This code is triggered when a patient or visitor interacts

with the web page. Each time the tracking technology is triggered, the software code is executed and sends the patient's PII/PHI directly to the relevant third party such as Facebook.

140. The Meta Pixel and other tracking technologies at issue act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they are surreptitiously installed. Instead, the tracking technology code lies in wait until triggered by an event, at which time it effectively opens a channel through the website that funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

141. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' websites by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendants' server in turn sends an HTTP response, which results in the search results being displayed.

142. This is not, however, the only HTTP request created by a patient's interaction with Defendants' websites and patient portal. In fact, at the very same time the web page is instructed to send an HTTP request to Defendants requesting search results, the embedded tracking technology, acting as a tap, is triggered, such that the patient's HTTP request is shared with Facebook, Google, and other third parties, informing them of the patient's exact search and the patient's personally identifiable information.

143. In addition to employing the Meta Pixel to track patients, Defendants' Web Properties used Google Analytics to track and disclose patient activity—including Plaintiffs'—without their consent. Unbeknownst to Plaintiffs and other Class Members, the installation of this code within the patient portal and patient portal mobile app resulted in disclosures of patients' PII/PHI, including their patient status, whenever they logged in to the patient portal and patient

portal mobile app for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The Google Analytics pixel within the patient portal and patient portal mobile app also disclosed when patients viewed specific pages within the patient portal, including prescription information and test results.

144. In addition, through Google Analytics, Defendants disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendants routinely and systematically disclosed patients' PII/PHI to Google using this technology.

145. A website developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.

146. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

147. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web properties with just the click of a few buttons.

148. Defendants deployed Google Tag Manager on their websites and patient portal through an "iframe," a nested "frame" that exists within the Defendants' websites and patient portal that is, in reality, an invisible window through which Defendants funnel tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

149. By purposeful design, none of the tracking is visible to patients visiting Defendants' websites, patient portal, or patient portal mobile app.

**F. Tracking technologies are designed to identify the individuals whose communications are intercepted, enabling Facebook, Google, and other third parties to build individualized behavioral profiles to inform targeted advertising.**

150. Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third-party tracking technology, as Defendants have.

151. These tracking technologies take advantage of numerous types of identifying information that follow users as they move through the internet.

**1. <u>IP Address</u>**

152. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook and Google a unique and semi-persistent identifier across devices—one that has limited privacy controls.[43]

153. Because of their uniquely identifying characteristics, IP addresses are personally identifiable information. *See* 45 CFR § 164.514. Tracking pixels collect website visitors' IP addresses. Accordingly, by deploying tracking technologies on their websites, Defendants caused IP addresses to be transmitted to third parties, among other things enabling Google and Facebook, when combined with other information described below, to identify the individual whose

[43] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

communications are intercepted and associate the intercepted communications with that individual's Google or Facebook profile (including their real names). This process of identification fueled targeted advertisements to these same individuals, for example, enabling Defendants to target advertisements to particular patients with particular conditions or receiving specific treatments.

**2. <u>Cookies</u>**

154. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

155. Cookies are designed to identify internet users. Advertising companies like Facebook and Google have developed methods to monetize and profit from cookies. These companies use third-party tracking cookies to collect and record user data and communications to sell targeted advertising tailored to a user's personal communications and browsing history. To build individual profiles of internet users, third-party advertising companies assign each user a unique (or a set of unique) identifiers.

156. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

157. In general, cookies are categorized by (1) duration and (2) party.

158. There are two types of cookies classified by duration.

159. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

160. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

161. Cookies are also classified by the party that uses the collected data.

162. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

163. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendants' website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

164. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy requires web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendants can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendants are not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values

associated with first-party cookies set by companies like Defendants. But big data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook and Google can gain access to first-party cookies.

165. JavaScript source code developed by third-party data companies and placed on a webpage by a developer such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers, effectively and deliberately circumventing any attempt by that individual to block tracking via third-party cookies.

166. Cookie syncing is a process that "allow[s] web companies to share (*i.e.*, synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[44] This allows entities to circumvent "the restriction that sites can't read each other's cookies, in order to better facilitate targeting and real-time bidding."[45]

167. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows

---

[44] Panagiotis Papadopoulos *et al.*, *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/
3308558.3313542.

[45] Gunes Acar *et al.*, *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) synchronize (i.e., join) two different identities (cookies) of the same user on the web.[46]

[46] Papadopoulos, *supra*, at 1433.




168. Through this process, third-party trackers like Google's and Facebook's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though they "do not have any collaboration with" the third party.[47]

169. On the flip side, "CSync may re-identify web users even after they delete their cookies."[48] "[W]hen a user erases her browser state and restarts browsing, trackers usually place

[47] *Id.* at 1434.

[48] *Id.*

and sync a new set of userIDs, and eventually reconstruct a new browsing history."[49] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users cannot abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link [a] user's history across state resets."[50]

170. Thus, "syncing userIDs of a given user increases [] user identifiability while browsing, thus reducing their overall anonymity on the Web."[51]

171. Cookie syncing is precisely what is happening here. Google's and Facebook's trackers sync their unique user identifiers with other third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they also share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

172. In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

173. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

---

[49] *See id.*

[50] *Id.*

[51] *Id.* at 1441.

174. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

175. Defendants require patients using their patient portal to have enabled first-party cookies to gain access to their patient portal.

176. The _fbp cookie is used as a unique identifier for patients by Facebook.

177. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook and Defendants (through their deployment of tracking technologies on their website) have disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendants with Facebook users.

178. Defendants have engaged in cookie syncing with Facebook, Google, and other third parties.

179. Defendants' cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Defendants assign to patients to also be made to third parties.

180. Defendants have used and caused the disclosure of patient cookie identifiers with each communication described herein, including patient communications concerning individual providers, conditions, and treatments. These disclosures of cookie identifiers—implemented through Defendants' purposeful decision to deploy tracking technologies, including Meta Pixel and Google Analytics, on their websites—provide an additional means that permits third parties like Google and Facebook to identify the individual whose communications were intercepted, thus

permitting Defendants to serve targeted advertising to that individual over Google and Facebook's platforms.

### 3. **Browser Fingerprint**

181. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser fingerprint is a collection of information gathered about a computing device (such as device type, device settings, browsing settings, browser window size, and the like) that can be used to identify the specific device, and, additionally, the individual using the device.

182. These browser fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked, and can provide a wide variety of data. As Google itself has explained: "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed, to generate a unique identifier which can then be used to match a user across websites."[52] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[53] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[54]

183. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[55]

---

[52] https://www.blog.google/products/chrome/building-a-more-private-web/
[53] https://pixelprivacy.com/resources/browser-fingerprinting/
[54] https://www.blog.google/products/chrome/building-a-more-private-web/
[55] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

184. Browser fingerprints are considered protected personal identifiers under HIPAA, 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser fingerprints from website visitors.

185. Defendants have purposefully used and caused the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each intercepted communication described herein, including patient communications concerning individual providers, conditions, and treatments. Such disclosures to Google and Facebook, caused directly by Defendants' purposeful decision to implement tracking technologies on their websites, provide a further means for Google and Facebook to associate intercepted communications with individuals' real-world identities, enabling Defendants to serve targeted advertising to such individuals over Google's and Facebook's platforms.

**4. <u>User Identifiers</u>**

186. A fourth kind of personally identifiable information protected by law against disclosure is unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of an individual with, e.g., a Facebook account across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.[56] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[57]

187. Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R), and are likewise capable of collection through pixel trackers.

[56] https://www.facebook.com/help/211813265517027
[57] https://smallseotools.com/find-facebook-id/

188. The tracking technologies are designed to associate intercepted communications with an individual's unique personal identifier, such as a person's Facebook ID, thus providing an additional method for Facebook to associate intercepted communications with an individual's real-world identity. This identification technique further enables Defendants to build behavioral profiles for individuals to serve them with targeted advertising.

**5. <u>Advertising ID</u>**

189. A fifth kind of personally identifiable information protected by law against disclosure is advertising IDs. An advertising ID is a unique identifier used by advertisers to track user activity and serve personalized advertisements on mobile phones. Advertising IDs allow advertisers to understand user behavior, measure ad performance, and tailor advertisements based on user interests. Examples include the Google Advertising ID (GAID) for Android and the IDFA Advertising ID for iOS devices.

190. Each Android device has a unique GAID advertising ID. Whenever an Android device connects to Google services, it is automatically assigned a GAID. Advertisers can use the GAID to target users with advertisements. Likewise, Google can use the GAID ID to link users with their individual Google accounts.

191. Mobile marketers use advertising IDs like the Google Advertising ID to understand which ads, creatives, and channels are most effective. In Android advertising, ad networks utilize the GAID to get an idea of a user's behaviors and interests. Meanwhile, advertisers use the GAID to monitor ad engagement and conversions. Advertisers and developers can see views and clicks of ads, as well as when a user subsequently installs an app, makes a purchase, or signs up for a subscription or other service.

192. Together, this data allows mobile app marketers to deliver targeted and retargeted ads to app users using precision segmentation for highly personalized experiences. Creating these

personalized ads provides advertisers with an efficient tool for targeting specific users to show specific advertisements directed to specific interests based on browsing history and other data that the advertising ID allows companies like Google to obtain.

193. Each of the individual data elements described above is, on its own, personally identifiable. Defendants' disclosures of such personally identifiable data elements are exacerbated because the disclosures of the different data elements are tied together. When taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals. By enabling several distinct methods for Google and Facebook to associate intercepted communications with individuals' real-world identities, the tracking technologies are designed specifically to fuel advertising targeted to the individual, based on the content of their intercepted communications, including their status as Defendants' patients, and information about their doctors, conditions, and treatments. As described above, Defendants deployed tracking technologies for precisely this primary purpose.

### G. How Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.

194. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[58] This information is disclosed to Facebook regardless of whether a user is logged in to their Facebook account at the time.

---

[58] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

195. The transmission is instantaneous—indeed, Facebook often receives the information before the health care provider does.

196. The transmission is invisible.

197. The transmission is made automatically, without any affirmative action taken by the patient.

198. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[59] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

199. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users' browsing histories on third-party websites and compiles these browsing histories into personal profiles, which are sold to advertisers to generate revenue.[60]

200. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information,

---

[59] *In re Facebook*, 956 F.3d at 596.
[60] *In re Facebook*, 956 F.3d at 596.

device identifiers, and other data. All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies that wish to display advertising for products similar to what the user looked at on the original shopping website.

201. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[61]

202. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendants with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website with advertising based on the content of their communications with Defendants.[62]

203. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

204. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[63] According to Facebook, the Meta Pixel is an analytics tool that allows

[61] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[62] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[63] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

businesses to measure the effectiveness of their advertising by understanding the actions people take on their websites."[64]

205. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code blocking the Pixel's execution and to ensure that visitors will be tracked.[65]

206. Once Meta Pixel is installed on a business's website, it tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the website owner. Facebook then uses this data to build a user profile on each user that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

207. Facebook tracks non-Facebook users through its widespread internet marketing products and source code, and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[66]

208. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

209. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[67] HTTP headers collect data including "IP addresses, information about

[64] https://www.oviond.com/understanding-the-facebook-pixel
[65] https://developers.facebook.com/docs/meta-pixel/get-started
[66] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[67] https://developers.facebook.com/docs/meta-pixel/

the web browser, page location, document, referrer and person using the website."[68] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[69]

210. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[70]

211. Facebook also receives personally identifiable information in the form of a user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

212. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

213. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user

[68] https://developers.facebook.com/docs/meta-pixel/
[69] https://developers.facebook.com/docs/meta-pixel/
[70] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

214. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[71] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[72]

215. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

216. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official

[71] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[72] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of PII/PHI that Defendants bartered to Facebook so that Facebook can identify, target, and market products and services to individuals, including for advertisements on Defendants' behalf, as described above.

### H. Defendants discreetly embedded the Meta Pixel and similar tracking technologies throughout their websites, capturing and disclosing patients' PII/PHI to Facebook and other third parties.

217. A business that incorporates the Meta Pixel on its website (such as Defendants here) benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The website owner also gains information from its customers through the Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

218. Facebook's intrusion into the personal communications of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When the Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website, ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data from all websites.[73] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads. Defendants in turn benefit by being able to use

---

[73] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

Facebook's advertising platforms fueled by the content of the communications intercepted by the Meta Pixel.

219. Facebook provides websites (including Defendants) using the Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites (including Defendants') use this data to create "custom audiences" to target the specific Facebook users with advertisements, as well as other Facebook users who match "custom audience" criteria. Businesses, including Defendants', that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

220. Businesses (including Defendants) install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[74] Businesses (including Defendants) also use the Meta Pixel to build custom audiences on Facebook that they can use for advertising.[75]

221. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

222. Facebook has designed the Meta Pixel to collect information about patient activities on hospital websites in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, log in, or create an appointment—Facebook code embedded on that page transmits the content of the patient's

[74] https://instapage.com/blog/meta-pixel
[75] https://instapage.com/blog/meta-pixel

communications to Facebook while the exchange of information between the patient and hospital is still occurring.

223. Defendants are among the hospital systems that have embedded the Meta Pixel on their websites. Via their use of the Meta Pixel, Defendants intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendants, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, Logout, or Enroll in Defendants' patient portal, summaries of Defendants' responsive communications, the parties to the communications, and the existence of communications at Defendants' websites.

224. When patients like Plaintiffs and the Class Members visited the homepage of Defendants' website, the Meta Pixel source code deployed by Defendants caused the patients' personally identifiable information (such as Facebook IDs, their IP address, and their browser fingerprints) to be transmitted to Facebook along with information identifying the specific pages on Defendants' websites that they viewed. In other words, *every time* that Defendants' patients, like Plaintiffs, visited their website, Defendants disclosed not only *who* those patients were, but also *what* medical treatments they reviewed on the website, *what* doctors they reviewed on the website, *what* search terms they typed into online forms, and whether they had logged in to Defendants' patient portal.

225. For example, a patient searching for a doctor on Defendants' website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's hometown, the patient's language preference, and other information that the patient provides:




226. All this data was disclosed to Facebook in real time via the Meta Pixel as patients transmit their information, along with other data, such as a patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendants, through their deployment and configuration of Meta Pixel, also disclosed other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser fingerprints, and device identifiers.

227. The UMass Memorial Website similarly includes a "Find a Doctor" function designed for patients, allowing them to find a doctor based on search criteria they provide. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester:




228. Hidden code in the results page for find-a-doctor searches causes the secret interception of the fact that the patient is using the find-a-doctor function and the specific criteria the patient has inputted as part of that search—information that is then disclosed to Google, Facebook, and other third parties. The interception and disclosure to Facebook, Google, and other third parties reveal patient status, as the doctor search feature, as implemented by UMass Memorial, is designed for patients. If a patient then clicks on the profile of a physician in the results

page, the identity of the patient's physician is disclosed to third parties via hidden tracking technology code.

229. Plaintiffs used the find-a-doctor function on Defendants' webpages, and Defendants intercepted and disclosed to Google, Facebook, and other third parties the specific content of their requests for doctors and information about their medical providers, as in the examples above. Defendants purposely made these disclosures to facilitate their own marketing, including serving targeted ads for Defendants to Plaintiffs and other patients on Facebook's and Google's platforms based on the content of the intercepted communications.

230. Defendants also disclosed such personally identifying information and sensitive medical information even when patients were searching for doctors on their websites to assist them with conditions such as substance abuse and addiction:



231. Likewise, a patient who desires an appointment at a specific hospital using Defendants' websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients. The Make-an-Appointment page is depicted below:




232. The above page is another page that, although public-facing, is specifically designed for patients, and accessing it reveals patient status to Google, Facebook, and other third parties through tracking technologies. Defendants injected hidden code onto the page that caused the interception and disclosure to Google, Facebook, and other third parties of the contents of patients' communications on the make-an-appointment page, including revealing individuals' status as patients of Defendants, to Google, Facebook, and other third parties. Plaintiffs Doe and Colleton used the appointment request function on Defendants' websites during the class period, and Defendants intercepted and their appointment for the purposes of making disclosures to Google, Facebook, and other third parties which would facilitate Defendants' own marketing,

including serving targeted ads for Defendants to Plaintiffs on Facebook's and Google's platforms based on the content of the intercepted communications.

233. The UMass Memorial Website also includes a section that allows patients to pay bills they received from Defendants. The "Pay Bill Online" page of the UMass Memorial website is depicted below:




234. When a patient visits the bill payment page, they confirm they are an individual who has received medical services from Defendants, thereby confirming their patient status. That communication with Defendants is intercepted and transmitted to Google, Facebook, and other third parties via hidden tracking technology code. The contents of the intercepted communication

reveal to Google, Facebook, and other third parties that the user is seeking to "Pay Bills Online" on the "UMass Memorial Health" webpage, thus confirming the individual's patient status to Google, Facebook, and other third parties even before the user proceeds to pay a bill.

235. If a patient scrolls down on the same bill payment webpage, Defendants provide a link to their myChart patient portal in order to view and pay bills, as depicted in the screenshot below:




236. If a patient clicks on the link to "Log-in to myChart," that communication through which the user connects to Defendants' patient portal (and confirms further their status as a patient) is intercepted and transmitted to Google and Facebook via hidden code, including that the user has "click[ed]" on a button for the "myChart Guest Portal" from the "Pay Bill Online" page.

237. The same interceptions occur if a patient accesses the myChart patient portal from other parts of the UMass Memorial Website. For example, if a patient clicks the myChart link on the main landing page, they are directed to the myChart patient portal landing page. That webpage is depicted below:




238. When a user requests the landing page for the myChart patient portal, Defendants intercept and transmit that communication to Google, Facebook, and other third parties through hidden tracking technology code that Defendants injected into the webpage. That code caused the communication through which the individual requests the "myChart patient website" for "UMass Memorial Health" to be intercepted and transmitted to Google, Facebook, and other third parties, thus revealing the individual's patient status to those third parties.

239. When Plaintiffs visited Defendants' patient portals, Defendants intercepted and purposely disclosed those communications to third-party marketing companies, in the manner described in the paragraphs above, revealing to Google, Facebook, and other third parties that

Plaintiffs are patients of Defendants. Google, Facebook, other third parties, and Defendants could then use the content of intercepted communications for marketing purposes, including serving targeted ads to Plaintiffs based on that content.

240. Defendants' websites also contain numerous pages for specific categories of medical care they offer, including treatments and services for specific conditions. When a patient (as confirmed by their use of the patient portal) accesses such pages, they indicate an interest in particular treatments or conditions. When the patient visited such pages, Defendants secretly intercepted and purposely disclosed the contents of the communication to Google, Facebook, and other third parties, including, by name, the patient's specific treatments or conditions for which they sought treatment. Google, Facebook, other third parties, and Defendants subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Defendants over Google's and Facebook's platforms.

241. For example, Defendants have used Facebook's platforms for the following advertisements, targeted to specific conditions, departments, and treatments:













These advertisements were targeted to Defendants' patients who had communicated with Defendants regarding these treatments and conditions. That is, Defendants exploited the content of sensitive patient communications to serve targeted advertising.

242. Plaintiffs each visited pages on Defendants' websites for specific conditions and treatments. For example, Plaintiff Doe communicated with Defendants regarding a spinal injury, and the other Plaintiffs likewise communicated with Defendants regarding specific conditions and treatments. Each of the Plaintiffs' communications were similarly intercepted and disclosed to Google, Facebook, and other third parties, revealing their specific conditions or treatments so that

Defendants could later exploit the content of the communications for targeted ads as in the examples above.

243. All this data about patients' interactions with Defendants' websites is disclosed to Facebook, Google, and other third parties simultaneously in real time as visitors transmit their information, including information such as the doctor they choose for treatment, the doctor's specialty, the patient's location, the patient's language and gender preferences, and the full-string URLs generated by the patient's searches. Along with other data, Defendants also disclose patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendants also disclose other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser fingerprints, and device identifiers.

244. A patient searching for information about cancer treatment or pregnancy, however, not only shares their PHI with Defendants, but also unknowingly shares their PHI with Facebook, Google, and other third parties, such as the fact that the patient is pregnant.

245. All these communications were acquired by Defendants and forwarded to third parties like Facebook, Google, and other third parties via tracking technologies that Defendants installed on their websites.

246. In other words, Facebook, Google, and other third parties learned not just that patients were seeking treatment from Defendants, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendants were not sharing with third-party marketing companies.

247. Defendants disclose patient information from across their websites including (but not limited to) communications that are captured by the websites' search bars, communications

that are captured when a patient searches for "Services and Treatments" offered by Defendants, communications made by patients using the websites' Bill Pay functions, communications made when patients access Defendants' patient portal and patient portal mobile app, and communications made when patients are researching specific medical conditions such as COVID-19.

248. Defendants have disclosed patient PII/PHI collected across their websites, including (but not limited to) the following communications:

a. when patients search via Defendants' search bars for their required care (e.g., for "substance abuse");

b. when patients search for a physician or provider—which reveal their location and required medical services and medical conditions (e.g., searching for "Gynecology");

c. when patients search for, register for, and/or click on classes or events; and

d. when patients research treatment information and medical services.

249. In other words, Facebook, Google, and other third parties learned not just that the individuals communicating through the websites were patients of Defendants and were seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendants are not sharing with third-party marketing companies.

250. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the specific

document a patient views on a website, reveal a significant amount of personal data about the patient. The captured search terms and resulting URLs reveal a patient's medical issues, personal interests, and queries on third-party websites operating outside Facebook's platform.

251. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' websites. The path identifies where a file can be found on a website. Likewise, a query string provides a list of parameters. The query string parameters in a search often indicate a search was done at Defendants' websites for information about a particular medical condition. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue.

252. Via the Meta Pixel, Defendants also provided Facebook with details about online forms that patients fill out in the form of POST requests. All the information that patients provided when filling out these forms was also disclosed to Facebook.

253. As the above demonstrates, knowing what information a patient is reviewing on Defendants' websites can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendants' websites tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendants' websites that would indicate to patients that, when they used Defendants' search function, their personally identifiable data and the precise content of their communications with Defendants were being automatically captured and made available to Facebook, which could then use that information for advertising purposes even when patients searched for treatment options for sensitive medical conditions such as cancer or substance abuse.

254. The amount of data collected is significant. Via the Meta Pixel, when patients interact with their websites, Defendants disclose a full-string, detailed URL to Facebook, which contains the name of the website, folder, and sub-folders on the web server, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendants' websites, the websites return links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

255. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendants' websites. The path identifies where a file can be found on a website. For example, take https://physicians.umassmemorial.org/details/5019/ edward-appelbaum-orthopedics-southbridge. Here, the "path" is details/5019/edward-appelbaum-orthopedics-southbridge. Similarly, a patient reviewing information about "Services" that Defendants offer patients, such as "Pediatrics," will generate a URL with the path https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/childrens-medical-centerpediatrics.

256. Likewise, a query string provides a list of parameters. A query string includes fields added to a base URL by a user's web browser or other client application. To illustrate, an example of a full-string URL that provides a query string is https://www.ummhealth.org/search-results?search_block_form=cancer&form_build_id=form-LTYWYGzK9G3Apqp3zsv-6B9rFLxKRNgPOSZTLxkXC6k&form_id=search_block_form#gsc.tab=0&gsc.q=cancer&gsc.page=1. The query string parameters in this search indicate that a search was done at Defendants' websites for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

257. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendants' websites and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendants' websites that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

258. The tracking technology Defendants deployed from Google and other third parties operated in essentially the same way as Meta Pixel.

259. Defendants also provide Facebook, Google, and other third parties with details about online forms that patients fill out in the form of POST requests. This results in information that patients provide when filling out these forms also being disclosed to Facebook, Google, and other third parties. For example, when Plaintiffs filled out the online forms that Defendants provided to assist patients in finding treating physicians, Defendants shared every detail that Plaintiffs entered into those forms, including the kind of doctor they searched for, their preferred treatment location, and their preferred gender of the treating physician. All those details from Plaintiffs' communications with Defendants were simultaneously shared with Facebook, Google, and other third parties without Plaintiffs' knowledge or consent, via source code that Defendants had installed on their websites.

260. The nature of the collected data is also important. Defendants' unauthorized disclosures result in Facebook, Google, and other third parties obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook, Google, and other third parties are then able to correlate that history with the time of day and other user actions on Defendants' websites. This process results in Facebook, Google,

and other third parties acquiring vast repositories of personal data about patients—all without their knowledge or consent.

261. Defendants disclosed the patient data described above to other third parties, including Twitter, New Relic, Acquia, and ShareThis.com, via tracking software that Defendants installed on their websites. As with the Facebook Meta Pixel and Google Analytics, Defendants provide patients and prospective patients with no notice that Defendants are disclosing the contents of their communications to these third parties. Likewise, Defendants do not obtain consent from patients and prospective patients before forwarding their communications to these companies.

262. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[76] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendants routinely disclose patients' PHI to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

263. Google cookies provide Google with personally identifiable data about patients who visit Defendants' websites. Defendants transmit personally identifiable Google cookie data to Google.

264. Defendants deploy Google tracking tools throughout their websites, patient portal, and patient portal mobile app, resulting in the disclosure of communications exchanged with patients to Google. These transmissions occur simultaneously with patients' communications with Defendants and include communications that Plaintiffs and Class Members made about specific

[76] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendants' patient portal and patient portal mobile app.

265. By compelling visitors to their websites to disclose personally identifiable data and sensitive medical information to Facebook, Google, and other third parties, Defendants knowingly disclose information that allows Facebook, Google, and other advertisers to link their patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook, Google, and other third parties may choose to do with their information, such as running "experiments" on their customers by manipulating the information they are shown on their Facebook pages).[77] Defendants intentionally share the PII/PHI of their patients with Facebook, Google, and other third parties in order to gain access to the benefits of the Meta Pixel tool, Google Analytics, and other third-party tools.

266. Because Defendants embedded the Meta Pixel on their website, for example, Defendants disclosed to Facebook intimate details about Plaintiffs' interactions with their website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity. For example, when Plaintiffs and Class Members visited Defendants' website, their PII/PHI was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms. During these same transmissions, Defendants' websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided—including the pages

[77] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

viewed, the physicians viewed, the appointments scheduled, and the locations of those physicians and appointments. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

267. Moreover, each time Plaintiffs used Defendants' Website, Defendants willfully disclosed Plaintiffs' IP address, the information entered on Defendants' Website, the pages viewed, the physicians viewed, the physicians called, the appointments scheduled, and the locations of those physicians and appointments to Google via Google Analytics.

268. This simultaneous disclosure of information allowed Google to read or learn the contents of communications between Plaintiffs and Defendants.

269. Defendants affirmatively made the decision to intrude on Plaintiffs' privacy by installing source code on their websites designed to secretly share patients' PHI with third parties. For example, Defendants knew that by embedding the Meta Pixel, Google Analytics, and other tracking technologies in their websites, they were permitting Facebook, Google, and other third parties, respectively, to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data. Indeed, that was Defendants' primary purpose in deploying the Meta Pixel, Google Analytics, and other tracking technologies; it was precisely such sharing of sensitive medical information that permitted Defendants to later exploit the intercepted communications by using Facebook's, Google's, and others' advertising platforms.

270. Defendants were also aware that such information would be shared with Facebook, Google, and other third parties simultaneously with patients' interactions with their websites. Defendants were also aware that deploying the Meta Pixel, Google Analytics, and other tracking technologies would result in dozens (if not hundreds) of unauthorized persons at Facebook,

Google, and other third parties viewing the PII/PHI of Defendants' patients, including PII/PHI of Plaintiffs and Class Members. Defendants' decision to affirmatively communicate and share their patients' PII/PHI with Facebook, Google, and other companies' employees violates the numerous protections afforded by Massachusetts law.

271. Defendants also knew that installing tracking technology would result in Plaintiffs' and Class Members' intercepted communications, including PII/PHI, being improperly accessed by Facebook, Google, and other company employees so that those companies could sell advertising. Moreover, Defendants were also aware that once it shared Plaintiffs' communications, including PII/PHI, with Facebook, Google, and other third parties, it would no longer have any control over what Facebook, Google, and other third parties did with that information or who Facebook, Google, and other third parties would share that information with. On information and belief, it is likely that the third parties with whom Defendants shared Plaintiffs' communications, including PII/PHI, further disseminated that information to additional third parties, including potential advertisers. On information and belief, Plaintiffs' PHI was viewed by one or more employees at Facebook, Google, and other third parties for the purpose of targeting them with advertising.

272. Defendants decided to barter their patients' PII/PHI to Facebook, Google, and other third parties to gain access to these third parties' advertising tools. While that bargain may have benefited Defendants, Facebook, Google, and other third parties, it also betrayed the privacy rights of Plaintiffs and Class Members.

## I. Plaintiffs and the Class Members did not consent to the interception, disclosure, or commercial exploitation of their communications or PHI.

273. Plaintiffs and Class Members had no idea when they communicated with Defendants through Defendants' websites, patient portal, and patient portal mobile app that their

personal communications, including sensitive medical information, was being collected and transmitted to Facebook, Google, and other third parties, or that Defendants and those third parties would later commercially exploit those intercepted communications for marketing purposes. That is because, among other things, the tracking technologies were seamlessly integrated into Defendants' websites, patient portal, and patient portal mobile app, and were invisible to patients visiting the websites, patient portal, and patient portal mobile app.

274. For example, when Plaintiffs John Doe and Janice Progin visited Defendants' website in 2022 at www.ummhealth.org, there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook. Nor was there any indication that Google Analytics was embedded on that website or that it would collect and transmit their sensitive medical data to Google.

275. Plaintiffs and their fellow Class Members could not consent to Defendants' conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook and Google in the first place.

276. While Defendants purport to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendants' homepage in type so small as to be unreadable to many visitors:




277. While disclosing that its website contains "cookies," Defendants' "Terms of Use" falsely promise patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[78] Contrary to that promise, Defendants' websites automatically transmit personally identifiable information to Facebook, for example, using multiple cookies, including c_user, datr, fr, and xs cookies. The transmission of IP addresses and browser fingerprints also enables Google, Facebook, and other third parties to connect the contents of intercepted communications to the real-world identities of the individual whose communications are intercepted.

278. The UMass Memorial Website terms of service also state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained above, the tracking technologies transmit to Google, Facebook, and other third parties the user's IP address, browser fingerprints, and unique identifiers assigned to

[78] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

individuals, which are designed to permit Google, Facebook, and other third parties to associate the intercepted communications with individuals' real-world identities. Google, Facebook, and other third parties can then use the contents of the intercepted communications to serve personalized advertising to those known individuals.

279. The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about them when they do.

280. The UMass Memorial Website's terms of service also tell users: "UMass Memorial may, on occasion, send you information concerning the health, development, and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google, Facebook, and other third parties, Defendants enable Google, Facebook, and other third parties to send direct advertising to specific users based on their communications with the website.

281. To locate Defendants' "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[79]

[79] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

282. Defendants' "Privacy Policy" gives no indication to patients that Defendants routinely allow Google, Facebook, and other third parties to capture and exploit patients' communications or PII/PHI. Indeed, Defendants expressly promise in their "Privacy Policy"[80] that protecting patients' health information is a priority:

# JOINT NOTICE OF INFORMATION PRACTICES

At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

283. These statements are false, deceptive, and misleading in light of Defendants' secret interception and disclosure of private communications, including patient information, to numerous third parties, including Facebook and Google. Defendants' privacy policy is also false, deceptive, and misleading because Defendants in fact routinely sell and/or barter their patients' communications or PII/PHI to Google, Facebook, and other third parties without patients' knowledge or consent in return for access to the Meta Pixel tool, Google Analytics, and other significant advertising benefits. This included personally identifiable information protected against disclosure by law, including Plaintiffs' (and Class Members') IP addresses, device identifiers, and browser fingerprints that Google, Facebook, and other third parties used to personally identify Defendants' patients and target them with advertising.

284. Even if a patient stumbled upon Defendants' carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendants are

[80] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

routinely allowing Google, Facebook, and other third parties to capture and exploit patients' communications and PHI.

285. Defendants do not have a legal right to share Plaintiffs' and Class Members' PHI with Google, Facebook, and other third parties, because this information is protected from such disclosure by law. *See* G.L. c.214, § 1B; 45 C.F.R. § 164.508. Nor are Defendants permitted to disclose patients' communications and PII/PHI to advertising and marketing companies like Google, Facebook, and other third parties without express written authorization from patients.

286. Defendants failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Google, Facebook, or other third parties is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendants of their patients' communications and PII/PHI to Google, Facebook, and other third parties means that a significant privacy injury has *already occurred*.

287. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendants expressly promised their patients that it would never sell or use their communications and PII/PHI for marketing purposes without express authorization.

288. Neither Plaintiffs nor Class Members knowingly consented to Defendants' disclosure of their communications or PII/PHI to Google, Facebook, and other third parties. Nowhere on their websites do Defendants tell patients that they routinely share their communications and PHI with Google, Facebook, and other third parties. Without disclosing such

practices, Defendants cannot have secured consent from Plaintiffs and Class Members for the disclosure of their communications and PII/PHI to Facebook, Google, and other third-party advertising companies.

289. Accordingly, Defendants lacked authorization to intercept, disclose to Google, Facebook, and other third parties, or use Plaintiffs and Class Members' communications and PHI, or to procure others (such as Facebook or Google) to intercept, disclose, or use such communications and PII/PHI.

**J. Defendants' disclosures of personal patient data to Facebook, Google, and other third parties, and their commercial exploitation of such data, are unnecessary.**

290. There is no information anywhere on the websites, patient portal, and patient portal mobile app operated by Defendants that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Google, Facebook, and other third parties. Nor are any of the disclosures of PII/PHI to Google, Facebook, and other third parties necessary for Defendants to maintain their healthcare websites, patient portal, and patient portal mobile app.

291. It is possible for a healthcare website to provide a doctor search function without disclosing patient sign-ups or appointments to third-party advertising companies. It is also possible for a website developer to use tracking tools without disclosing patients' communications to companies like Facebook and Google. Likewise, it is possible for Defendants to provide medical services to patients without sharing their communications with Google, Facebook, and other third parties so that this information can be exploited for advertising purposes.

292. Indeed, after Plaintiffs filed suit in October 2022, Defendants removed the Facebook Meta Pixel from all pages on their websites.

293. Despite the wholly unnecessary nature of tracking technologies for Defendants to run their business, Defendants willfully chose to implement Meta Pixel and other tracking technologies on their websites and aid in the disclosure of personally identifiable information and sensitive medical information about their patients, as well as the contents of their communications with Defendants, to third parties, including Facebook.

**K. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information.**

294. Plaintiffs and Class Members have a reasonable expectation of privacy in their communications with Defendants and their PII/PHI, including personally identifying data and sensitive medical information. Defendants' surreptitious interception, collection, and disclosure of patients' communications and PII/PHI to Google, Facebook, and other third parties violated Plaintiffs' and Class Members' privacy interests.

295. As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider would not disclose their PII/PHI to third parties without their express authorization.

296. Patient personal health information is specifically protected by law. *See* G.L. c.214, § 1B (Right to Privacy); G.L. c. 111, § 70E (Patients' and Residents' Rights). The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 45 C.F.R. § 164.514(b)(2)(i). Both state and federal law also restrict the use of patients' PHI, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

297. HIPAA sets national standards for safeguarding PII and PHI. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information

without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities, like Defendants, implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). Both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendants.

298. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[81]

299. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[82] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

300. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when

[81] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[82] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

there has been a significant infringement on privacy of which the patient would otherwise not be aware."[83]

301. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship."[84]

302. Multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that such disclosure violates expectations of privacy established as general social norms.

303. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares their customers' data.

304. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[85]

305. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing

---

[83] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[84] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).
[85] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[86]

306. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "[w]hat is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[87]

307. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Google and Facebook. As those critics have pointed out, having a patient's communications and PII/PHI disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**L. Defendants harmed Plaintiffs when they illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI, which, after all, is Plaintiffs' property and has economic value.**

308. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants have collected and disclosed from Plaintiffs and Class Members.

[86] https://www.wired.co.uk/article/apple-ios14-facebook
[87] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

309. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[88]

310. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[89] That same article noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[90]

311. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[91] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[92]

312. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[93]

---

[88] https://ig.ft.com/how-much-is-your-personal-data-worth/
[89] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[90] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[91] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[92] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[93] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

313. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[94] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.[95]

314. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[96]

315. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendants have deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook, Google, and other third parties without consideration for Plaintiffs' and the Class Members' property.

### M. Defendants are unjustly enriched by their unlawful, unauthorized, and unnecessary disclosures and commercial exploitation of their patients' PII/PHI.

316. In exchange for disclosing PII/PHI about their patients, Defendants have been compensated by Google, Facebook, and other third parties with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. The access to these advertising benefits results in enormous financial savings to companies like Defendants because it reduces their advertising costs. Among other things, Defendants have run numerous advertising campaigns on Facebook, utilizing the advantages it gained by installing the Meta Pixel on their website.

---

[94] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app

[95] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[96] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

317. Defendants did not pay (or offer to pay) Plaintiffs and Class Members for their communications or PII/PHI before Defendants shared this data with Facebook, Google, and other third parties.

318. Defendants profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

319. Defendants were unjustly enriched by their conduct.

320. A data broker is a company that collects and sells personal information about individuals to other businesses. Data brokers gather consumers' personal information from a variety of sources, and then compile comprehensive profiles that they sell for purposes such as targeted advertising, risk assessment, and background checks. Data brokers mass collection and sale of personal information raise significant consumer privacy concerns. The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

321. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[97] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few

[97] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[98]

322. For instance, as a report by NATO found, data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be expected to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[99]

323. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[100] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[101]

324. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public

---

[98] Tehila Minkus *et al.*, *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[99] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and _security_20-01-2020.pdf.

[100] SHERMAN, *supra*, at 1.

[101] *Id.*

disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[102]

325. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[103]

326. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[104]

---

[102] *Id.* at 9.

[103] *Id.*

[104] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.




327. Data brokers compile such vast swaths of information in part by collecting users' IP addresses and other device information, which they use to track users across the Internet.[105] Indeed, as McAfee (a data security company) notes, "data brokers [like Defendant] can … even

[105] *Id.* at 11.

place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[106]

328. Data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[107]

329. In short, data brokers track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

330. Both Facebook and Google have a history of sharing the data they receive via analytics technologies with data brokers, which they and the data brokers then monetize as part of their real-time bidding (RTB) auction process for advertising.

331. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[108]

332. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s]

---

[106] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[107] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[108] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[109] An Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[110]

333. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

334. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[111]

---

[109] Geoghegan, *supra*.

[110] *Introduction To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/enus/xandr/industry-reference/introduction-to-ad-serving.

[111] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.




335. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users. But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendants:

> [T]he economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendant]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[112]

---

[112] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; see also PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.




336. In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available. SSPs and DSPs do this by connecting with entities like Google and Facebook, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users they may have compiled. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information on which to base their targeting. This naturally enriches website and app operators, as their users are now more valuable. It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users. And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

337. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as

> possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (b) "send[ing] sensitive data across geographic borders."
>
> (c) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[113]

338. The last point bears additional emphasis, as it means the data Defendants provide to Google, Facebook, and data brokers to serve targeted advertisements is even provided to those entities that do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

339. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[114]

340. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[115]:

---

[113] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[114] Geoghegan, *supra*.

[115] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).




341. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm that was long recognized at common law and that statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

342. When advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique

demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

343. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

344. Facebook also has a history of sharing its customers' data with third parties, including most infamously Cambridge Analytica, which gained access to the data of tens of millions of Facebook users. Facebook has also shared its customers' data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Facebook nor its users has control over this data as it is endlessly sold and resold to data brokers around the world.

345. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

346. For example, retargeting could allow a web developer to show advertisements on other websites to customers or potential customers based on the specific communications

exchanged by a patient or their activities on a website. Using the Meta Pixel, for example, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

347. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook or Google, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

348. The monetization of the data being disclosed by Defendants—by Defendants, Google, Facebook, and other third parties—demonstrates the inherent value of the information being collected.

349. As a consequence of Defendants' unauthorized disclosure of patients' communications and PII/PHI to Google, Facebook, and other third parties, Plaintiff and Class Members have further been harmed by their loss of control over their own communications and PII/PHI, which have now been shared with numerous data brokers participating in the online data market.

350. The only remedy for patients whose communications and PII/PHI have been shared with Google, Facebook, and other third parties is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online marketplace and "delete" patients' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try to regain control over their personal information.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

351. The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

352. Defendants seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into their websites, patient portal, and patient portal mobile app, providing no indication to users that they were interacting with a website or patient portal mobile app that had such tracking technologies embedded. Defendants had knowledge that their websites, patient portal, and patient portal mobile app incorporated Meta Pixel and other trackers, yet failed to disclose that by interacting with their websites, patient portal, and patient portal mobile app, Plaintiffs' and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, and other third parties.

353. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

354. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

355. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of patients' communications and PII/PHI have continued unabated through the date of at least the filing of the earliest Original Complaint. What's more, Defendants were under a duty to disclose the nature and significance of their data collection practices, but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

356. Defendants' conduct violates the law and breaches their express and implied privacy promises.

357. Defendants' unlawful conduct has injured Plaintiffs and Class Members.

358. Defendants' conduct is ongoing.

359. Plaintiffs bring this action individually and as a class action against Defendants.

360. Plaintiffs seek class certification for the following proposed Classes:

> **The Massachusetts Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendants' websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.

> **The Nationwide Class:** During the fullest period allowed by law, all current or former patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendants' websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.

361. Excluded from the proposed Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

362. Plaintiffs reserve the right to redefine the Classes and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

363. This action is properly maintainable as a class action as specifically defined in Federal Rule of Civil Procedure 23.

364. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Classes, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

365. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendants' acts and practices violated Plaintiffs' and Class Members' privacy rights;

b. Whether Defendants' acts and practices violate 18 U.S.C. § 2510, et seq.;

c. Whether Defendants' acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendants' acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendants knowingly allowed the surreptitious collection and disclosure of Plaintiffs' and Class Members' PII/PHI to Facebook and other third parties;

f. Whether Defendants' acts and practices constitute a breach of fiduciary duty;

g. Whether Defendants profited from disclosures of patient PII/PHI to third parties, including Facebook;

h. Whether Defendants were unjustly enriched;

i. Whether Defendants' acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

366. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

367. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members, and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members.

Plaintiffs and all Class Members are patients of Defendants who used the websites set up by Defendants for patients and are victims of Defendants' respective unauthorized disclosures to third parties, including Facebook. All claims of Plaintiffs and Class Members are based on Defendants' wrongful conduct and unauthorized disclosures.

368. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

369. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendants, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by the prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses, and Defendants' misconduct will continue without a proper remedy.

370. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable, and direct notice can be provided from the records maintained by Defendants, electronically or by publication, the cost of which is properly imposed on Defendants.

371. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

372. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

373. Plaintiffs bring this claim on behalf of themselves and all members of the Nationwide Class.

374. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

375. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

376. A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of

a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

377. Plaintiffs' communications with Defendants on their Web Properties are covered communications under 18 U.S.C. §§ 2510, 2511.

378. Plaintiffs' and Class Members' communications with Defendants constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

a. parties to the communications;

b. the precise text of patient search queries;

c. personally identifiable information such as patients' IP addresses, Facebook IDs, Google IDs, browser fingerprints, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendants' website(s);

k. the precise dates and times when patients visit Defendants' websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendants sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendants have aided third parties in scraping from webpages or communication forms at web properties.

379. Plaintiffs and Class Members' communications with Defendants constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Google Analytics;

f. Internet cookies;

g. Defendants' computer servers; and

h. Third-party source code used by Defendants.

380. As set forth more fully throughout this complaint, Defenants' disclosures of patients' communications and PII/PHI were "knowing" because, among other things:

a. Defendants deliberately chose to deploy tracking technologies on its websites, patient portal, and patient portal mobile app knowing they contained PII/PHI.

b. Defendants knew that by deploying tracking technologies on its websites, patient portal, and patient portal mobile app it was permitting third parties to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data.

c. Google warns web developers that Google Analytics is not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should be used by advertisers to target ads to users or promote advertisers' products or services. Defendants either knew or should have known of these warnings from Google, and despite the warnings deployed Google Analytics on its websites, patient portal, and patient portal mobile app.

d. Defendants intentionally concealed their use of tracking technologies from the public, suggesting Defendants knew what they was doing was illegal.

e. Defendants accessed, obtained, and disclosed Plaintiffs' and Class Members' communications and PII/PHI for the purpose of committing the crimes and torts described in detail in this complaint.

381. Whenever Plaintiffs and Patient Class members interacted with Defendants' Web Properties, including their patient portal and patient portal mobile app, Defendants, through the source code it imbedded and ran on their Web Properties, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

382. Defendants' intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class Members, including but not limited to communications that disclose Plaintiffs' and Class Members' PII/PHI, status as patients of Defendants' patients, their treatments, medications, doctors, precise search terms they entered on Defendants' website, and information regarding their requests for scheduling.

383. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

384. Thus, although Defendants are "part[ies] to the communications" at issue, they still incur liability under the ECPA because they intercepted Plaintiffs' communications and personal information without consent for purposes of committing criminal and tortious acts, as alleged throughout this complaint. In particular, as supported by the detailed factual allegations set forth in Section C of the Factual Background, with additional factual allegations throughout this complaint, Defendants' primary purpose in knowingly and intentionally intercepting their own patients' communications was to perform acts made impermissible by HIPAA and the Massachusetts tort causes of action set forth in this complaint (including the Massachusetts Right to Privacy Act), including the unauthorized disclosure and subsequent commercial exploitation of patient communications.

385. Before engaging in such criminal and tortious acts, Defendants were warned not to use tracking technology on webpages with health information without informed consent, which Defendants did not obtain. In committing such criminal and tortious acts, Defendants were motivated by their own financial self-interest in maximizing the effectiveness of their online marketing. Defendants' financial motivations demonstrate that their purpose was to commit a

criminal or tortious act, as Defendants had an incentive, which they acted on, to disclose sensitive patient communications and PHI to Google and Facebook and later to use the same intercepted communications for marketing purposes, in order to advance their own marketing on Google and Facebook's advertising platforms.

386. Defendants' acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts, including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

387. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

388. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

389. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

390. Defendants accessed, obtained, and disclosed Plaintiffs' and Class Members' communications and PII/PHI for the purpose of committing the crimes and torts described herein because they would not have been able to obtain the information or the marketing services if they had complied with the law.

391. As supported by the detailed factual allegations set forth in Section C of the Factual Background, with additional factual allegations throughout this complaint, Plaintiffs allege two criminal and tortious acts that were separate and independent of the interception itself—the (i) disclosure and (ii) commercial exploitation of patient communications, including but not limited to communications that reveal PII/PHI.

392. As such, Defendants cannot viably assert any affirmative defense of one-party consent to ECPA liability.

393. As a result, Defendants harmed Plaintiffs and the Class, breaching the confidentiality of their private communications and medical information, violating their privacy, breaching their contract with the hospital, depriving them of the full benefit of their bargain with Defendants for care, and causing actual damages in an amount to be proven at trial.

394. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

395. For these reasons, Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Invasion of Privacy in Violation of the Massachusetts Right to Privacy Act, G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

396. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

397. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

398. G.L. c. 214, § 1B (the "Massachusetts Right to Privacy Act") provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

399. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

400. Undisclosed electronic surveillance violates the Massachusetts Right to Privacy Act, without regard to whether the surveillance involves medical communications or any other sensitive communications. The improper electronic surveillance here is made worse by the duty health care providers owe their patients, which Defendants violated, not to disclose private communications with or medical information about a patient without a patient's informed consent.

401. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

402. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession, which has come to be justifiably relied on by patients seeking advice and treatments.

403. Plaintiffs and Class Members are patients of Defendants.

404. Defendants owe Plaintiffs and Class Members a duty of confidentiality.

405. Despite their duty not to disclose patient communications and PHI without informed consent and written authorization, Defendants disclosed such communications and information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

406. The information disclosed included personally identifiable information, Plaintiffs' and Class Members' statuses as patients of Defendants, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendants, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendants' website.

407. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

408. Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' disclosure of their communications and PII/PHI to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their communications with healthcare providers or their sensitive medical information could be collected, used, and monetized by Facebook, Google, and other third parties. To the contrary, Defendants falsely promised to Plaintiffs and Class Members that it would protect patient communications and not disclose them

to third parties without consent, promises it breached when it deployed tracking technologies that disclose patient communications to third parties for marketing purposes.

409. Defendants' intentional disclosure of patients' private communications and PII/PHI to third-party advertising companies like Facebook and Google without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their PII/PHI would not be collected, used, and monetized by third-party advertising companies.

410. Defendants' disclosure of private communications and PII/PHI from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

411. Given the nature of the private communications and PII/PHI that Defendants disclosed to Facebook, Google, and other third parties, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Alzheimer's"), the condition selected from dropdown menus (i.e., "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

412. Additionally, Defendants' injection of hidden code into their websites that disclosed patient communications to third parties constituted an intrusion upon the seclusion of Plaintiffs and Class Members by invading Plaintiffs' and Class Members' private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive because of both the disclosure of communications and the later use of those

communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

413. To be clear, Defendants' facilitation of undisclosed electronic surveillance of Plaintiffs and Class Members further supports a claim under G.L. c. 214, § 1B, even independent of the medically sensitive nature of the communications intercepted. That is, Plaintiffs' claim under the Massachusetts Right to Privacy Act does not depend upon the contents of any intercepted communications being medical in nature or protected by any particular statutory provision, particularly where, as here, such surveillance contradicts Defendants' promises to Plaintiffs and Class Members.

414. Defendants' breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their communications and PII/PHI;

e. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for thivrd-party services to scrub their communications and PII/PHI from data broker rolls; and

f. Defendants' actions diminished the value of Plaintiffs' and Class Members' communications and PII/PHI.

415. Plaintiffs' and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

416. Plaintiffs' and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to seek just compensation, including monetary damages.

417. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of their intrusions on Plaintiffs and Class Members' privacy.

418. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

419. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

420. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

421. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

422. All conditions precedent to this action have been performed or occurred.

423. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

424. As medical provider for Plaintiffs and Class Members, Defendants owe Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendants and Plaintiffs or Class Members. Defendants also owe Plaintiffs and Class Members a duty not to exploit for Defendants' own gain or commercial advantage any confidential information entrusted to Defendants, including Plaintiffs' and Class Members' status as patients of Defendants and their patient communications with Defendants.

425. Defendants solicited and invited Plaintiffs and Class Members to communicate with Defendants and to provide their PII/PHI on their websites, patient portal, and patient portal mobile app as part of Defendants' regular business practices. Defendants required Plaintiffs and Class Members to communicate with Defendants and obtain Plaintiffs' and Class Members' communications and PII/PHI as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' communications and PII/PHI.

426. Instead of safeguarding Plaintiffs' and Class Members' communications and PII/PHI, Defendants intentionally shared that information with Facebook, Google, and other third parties, thereby breaching the implied contracts it had with Plaintiffs and Class Members. Defendants also subsequently commercially exploited those communications for commercial and marketing purposes, including by using the content of the intercepted communications for targeted advertising.

427. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep private their healthcare-related communications and PII/PHI associated with obtaining healthcare. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect and commercially exploit their communications and PII/PHI without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

428. Plaintiffs and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate their websites, patient portal, and patient portal mobile app free of surreptitious collection and exploitation of communications between the parties. Defendants failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their communications and PII/PHI with Facebook, Google, and other third parties without their knowledge or written consent.

429. Defendants breached their duty of confidentiality by disclosing and commercially exploiting their communications with Plaintiffs and Class Members, and PII/PHI about Plaintiffs and Class Members, including their status as patients, the content of their communications, and

information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payments.

430. Defendants also materially breached their obligation to protect Plaintiffs' and Class Members' non-public communications and PII/PHI when they failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients communications and PII/PHI without consent to third-party advertising companies like Facebook and Google, (2) failed to implement adequate reviews of the software code and JavaScript installed on their websites, patient portal, and patient portal mobile app to ensure that patient communications and PII/PHI were not being automatically routed without consent to third party advertising companies like Facebook and Google, (3) failed to provide adequate notice to the public that visitors to their websites, patient portal, and patient portal mobile app risked having their communications and PII/PHI shared with third party advertising companies like Facebook and Google, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on their websites, patient portal, and patient portal mobile app, (5) failed to provide visitors to their websites, patient portal, and patient portal mobile app with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook and Google, (6) failed to implement internal policies and educational programs to ensure that Defendants' website, patient portal, and patient portal mobile app managers and coders were familiar with the legal regulations governing the disclosure patient communications and PII/PHI to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients communications and PII/PHI to third party advertising companies like Facebook and Google.

431. The medical services that Defendants offer are available from many other health care systems that do protect the confidentiality of patient communications and that refrain from commercially exploiting patient communications and PII/PHI. Had Defendants disclosed that they would allow third parties to secretly collect Plaintiffs' and Class Members' communications and PII/PHI without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or their affiliated healthcare providers.

432. Defendants' conduct in sharing Plaintiffs' and Class Members' communications and PII/PHI with Facebook, and later commercially exploiting those same communications and PII/PHI, also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendants (which Defendants then shared with Facebook, Google, and other third parties). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their communications and PII/PHI and by losing the sales value of that information.

433. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the disclosure and commercial exploitation of their communications and PII/PHI, the loss of control of their PII/PHI, and the diminution in value of their PII/PHI.

434. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

435. Defendants' breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their communications and PII/PHI;

e. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their communications and PII/PHI from data broker rolls; and

e. Defendants' actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied in Fact Contract**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

436. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

437. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

438. Defendants solicited and invited Plaintiffs and Class Members to provide their PII/PHI on their websites, patient portal, and patient portal mobile app as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PII/PHI, which included personally identifiable information such as their names, telephone

numbers, IP addresses, Facebook IDs, Google IDs, browser fingerprints, and device identifiers to Defendants as part of acquiring Defendants' medical services and using their Web Properties. Per their contractual, legal, ethical, and fiduciary duties, Defendants were obligated to take adequate measures to protect Plaintiffs' and Class Members' communications and PII/PHI from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendants took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

439. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendants when they sought medical treatment from Defendants. Specifically, through their course of conduct, Defendants, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendants to retain and protect the privacy of Plaintiffs' and Class Members' communications and PII/PHI.

440. Defendants required and obtained Plaintiffs' and Class Members' communications and PII/PHI as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' communications and PII/PHI. Defendants, through their privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that they would safeguard Plaintiffs' and Class Members' communications and PII/PHI in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

441. Implied in the exchange was a promise by Defendants to ensure that the communications and PII/PHI of Plaintiffs and Class Members in their possession would only be used for medical treatment purposes and would not be shared with third parties, such as Facebook

and Google, without the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' communications and PII/PHI, Defendants assented to protecting the confidentiality of that information. Defendants' implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' communications and PII/PHI was necessary to effectuate the contract between the parties.

442. Plaintiffs and Class Members provided their communications and PII/PHI in reliance on Defendants' implied promise that this information would not be shared with third parties without their consent.

443. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their PII/PHI in exchange for the medical treatment and other benefits provided by Defendants (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendants for medical services was intended to ensure the confidentiality of their communications and PII/PHI.

444. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants would comply with their promises to protect the confidentiality of their communications and PII/PHI as well as applicable laws and regulations governing the disclosure of such information and that Defendants would not allow third parties to collect or exploit their communications with Defendants without their consent.

445. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their communications and PII/PHI to Defendants but for the prospect of Defendants' promise of medical treatment and other benefits. Conversely, Defendants presumably would not have taken Plaintiffs

and Class Members' communications and PII/PHI if it did not intend to provide them with medical treatment and other benefits.

446. Defendants were therefore required to reasonably safeguard and protect the communications and PII/PHI of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

447. Plaintiffs and Class Members accepted Defendants' medical services offer and fully performed their obligations under the implied contract with Defendants by providing their PII/PHI to Defendants, among other obligations. Plaintiffs and Class Members would not have provided and entrusted their communications and PII/PHI to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their communications and PII/PHI for uses other than the benefits offered by Defendants.

448. As a condition of utilizing Defendants' websites, patient portal, and patient portal mobile app and receiving services from Defendants' healthcare facilities and professionals, Plaintiffs and the Class Members provided their PII/PHI and compensation for their medical care.

449. Plaintiffs and Class Members relied on Defendants' implied promises to safeguard their communications and PII/PHI to their detriment. Defendants breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' communications and PII/PHI from disclosure to Facebook, Google, and other third parties.

450. Defendants' failure to implement adequate measures to protect the communications and PII/PHI of Plaintiffs and Class Members and Defendants' intentional disclosure of the same to Facebook, Google, and other third parties violated the purpose of the agreement between the

parties: Plaintiffs' and Class Members' provision of money and PII/PHI in exchange for medical services and other benefits.

451. Instead of safeguarding Plaintiffs' and Class Members' communications and PII/PHI, Defendants intentionally shared that information with Facebook, Google, and other third parties thereby breaching the implied contracts it had with Plaintiffs and Class Members.

452. Plaintiffs and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate their websites, patient portal, and patient portal mobile app free of surreptitious collection and exploitation of communications between the parties. Defendants failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their communications and PII/PHI with Facebook, Google, and other third parties without their knowledge or written consent.

453. Under the implied contracts, Defendants and/or their affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' communications and PII/PHI provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their PII/PHI through the use of Defendants' websites, patient portal, and patient portal mobile app.

454. Both the provision of medical services and the protection of Plaintiffs and Class Members' communications and PII/PHI were material terms of these implied contracts.

455. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' communications and PII/PHI unless they consent—are also acknowledged, memorialized, and

embodied in multiple documents, including (among other documents) Defendants' published Notice of Privacy Practices.

456. Defendants' express representations, including, but not limited to the express representations found in their Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendants to refrain from aiding or allowing third parties to collect Plaintiffs and Class Members' communications and PII/PHI without consent. By soliciting and acquiring Plaintiffs' and Class Members' communications and PII/PHI, Defendants assumed an independent duty to handle Plaintiffs' and Class Members' communications and PII/PHI with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

457. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their communications and PII/PHI associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their PII/PHI without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their PII/PHI to Defendants and entered into these implied contracts with Defendants without an understanding that their communications and PII/PHI would be safeguarded and protected, or entrusted their PII/PHI to Defendants, in the absence of their implied promise to do so.

458. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their PII/PHI to Defendants and/or their affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their communications and PII/PHI.

459. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their PII/PHI.

460. Defendants materially breached their contractual obligation to protect the nonpublic PII/PHI Defendants gathered when they allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

461. Defendants also materially breached their contractual obligation to protect Plaintiffs' and Class Members' communications and PII/PHI when they failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' communications and PII/PHI without consent to third-party advertising companies like Facebook and Google, (2) failed to implement adequate reviews of the software code and JavaScript installed on their websites, patient portal, and patient portal mobile app to ensure that patients' communications and PII/PHI were not being automatically routed without consent to third party advertising companies like Facebook and Google, (3) failed to provide adequate notice to the public that visitors to their websites, patient portal, and patient portal mobile app risked having their communications and PII/PHI shared with third party advertising companies like Facebook and Google, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on their websites, patient portal, and patient portal mobile app, (5) failed to provide visitors to their websites, patient portal, and patient portal mobile app with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook and Google, (6) failed to implement internal policies and educational programs to ensure that Defendants' website, patient portal, and patient portal mobile app managers and coders were

familiar with the legal regulations governing the disclosure patient communications and PII/PHI to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' communications and PII/PHI to third party advertising companies like Facebook and Google.

462. As a result of Defendants' failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

463. As a result of Defendants' material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendants because they spent more on medical services with Defendants than they would have if they had known that Defendants were not providing the reasonable data security and confidentiality of patient communications and PII/PHI that Defendants represented that they were providing in their privacy policies. Defendants' failure to honor their promises that they would protect the confidentiality of patient communications and PII/PHI thus resulted in Plaintiffs and Class Members overpaying Defendants for the services they received.

464. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendants were worth quantifiably less than the services that Defendants promised to provide, which included Defendants' promise that any patient communications with Defendants would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

465. The medical services that Defendants offer are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendants disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' communications and PII/PHI without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or their affiliated healthcare providers.

466. Defendants' conduct in sharing Plaintiffs' and Class Members' communications and PII/PHI with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendants (which Defendants then disclosed to third parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their communications and PII/PHI and by losing the sales value of that information.

467. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their communications and PII/PHI, the loss of control of their communications and PII/PHI, the diminution in value of their communications and PII/PHI, and the loss of the benefit of the bargain they had struck with Defendants.

468. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

469. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their communications and PII/PHI both because such information remains

within Defendants' control and because anytime that Plaintiffs and/or Class Members interact with Defendants' websites, patient portal, or patient portal mobile app to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure and commercial exploitation of their communications and PII/PHI. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of communications and PII/PHI and to cease all efforts to exploit any communications and PII/PHI they have previously collected through the tracking technologies described in this complaint.

470. Plaintiffs and Class Members would not have entrusted Defendants with their communications and PII/PHI in the absence of an implied contract between them and Defendants obligating Defendants not to disclose their communications and PII/PHI without their consent.

471. Plaintiffs and Class Members would not have retained Defendants to provide healthcare services in the absence of an implied contract between them and Defendants obligating Defendants not to disclose communications and PII/PHI without consent.

472. Defendants deliberately and consciously breached these implied contracts by disclosing Plaintiffs' and Class Members' communications and PII/PHI without consent to third parties like Facebook and Google.

473. Defendants consciously took advantage of Plaintiffs and Class Members, making the opportunistic calculation that it could engage in an intentional and profitable interference with Plaintiffs' and Class Members' legally protected property rights by secretly sharing their communications and PII/PHI with Facebook and Google, despite their express promises (1) that "uses and disclosures not described in [their notice] may be made with [patients'] signed

authorization"; and collected from their websites "with any organization or business"; and (2) "[s]ome of the times [Defendants] may need [patients'] signed permission to use and disclose [patients'] information include sale of [patients'] information, [and] marketing purposes . . . ." Defendants consciously decided not to inform their patients that it was routinely sharing their communications and PII/PHI with third parties with the hope that their misconduct in intentionally breaching their implied contracts with Plaintiffs and Class Members would never come to light.

474. By deliberately breaching their implied contracts with Plaintiffs and Class Members, Defendants were knowingly enriched by the savings in costs that should reasonably have been expended to protect the communications and PII/PHI of Plaintiffs and Class Members. Defendants were further knowingly enriched by the financial benefits that they received for bartering Plaintiffs' and Class Members' communications and PII/PHI to third parties like Facebook and Google, including analytics and advertising benefits that Defendants received in exchange for Plaintiffs' and Class Members' communications and PII/PHI.

475. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their PII/PHI.

476. Plaintiffs and Class Members are entitled to compensatory and consequential damages, including attorney's fees and actual damages, as a result of Defendants' breach of implied contract. Alternatively, because Defendants' deliberate breach of contract resulted in profit to Defendants where the available damages remedy potentially affords inadequate protection to Plaintiffs' and Class Members' contractual entitlement, Plaintiffs and Class Members are entitled to restitution measured by the profits realized by Defendants from their deliberate breach of contract.

477. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their communications and PII/PHI both because the information previously collected remains within Defendants' control, subject to their commercial exploitation through Google and Facebook's advertising platforms, and because anytime that Plaintiffs and/or Class Members interact with Defendants' websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure and commercial exploitation of their patient communications and PII/PHI. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of communications and PII/PHI and cease all commercial exploitation of communications and PII/PHI previously collected through the tracking technologies described in this complaint.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

478. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

479. Plaintiffs hereby plead this Count in the alternative to Counts IV.

480. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

481. Plaintiffs and Class Members conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendants appreciated this benefit.

482. Defendants gained access to communications and PII/PHI provided by Plaintiffs and Class Members by (1) knowingly concealing their use of pixel tracking technologies from the public; (2) lying to the public in their privacy policies about protecting personally identifying information disclosed via the websites, patient portal, and patient portal mobile app from unauthorized disclosure to third parties; (3) failing to institute warnings on their websites, patient portal, and patient portal mobile app that they had installed tracking technologies; (4) failing to provide industry standard privacy safeguards for their patients' PII/PHI; (5) intentionally disregarding years of warnings from the United States Department of Health and Human Services that they was obligated to protect their patients' communications and PII/PHI from unauthorized disclosures to third parties; (6) intentionally violating their own internal privacy policies by making unauthorized disclosures of patients' communications and PII/PHI; and (7) intentionally violating Massachusetts law.

483. Defendants benefited from the use of Plaintiffs' and Class Members' private communications and PII/PHI and unjustly retained those benefits at their expense.

484. Defendants collected, used, and disclosed this information for their own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Defendants bartered Plaintiffs' and Class Members' communications and PII/PHI to Facebook and Google in return for both advertising benefits and "free" website analytics information. What's more, by sharing their patients' communications and PII/PHI with Facebook, Defendants gained the ability to utilize Facebook's customized audiences and targeted advertising features, which saved Defendants substantial revenues by making advertising far less expensive than it would have been otherwise. Defendants also gained access to free website analytics data, which they otherwise would have had to pay substantial amounts of money to obtain.

485. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendants in the form of monetary compensation.

486. Defendants unjustly retained the monies that Plaintiffs and Class Members paid with the expectation that Defendants would spend a percentage of those funds to implement adequate data security and privacy training to protect their communications and PII/PHI against unauthorized disclosure to third parties and unauthorized commercial exploitation.

487. Plaintiffs and the Class Members would not have used the Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, exploit, and disclose this information to third parties like Facebook and Google.

488. Defendants exceeded any authorization given and instead consciously disclosed and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

489. Facebook and Google are not charities. Facebook and Google were willing to provide Defendants with "free" analytics benefits only because the patient health data that Defendants surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Facebook and Google provided Defendants.

490. Defendants wrongfully secured the benefits it obtained from Plaintiffs and Class Members by intentionally misleading them about how it would use and exploit their communications and PII/PHI.

491. Defendants' decision to intentionally mislead Plaintiffs and Class Members about their use of tracking technologies for their own financial benefit is a textbook example of an "unjust" enrichment.

492. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

493. Plaintiffs were aware of the economic value of their communications and PII/PHI and reasonably expected to be *substantially* compensated by any party that shared or accessed their communications and PII/PHI to sell advertising. Plaintiffs and Class Members did not consent to Defendants' giving their communications and PII/PHI away for free.

494. By engaging in the acts and failures to act described in this Complaint, Defendants have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII/PHI of the Plaintiffs and the Class. Defendants was on notice that their patients' communications and PII/PHI were protected by law; that their patients' communications and PII/PHI had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to their patients' communications and PII/PHI, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of their patients' communications and PHI to Facebook, Google, and other third parties.

495. The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this complaint.

496. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Violation of M.G.L. c. 93A for Unfair and Deceptive Acts or Practices in the Commonwealth of Massachusetts**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

267. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

268. At all relevant times, Defendants were engaged in trade or commerce in Massachusetts.

269. Defendants' willful and knowing use of tracking technologies on its websites, patient portal, and patient portal mobile app was unscrupulous in that it constituted and encouraged illegal conduct, including:

a. the secret interception of wire communications in violation of 18 U.S.C. § 2510, *et seq.*;

b. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

c. Invasion of privacy in violation of G.L. c. 214, § 1B;

d. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

e. Violations of Defendants' ethical obligations to patients.

270. Defendants' actions were oppressive or otherwise unconscionable within the meaning of M.G.L. c. 93A § 2 and 9 and 940 C.M.R. § 3.16 *et seq.*

271. Defendants' willful, knowing, and concealed use of tracking technologies on its websites, patient portal, and patient portal mobile app was also deceptive. As described, Defendants actively misled their patients about the steps they would take to protect the confidentiality of their communications and PII/PHI, and concealed their use of tracking technologies from patients. What is more, the very nature of the password-protected patient portal

and patient portal mobile app that Defendants offered patients evinced an implied promise by Defendants that Plaintiffs' and Class Members' communications and PII/PHI would be protected from unauthorized disclosures—not shared with Google, Facebook, and countless other third parties for the purposes of exploiting that it. This promise was false because at all relevant times, Defendants tracked and disclosed patients' communications and PII/PHI to third parties in return for marketing benefits.

272. Plaintiffs and Class Members would not have provided and entrusted their communications and PII/PHI to Defendants in the absence of Defendants' implicit and explicit promises to protect their privacy and the confidentiality of their communications and PII/PHI. Instead, they would have retained the opportunity to control their communications and PII/PHI for uses other than the benefits offered by Defendants. Plaintiffs and the Class Members also would not have used Defendants' services if they had known that Defendants would collect, use, and disclose their communications and PII/PHI to third parties.

273. As a result of Defendants' conduct, Plaintiffs and Class Members suffered both economic and noneconomic injuries, including:

a. Deprivation of their right to privacy;

b. The release and disclosure of their communications and PII/PHI;

c. The loss of control of their communications and PII/PHI;

d. The diminution in value of their communications and PII/PHI;

e. The necessity to incur substantial costs to remediate the release and disclosure of their communications and PII/PHI; and

f. The loss of the benefit of the bargain they had struck with Defendants.

274. Defendants operated in a business context and are liable under M.G.L. c. 93A, even though Defendants are organized as non-profits, because the conduct in which they engaged — knowingly and secretly disclosing patients' communications and PII/PHI in violation of state and federal law and Defendants' ethical obligations—is not part of Defendants' "core mission" as a non-profit hospital to provide healthcare services and foster the well-being of the community it serves.[116] Indeed, the conduct described in this complaint directly conflicts with and undermines Defendants' core mission.

275. Moreover, Defendants' purpose in deploying tracking technologies was to increase their own revenues, not to further the hospitals' core mission of advancing their patients' medical interests. Indeed, the sharing of patient communications and PHI to marketing and technology companies undermines Defendants' core mission by betraying patient privacy to increase revenues. That is, Defendants' conduct in surreptitiously deploying tracking technologies was motivated by business reasons. They acted in concert with for-profit entities (Google, Facebook, and other technology/marketing companies) to increase their own revenues, further demonstrating that Defendants were operating in trade and commerce.

276. Plaintiffs, through their attorneys, sent Defendants a written demand for relief more than 30 days prior to the filing of this complaint under M.G.L. c. 93A § 9, par. 3, identifying the claimants and reasonably describing the unlawful, unfair, and deceptive acts or practices relied upon, and the damages sustained as a result.

277. In response, Defendants have refused to grant reasonable relief upon demand. Indeed, Defendants' refusal was made in bad faith with knowledge or reason to know that its acts and practices violated M.G.L. c. 93A § 2.

---

[116] *E.g.*, https://www.ummhealth.org/about-us/our-commitment-to-our-community/our-values

278. WHEREFORE, pursuant to M.G.L. c. 93A, Plaintiffs demand judgment against Defendants, damages, punitive damages, treble damages, attorneys' fees, pre- and post-judgment interest, other litigation disbursements, disgorgement of profits, injunctive relief, and such other further relief as is just and equitable.

**COUNT VI**
**Negligence**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

497. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

498. Upon accepting, storing, and controlling the patient communications, including PHI, of Plaintiffs and the Class, Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their patient communications and highly sensitive PHI.

499. Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' patient communications and PHI from unauthorized disclosure.

500. It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' communications, including PHI, through their tracking technologies would result in unauthorized third parties gaining access to such communications and PHI for no lawful purpose.

501. Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiffs and Class Members' patient communications and PHI arose due to the special relationship between Defendants and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

502. In addition, Defendants had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

503. Defendants' conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their communications and PHI. Defendants' misconduct included the failure to (i) secure Plaintiffs and Class Members' communications and PHI; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

504. Defendants' wrongful actions and/ or inactions and the resulting unauthorized disclosure of Plaintiffs and Class Members' communications and PHI constituted negligence at common law.

505. Accordingly, Plaintiffs, individually and on behalf of members of the Class, seek compensatory damages (including damages to compensate for the injuries described in Section J, supra), plus costs and attorneys' fees.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a. Certifying the Classes and appointing Plaintiffs as the Classes' representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, Ahmad, Zavitsanos, & Mensing P.C., Colonna & Doyle, and Coulson P.C., and Shapiro Haber & Urmy LLP as class counsel;

c. Finding that Defendants' conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendants from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiff and Class Member pursuant to 18 U.S.C. § 2520;

f. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED, FOR PLAINTIFFS AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

Dated: April 10, 2026

*<u>/s/ Patrick J. Vallely</u>*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 - Telephone
(617) 439-0134- Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff Janice Progin and the Putative Classes*

William P. Doyle (556999)
**LAW OFFICES OF COLONNA & DOYLE**
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (*pro hac vice)*
Ellyn Gendler (*pro hac vice*)
**COULSON P.C.**
300 River Place Drive
Suite 1700
Detroit, MI 48207
(313) 644-2685
Nick@Coulsonpc.com
egendler@coulsonpc.com

*Attorneys for Lisa Colleton and the Putative Class*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Ryan Hawkins, BBO# 686289
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Justin C. Kenney *(pro hac vice)*
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

*Attorneys for John Doe and the Putative Class*

## CERTIFICATE OF SERVICE

I, Patrick J. Vallely, do hereby certify that on April 10, 2026, the foregoing Consolidated Second Amended Action Complaint and Demand for Jury Trial was filed electronically and e-served on all counsel of record.

*/s/ Patrick J. Vallely*
Patrick J. Vallely