**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANICE PROGIN, LISA COLLETON, and JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL COMMUNITY ENTITIES, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **Case No. 1:25-cv-40003-ADB** |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED COMPLAINT

J. Tucker Merrigan (BBO# 681627)
**Sweeney Merrigan Law**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

*Counsel for John Doe and the Putative Classes*

Patrick J. Vallely (BBO #663866)
**Shapiro Haber & Urmy LLP**
One Boston Place
Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
Fax: (617) 439-0134
pvallely@shulaw.com

*Counsel for Janice Progin and the Putative Classes*

William P. Doyle (BBO# 556999)
**Law Offices of Colonna & Doyle**
26 Main Street
Lynnfield, MA 01940
Tel: (781) 245-1127
Fax: (781) 245-1148
bill@colonna-doyle.com

*Counsel for Lisa Colleton and the Putative Classes*

***Additional Counsel Listed in Signature Block***

# Table of Contents

Pages

I. Introduction ........ 1

II. Factual Background ........ 2

A. UMass Intentionally Intercepted and Disclosed Patient Communications to Facebook and Google via Hidden Tracking Code on Its Website and Patient Portal. ........ 2

B. UMass Intercepted Patient Communications for the Primary Purpose of Disclosing and Exploiting Them in Violation of HIPAA and State Law. ........ 3

III. Legal Standard ........ 4

IV. Argument ........ 5

A. Plaintiffs' Allegations Trigger the ECPA's Crime-Tort Exception. ........ 5

1. UMass's Purpose in Installing Tracking Technologies Was to Disclose Patient Communications to Third Parties and Exploit Them for Marketing. ........ 7

2. Disclosing Patient Communications to Third Parties and Exploiting Them for Marketing is a Crime and/or Tort. ........ 8

a. UMass's Conduct Violated HIPAA ........ 8

b. Violation of Massachusetts Tort Law. ........ 13

B. Plaintiffs Adequately Allege Their State Law Claims. ........ 14

1. Plaintiffs State a Claim under the MRPA. ........ 14

2. Plaintiffs State a Claim for Breach of Fiduciary Duty ........ 17

3. Plaintiffs State a Claim for Negligence ........ 18

4. Plaintiffs State a Claim for Breach of Implied Contract ........ 20

5. Plaintiffs State a Claim for Unjust Enrichment. ........ 22

6. Plaintiffs State a Claim for Violation of Chapter 93A. ........ 22

V. Conclusion ........ 25

## Table of Authorities

Pages

**Cases**

*A.J. v. LMND Med. Grp., Inc.*,
2024 U.S. Dist. LEXIS 194480 (N.D. Cal. Oct. 25, 2024) ....12, 18, 22

*All Seasons Servs. v. Comm'r of Health & Hosps.*,
416 Mass. 269 (1993) ....25

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .... 10, 11

*Angiuoni v. Billerica*,
2012 WL 12910268 (D. Mass. July 16, 2012) ....10

*B.N. v. Or. Reprod. Med., LLC*,
2026 U.S. Dist. LEXIS 73607 (D. Or. Apr. 3, 2026) ....8

*Begelfer v. Najarian*,
381 Mass. 177 (1980) ....23

*Bennett v. Eagle Brook County Store, Inc.*,
408 Mass. 355 (1990) ....19

*Berry v. Funk*,
146 F.3d 1003 (D.C. Cir. 1998) ....25

*Brahm v. Hosp. Sisters Health Sys.*,
2024 U.S. Dist. LEXIS 114827 (W.D. Wis. June 28, 2024) ....12

*Bratt v. Int'l Bus. Machines Corp.*,
392 Mass. 508 (1984) ....15

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .... 16, 25

*Castillo v. Costco Wholesale Corp.*,
2024 U.S. Dist. LEXIS 207197 (W.D. Wash. Nov. 14, 2024) ....11

*Conformis, Inc. v. Aetna, Inc.*,
58 F.4th 517 (1st Cir. 2023) ....5

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024) ....9

*Doe v. Bayhealth Med. Ctr. Inc.*,
2025 Del. Super. LEXIS 154 (Super. Ct. Apr. 2, 2025) ....11

*Doe v. Bos. Med. Ctr. Corp.*,
2023 Mass. Super. LEXIS 674 (Super. Ct. Sept. 14, 2023) ........ 16

*Doe v. Deaconess Ill. Union Cnty. Hosp. Inc.*,
2025 U.S. Dist. LEXIS 192058 (S.D. Ill. Sept. 29, 2025) ........ 11

*Doe v. Emerson Hosp.*,
2023 Mass. Super. LEXIS 673 (Super. Ct. Nov. 22, 2023) ........ passim

*Doe v. Harbor Sch., Inc.*,
446 Mass. 245 (2006) ........ 17

*Doe v. Lawrence Gen. Hosp.*,
2025 U.S. Dist. LEXIS 195964 (D. Mass. Aug. 29, 2025) ........ 6

*Doe v. Lawrence Gen. Hosp.*,
Case No. 25-cv-10081-NMG, Doc. No. 55 (D. Mass. Oct. 29, 2025) ........ 6

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142 (D. Mass. 2024) ........ passim

*Doe v. Wellstar Health Sys., Inc.*,
799 F. Supp. 3d 1268 (N.D. Ga. 2025) ........ 9, 12

*Gaige v. Exer Holdings Co., LLC*,
2025 U.S. Dist. LEXIS 17146 (C.D. Cal. Jan. 30, 2025) ........ 11

*Goulart v. Cape Cod Healthcare, Inc.*,
2025 U.S. Dist. LEXIS 119435 (D. Mass. June 24, 2025) ........ 6

*Grajales v. P.R. Ports Auth.*,
682 F.3d 40 (1st Cir. 2012) ........ 5

*Green v. Sirchie Acquisition Co. LLC*,
633 F. Supp. 3d 393 (D. Mass. 2022) ........ 18

*Hannant v. Culbertson Memorial Hosp. Found.*,
2026 U.S. Dist. LEXIS 57449 (C.D. Ill. Mar. 19, 2026) ........ 9

*Hartley v. Univ. of Chi. Med. Ctr.*,
2024 U.S. Dist. LEXIS 78517 (N.D. Ill. Apr. 30, 2024) ........ 7

*Hartley v. Univ. of Chi. Med. Ctr.*,
2025 U.S. Dist. LEXIS 194466 (N.D. Ill. Oct. 1, 2025) ........ 11

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ........ 16

*Hubert v. Melrose-Wakefield Hosp. Ass'n*,
40 Mass. App. Ct. 172 (1996) ........ 25

*I.T. v. Choicepoint LLC*,
2025 U.S. Dist. LEXIS 169202 (W.D. Wash. Aug. 29, 2025) .......... 10, 11

*In re Allstate & Arity Consumer Privacy Litig.*,
2026 U.S. Dist. LEXIS 43200 (N.D. Ill. Mar. 3, 2026) .......... 12

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 16

*In re Google, Inc.*,
806 F.3d 125 (3d Cir. 2015) .......... 16

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 9, 11, 16

*In re Meta Pixel Healthcare Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024) .......... 20

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) .......... 4, 15, 20

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
721 F. Supp. 3d 152 (D. Mass. 2024) .......... 17

*Josef Gartner USA LP v. Consigli Constr. Co.*,
2011 U.S. Dist. LEXIS 62492 (D. Mass. June 10, 2011) .......... 20

*Jupin v. Kask*,
447 Mass. 141 (2006) .......... 18

*Kane v. Univ. of Rochester*,
2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. Mar. 19, 2024) .......... 7

*Koppel v. Moses*,
2020 U.S. Dist. LEXIS 199483 (D. Mass. Oct. 27, 2020) .......... 16

*Korper v. Weinstein*,
57 Mass. App. Ct. 433 (2003) .......... 17

*Kurowski v. Rush Sys. for Health*,
2024 U.S. Dist. LEXIS 126837 (N.D. Ill. July 18, 2024) .......... 7

*Lanier v. President and Fellows of Harvard College*,
490 Mass. 37 (2022) .......... 18

*Lee v. Conagra Brands, Inc.*,
958 F.3d 70 (1st Cir. 2020) .......... 20

*Linkage Corp. v. Trs. of Bos. Univ.*,
425 Mass. 1 (1997) .......... 22, 23

*Lugo v. Inova Health Care Servs.*,
2025 U.S. Dist. LEXIS 55590 (E.D. Va. Mar. 25, 2025) ....................12

*M.R. v. Salem Health Hosps. & Clinics*,
2024 U.S. Dist. LEXIS 155513 (D. Or. Aug. 28, 2024)....................11

*McManus v. Tufts Med. Ctr., Inc.,*
2025 U.S. Dist. LEXIS 191546 (D. Mass. Sep. 29, 2025)....................1

*McParland v. Colvin*,
215 F. Supp. 3d 129 (D. Mass. 2016)....................4

*Muscarello v. United States*,
524 U.S. 125 (1998) ....................5

*Ortiz v. Examworks, Inc.*,
470 Mass. 784 (2015)....................15

*Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*,
398 Mass. 480 (1986)....................22

*Polay v. McMahon*,
468 Mass. 379 (2014)....................14

*Progin v. UMass Mem'l Health Care, Inc.*,
2026 U.S. Dist. LEXIS 46522 (D. Mass. Mar. 6, 2026) ....................passim

*R.S. v. Prime Healthcare Servs.*,
2025 U.S. Dist. LEXIS 6338 (C.D. Cal. Jan. 13, 2025) ....................12

*Ramirez v. Lasikmd USA, Inc.*,
2026 U.S. Dist. LEXIS 14108 (S.D. Cal. Jan. 26, 2026)....................12

*Reyad v. Caritas Norwood Hosp.*,
2011 WL 4837278 (Mass. Super. Ct. 2011)....................23

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ....................6

*Rodriguez v. Google, LLC*,
2026 U.S. Dist. LEXIS 20412 (C.D. Cal. Jan. 30, 2026) ....................17

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
490 F.3d 92 (1st Cir. 2007) ....................4

*Roe No. 1 v. Children's Hosp. Med. Ctr.*,
469 Mass. 710 (2014)....................19

*Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
409 Mass. 514 (1991)....................14

*SEC v. Willis*,
787 F. Supp. 58 (S.D.N.Y. 1992) .......... 14

*Shedd v. Sturdy Mem'l Hosp., Inc.*,
2022 WL 1102524 (Mass. Super. Ct. Apr. 5, 2022) .......... 25

*Smart v. Main Line Health*,
2026 U.S. Dist. LEXIS 81515 (E.D. Pa. Apr. 14, 2026) .......... 8

*Stein v. Edward-Elmhurst Health*,
2025 U.S. Dist. LEXIS 31273 (N.D. Ill. Feb. 21, 2025) .......... 5

*T.F. v. B.L.*,
813 N.E.2d 1244 (Mass. 2004) .......... 20

*Theys v. Dental Intel., Inc.*,
2026 U.S. Dist. LEXIS 46654 (N.D. Ill. Mar. 6, 2026) .......... 12

*Tower v. Hitschhorn*,
397 Mass. 581 (1986) .......... 15

*Trustees of Boston Univ. v. ASM Commc'ns, Inc.*,
33 F. Supp. 2d 66 (D. Mass. 1998) .......... 24

*United States v. O'Hagan*,
521 U.S. 642 (1997) .......... 14

*Vita v. New England Baptist Hosp.*,
494 Mass. 824 (2024) .......... 14, 16, 22

*Vriezen v. Infinite Health Collaborative, P.A.*,
2025 U.S. Dist. LEXIS 211708 (D. Minn. Sep. 30, 2025) .......... 12

*Weekes v. Cohen Cleary P.C.*,
723 F. Supp. 3d 97 (D. Mass. 2024) .......... 21

*Williams v. TMC Health*,
No. CV-23-00434 (D. Ariz. Aug. 19, 2025) .......... 6

**Statutes**

18 U.S.C. § 2511 .......... 5

42 U.S.C. § 1320d-6 .......... 9

G.L. c. 214, § 1B .......... 14

G.L. c. 93A, § 2 .......... 22

**Other Authorities**

*Health Information Privacy*,
U.S. Dep't of Health and Human Services (July 26, 2013).....9

Restat. 3d of Agency § 8.05.....13

*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,*
U.S. Dep't of Health & Human Services (Dec. 1, 2022).....9

**Rules**

Fed. R. Civ. P. 8.....4

Fed. R. Civ. P. 9.....5

**Regulations**

45 C.F.R. § 160.103.....9

45 C.F.R. § 164.508.....9

## I. INTRODUCTION

Defendants (hereinafter "UMass")—trusted healthcare providers for thousands of Massachusetts residents—surreptitiously installed hidden tracking tools on their websites and patient portal to intercept patient communications, disclosed the communications to Facebook and Google, and exploited them for their own targeted advertising and financial gain, all in direct contradiction of their promises and legal obligations to protect patients' confidentiality.

Plaintiffs assert claims under the federal Electronic Communications Privacy Act ("ECPA") and state law. In response, UMass invokes the ECPA's one-party consent defense, but that defense does not apply because UMass intercepted communications for the purpose of committing a criminal or tortious act. The Court previously ruled that Plaintiffs had not sufficiently alleged that UMass "purposefully disclosed Plaintiffs' individually identifiable health information" or "purposefully invaded Plaintiffs' privacy," rather than the disclosures and invasions of privacy being mere "side-effect[s] of the interceptions." *Progin v. UMass Mem'l Health Care, Inc.*, 2026 U.S. Dist. LEXIS 46522, at *13-14 (D. Mass. Mar. 6, 2026) ("MTD Decision"). Plaintiffs' Second Consolidated Amended Complaint ("SCAC")[1] now details how UMass intercepted patient communications for the purpose of committing acts that are criminal and tortious, including (i) disclosing patient communications to Facebook and Google in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), the Massachusetts Right to Privacy Act ("MRPA"), other tort law, and UMass's own promises to patients; and (ii) subsequently exploiting the patient communications for commercial and marketing purposes to serve targeted advertising, which separately violated federal and state law.

Further, UMass's challenges to the state law claims lack merit. Massachusetts courts consistently affirm the claims Plaintiffs assert here based on the same conduct; there is no reason for the Court to depart from that established authority.

---

[1] Plaintiff attaches as Exhibit 1 a redline of the SCAC compared against Plaintiffs' prior complaint.

## II. FACTUAL BACKGROUND

### A. ***UMass Intentionally Intercepted and Disclosed Patient Communications to Facebook and Google via Hidden Tracking Code on Its Website and Patient Portal.***

Plaintiffs are Massachusetts residents and UMass patients. ¶¶ 17-19.[2] Plaintiffs regularly used the UMass website to obtain information about doctors, search for information on specific medical conditions and procedures, review medical records, schedule appointments, and pay bills. ¶¶ 23, 26, 30. Each Plaintiff also used the UMass patient portal. ¶¶ 22, 27, 29.

Unbeknownst to Plaintiffs, UMass injected hidden tracking code throughout its website and patient portal. It configured that code to redirect patients' PHI, PII, and communications to Facebook and Google. ¶¶ 118, 223-53. UMass deployed the tracking code on pages designed for patients, including (i) the login button and pages within its patient portal (¶¶ 236-39); (ii) appointment request pages (¶¶ 231-32); (iii) doctor selection pages (¶¶ 225-29); and (iv) bill payment pages (¶¶ 233-35). UMass used tracking technologies on the specific pages that the Plaintiffs visited. ¶¶ 33, 225-29, 231-32, 234, 236-39, 274. Contrary to UMass's characterizations, Plaintiffs present specific facts on the interceptions and disclosures of their own communications, including identifying specific pages they visited. ¶¶ 23-24, 66, 80, 229, 239, 242.

Via the tracking technologies on pages designed for patients, UMass disclosed to Facebook and Google Plaintiffs' PHI—including their statuses as UMass patients and the contents of their communications with UMass about their doctors, medical conditions, and medical procedures—and PII. ¶¶ 25, 28, 31, 102, 105, 193, 224. The tracking code disclosed to Facebook and Google the substance of their communications on each webpage they visited, without informing them. ¶¶ 139, 149. By disclosing full-string URLs, UMass disclosed the names of patients' physicians, their medical conditions, and their doctors' locations. ¶¶ 243, 259. Plaintiffs did not know of or consent to these

---

[2] "¶ __" refers to paragraphs of the SCAC.

interceptions or disclosures. ¶¶ 25, 28, 31, 273, 288.

UMass knew the tracking technologies it deployed were designed to, and did, enable Facebook and Google to associate intercepted communications with the real-world identities of its patients for the purpose of targeting them for advertising (for UMass ***and*** other businesses that buy advertising from Facebook and Google). ¶¶ 104, 193. Facebook and Google used several identifiers, individually and in combination,[3] to confirm the identities of the patients using the UMass Website. ¶ 193.

### B. *UMass Intercepted Patient Communications for the Primary Purpose of Disclosing and Exploiting Them in Violation of HIPAA and State Law.*

UMass intercepted patient communications, including those that revealed protected health information and personally identifiable information, for the purpose of disclosing them to third-party advertising companies. ¶¶ 5, 46-47, 269-270. In doing so, UMass's primary purpose was to advance its own advertising on those companies' platforms and improve the ROI on its marketing spend. ¶¶ 5, 7, 48-108, 113, 229, 231-39, 238-42, 244, 247-49, 253-59, 269-71, 384-385.

UMass knew how the technologies worked and how it could use the intercepted communications to optimize its digital advertising on Facebook's and Google's platforms. ¶¶ 8, 60-72, 78-83. UMass purposefully shared as much data as possible with Facebook and Google, including "patients' identities, treatments, and other sensitive information, to maximize the effectiveness and [return on investment] of UMass's advertising on Google's and Facebook's platforms." ¶ 81. These disclosures "enabled Defendants to target their advertisements to patients with particular conditions or medical statuses based on the content of the patients' intercepted communications." *Id.*

UMass extensively used Facebook and Google's platforms to advertise, thereby exploiting its patients' intercepted communications. ¶¶ 65-72, 79-83. For example, UMass used the intercepted

---

[3] The tracking technologies identified patients through their IP addresses, ¶¶ 152-153; cookies, ¶¶ 154-155; browser fingerprints (unique combinations of browser and computer settings that confirm the identity of an individual), ¶¶ 181-182; and persistent personal identifiers (identification numbers) assigned by Google or Facebook used to track a particular individual across the UMass website and other websites, ¶¶ 186-187, 189-192.

communications to target its own patients on Facebook's and Google's ad platforms based on specific conditions such as "GI Doctors" and "Major Depressive Disorder." ¶¶ 65-66, 79-80, 241.

Facebook and Google directed businesses not to use tracking technologies without consent or on health-related pages, but UMass disregarded both directives. UMass deployed tracking technologies without consent throughout a health-related website, while falsely promising its patients that it protected the confidentiality of patient communications. ¶¶ 68-70, 82-83, 106, 273-89, 385. UMass deceived its own patients regarding the technologies, which, by design, are invisible to patients and implemented through hidden code that patients cannot observe. ¶¶ 149, 408. Rather than disclosing its use of the technologies or that Google or Facebook would eavesdrop on patient communications, UMass falsely promised the exact opposite. UMass promised patients it had "designed [its] website to allow [patients] to visit most areas without identifying [themselves] or providing personal information." ¶ 278. But in fact, UMass configured the hidden tracking technologies to identify users and serve them individualized advertising. *Id.* UMass also promised that it would "not disclose your information to third parties except" in particular circumstances, which did **not** include sharing website communications with third-party technology and marketing companies. ¶¶ 106, 279. This promise, too, was false. ¶ 279.

## III. LEGAL STANDARD

When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. *McParland v. Colvin*, 215 F. Supp. 3d 129, 131 (D. Mass. 2016). "Dismissal is only appropriate if the complaint, so viewed, fails to allege a 'plausible entitlement to relief.'" *Id.* (quoting *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007)).

UMass's "purpose" in intercepting communications is a question of its state of mind. Fed. R. Civ. P. 8(a)(2)'s liberal pleading standard applies, including to allegations of state of mind. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1005 (N.D. Cal. 2024) (applying Rule 8 to ECPA). That standard "does not demand a plentitude of factual content" and "[f]or pleading purposes,

circumstantial evidence often suffices to clarify a protean issue such as an actor's motive or intent," given "[d]irect evidence" on state of mind is "rare."[4]

## IV. ARGUMENT

### ***A. Plaintiffs' Allegations Trigger the ECPA's Crime-Tort Exception.***

UMass asserts that Plaintiffs have not alleged facts to support the application of the ECPA's crime-tort exception. Mem. 7.[5] But that argument overlooks (i) the growing weight of authority nationally affirming claims like those here, most recently *Doe v. Baystate Health Sys., Inc.,* 2026 U.S. Dist. LEXIS 57677 (D. Mass. Mar. 19, 2026) (Kobick, J.); (ii) the true holdings of its cited authorities (not rejecting Plaintiffs' legal theory but rather the particular facts alleged); and (iii) the pending appeal and therefore unsettled nature of the ***only*** decision in this District to dismiss similar claims with prejudice.

The ECPA permits one-party consent to an interception unless the consenting party intercepts the communication "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d); *Juenger v. Deaconess Health Sys., Inc.*, 2025 U.S. Dist. LEXIS 193628, at *24-25 (S.D. Ill. Sept. 30, 2025). Contrary to UMass's argument, Mem. 7 n.3, the crime-tort exception does not require that a defendant ***intend*** to break the law.[6] This Court rejected that argument and held "[t]he purpose must be to commit an act, and that act must be criminal or tortious…. ***A desire to commit a crime qua crime, or a tort qua tort, isn't necessary***." *Progin*, 2026 U.S. Dist. LEXIS 46522, at *12 (emphasis added); *Stein v. Edward-Elmhurst Health*, 2025 U.S. Dist. LEXIS 31273, at *14 (N.D. Ill. Feb. 21, 2025) ("The "act" must be criminal or tortious, but the "purpose" does not need to be criminal or tortious.");

---

[4] *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528, 535-36 (1st Cir. 2023) (reversing dismissal where district court imposed too stringent a pleading standard on state of mind); *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012) ("paucity of direct evidence" on state of mind not "fatal," given "smoking gun" proof on state of mind "is rarely available" at the pleading stage). Even in cases involving fraud (this is not one), "conditions of a person's mind may be be alleged generally." Fed. R. Civ. P. 9(b).

[5] "Mem. __" refers to the Memorandum in Support of Defendants' Motion to Dismiss (Doc. No. 52).

[6] UMass, in a footnote, invokes the rule of lenity. Mem. 7 n.3. But the rule applies only if "there is a grievous ambiguity or uncertainty in the statute," *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (citation omitted), which does not exist here.

*Kurowski v. Rush Sys. for Health,* 2024 U.S. Dist. LEXIS 126837, at *10-11 (N.D. Ill. July 18, 2024).[7]

Moreover, "a financial motivation (on the one hand) and a criminal or tortious motivation (on the other hand) are not mutually exclusive." *Progin*, 2026 U.S. Dist. LEXIS 46522, at *12-13 n.1. This is because "[m]any crimes and torts are motivated by a desire to make money, and it 'defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 U.S. Dist. LEXIS 126837, at *16; *see also Baystate*, 2026 U.S. Dist. LEXIS 57677, at *13 (fact that "Baystate installed the tracking technologies…for marketing and/or analytics purposes [and] financial gain does not change [the] conclusion" that the plaintiff adequately alleges the crime-tort exception) (internal quotations omitted).[8]

The SCAC's allegations go well beyond what is necessary to satisfy the crime-tort exception on a Rule 12(b)(6) motion. This Court should follow the lead of recent decisions that sustain ECPA claims after plaintiffs amend to add allegations like those here.[9] *E.g., Williams v. TMC Health*, No. CV-23-00434 (D. Ariz. Aug. 19, 2025) (attached as Exhibit 3) at 5-8 (sustaining ECPA claim after

---

[7] This Court's articulation of the crime-tort exception aligns with Judge Dunlap's statements during the First Circuit's hearing in *Goulart v. Cape Cod Healthcare, Inc.,* No. 25-1672: "The first argument is that you have to have an intent to commit a crime. I'm not sure that the language of the statute bears that out. It seems to be an intent to carry out the act, which is criminal." Transcript, at 14:20-14:25 (attached as Exhibit 2).

[8] *See also McManus v. Tufts Med. Ctr., Inc.*, 2025 U.S. Dist. LEXIS 191546, at *8 n.1 (D. Mass. Sept. 29, 2025) ("financial motivation…and a criminal or tortious motivation…are not mutually exclusive") (quotations omitted); *Doe v. Lawrence Gen. Hosp.*, 2025 U.S. Dist. LEXIS 195964, at *24 (D. Mass. Aug. 29, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. 2025) ("existence of an underlying financial motivation does not mean that the act lacked a criminal or tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money.").

[9] Decisions in this District that dismissed ECPA claims for failure to plead the crime-tort exception did not hold that such claims are nonviable as a matter of law; instead, they turned on the allegations presented. Indeed, like this Court, the court in *Lawrence General* (Mem. 7, 9-10) permitted amendment, recognizing the viability of the theory if factually supported. *Doe v. Lawrence Gen. Hosp.*, Case No. 25-cv-10081-NMG, Doc. No. 55 (D. Mass. Oct. 29, 2025) (Levenson, M.J.). Judge Stearns (*Goulart v. Cape Cod Healthcare, Inc.*, 2025 U.S. Dist. LEXIS 119435 (D. Mass. June 24, 2025)) is the only judge in this District to dismiss ECPA claims with prejudice, but that is now on appeal. *Goulart* endorses arguments that this Court rejects, including arguments that a purpose of "commercial gain" is incompatible with the crime-tort exception, and that interception and disclosure are the same act. *Id.* at *8-10 & n3.

previously dismissing it without prejudice; plaintiff added allegations like those here); *Jarrett v. Upperline Health, Inc.*, 2025 U.S. Dist. LEXIS 219352, at *4, 9 (S.D. Ind. Aug. 8, 2025) (sustaining ECPA claims after previously finding inadequate allegations on HIPAA; plaintiff added allegations like those here); *Kurowski*, 2024 U.S. Dist. LEXIS 126837 at *4-22 (denying motion to dismiss further amended complaint based on similar facts); *Hartley v. Univ. of Chi. Med. Ctr.*, 2024 U.S. Dist. LEXIS 78517, at *2-7 (N.D. Ill. Apr. 30, 2024) (same).

1. <u>UMass's Purpose in Installing Tracking Technologies Was to Disclose Patient Communications to Third Parties and Exploit Them for Marketing.</u>

As this Court explained, if UMass's "purpose [was] to do X," and "X is a crime or a tort," then "the crime-tort exception to the one-party consent rule applies." *Progin,* 2026 U.S. Dist. LEXIS 46522, at *12. To meet that standard, Plaintiffs have alleged that UMass's purpose in installing the tracking technologies was to disclose patient communications to third parties and exploit those communications and disclosures for marketing.

The SCAC adds facts to directly address the Court's holding on the sufficiency of the allegations on the crime-tort exception, demonstrating UMass's disclosures were the purpose of its deployment of the tracking technologies, not an incidental byproduct. Those allegations show:

- **UMass's deployment of the tracking technologies**. UMass deployed tracking technologies across multiple patient-facing pages, including the patient portal, bill-pay, and appointment-request pages. ¶¶ 231-39.

- **UMass's knowledge about the functionality of the tools**. UMass knew that by embedding tracking technologies on its websites, it was permitting Facebook, Google, and others to collect, use, and share Plaintiffs' PHI, including sensitive medical information and personally identifiable data. ¶¶ 269-271.

- **UMass's use of the tools to promote targeted ads**. UMass deployed tracking technologies and configured them to intercept and retransmit to Google and Facebook communications revealing patient status and information about doctors, conditions, and treatments to Facebook and Google, ¶¶ 240-42, 244, 247-49, 253-59, enabling UMass to advertise to patients based on the contents of those communications. ¶¶ 48-64, 73-78, 108, 113.

- **UMass's commercial motive**. UMass had commercial incentives to use those tools, knew of legal and contractual restrictions on doing so, and nevertheless proceeded without the required consent and contrary to its own privacy promises. ¶¶ 65-72, 79-108.

- **UMass disregarded directions from Google and Facebook**. UMass violated Google's and Meta's terms of service, which required it to obtain users' consent and not to use these technologies on health-related webpages. ¶¶ 68-70, 82.

- **UMass flouted its promises to patients**. UMass understood the restrictions imposed by HIPAA and Massachusetts law, as its promises to patients confirm, but flouted those promises by sharing PHI with third parties without patient authorization. ¶ 45-46, 84, 89, 92-95, 98, 106, 274-84.

- **UMass engaged in separate acts of disclosure and commercial exploitation in addition to interception**. UMass's disclosure and exploitation of patient communications were both acts distinct from the interceptions. ¶¶ 109-17.[10]

Taken together, those allegations support the reasonable inference that disclosure and marketing use of patient communications were not incidental side effects of UMass's installation of the tracking technologies, but rather the very purpose of the interception.

2. Disclosing Patient Communications to Third Parties and Exploiting Them for Marketing is a Crime and/or Tort.

UMass's primary purpose in installing tracking technologies—disclosure to third parties and marketing use of patient communications—is a crime or tort sufficient to satisfy the ECPA crime-tort exception because its purposeful acts violate HIPAA and Massachusetts tort law.

*a. UMass's Conduct Violated HIPAA*

UMass's intentional disclosure to third parties of patient communications and its marketing use of those communications violated HIPAA.[11]

---

[10] Given this Court's decision, *Progin*, 2026 U.S. Dist. LEXIS 46522, at *14 n.4 ("act of disclosure might be construed as independent from the act of interception, even if the acts occur simultaneously"), UMass no longer contends, as before (Doc. No. 17 at 9-11), that the criminal or tortious act is not "independent" of the interception. Recent cases confirm Plaintiffs' position. *Smart v. Main Line Health*, 2026 U.S. Dist. LEXIS 81515 (E.D. Pa. Apr. 14, 2026) ("After the Meta [pixel] captured the contents of user communications [defendant] shared that information to allow marketers and advertisers to make targeted outreach to users. Just because those acts happen at nearly the same time does not mean the act is singular…. The use of the intercepted communications is distinct from the capture of those communications."); *B.N. v. Or. Reprod. Med., LLC*, 2026 U.S. Dist. LEXIS 73607, at *10 (D. Or. Apr. 3, 2026) ("[T]he weight of authority supports that an alleged violation of HIPAA can constitute an independent act for purposes of ECPA's crime-tort exception.").

[11] To be clear, Plaintiffs do not assert a HIPAA claim, and none of their claims require proof of a HIPAA violation. As Judge Kobick recently explained on materially similar facts, where the alleged

HIPAA protects "information…[that] relates to…the provision of health care to [the] individual [and for] which there is a reasonable basis to believe can be used to identify the individual." 45 C.F.R. § 160.103. HIPAA prohibits healthcare providers from "knowingly" disclosing individually identifiable health information and imposes "penalties when a covered entity discloses the information with the intent to use it '***for commercial advantage***….'" *Doe v. Wellstar Health Sys., Inc.*, 799 F. Supp. 3d 1268, 1279 (N.D. Ga. 2025); 42 U.S.C. § 1320d-6(b)(3); *see also Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 379 (S.D.N.Y. 2024) ("HIPAA makes it a crime for … health care providers…to knowingly disclose individually identifiable health information ("IIHI") without authorization 'with intent to sell, transfer, or ***use*** individually identifiable health information for commercial advantage.'"); *Hannant v. Culbertson Memorial Hosp. Found.*, 2026 U.S. Dist. LEXIS 57449, at *20 (C.D. Ill. Mar. 19, 2026) ("HIPAA itself anticipates that IIHI can be transferred for the purpose of commercial advantage…and, in such cases, imposes heightened criminal sanctions"). HIPAA ***also*** prohibits "any use…of [PHI] for marketing," without consent. 45 C.F.R. § 164.508(a)(3)(i).[12]

"[P]atient status is protected health information" on its own, even without a disclosure of any additional information about a patient's conditions, treatments, or doctors. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792-93 (N.D. Cal. 2022)*; see also* n.16 & accompanying text, *infra.*[13]

---

violation of state privacy law sufficed, "the Court need not consider whether [the hospital] also acted with the intent to violate [HIPAA]"; that is, a HIPAA violation is not essential to Plaintiffs' ECPA claim. *Doe v. Baystate Health Sys., Inc.,* 2026 U.S. Dist. LEXIS 57677, at *13, n.1 (D. Mass. Mar. 19, 2026). Plaintiffs' allegations that UMass violated HIPAA provide ***one of several bases*** to invoke the ECPA's crime-tort exception. ¶¶ 84-108, 383-92.

[12] *See also Health Information Privacy*, U.S. Dep't of Health and Human Services (July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html ("With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her [PHI] can be made for marketing…"). UMass acknowledged those HIPAA restrictions in its privacy disclosures, which stated: "[U]ses and disclosures [of PHI] not described in this notice may be made with your signed authorization. [These] include ***the sale of your information,*** [and] ***marketing purposes***." ¶ 98. UMass obtained no such authorization. ¶ 106.

[13] There is zero support for UMass's argument that the absence of a private right of action for HIPAA precludes its use as a "criminal act" for purposes of the ECPA's crime-tort exception. The crime-tort

UMass's argument that communications on a "public website" cannot involve PHI, Mem. 5, ignores that UMass deployed tracking technologies not only on public-facing pages but also in its patient portal and mobile app. ¶¶ 32-33, 237-39. Interceptions within a patient portal plainly implicate protected health information because they at least reveal patient status, which, as noted, is by itself PHI. *Lawrence Gen.*, 2025 U.S. Dist. LEXIS 195964, at *20-21 (collecting "decisions involving allegations that web tracking tools…deployed within patient portals or billing portals, which may implicate significantly greater privacy issues than tracking public web pages").[14]

In any event, publicly accessible webpages also reveal PHI, particularly where they reveal patient status. *I.T. v. Choicepoint LLC*, 2025 U.S. Dist. LEXIS 169202, at *23 (W.D. Wash. Aug. 29, 2025) ("whether the PHI was provided through a public webpage or patient portal is 'immaterial' and courts have found information that identifies an individual and relates to a health condition can support the HIPAA crime-tort exception for ECPA liability, regardless of whether a webpage was publicly accessible.").[15] UMass used tracking technologies on pages designed for patients, including

---

exception is not limited to interceptions "for the purpose of violating a statute that itself authorizes a private lawsuit" but instead applies broadly to any "criminal or tortious act." The Court must enforce ECPA's plain terms, consistent with the wealth of authority invoking HIPAA in precisely the same context, and the entire absence of authority limiting the crime-tort exception to crimes for which there is already a private right of action.

[14] UMass argues Plaintiffs' in-portal allegations improperly rely on information and belief. Mem. 2. Plaintiffs' allegations are proper because the underlying facts are largely within UMass's control, and the SCAC alleges surrounding facts that make the inference plausible: (i) UMass broadly installed tracking code on pages for patients, including appointment request, bill payment, and patient portal access pages. ¶¶ 32, 224-65; (ii) there was no technological impediment to installing tracking code in the patient portal itself, ¶¶ 145-48, and (iii) UMass had an incentive to violate patient privacy by installing the code inside the patient portal, ¶¶ 5, 65-67, 79-81. These allegations satisfy the applicable plausibility standard, and even the heightened standard UMass mistakenly cites, Mem. 2, which does not apply here. *Angiuoni v. Billerica*, 2012 WL 12910268, at *6 (D. Mass. July 16, 2012), *report and recommendation adopted sub nom. Angiuoni v. Billerica, Town of*, 2012 WL 12950635 (D. Mass. Sept. 27, 2012) ("'information and belief' allegations [permissible with] a good faith basis for doing so, particularly when the facts are the kind that are peculiarly within the possession and control of defendant [] or where the belief is based on factual information that makes the inference of culpability plausible").

[15] *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), is not to the contrary. *Becerra* did not hold that communications on "public" pages can never reveal PHI. *Becerra* vacated part of a

appointment request, bill payment, and portal access pages. ¶¶ 231-39. Such pages reveal protected patient status even though they are public. *Meta Pixel Healthcare*, 647 F. Supp. 3d at 792-93 (interceptions showing "user is about to log in to a healthcare provider's website" reveal protected patient status); *M.R. v. Salem Health Hosps. & Clinics*, 2024 U.S. Dist. LEXIS 155513, at *10-11, 16-17 (D. Or. Aug. 28, 2024) (interceptions on "financial assistance form" disclose protected "status as a patient").[16] UMass additionally configured tracking technologies to intercept information about Plaintiffs' doctors, medical conditions, and treatments. ¶¶ 240-42, 244, 247-49, 253-59. Disclosure and exploitation of information about patients' doctors, conditions, and treatments violates HIPAA.[17] But even if communications about doctors, conditions, and treatments were not, on their own, HIPAA-

---

bulletin issued by the Department of Health and Human Services relating to a "Proscribed Combination" of an "IP address" and a public page "addressing specific health conditions or healthcare providers," holding disclosure of those two facts alone is insufficient for a HIPAA violation. 738 F. Supp. 3d at 789. ***None*** of Plaintiffs' claims, however, depends on the HHS Bulletin or the "Proscribed Combination." ¶¶ 372-505. UMass's deployment of tracking technologies on public pages designed for patients, including its patient portal login page, distinguishes this case from *Becerra*, which did not consider pages that reveal HIPAA-protected patient status like here. *Gaige v. Exer Holdings Co., LLC*, 2025 U.S. Dist. LEXIS 17146, at *10 (C.D. Cal. Jan. 30, 2025) (*Becerra* does ***not*** preclude invoking HIPAA under the ECPA's crime-tort exception where "Plaintiff's claims are not premised on a violation of HHS guidance, but rather…on violations of various statutes and common law"); *Doe v. Bayhealth Med. Ctr. Inc.*, 2025 Del. Super. LEXIS 154, at *16-17 (Super. Ct. Apr. 2, 2025) ("[T]he HHS guidance vacated by *Becerra* has no impact on a plaintiff's disclosure allegations when the plaintiff's claims are based on statutory and common law violations").

[16] *See also Jarrett*, 2025 U.S. Dist. LEXIS 219352, at *4, 9 (public appointment scheduling pages revealed protected patient status); *Kane v. Univ. of Rochester*, 2024 U.S. Dist. LEXIS 48515, at *5-7, 16 (W.D.N.Y. Mar. 19, 2024) (same for "'Schedule an Appointment' button or click [of] the physician's phone number to schedule an appointment"); *Hartley v. Univ. of Chi. Med. Ctr.*, 2025 U.S. Dist. LEXIS 194466, at *7-15 (N.D. Ill. Oct. 1, 2025) ("act of logging into a healthcare provider's patient portal when combined with individual identifiers such as an IP address or a Facebook ID, can reveal patient status"); *Castillo v. Costco Wholesale Corp.*, 2024 U.S. Dist. LEXIS 207197, at *23-24 (W.D. Wash. Nov. 14, 2024) (Costco collected PHI of users who "click[ed] a 'Refill Prescription' button that prompts a 'Sign In' page," which "'relate[d] to' [their] individualized health conditions even though they d[id] not allege that their data were collected while they were logged into their patient portals").

[17] *Hartley*, 2025 U.S. Dist. LEXIS 194466, at *7-8 ("'find-a-physician'" pages and pages about "providers, conditions, and treatments" may include protected information); *Doe v. Deaconess Ill. Union Cnty. Hosp. Inc.*, 2025 U.S. Dist. LEXIS 192058, at *27 (S.D. Ill. Sept. 29, 2025) (interceptions of "symptoms, providers, and services" disclosed HIPAA-protected information); *I.T.*, 2025 U.S. Dist. LEXIS 169202, at *9 (public searches for physicians by specialty involve information "'about a present medical condition and the provision of medical care covered by HIPAA'").

protected, UMass did not disclose them in isolation; rather, it disclosed them alongside communications revealing HIPAA-protected patient status and PII confirming patients' real-world identities. ¶¶ 49-50, 74, 104, 153, 185, 188, 193, 277-278. Finally, UMass transmitted all these communications revealing patient status and information about doctors, conditions, and treatments to Facebook and Google, ¶¶ 240-42, 244, 247-49, 253-59; and commercially exploited the intercepted communications to serve targeted ads, ¶¶ 48-108, 231-59.

The crime-tort exception is satisfied when, as here, a hospital uses tracking technologies to intercept patient communications for the purpose of disclosing and exploiting information protected by HIPAA. *See In re Allstate & Arity Consumer Privacy Litig.*, 2026 U.S. Dist. LEXIS 43200, at *32-33 (N.D. Ill. Mar. 3, 2026) (endorsing *Stein* as "particularly persuasive"; finding crime-tort exception based on a HIPAA violation); *Theys v. Dental Intel., Inc.*, 2026 U.S. Dist. LEXIS 46654, at *35 (N.D. Ill. Mar. 6, 2026) (transmission of PHI "to third parties in violation of HIPAA" supports the "crime-tort exception"); *Vriezen v. Infinite Health Collaborative, P.A.*, 2025 U.S. Dist. LEXIS 211708, at *19 (D. Minn. Sep. 30, 2025) ("plaintiffs plausibly alleged the crime-tort exception based on HIPAA violations"); *Wellstar*, 799 F. Supp. 3d at 1279-80 ("Plaintiffs allege that Defendant captured and transmitted their PII and PHI to third parties without their consent and in violation of Defendant's own privacy policies and HIPAA… Plaintiffs sufficiently allege that Defendant intercepted the communications for a criminal or tortious purpose").[18] UMass's deployment of tracking technologies across patient-facing pages, including portal, bill-pay, and appointment-request pages, which revealed

[18] *See also Brahm v. Hosp. Sisters Health Sys.*, 2024 U.S. Dist. LEXIS 114827, at *13-16 (W.D. Wis. June 28, 2024) ("defendants intercepted patients' electronic communications for the purposes of making disclosures that violated HIPAA"); *Lugo v. Inova Health Care Servs.*, 2025 U.S. Dist. LEXIS 55590, at *16-22 (E.D. Va. Mar. 25, 2025) (following "[c]ourts around the country [that permit] the invocation of the ECPA's crime-tort exception when plaintiffs allege violations of HIPAA"); *R.S. v. Prime Healthcare Servs.*, 2025 U.S. Dist. LEXIS 6338, at *13-14 (C.D. Cal. Jan. 13, 2025) ("intent to disclose [HIPAA-protected] information" sufficient); *A.J. v. LMND Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 194480, at *3-4 (N.D. Cal. Oct. 25, 2024) (same); *Ramirez v. Lasikmd USA, Inc.*, 2026 U.S. Dist. LEXIS 14108, at *8 (S.D. Cal. Jan. 26, 2026) (same).

patient status, and its disclosure of patients' doctors, conditions, and treatments, all synced together with patients' identities to facilitate UMass's individualized advertising targeting its own patients across Google and Facebook's advertising platforms, ignoring Google and Facebook's directions and UMass's own promises to patients (*see* § IV-A-1, *supra*), strongly supports the inference that UMass intercepted communications for the primary purpose of engaging in acts that are criminal under HIPAA. The ECPA's crime-tort exception therefore applies.

*b. Violation of Massachusetts Tort Law.*

UMass also intercepted communications for the purpose of committing tortious acts under Massachusetts law. ¶¶ 107, 384, 386, 396-435. Those torts include invasion of privacy under the MRPA and breach of fiduciary duty. Although the elements differ, Plaintiffs' theory is straightforward: UMass intentionally disclosed patient communications to third parties and commercially exploited them, contrary to its promises to patients and their reasonable expectations of privacy. ¶¶ 400, 405-13, 423-24, 426-32.

The MRPA allegations independently satisfy the ECPA's crime-tort exception because UMass used patient communications in violation of its promise not to disclose confidential information entrusted to it, and such disregard for promises to patients supports a tort claim under the MRPA. *See Baystate*, 2026 U.S. Dist. LEXIS 57677, at *11-13. In *Baystate,* the court concluded that the plaintiff had plausibly alleged that the defendant "intentionally intercepted her communications on its website for the purpose of committing a tortious act in violation of [the MRPA]" when it installed tracking technologies like those here after it, "through its Privacy Policy, affirmatively misled [the plaintiff] by promising that any 'identifiable information' she submitted would 'only be used to support [her] customer/patient relationship' . . . and would be disclosed only if 'required by law' or with 'specific written consent.'" *Id.* The same reasoning applies here.

UMass's conduct also violated its fiduciary duties by disclosing and using the communications for its commercial advantage without authorization. *See* Restat. 3d of Agency § 8.05 (fiduciary owes

duty "not to use…confidential information of the principal for the [fiduciary's] own purposes").[19]

Thus, the SCAC adequately alleges that UMass purposefully engaged in acts that are tortious under Massachusetts law, independently supporting application of the crime-tort exception.

### *B. Plaintiffs Adequately Allege Their State Law Claims.*

1. Plaintiffs State a Claim under the MRPA.

UMass's argument that Plaintiffs fail to state a claim under the MRPA, G.L. c. 214, § 1B (Mem. 11-15),[20] misreads the SCAC and applicable law. As the SJC has observed, the Massachusetts Legislature has provided "statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information." *Vita v. New England Baptist Hosp.*, 494 Mass. 824, 849-50 (2024) (citing claims for negligence, implied contract, unjust enrichment, breach of fiduciary duty, and right to privacy under the MRPA). A court in this District has found several of Plaintiffs' state law claims viable under similar facts. *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 151-52 (D. Mass. 2024) (Saris, J.). UMass offers no reason for this Court to depart from such established authority.

The MRPA codifies the common law tort of invasion of privacy. *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 519 (1991). It includes in its "broad" terms claims for intrusion upon seclusion and disclosure of private facts, torts well-known at common law. *Polay v. McMahon*, 468 Mass. 379, 382-84 (2014). The MRPA prohibits "unreasonable, substantial or serious interference" with a person's privacy. G.L. c. 214, § 1B. A plaintiff "must plausibly allege an invasion

---

[19] *See also United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("fiduciary's undisclosed, self-serving use of a principal's information" for the fiduciary's financial interests is a "breach of a duty of loyalty and confidentiality"); *SEC v. Willis*, 787 F. Supp. 58, 61-62 (S.D.N.Y. 1992) (fiduciary "becomes duty-bound not to appropriate the [information] for his own use").

[20] UMass also argues that Plaintiffs cannot state a claim under G.L. c. 111 § 70E, but Plaintiffs do not assert a claim under that section. Any reference to § 70E simply underlines that medical records and communications are sensitive and private.

of her privacy that is 'both unreasonable and substantial or serious.'" *Baystate*, 2026 U.S. Dist. LEXIS 57677, at *7 (D. Mass. Mar. 19, 2026) (quoting *Ortiz v. Examworks, Inc.*, 470 Mass. 784, 793 (2015)).[21]

Here, Plaintiffs visited the find-a-doctor page, pages for particular symptoms and treatments, the appointment scheduling page, the bill payment pages, and the UMass patient portal, among others, and UMass intercepted communications on those pages. ¶¶ 22-32. Plaintiffs reasonably expected that such communications would remain confidential. ¶¶ 273-89. UMass argues these are not sufficiently "particular communications," citing no case law in support. Mem. 11-12. However, to vindicate their privacy rights, Plaintiffs need not publicize the exact contents of their intercepted private communications. *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1004 ("Plaintiffs do not need to plead the specific and presumably highly sensitive contents of the communications they say were intercepted in order to plausibly allege that interception occurred."); *Doe v. Emerson Hosp.*, 2023 Mass. Super. LEXIS 673, at *11-12 (Super. Ct. Nov. 22, 2023) (rejecting similar argument that complaint "reveals little about the information that Plaintiff entered on its website").

Citing several California federal cases, UMass argues that this information is not "highly personal or intimate [in] nature." Mem. 12. Numerous courts in Massachusetts have ruled otherwise and held that these allegations state a claim for invasion of privacy under the MRPA. *Baystate*, 2026 U.S. Dist. LEXIS 57677, at *8 (allegations that plaintiff "'regularly exchanged communications' on [defendant's] website, including inquiries" for health care screenings and "to log in to [the patient portal], and to search for providers" were sufficient); *Tenet*,[22] 731 F. Supp. 3d at 151-52 (disclosure of "[p]laintiff's identity, patient status, request for medical treatment, health conditions and treatments,

[21] A claim under the MRPA does not require "public" dissemination of highly personal or intimate facts for an invasion of privacy to be actionable. *See Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 519 & n.15 (1984); *Tower v. Hitschhorn*, 397 Mass. 581, 586 (1986) ("[T]he success of [an MRPA claim] is not dependent on communication of the personal matters disclosed to the public at large.").

[22] UMass weakly attempts to distinguish *Tenet* on the basis that it predates *Becerra*. Mem. 6 n.2. *Becerra* is irrelevant because it does not construe Massachusetts law.

and appointment time and location[]"); *Doe v. Bos. Med. Ctr. Corp.*, 2023 Mass. Super. LEXIS 674, at *11 (Super. Ct. Sept. 14, 2023) ("alleged disclosure of personal and healthcare-related information [medical condition searches, finding doctors, and making appointments] over multiple website visits for the sole purpose of targeted advertising efforts suffices to advance Plaintiffs' claim"); *Emerson*, 2023 Mass. Super. LEXIS 673, at *12. (defendant shared with Facebook "information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, [and] bill payment"); *Vita*, 494 Mass. at 849 (suggesting MRPA claim to address misuse of private medical information).[23]

Finally, UMass's lies to patients about tracking technologies, ¶¶ 276-83, directly support Plaintiffs' privacy claim independent of the substance of the communications. *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020) (affirming privacy claim where "tracking" contradicted "privacy disclosures"); *In re Google, Inc.*, 806 F.3d 125, 150-52 (3d Cir. 2015) (reversing dismissal of privacy claim where Google's practices contradicted its own disclosures); *Meta Pixel Healthcare*, 647 F. Supp. 3d at 799-800 (defendant's violation of own "policies tend[s] to support" a "fairly strong" privacy claim); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1076 (N.D. Cal. 2021) (company's "privacy disclosures…failed to acknowledge [the] tracking …[and] suggest[ed] that users' information would not be tracked"); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 864-65 (C.D. Cal. 2024) (that tracking technologies implemented "surreptitiously" supported privacy claim).

Indeed, a federal court recently affirmed a jury verdict and class certification against Google regarding tracking technologies in cell phone apps, rejecting the argument that a privacy claim (similar in scope and substance to the MRPA) depends on the substance of the information intercepted.

---

[23] The lone case UMass cites from this District involved one individual sending an email that "referred to the fact that [plaintiff], like millions of other persons, works hard to overcome a disability." *Koppel v. Moses*, 2020 U.S. Dist. LEXIS 199483 (D. Mass. Oct. 27, 2020). The court dismissed the privacy claim because "the email," in reality, made no reference, either explicitly or implicitly, to [plaintiff's] disability." *Id.* at *21. The court did not consider a hospital's disclosure of patient communications or any deception regarding confidentiality.

*Rodriguez v. Google, LLC*, 2026 U.S. Dist. LEXIS 20412, at *4-5, 33, 37 (C.D. Cal. Jan. 30, 2026). The court explained that the plaintiff's theory was that Google "collect[ed] certain data *after it said it would not*"; the "nature of the data collected played [only] a supporting role." *Id.*

2. Plaintiffs State a Claim for Breach of Fiduciary Duty.

UMass contends that Plaintiffs fail to plead a fiduciary relationship with UMass, but UMass's authority misses the mark, and Massachusetts courts consistently recognize a fiduciary duty between healthcare providers and their current patients.

To plead a claim for breach of fiduciary duty, a plaintiff must allege (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) a causal relationship between the breach and harm to the plaintiff. *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 165 (D. Mass. 2024). "A fiduciary duty exists when one reposes faith, confidence, and trust in another's judgment and advice." *Doe v. Harbor Sch., Inc.*, 446 Mass. 245, 252 (2006) (quotations omitted).

UMass only quibbles on the first element, asserting that a patient communicating through a website does not sufficiently relate to any fiduciary duty UMass owed to patients. UMass's only authority on this point (*Korper v. Weinstein*, 57 Mass. App. Ct. 433 (2003)) is inapposite. In *Korper*, the doctor-patient relationship between the parties ended when their affair began. Therefore, the court concluded that the conduct was outside the scope of the fiduciary relationship. In fact, the court noted that "the scope of the fiduciary duty is defined by the incidents and undertakings of the defendant as a physician." *Id.* at 438. Here, UMass designed and published its website for patient communications, bringing it within the scope of the fiduciary relationship.

Massachusetts courts recognize that the same conduct Plaintiffs allege here supports a fiduciary duty claim. In *Emerson*, the court applied Massachusetts law and rejected the argument that UMass makes here—that patient communications on a health provider's website are not sufficiently related to the fiduciary doctor/patient relationship. 2023 Mass. Super. LEXIS 673, at *5-7. Other

courts applying Massachusetts law are in accord.[24] UMass's conduct here constitutes a particularly egregious fiduciary breach, given the use of hidden tracking technologies in the patient portal and UMass's deception about them.

Further, UMass's emphasis on the fact that its website was "public" ignores that UMass used tracking technologies on several pages designed specifically for patients, which Plaintiffs visited as patients. ¶¶ 236-39 (patient portal); ¶¶ 225-30 (doctor pages); ¶¶ 232-33 (appointment requests); ¶¶ 233-35 (bill payment page). *See Baystate*, 2026 U.S. Dist. LEXIS 57677, at *23 (rejecting argument that patient's use of its public website was outside "the scope of the fiduciary duty a doctor owes a patient."). Finally, UMass's argument that they owe no duty to non-patients, Mem. 20-21, is irrelevant, as the only plaintiffs before this Court are patients who used the UMass Website as patients.

3. Plaintiffs State a Claim for Negligence.

To state a claim for negligence, a plaintiff must allege that (1) the defendants owed the plaintiff a duty of care, (2) the defendants breached that duty, and (3) the plaintiff suffered injury because of the breach. *Green v. Sirchie Acquisition Co. LLC*, 633 F. Supp. 3d 393, 401 (D. Mass. 2022) (citing *Jupin v. Kask*, 447 Mass. 141, 146 (2006)). Plaintiffs allege all elements.

UMass contends that Plaintiffs allege no duty and therefore no breach of any duty. Mem. 15-16. Plaintiffs do not contend, as UMass suggests, that UMass's duty arises solely out of statute or fiduciary relationship. Mem. 15. The duty UMass owes to patients is informed by state and federal privacy laws, which reflect "social values and customs and appropriate social policy." *Lanier v. President and Fellows of Harvard College*, 490 Mass. 37, 45 (2022); *see also* ¶¶ 301-02, 339. A hospital "already has a

[24] *See Tenet*, 731 F. Supp. 3d at 151 ("fiduciary relationship exists between healthcare providers and patients. Plaintiff, a patient at Tenet, states a viable claim of breach of fiduciary duty against her healthcare provider for disclosing her Private Information.") (internal citation omitted); *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *10-11 ("Plaintiffs have plausibly alleged that [online doctor's office,] owed a fiduciary duty to protect their confidential medical information"); *Baystate*, 2026 U.S. Dist. LEXIS 57677, at *21-24 (hospitals also have "a fiduciary duty to maintain the confidentiality of a [patient's] medical records."); *Partners Healthcare*, No. 1984CV01651-BLS1 (Mass. Sup. Ct. Nov. 20, 2019) (previously filed at Doc. No. 34-1) (sustaining breach of fiduciary duty claim).

legally cognizable duty to prevent harm" to its patients. *Roe No. 1 v. Children's Hosp. Med. Ctr.*, 469 Mass. 710, 720 (2014). Privacy laws manifest society's recognition of the importance of confidentiality in healthcare-related communications and of consent to any disclosure of those communications, even if those statutes do not themselves provide for a "per se" negligence liability. *Bennett v. Eagle Brook County Store, Inc.*, 408 Mass. 355, 358-59 (1990) (even though "violation of a statute does not by itself establish breach of duty," it does provide "some evidence of the defendant's negligence"). Addressing similar facts, Judge Saris in *Tenet* upheld a negligence claim against a hospital for its surreptitious use of tracking technologies. 731 F. Supp. 3d at 149 (denying motion to dismiss negligence claim).[25]

UMass also argues Plaintiffs allege no cognizable damages. Not so. Plaintiffs amply allege compensable loss, including through detailed allegations regarding the significant, quantifiable economic value that the intercepted communications have to patients, UMass, and the third-party eavesdroppers and advertisers that monetize the intercepted communications—that is, there is an established, mature market for the intercepted communications. ¶¶ 202, 217, 272, 316-22 (describing value UMass "bartered" in exchange for permitting Facebook and Google to eavesdrop on communications, resulting in increased revenue for UMass); ¶¶ 51-64, 216 (describing how Meta Pixel contributes to Facebook's building of individual profiles from which Facebook derives its revenues); ¶¶ 155, 262-64, 268 (describing how Google Analytics contributes to Google's building of individual profiles from which Google derives its revenues); ¶¶ 308-10 (describing "economic market for consumers' personal data" and particular value of health data, including pricing of such data); ¶¶ 311-14 (describing a market through which consumers sell and monetize their own data).

Such allegations are sufficient at this stage of the case. *Tenet*, 731 F. Supp. 3d at 149 (allegations that plaintiff's private information was collected and transmitted to third parties without her consent

---

[25] UMass does not dispute that if there is a duty, its sharing of Plaintiffs' personal and private medical information and communications without their consent and in violation of the law and social norms, sufficiently alleges a breach. ¶¶ 25, 28, 31-32, 45, 70, 98, 108, 143, 259, 261, 270, 356, 372-412.

"sufficient to defeat a motion to dismiss"); *Emerson*, 2023 Mass. Super. LEXIS 673, at *5 (allegations that "private medical information was disclosed to Facebook" and defendant "and Facebook monetized [plaintiff's] personal health information without compensating him" sufficient at the pleading stage) *Meta Pixel Tax Filing*, 724 F. Supp. 3d at 1019-24 (allegations of "loss of privacy," "diminution in value," and "loss of the benefit of [the] bargain" sufficient even if not quantified; "[i]f a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have").[26]

That Plaintiffs do not yet quantify damages or present expert testimony on value does not matter. *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 80-81 (1st Cir. 2020) (plausible, even if general, allegations of benefit-of-the-bargain damages at pleadings stage sufficient); *In re Meta Pixel Healthcare Litig.*, 713 F. Supp. 3d 650, 655-56 (N.D. Cal. 2024) (allegation, even without quantification or expert testimony, that "Meta unjustly profited from the data taken," is sufficient).

4. Plaintiffs State a Claim for Breach of Implied Contract.

UMass argues Plaintiffs have not established an implied-in-fact contract because they do not allege UMass assented to a contract or the existence of consideration for an implied contract. Both arguments are incorrect.

Under Massachusetts law, a valid contract requires "an offer, acceptance, and consideration." *Josef Gartner USA LP v. Consigli Constr. Co.*, 2011 U.S. Dist. LEXIS 62492, at *11-12 (D. Mass. June 10, 2011). "[I]n the absence of an express agreement," however, mutual assent (acceptance)—and therefore an implied contract—may be inferred from the conduct and the relationship of the parties. *Tenet*, 731 F. Supp. 3d at 149 (quoting *T.F. v. B.L.*, 813 N.E.2d 1244, 1249 (Mass. 2004)).

[26] UMass's argument that courts have rejected diminution of value damage theories where the plaintiff fails to allege the existence of a market (Mem. 17) is inapplicable here because Plaintiffs have alleged the existence of a market. ¶¶ 308-14.

Here, Plaintiffs allege that they paid UMass for healthcare services, understanding that UMass would maintain the confidentiality of their communications, including PII/PHI, as expected in a physician-patient relationship. ¶ 457. That understanding was reinforced by UMass's promise to keep their PII/PHI secure and confidential, including that UMass "does not disclose your information to third parties" and several other palpably false promises. ¶¶ 106, 278-84, 287. These promises bolster reasonable expectations patients have "***as a matter of law***…that the information will be kept private and not sold to third-party companies, regardless of whether [they] read the privacy policies." *Tenet*, 731 F. Supp. 3d at 150 (emphasis added). UMass's assertion that Plaintiffs rely on their own "mere beliefs" ignores its own privacy policies that made those promises.

Likewise, in *Emerson*, the court declined to dismiss an implied contract claim based on the same conduct, concluding that "[t]he implied promise was evidenced by [the defendant]'s privacy policies, codes of conduct, company security practices, and other conduct, including the statement on its website that it would not share health information for advertising purposes without consent." 2023 Mass. Super. LEXIS 673, at *8-9; *see also Baystate*, 2026 U.S. Dist. LEXIS 57677, at *19-20 (finding hospital's similar arguments "unpersuasive" because plaintiff need not allege the hospital assented to the implied contract; "[i]n exchange for her submission of private information, [defendant] agreed not to disclose that information to third parties without her consent" and that she "'reasonably believed and expected' that [the defendant] would not share her health information because it promised that it would not do so"); *Tenet*, 731 F. Supp. 3d at 150 ( "sufficient factual allegations that [the defendant] breached its implied contractual obligations by using third-party trackers on its Website").[27]

UMass also argues in one sentence that Plaintiffs do not plead consideration, asserting that,

[27] UMass relies on *Weekes v. Cohen Cleary P.C.*, 723 F. Supp. 3d 97 (D. Mass. 2024), to assert that the parties must "discuss" the need to safeguard information to form a contract (Mem. 18). However, the plaintiff there did not allege any discussion ***or*** written promises. The court did not hold that only a live discussion can give rise to an agreement.

because a promise to perform a pre-existing duty is not valid consideration and because HIPAA obligates UMass to protect PII/PHI, Plaintiffs cannot allege consideration. Mem. 19. Massachusetts law does not support this argument. As in *Emerson*, Plaintiffs here allege that "[a] portion of the price of each payment that Plaintiffs and the Class Members made to UMass for medical services was intended to ensure the confidentiality of their communications and PII/PHI." ¶ 443. These allegations "plausibly allege[]" consideration. 2023 Mass. Super. LEXIS 673, at *8. And as in *Baystate*, 2026 U.S. Dist. LEXIS 57677, at *20, Plaintiffs allege that UMass obtained a benefit from their receipt of Plaintiffs' PII/PHI, sufficiently pleading consideration, ¶¶ 217-18, 265, 283, 316, 474.

5. Plaintiffs State a Claim for Unjust Enrichment.

UMass's only argument against Plaintiffs' unjust enrichment claim is that Plaintiffs could not have reasonably expected compensation for the economically valuable, secretly intercepted, and improperly disclosed communications (while they were unaware of those interceptions). Mem. 21-22. As Massachusetts courts (both state and federal) affirm under the same facts, an unjust enrichment claim arises, where, as here, a hospital enriches itself at a plaintiff's expense without that plaintiff's contemporaneous knowledge. *A.J.*, 2024 U.S. Dist. LEXIS 194480, at *13-14; *Tenet*, 731 F. Supp. 3d at 150-51; *Emerson*, 2023 Mass. Super. LEXIS 673, at *9-11; *see also Vita*, 494 Mass. at 849-50 (unjust enrichment claim "cognizable" based on hidden tracking technologies).

6. Plaintiffs State a Claim for Violation of Chapter 93A.

Chapter 93A makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). The only challenge UMass presents is whether its acts occurred "in the conduct of any trade or commerce." *See* Mem. 22. They did.

"An entity's 'status as a "charitable" corporation is not, in and of itself, dispositive of the issue whether c. 93A applies.'" *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 23 (1997) (quoting *Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 492-93 (1986)). Rather, "each case requires examination of its own circumstances to determine whether it arose in a 'business

context.'" *Id.* This requires assessing "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties.... Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons ... and whether the participant played an active part in the transaction." *Id.* (quoting *Begelfer v. Najarian*, 381 Mass. 177, 191 (1980)).

Here, consideration of the totality of Plaintiffs' allegations—rather than the cherry-picked items UMass cites in its Memorandum—makes clear that UMass's actions took place in a "business context." The nature of the transaction between Plaintiffs and UMass was as follows: Plaintiffs sought healthcare services from UMass and, in so doing, expected UMass to comply with all its obligations to maintain the confidentiality of their Health Information under state and federal law. ¶¶ 36, 295. Plaintiffs were patients of UMass, and UMass was their healthcare provider. ¶¶ 17-19, 38, 403. Plaintiffs entered into a provider-patient relationship with UMass and paid money to UMass in exchange for its provision of healthcare services. ¶¶ 443, 448.

In these circumstances, a nonprofit entity is subject to Chapter 93A liability. *Linkage*, 425 Mass. at 26-27 (nonprofit acted in business context by contracting with third party for training, with the goal of generating revenue for the university; institution "inserted itself into the marketplace"). Plaintiffs allege UMass deliberately engaged in a commercial, arm's-length exchange with third-party advertising companies by using patients' PII/PHI as the "currency" to obtain marketing benefits. UMass willfully deployed tracking technologies that transmitted patient identity and health-related information to Facebook and Google in return for marketing benefits; UMass made that bargain because it wanted access to those marketing capabilities. ¶ 316. And all of this occurred in the context of marketing UMass's paid services to boost UMass's revenues and bottom line. This is classic "trade or commerce" under Chapter 93A, whose definition is broad and expressly encompasses advertising and the distribution of services. *See Reyad v. Caritas Norwood Hosp.*, 2011 WL 4837278, at * 5 (Mass. Super. Ct. 2011) (denying dismissal where plaintiff alleged hospital's conduct was economically motivated—

seeking profit from hospitalist program amid impending sale—thus potentially outside charitable exemption to c. 93A).

It is true, as UMass asserts, that a nonprofit "is not engaged in trade or commerce 'if, in the transaction in question, the nonprofit is merely engaged in the customary business ***necessary to meet its charitable purpose***.'" *Trustees of Boston Univ. v. ASM Commc'ns, Inc.*, 33 F. Supp. 2d 66, 77 (D. Mass. 1998) (citation omitted) (emphasis added). But the SCAC explains in detail why UMass's deployment of the tracking technologies was "wholly unnecessary," ¶ 293, to the operation of its website.

> Defendants operated in a business context and are liable under M.G.L. c. 93A, even though Defendants are organized as non-profits, because the conduct in which they engaged—knowingly and secretly disclosing patients' communications and PII/PHI in violation of state and federal law and Defendants' ethical obligations—is not part of Defendants' "core mission" as a non-profit hospital to provide healthcare services and foster the well-being of the community it serves. Indeed, the conduct described in this complaint directly conflicts with and undermines Defendants' core mission. . . .
>
> It is possible for a healthcare website to provide a doctor search function without disclosing patient sign-ups or appointments to third-party advertising companies. It is also possible for a website developer to use tracking tools without disclosing patients' communications to companies like Facebook and Google. Likewise, ***it is possible for Defendants to provide medical services to patients without sharing their communications with Google, Facebook, and other third parties so that this information can be exploited for advertising purposes.***
>
> ***Indeed, after Plaintiffs filed suit in October 2022, Defendants removed the Facebook Meta Pixel from all pages on their websites.***

¶¶ 274, 291-292 (emphasis added).

UMass's reliance on *Doe v. Partners Healthcare Sys. Inc.*, 1984CV01651 (Mass. Super. Ct. Nov. 20, 2020) is misplaced. The margin opinion indicates the websites were "informational" and served the hospital's "core mission," but by contrast, Plaintiffs here plead materially different, additional facts, including UMass's promise not to engage in the conduct at issue, ¶¶ 98, 106, 279, the fact that UMass engaged in an economically motivated quid pro quo to obtain the tracking technology, ¶ 316, 484, 489, and that its use of the tracking technologies was wholly unnecessary for it to provide healthcare services to patients, ¶¶ 274, 291-292, all of which demonstrate the conduct occurred in a "business

context" and did not advance its charitable mission. Indeed, courts reject similar arguments that conduct in violation of a company's own promises can be part of its ordinary course of business. *Brown*, 525 F. Supp. 3d at 1072-73; *Berry v. Funk*, 146 F.3d 1003, 1009-10 (D.C. Cir. 1998) (defendant's position "fatally undermined by [its own] guidelines …which must be regarded as the ordinary course of business"). The same logic applies here: UMass's violation of promises to patients for commercial gain cannot logically be part of its "core mission" as a "charity."[28]

The SCAC's allegations plausibly place UMass's conduct in a "business context" and "trade or commerce," making c. 93A applicable at the pleading stage.

## V. CONCLUSION

The Court should deny UMass's motion to dismiss.

[28] The hospital-related cases cited by UMass (Mem. 24-25) are inapposite. *All Seasons Servs. v. Comm'r of Health & Hosps*., 416 Mass. 269, 271 (1993), and *Hubert v. Melrose-Wakefield Hosp. Ass'n*, 40 Mass. App. Ct. 172, 175-76 (1996), are much different: neither involved tracking technology or alleged disclosures of PHI/PII as here. *Shedd v. Sturdy Mem'l Hosp.*, *Inc.* involved a ransomware-driven data breach and a hospital's alleged failure to safeguard information it was required to obtain and keep to provide and bill for care. 2022 WL 1102524, at *6-7 (Mass. Super. Ct. Apr. 5, 2022). The court held that "there are no factual allegations that would take the receipt and maintenance of confidential patient information, necessary to render and bill for medical services, outside of Sturdy Memorial's core mission." *Id.* at *7.

Dated: June 5, 2026

**Respectfully submitted,**

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan (BBO# 681627)
Thomas T. Merrigan (BBO# 343480)
Ryan Hawkins (BBO# 686289)
Erin E. McHugh (BBO# 703701)
**Sweeney Merrigan Law**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Justin C. Kenney *(pro hac vice)*
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos, & Mensing, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
Tel: (312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

*Attorneys for John Doe and the Putative Classes*

*/s/ William P. Doyle*
William P. Doyle (BBO# 556999)
**Law Offices of Colonna & Doyle**
26 Main Street
Lynnfield, MA 01940
Tel: (781) 245-1127
Fax: (781) 245-1148
bill@colonna-doyle.com

Nicholas A. Coulson (*pro hac vice*)
Ellyn Gendler (*pro hac vice*)
**Coulson P.C.**
300 River Place Drive
Suite 1700
Detroit, MI 48207
Tel: (313) 644-2685
nick@Coulsonpc.com
egendler@coulsonpc.com

*Attorneys for Lisa Colleton and the Putative Classes*

*/s/ Patrick J. Vallely*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**Shapiro Haber & Urmy LLP**
One Boston Place
Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
Fax: (617) 439-0134
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Janice Progin and the Putative Classes*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: June 5, 2026

*/s/ Patrick J. Vallely*
Patrick J. Vallely (BBO #663866)